# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit
Union, Members United Corporate Federal
Credit Union, Southwest Corporate Federal
Credit Union, and Constitution Corporate
Federal Credit Union,

               Plaintiffs,

v.

U.S. BANK NATIONAL ASSOCIATION, and
BANK OF AMERICA, NATIONAL
ASSOCIATION,

               Defendants.

**14 CV 9928**

Case No.

**JURY TRIAL DEMANDED**

RECEIVED
DEC 16 2014
U.S.D.C. S.D. N.Y.

## COMPLAINT

TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................ 1

II.     PARTIES ....................................................................................................... 6

III.    JURISDICTION AND VENUE ..................................................................... 10

IV.     THE TRUSTS ............................................................................................... 11

V.      BACKGROUND ........................................................................................... 12

        A.      RMBS Trusts .................................................................................... 12

                Figure 1 ............................................................................................ 13

        B.      The Trustees' General Duties ........................................................... 15

        C.      The Trustees' Duties Under the Pooling and Servicing
                Agreements ....................................................................................... 16

        D.      Duty Properly to Take Title to the Mortgage Loans Conveyed
                to the Trust ...................................................................................... 17

        E.      Duty to Provide Notice of Incomplete or Defective Mortgage
                Files and Enforce Repurchase Rights with Respect to Mortgage
                Files that Cannot be Cured ............................................................. 19

        F.      Duty to Provide Notice of Breaches and to Enforce Repurchase
                Rights with Respect to Defective Loans ........................................... 20

        G.      Duties under the Transfer Agreements ............................................. 22

        H.      Duties Regarding the Servicers ........................................................ 24

        I.      The Trustees' Duties upon Knowledge of an Event of Default .......... 25

        J.      The Trustees' Duties and Obligations under the TIA and the
                Streit Act ........................................................................................ 25

VI.   **DEFENDANTS SHOULD HAVE CAREFULLY INVESTIGATED THE FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN APPROPRIATE ACTION** ........................................27

A.   General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards .......................................................28

B.   Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices .......................................33

1.   American Home ........................................................................34

2.   Bank of America ......................................................................36

3.   Chase ........................................................................................39

4.   Citigroup ..................................................................................46

5.   Countrywide ............................................................................53

6.   Decision One ...........................................................................59

7.   DLJ/Credit Suisse ...................................................................60

8.   Fremont ....................................................................................66

9.   GreenPoint ...............................................................................69

10.   IndyMac ...................................................................................74

11.   Morgan Stanley Mortgage Capital ..........................................79

12.   National City ...........................................................................83

13.   New Century ............................................................................85

14.   OwnIt .......................................................................................94

15.   Residential Funding ................................................................96

16.   RBS/Greenwich Capital ..........................................................98

17.   UBS ..........................................................................................99

18.   Washington Mutual ...............................................................101

19.     Wells Fargo ...................................................................... 112

C.     A High Number of Borrower Delinquencies and Defaults on
       Mortgages in the Trusts' Loan Pools and Enormous Trust
       Losses Are Further Evidence of the Originators' Systematic
       Disregard of Underwriting Standards ............................................ 117

       1.     The Trusts Suffered from High Delinquency and
              Default Rates ................................................................ 117

       2.     The Trusts Suffered Huge Losses .................................... 118

D.     The Collapse of the Certificates' Credit Ratings Is Further
       Evidence of Systematic Disregard of Underwriting Guidelines ......... 119

       Table 2 ............................................................................... 120

VII.   ADDITIONAL EVIDENCE SHOWS THAT DEFENDANTS KNEW OF
       DEFAULTS ................................................................................. 121

A.     In Their Capacities as RMBS Servicers for Other Trusts,
       Defendants Discovered Extensive Responsible Party Breaches
       of Representations and Warranties ............................................... 121

B.     Defendants Received Written Notice of Systematic,
       Widespread Breaches of Representations and Warranties from
       Monoline Insurers .................................................................... 122

C.     Global RMBS Repurchase Investigations and Settlements
       Alerted Defendants to Systematic, Widespread Breaches of
       Representations and Warranties .................................................. 124

D.     Defendants Have Been Involved in Repurchase Litigation
       Against Many Responsible Parties ............................................... 126

E.     In Acquiring Bank of America's Trustee Business, U.S. Bank
       Attempted to Contract around its Predecessor's Liability and
       Obligations ............................................................................. 128

VIII.  DEFENDANTS FAILED TO ADHERE TO THEIR STATUTORY AND
       CONTRACTUAL DUTIES AFTER MASTER SERVICER AND
       SERVICER DEFAULTS AND EVENTS OF DEFAULT ......................... 129

A.     The Master Servicers and Servicers Defaulted on their Duty to
       Notify the Trustee of Breaches of the Mortgage Loan
       Representations and Warranties .................................................. 129

B.     Defendants Knew of the Master Servicer and Servicer Defaults ....... 131

IX.    **DEFENDANTS FAILED TO ENSURE PROPER MORTGAGE LOAN DOCUMENTATION AND THUS FAILED TO FORCE THE RESPONSIBLE PARTIES TO CURE, SUBSTITUTE OR REPURCHASE INADEQUATELY DOCUMENTED LOANS** ...............................133

X.    **DEFENDANTS FAILED TO SATISFY THEIR PRE-AND POST-DEFAULT DUTIES**..........................................................................................134

XI.    **THE "NO ACTION" CLAUSES DO NOT APPLY**...................................136

XII.    **CLAIMS FOR RELIEF** .........................................................................137

    COUNT ONE-VIOLATION OF THE TRUST INDENTURE ACT OF 1939.....................................................................................................137

    COUNT TWO-VIOLATION OF THE STREIT ACT ...................................140

    PRAYER FOR RELIEF ............................................................................141

XIII.  **JURY DEMAND**...................................................................................142

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity

as liquidating agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western

Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union

("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and

Constitution Corporate Federal Credit Union ("Constitution"), (collectively, the "CCUs" and the

NCUA Board as liquidating agent for each, the "Plaintiffs"), by and through their attorneys, for

this action against U.S. Bank National Association ("U.S. Bank") and Bank of America, National

Association ("Bank of America," and collectively with U.S. Bank, "Defendants"), alleges as

follows:

## I.    NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendants for violating the Trust Indenture

Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa *et seq.*, and, regarding the New York trusts, for

violating New York Real Property Law § 124 *et seq.* (the "Streit Act") to recover the damages

they have suffered because of Defendants' violations of their statutory and contractual

obligations.

2.      This action arises out of Defendants' roles as trustees for 99 trusts identified on

Exhibit A that issued residential mortgage-backed securities ("RMBS").[1] Each trust consists of

---

[1] Of the 99 trusts at issue here, U.S. Bank was the original trustee for 61 trusts, LaSalle Bank, N.A. ("LaSalle") was the original trustee for 28 trusts, and Wachovia Bank, N.A. ("Wachovia") was the original trustee for 10 trusts. U.S. Bank acquired Wachovia's corporate trust and institutional custody businesses on December 30, 2005 and was subsequently appointed as successor trustee to Wachovia on those 10 trusts. In or about October 2007, Bank of America acquired LaSalle through its acquisition of ABN AMRO North America Holding Company, thus becoming the trustee of the 28 trusts for which LaSalle was originally the trustee. Between February and April 2009, Bank of America resigned as trustee for 6 trusts in which the CCUs invested, and U.S. Bank was appointed as the successor trustee for those trusts. U.S. Bank acquired Bank of America's securities trust administration business on or about December 31, 2010, and became the trustee of the remaining trusts thereafter. As noted below and in Exhibit A,

hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trust that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

3.      The CCUs purchased the certificates in the trusts identified on Exhibit A at an original face value of approximately $5.8 billion.

4.      The certificates' value was dependent on the quality and performance of the mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitization, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustees to protect their interests.

5.      Defendants, as the trustees for the trusts, had contractual and statutory duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. The trustee for each trust has three primary duties. First, the trustee must take possession and acknowledge receipt of the mortgage files, review the documents in the mortgage files, identify any mortgage files that lack a complete chain of title or that have missing documents, and then certify that the mortgage files are complete and accurate. If the trustee

---

the NCUA Board is not asserting claims against Bank of America with respect to the following trusts: Banc of America Funding 2005-E Trust; Banc of America Funding 2005-F Trust; Banc of America Funding 2005-H Trust; Banc of America Funding 2006-D Trust; Banc of America Funding 2006-I Trust; Banc of America Funding 2007-1 Trust; Banc of America Funding 2007-3 Trust; Banc of America Funding 2007-B Trust; Banc of America Funding 2007-C Trust; Banc of America Funding 2007-D Trust; Bayview Financial Mortgage Pass-Through Trust 2006-C; C-BASS 2007-CB1 Trust; FFMLT Trust 2005-FF7; First Franklin Mortgage Loan Trust 2006-FF2; Home Equity Mortgage Trust 2007-2; Merrill Lynch Mortgage Investors Trust Series MLCC 2005-3; Merrill Lynch Mortgage Investors Trust Series 2006-RM2; Merrill Lynch Mortgage Investors Trust Series 2006-RM3; Merrill Lynch Mortgage Investors Trust Series 2007-HE3; and Wells Fargo Mortgage Backed Securities 2004-BB1 Trust.

identifies defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

6.      Second, if the trustee discovers a breach of the representations and warranties concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders will suffer losses properly borne by the party responsible for the defective loans.

7.      Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of defaults concerning the trust. Thus, when the trustee discovers a default, or is notified by other parties, such as servicers, of defaults like breaches of representations and warranties with respect to the underlying mortgage loans, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.      Here, Defendants even failed to perform the threshold duties of taking full possession of the original notes and mortgages and properly reviewing the mortgage loan files for irregularities. If they had fulfilled their obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased or substituted.

9.      Moreover, an overwhelming number of events alerted Defendants to the fact that the trusts suffered from numerous problems, yet they did nothing. First, the trusts suffered

enormous losses due to the high number of mortgage defaults, delinquencies, and foreclosures caused by defective loan origination and underwriting. Second, highly publicized government investigations and enforcement actions, public and private litigation, and media reports highlighted the mortgage originators' systematic abandonment and disregard of underwriting guidelines and the deal sponsors' poor securitization standards in the years leading up to the financial crisis. As summarized below, these actions and reports detail the incredible volume of defective loans and notorious activities of the originators, sponsors, and other players in the RMBS industry. Yet Defendants failed to take steps to preserve their rights or hold the responsible parties accountable for the repurchase or substitution of defective mortgage loans in direct contravention of their obligations as trustees.

10.     Finally, Defendants failed to address servicer and/or master servicer defaults and events of default. Defendants knew that the master servicers and servicers were ignoring their duty to notify other parties, including Defendants as trustees, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendants' knowledge of these ongoing defaults and events of default, Defendants failed to act prudently to protect the interests of the trusts and the certificateholders.

11.     Defendants' failures resulted in the trusts and certificateholders suffering losses rightfully borne by other parties. Had Defendants adequately performed their contractual and statutory obligations, breaching loans would have been removed from the loan pools underlying the certificates and returned to the responsible party. Defendants' improper conduct directly caused losses to certificateholders like the Plaintiffs.

12.     Even after ample evidence came to light that the trusts were riddled with defective loans, Defendants shut their eyes to such problems and failed to take the steps necessary to

4

protect the trusts and certificateholders. Defendants failed to act in part because protecting the

best interests of the trusts and the certificateholders would have conflicted with Defendants'

interests. As participants in many roles in the securitization process, Defendants were

economically intertwined with the parties they were supposed to police.

13.      Because of the widespread misconduct in the securitization process, Defendants

had incentives to ignore other parties' misconduct in order to avoid drawing attention to their

own misconduct. Thus, Defendants failed and unreasonably refused to take action to protect the

trusts and certificateholders against responsible party breaches.

14.      Indeed, it is precisely this type of trustee complicity and inaction that led

Congress to enact the TIA to "meet the problems and eliminate the practices" that plagued

Depression-era trustee arrangements and provide investors with a remedy for trustees that utterly

neglect their obligations. *See, e.g.*, 15 U.S.C. § 77bbb(b) (explaining purposes of the TIA in light

of problems identified in 15 U.S.C. § 77bbb(a)).

15.      To that end, several sections of the TIA impose duties on trustees. First, TIA

Section 315(a) provides that, prior to default (as that term is defined in the governing

documents), the trustee is liable for any duties specifically set out in the governing documents.

15 U.S.C. § 77ooo(a)(1). Second, TIA Section 315(b) provides that the trustee must give holders

of covered securities "notice of all defaults known to the trustee, within ninety days after the

occurrence thereof." 15 U.S.C. § 77ooo(b). Third, Section 315(c) requires a trustee to act

prudently in the event of a default (as that term is defined in the governing documents). 15

U.S.C. § 77ooo(c). Finally, the TIA states that "[n]otwithstanding any other provision of the

indenture to be qualified, the right of any holder of any indenture security to receive payment of

the principal of and interest on such indenture security, on or after the respective due dates

expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).

16.     In addition, Section 124 of the Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the trust and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in the performance of its duties as would a prudent person under the same circumstances. N.Y. Real Prop. Law § 126(1).

17.     Finally, upon awareness of the various failures discussed in this complaint, the governing agreements require Defendants to exercise their rights and powers using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

18.     Defendants' failure to perform their duties under the TIA, the Streit Act, and the governing agreements has caused Plaintiffs to suffer enormous damages.

## II.    PARTIES

19.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury

Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of

account holders in all federal credit unions and the majority of state-chartered credit unions. The

NCUA has regulatory authority over state-chartered credit unions that have their deposits insured

by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU

Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA

Board, in specified circumstances and in a distinct capacity, may close an insured credit union

and appoint itself the Liquidating Agent for such credit union.  As Liquidating Agent, the NCUA

Board succeeds to all rights, titles, powers, and privileges of the credit union, its members,

accountholders, officers, and directors.

     20.     U.S. Central was a federally chartered corporate credit union with its offices and

principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided

investment and financial services to other credit unions.

     21.     WesCorp was a federally chartered corporate credit union with its offices and

principal place of business in San Dimas, California. As a corporate credit union, WesCorp

provided investment and financial services to other credit unions.

     22.     Members United was a federally chartered corporate credit union with its offices

and principal place of business in Warrenville, Illinois. Members United was created in mid-

2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions. As a corporate

credit union, Members United provided investment and financial services to other credit unions.

     23.     Southwest was a federally chartered corporate credit union with its offices and

principal place of business in Plano, Texas. As a corporate credit union, Southwest provided

investment and financial services to other credit unions.

     24.     Constitution was a federally chartered corporate credit union with its offices and

principal place of business in Wallingford, Connecticut. As a corporate credit union, Constitution provided investment and financial services to other credit unions.

25.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A) and appointed itself Liquidating Agent. On September 24, 2010, the NCUA Board placed Members United, Southwest, and Constitution into conservatorship pursuant to the FCU Act. On October 31, 2010, the NCUA Board placed Members United, Southwest, and Constitution into involuntary liquidation, appointing itself Liquidating Agent.

26.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the CCUs, and succeeds to all rights, titles, powers, and privileges of the CCUs. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

27.     U.S. Bank is a national banking association organized and existing under the laws of the United States. U.S. Bank's principal place of business and principal place of trust administration is located in Minneapolis, Minnesota. As trustee for the trusts, U.S. Bank owed certificateholders certain statutory and contractual duties with respect to the trusts. As of December 31, 2013, U.S. Bank's corporate parent, U.S. Bancorp, was the fifth largest

commercial bank in the United States based on assets and the fourth largest in total branches. U.S. Bank is U.S. Bancorp's second largest subsidiary. U.S. Bank does business in and maintains offices in New York, including a corporate trust office at 100 Wall Street, New York, New York 10005.

28.     U.S. Bank, together with its affiliates, is involved in all aspects of the private-label RMBS market. U.S. Bank currently acts as trustee of more than $3 trillion in trust assets, operating 50 corporate trust offices across the country. U.S. Bank currently serves as trustee for thousands of RMBS trusts with assets of over $1 trillion in original face value. U.S. Bank is trustee for approximately 30% of all RMBS issued between 2004 and 2007.

29.     In addition, U.S. Bank, together with its subsidiary, U.S. Bank Home Mortgage, Inc., serves as a master servicer of residential mortgage loans. U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.

30.     U.S. Bank Home Mortgage, Inc. has acted as a mortgage loan seller, selling over $400 million of loans in RMBS deals issued between 2004 and 2007.

31.     Bank of America is a national banking association with its principal offices in Charlotte, North Carolina. In or about October 2007, Bank of America acquired LaSalle, which was serving as the original trustee for some trusts, and became the successor trustee via its acquisition of ABN AMRO North America Holding Company. As trustee for some of the trusts, Bank of America owed certificateholders certain statutory and contractual duties with respect to the trusts.

32.     Of the 99 trusts at issue here, U.S. Bank was the original trustee for 61 trusts, LaSalle was the original trustee for 28 trusts, and Wachovia was the original trustee for 10 trusts.

U.S. Bank acquired Wachovia's corporate trust and institutional custody businesses on
December 30, 2005 and was subsequently appointed as successor trustee to Wachovia on those
10 trusts. Between February and April 2009, Bank of America resigned as trustee for 6 trusts in
which the CCUs invested, and U.S. Bank was appointed as the successor trustee for those trusts.
U.S. Bank acquired Bank of America's securities trust administration business on or about
December 31, 2010, and became the trustee of the remaining trusts thereafter.

## III.   JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction pursuant to the following statutes: (a)
12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in
equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the
United States, and the United States district courts shall have original jurisdiction thereof,
without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the
district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced
by the United States, or by any agency or officer thereof expressly authorized to sue by Act of
Congress"; (c) 15 U.S.C. § 77v, providing for jurisdiction for claims under the TIA; (d) 15
U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the
Constitution, laws, or treaties of the United States"; and (e) 15 U.S.C. § 1367, providing for
"supplemental jurisdiction over all other claims that are so related to claims in the action within
such original jurisdiction that they form part of the same case or controversy." This Court also
has jurisdiction over the claims asserted under the Streit Act because this case involves New
York common law trusts.

34.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C.
§ 77v(a), and/or 28 U.S.C. §1391(b)(1), because Defendants are residents of and/or conduct

business in this District. This Court has personal jurisdiction over Defendants because they are residents of and/or conduct business in this District and under N.Y. C.P.L.R. 301, New York's long arm statute.  The claims relate to Defendants' roles as trustees over trusts created under New York law and/or administered at least in part in New York.  In addition, Defendants have filed foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation warranty breaches.

## IV.    THE TRUSTS

35.    The trusts identified on Exhibit A are 99 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2004 and 2008.

36.    The trusts have a high concentration of loans originated by the following lenders and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment Corp.; Aurora Loan Services, LLC; BNC Mortgage, Inc.; Decision One Mortgage Co., LLC; DLJ Mortgage Capital, Inc.; Fremont Investment and Loan; National City Mortgage Co.; Residential Funding Company, LLC; Bank of America, N.A.; J.P. Morgan Chase Bank, N.A.; Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP; Credit Suisse Financial Corp.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; New Century Mortgage Corporation; OwnIt Mortgage Solutions, Inc.; Washington Mutual Bank; and Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage, Inc. (collectively, the "originators").

37.    A significant portion of the trusts were sponsored by the following sponsors and their affiliates: American Home Mortgage Acceptance, Inc.; DLJ Mortgage Capital, Inc.; Bank of America, N.A.; Citigroup Global Markets Realty Corp. and CitiMortgage, Inc.; EMC

Mortgage Corp.; Morgan Stanley Mortgage Capital, Inc. and Morgan Stanley Mortgage Capital

Holdings, Inc.; Merrill Lynch Mortgage Lending, Inc.; Washington Mutual Bank and

Washington Mutual Mortgage Securities Corp.; Wells Fargo Bank, N.A. and Wells Fargo Home

Mortgage, Inc. and Wells Fargo Asset Securities Corp.; Greenwich Capital Financial Products,

Inc.; and UBS Real Estate Securities, Inc. (collectively, the "sponsors").

## V.   BACKGROUND

### A.   RMBS Trusts

38.     RMBS certificates are debt instruments issued to investors by an issuing trust that

holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists

almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the

income stream generated by the trust as borrowers make payments on their mortgage loans.

39.     Because residential mortgage loans are the assets collateralizing RMBS, the

origination of mortgages starts the process that leads to the creation of RMBS. Originators

decide whether to loan potential borrowers money to purchase residential real estate through a

process called mortgage underwriting. The originator applies its underwriting standards or

guidelines to determine whether a particular borrower is qualified to receive a mortgage for a

particular property.

40.     The securitization process begins with a sponsor who purchases loans in bulk

from one or more originators. The sponsor transfers title of the loans to an entity called a

depositor.

41.     The depositor transfers the loans to a trust called the issuing entity.

42.     The issuing entity then issues notes and/or certificates, providing

certificateholders scheduled principal and interest payments derived from the cash flow from the

mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

43.     The depositor files required documents (such as registration statements and prospectuses) with the U.S. Securities and Exchange Commission ("SEC") so the certificates can be offered to the public.

44.     One or more underwriters then sell the notes or certificates to investors.

45.     Figure 1 (*infra*) depicts a typical securitization process.

### Figure 1
### *Illustration of the Securitization Process*



46.     The establishment and administration of each trust is governed by a series of contracts (the "governing agreements"). The vast majority of trusts are governed by an agreement called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA references and incorporates. The remaining trusts are governed by a document called an Indenture and certain related agreements that the Indenture references and incorporates, including a document called the Sales and Servicing Agreement. All of the governing agreements are substantially similar, and impose the same duties on Defendants. Accordingly, this Complaint primarily refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

47.     Once the loans are deposited into a trust, borrowers begin making payments to the trust through a master servicer. The master servicer is ultimately responsible for servicing the loans, but may use a designee, typically called a servicer or sub-servicer, to perform some or all of the mortgage servicing functions. The master servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

48.     When the master servicer collects loan payments from borrowers, it then transfers those payments, less allowable deductions, to the trustee. The trustee then uses the payments, less allowable fees and expenses, to make scheduled principal and interest payments to certificateholders. The trustee also delivers monthly remittance reports to certificateholders describing the performance of underlying loans and compliance with the governing agreements. The contents of those reports are specified in the governing agreements and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in

these remittance reports.

49.     Thus, each trust is administered primarily by two entities – the trustee and the master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements, as well as those duties imposed by the TIA and the Streit Act.

50.     The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing agreements, the TIA, and the Streit Act impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

**B.     The Trustee's General Duties**

51.     Although the governing agreements for each of the trusts are separate agreements that were individually negotiated and display degrees of variation, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the governing agreements and impose substantially the same, if not identical, duties and obligations on the parties to the governing agreements. Further, upon information and belief, Defendants employed the same general set of policies and procedures to oversee and manage the trusts regardless of the individual variations contained within the governing agreements.

52.     Most importantly, Defendants have an absolute duty under the governing agreements, the TIA, and the Streit Act to acquire and protect the trust corpus for the benefit of certificateholders. "The Trustee acknowledges receipt [of the mortgage loans] and declares that it holds and will hold such documents and the other documents delivered to it constituting a

Mortgage File, and that it holds or will hold all such assets and such other assets . . . in trust for the exclusive use and benefit of all present and future Certificateholders." PSA Section 2.02.[2]

### C.   The Trustee's Duties Under the Pooling and Servicing Agreements

53.     The PSAs are contracts between, in addition to others, the depositor, the master servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs for each of the trusts are substantially similar and memorialize the following events and conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust; (ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates.[3]

54.     The PSAs also set forth Defendants' contractual duties and obligations, which are identical or substantially identical for each trust. Specifically, each PSA requires Defendants to oversee and enforce the depositors' and the servicers' obligations. In performing these contractual obligations, Defendants must act in the best interests of and for the protection of the trusts and the certificateholders. Certificateholders, unlike the trustee, have no direct contact with the depositors and servicers. Moreover, under the PSAs, certificateholders do not have the right to compel the trustee to enforce the responsible party's representations and warranties,[4] absent

_____

[2] All cites to the PSA are to the PSA and related agreements specific to the MASTR Asset Backed Securities Trust 2006-WMC4 ("MABS 2006-WMC4"), which, as alleged above, are substantially similar to the governing agreements for all of the trusts. A copy of the MABS 2006-WMC4 PSA is attached as Exhibit B.

[3] Some of the trusts have a different structure—they issued notes pursuant to an indenture (collectively, the "Indentures") on which one of the Defendants serve as indenture trustee. A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of these transactions. Although there are some differences between the PSA and Indenture structures, with regard to this Complaint, both the nature of the claims asserted and Defendants' duties and obligations are similar under the two structures.

[4] The governing agreements specify the party that is responsible for repurchasing any defective loan. With modest variations across the governing agreements, they provide that, upon discovery and/or notice of a breach of a representation and warranty with respect to a mortgage loan that

satisfaction of the collective action provisions. Certificateholders must rely on Defendants to protect their interests.

**D.      Duty Properly to Take Title to the Mortgage Loans Conveyed to the Trust**

55.      The trusts must take title to the mortgages conveyed to them for due consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance terms of the mortgage loans to the trustee, on behalf of the trust and the RMBS certificateholders, and those terms are intended to ensure that the trustee, on behalf of the trusts, takes full title to the mortgage loans.

56.      The first part of this conveyance involves the depositor assigning to the trustee, among other things, its rights, title, and interest in the mortgage loans and the depositor's rights under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section 2.01 ("Conveyance of the Mortgage Loans") provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule [and] the rights of the Depositor under the Assignment Agreement [transfer agreement] . . . .

57.      Furthermore, the PSAs require Defendants, or their agents acting as custodians, to acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all mortgage pool assets—including the mortgage files and related documents and property—are held by them as trustees. Significantly, Defendants, or their agents, must take physical

---

materially and adversely affects the interests of the certificateholders, the responsible party shall cure the breach or repurchase the affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due on the mortgage loan. The responsible party is generally either the originator of the loans, the seller of the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same or affiliated entities. For simplicity's sake, this complaint uses "responsible party" to refer to the entity responsible for repurchase of any defective loans.

possession of the mortgage files, including the mortgage note and the mortgage, properly

endorsed and assigned to the trustee. As set forth in PSA Section 2.02:

> The Trustee acknowledges receipt (or receipt by the Custodian on behalf of the Trustee), subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, of the documents referred to in Section 2.01 . . . and declares that it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets . . . for the exclusive use and benefit of all present and future Certificateholders.

58.    Section 2.01 of the PSA also specifically sets forth the operative documents that

must be contained in the mortgage file:

> In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Custodian (on behalf of the Trustee), with respect to the related Mortgage Loans, the following documents or instruments with respect to each Mortgage Loan so transferred and assigned (a "Mortgage File"):
>
> (i) the original Mortgage Note, endorsed in blank or in the following form: "Pay to the order of U.S. Bank National Association, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the Originator to the Person so endorsing to the Trustee;
>
> (ii) the original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording thereon, and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;
>
> (iii) unless the Mortgage Loan is registered on the MERS® System, an original Assignment in blank;
>
> (iv) the original recorded Assignment or Assignments showing a complete chain of assignment from the Originator to the Person assigning the Mortgage to the Trustee (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of the MIN) as contemplated by the immediately preceding clause (iii);
>
> (v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and
>
> (vi) the original lender's title insurance policy, together with all endorsements or riders that were issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a first or second lien on the Mortgaged Property represented therein as a

fee interest vested in the Mortgagor, or in the event such original title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

59.     Once the mortgage files are in Defendants' or their custodians' possession, Defendants, or the custodians on Defendants' behalf, are required to ensure that the underlying mortgage loans were properly conveyed to the trusts, and that the trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each mortgage loan. Defendants, or the custodians on Defendants' behalf, are required to review each mortgage file within a certain period after the "closing date" of the securitization and deliver to the depositor a certification that all documents required have been executed and received. This duty overlaps with and forms part of the requirements that the trustee must satisfy to properly take title to the mortgage loans. As set forth in PSA Section 2.02:

> The Trustee (or the Custodian on behalf of the Trustee) agrees, for the benefit of the Certificateholders and the NIMS Insurer, to review each Mortgage File and, within 45 days of the Closing Date, to certify . . . that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents constituting part of such Mortgage File . . . required to be delivered to it pursuant to this Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to such Mortgage Loan and (iii) based on its examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (1), (3), (12), (15) and (18) of the definition of "Mortgage Loan Schedule" accurately reflects information set forth in the Mortgage File.

**E.     Duty to Provide Notice of Incomplete or Defective Mortgage Files and Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be Cured**

60.     If Defendants or the custodians identify any defect in a mortgage loan file for an underlying mortgage loan contained in a trust, Defendants must promptly notify the relevant parties. As set forth in PSA Section 2.02:

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee (or the Custodian on behalf of the Trustee) finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the **Trustee (or the Custodian on behalf of the Trustee) shall so notify the Depositor**, the NIMS Insurer, the Trustee, the Servicer and the Master Servicer.

61.     Once incomplete mortgage files or loans with defective transfer documentation are identified, the parties to the governing agreements must work to remedy these deficiencies. The trustee is tasked with enforcing the responsible party's obligation to cure the deficiencies or repurchase the mortgage loans. As set forth in PSA Section 2.03(a):

> Upon receipt of written notice from the Custodian of any materially defective document in, or that a document is missing from, a Mortgage File … the Trustee shall promptly notify the Trust Administrator, the Seller, the NIMS Insurer, the Originator, the Servicer and the Master Servicer of such defect, missing document or breach and request that the Originator or the Seller, as applicable, deliver such missing document or cure such defect or breach within 90 days from the date the Originator or the Seller, as applicable, was notified of such missing document, defect or breach, and if the Trustee receives written notice from the Depositor, the Servicer, the Master Servicer, the Trust Administrator or the Custodian that the Originator or the Seller, as applicable, has not delivered such missing document or cured such defect or breach in all material respects during such period, **the Trustee shall enforce the obligations of the Originator or the Seller**, as applicable, under the Assignment Agreement and/or Originator Master Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price.

**F.      Duty to Provide Notice of Breaches and to Enforce Repurchase Rights with Respect to Defective Loans**

62.     The quality of the mortgage loans to which the trusts purportedly receive title is also critical to an RMBS securitization. For that reason, the governing agreements contain "representations and warranties" by the responsible party attesting to the characteristics of the borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

63.     As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the responsible party to cure, substitute, or

repurchase any mortgage loans that materially breach the responsible party's representations and warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the responsible party's repurchase obligations:

> Upon receipt of written notice from the Custodian . . . or from the Depositor, the Servicer, the Master Servicer, the Trust Administrator or the Custodian of the breach by the Originator or the Seller of any representation, warranty or covenant under the Assignment Agreement or the Originator Master Agreement . . . in respect of any Mortgage Loan that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Trust Administrator, the Seller, the NIMS Insurer, the Originator, the Servicer and the Master Servicer of such defect, missing document or breach and request that the Originator or the Seller, as applicable, deliver such missing document or cure such defect or breach within 90 days from the date the Originator or the Seller, as applicable, was notified of such missing document, defect or breach, and if the Trustee receives written notice from the Depositor, the Servicer, the Master Servicer, the Trust Administrator or the Custodian that the Originator or the Seller, as applicable, has not delivered such missing document or cured such defect or breach in all material respects during such period, **the Trustee shall enforce the obligations of the Originator or the Seller**, as applicable, under the Assignment Agreement and/or Originator Master Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price.

PSA Section 2.03(a).

64.     Consequently, under the governing agreements, Defendants are entrusted to ensure that the mortgage loans in the trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain quality as represented by the responsible party in the transfer agreements.

65.     To protect the trusts and all certificateholders, the governing agreements require Defendants to give prompt written notice to all parties to the governing agreements upon their knowledge of a breach of a representation or warranty made by the responsible party about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or

appropriate to enforce the rights of the trusts regarding the breach.

### G.   Duties under the Transfer Agreements

66.   Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), and Assignment and Recognition Agreements (collectively, "transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These transfer agreements are generally between either the originator and the depositor, or the sponsor and the depositor.

67.   One of the parties to the transfer agreement—typically an originator or sponsor— makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans in either the PSA or the associated transfer agreement.[5] For simplicity's sake, this Complaint refers to that party as the "responsible party."

68.   The responsible party's typical representations and warranties in the transfer agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator. To the extent mortgages breach the

---

[5] The governing agreements frequently refer to the same entity by different titles depending upon the role being played. The role of seller or transferor generally overlaps with that of the sponsor.

responsible party's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

69.     Under the transfer agreements, upon discovery or receipt of notice of any breach of the responsible party's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the responsible party is obligated to cure the breach in all material respects. The transfer agreements do not specify what constitutes "discovery" of a breach or what evidence must be presented to the responsible party in providing notice of a breach.

70.     If a breach is not cured within a specified period, the responsible party is obligated either to substitute the defective loan with a loan of adequate credit quality, or to repurchase the defective loan.

71.     The repurchase provisions ensure that the trust need not continue to hold mortgage loans for which the responsible party breached its representations and warranties. Thus, the repurchase provisions are designed to transfer the risk of any decline, or further decline, in the value of defective mortgage loans that results from a breach from the trusts to the responsible party.

72.     Under the transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or the certificateholders' interests in the loans. The responsible party's cure, substitute, and repurchase obligations do not require any showing that the responsible party's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or require that the demanding party prove reliance on servicing and origination documents.

73.     Upon the sale of the mortgage loans to the trust, the rights under the transfer

agreements, including the responsible party's representations and warranties concerning the mortgage loans, are generally assigned to Defendants, as trustees, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

**H.     Duties Regarding the Servicers**

74.     Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

75.     Section 3.01 of the PSA states that: "[t]he Servicer shall service and administer the Mortgage Loans on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificateholders." Section 3.01 further provides: "the Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes."

76.     Under the PSAs, Defendants, as trustees, have certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendants' obligations upon occurrence of an "event of default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time.[6] Section 7.01 of the PSAs identifies several types of failures by the servicer that may give rise to an event of default. Such failures include a breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee.

77.     The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers.

---

[6] Similarly, for those trusts structured with an indenture instead of a PSA, events of default is defined as a specified failure of the issuer to perform some similar duty.

### I. The Trustee's Duties upon Knowledge of an Event of Default

78.     The PSAs impose additional obligations upon Defendants once one of their responsible officers knows a default has occurred. First, under Section 7.01 of the PSAs, Defendants must give written notice to the servicer of the occurrence of such an event within the specified period after Defendants obtain knowledge of the occurrence.

79.     Second, within sixty to ninety days after a default has occurred, Defendants must provide written notice to all certificateholders about that event, unless the default has been cured or waived. As set forth in PSA Section 7.04(b):

> Not later than the later of 60 days after the occurrence of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Servicer Event of Default or a Master Servicer Event of Default or five days after a Responsible Officer of the Trust Administrator (in the case of a Servicer Event of Default) or the Trustee (in the case of a Master Servicer Event of Default) becomes aware of the occurrence of such an event, the Trust Administrator or **Trustee, as applicable, shall transmit by mail to the Credit Risk Manager, the NIMS Insurer and to all Holders of Certificates notice of each such occurrence**, unless such default, Servicer Event of Default or Master Servicer Event of Default shall have been cured or waived.

80.     Third, and most importantly, Section 8.01 of the PSAs requires Defendants to exercise the rights and powers vested in them by the PSA using "the same degree of care and skill . . . as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."

### J. The Trustee's Duties and Obligations under the TIA and the Streit Act

81.     Each of the PSAs (or indentures) is substantially similar and imposes substantially the same duties on Defendants as trustees. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs (or indentures) and the related trusts. 15 U.S.C. § 77ddd(a)(1).

82.     The TIA imposes two sets of duties and obligations on Defendants as trustees of

the trusts – one set "prior to default" and the other set "in case of default."

83.     Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust. 15 U.S.C. § 77ooo(a)(1). Under that provision, Defendants had to perform the duties specifically assigned to them under the governing agreements, including those duties described above.

84.     Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture] to determine whether or not such evidence conforms to the requirements of the indenture." 15 U.S.C. § 77ooo(a) (citing 15 U.S.C. § 77nnn). Thus, Defendants were required to examine the evidence the master servicer or custodian provided to the trusts, certifying their compliance with the covenants they made under the governing agreements, and Defendants also had to determine whether that evidence conformed to the governing agreements' requirements.

85.     In addition, a trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Defendants consequently had to inform RMBS certificateholders of defaults and breaches of the governing agreements within ninety days after their occurrence.

86.     In case of a default (as defined in the PSA or indenture), a trustee must exercise "such of the rights and powers vested in it by such indenture, and [ ] use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).

87.     Section 124 of the Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the

trust and to protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA,

following an event of default, the Streit Act provides that the trustee must exercise the same

degree of skill and care in performing its duties as a prudent person would under the same

circumstances. N.Y. Real Prop. Law § 126(1).

88.      As set forth below, Defendants are liable to Plaintiffs under the TIA and the Streit

Act for failing to exercise the same degree of skill and care as a prudent person in enforcing their

rights and powers under the governing agreements.

## VI.    DEFENDANTS SHOULD HAVE CAREFULLY INVESTIGATED THE FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN APPROPRIATE ACTION

89.      The trusts' loan pools contained large numbers of loans that materially breached

the responsible parties' representations and warranties concerning the originators' compliance

with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other

associated standards. By 2009 at the latest, Defendants had a duty to carefully investigate the

evidence, public evidence or evidence otherwise available to trustees, demonstrating the

widespread breaches of representations and warranties in the trusts, including: 1) general reports

concerning originators' systematic abandonment of their underwriting standards and reports

concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific

reports concerning the originators of loans in the trusts abandoning their underwriting standards

and sponsors of the securitizations failing to follow prudent practices; 3) the high number of

borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses

to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings

when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous

lawsuits brought against Defendants and their affiliates alleging the systematic abandonment of

originator underwriting guidelines.

### A. General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards

90.     By 2009, government reports, public and private investigations, and media reports

had surfaced concerning the collapse of the RMBS market and revealed the potential for massive

problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the

duty to carefully investigate these issues and to take action as necessary. These reports and

investigations identified the originators' pervasive abandonment of underwriting standards and

sponsors' disregard of prudent securitization standards as the cause of the crisis.

91.     For example, the Office of the Comptroller of the Currency (the "OCC"),

published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest

rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in

those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized

the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

92.     Despite the importance of sticking to underwriting standards, it was clear that

originators were not following them. Chairman of the Federal Reserve Board, Benjamin

Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs

Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient

attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008, *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

93.     In November 2010, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report recounts widespread foreclosure abuses in connection with mortgages that have been securitized and the numerous federal and state investigations that have detailed this problem. The abuses identified in the report—including forged or back-dated mortgage assignments and "robo-signing" of false affidavits used in foreclosure actions—arise from failures in the documentation and transfer of mortgage loans from the originators to other entities in the securitization process, and ultimately into the trusts. As the report explains, irregularities in the chain of title between the originator and the trust can have significant legal consequences that damage the trusts and certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010), *available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

94.     Other reports reached similar conclusions. The Permanent Subcommittee on

Investigations in the United States Senate ("PSI") issued a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

95.     The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

96.     The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id.* at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id.* at xvi.

97.     The FCIC Report also noted that during the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic

capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii. A default in the first few months of a mortgage, known as an early payment default, is known in the mortgage industry as a significant indicator of pervasive disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards." *Id.*

98.     In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

99.     Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

100.     In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

101.     The predominant RMBS securitization method involved an originate-to-distribute ("OTD") model where the originators of the loans do not hold the loans, but instead repackage

31

and securitize them. The OTD model created a situation where the origination of low quality

mortgages through poor underwriting thrived. The Financial Stability Oversight Council

("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront
> without retaining a material ongoing economic interest in the performance of the loan.
> This reduces the economic incentive of originators and securitizers to evaluate the credit
> quality of the underlying loans carefully. Some research indicates that securitization was
> associated with lower quality loans in the financial crisis. For instance, one study found
> that subprime borrowers with credit scores just above a threshold commonly used by
> securitizers to determine which loans to purchase defaulted at significantly higher rates
> than those with credit scores below the threshold. By lower underwriting standards,
> securitization may have increased the amount of credit extended, resulting in riskier and
> unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011)

("FSOC Report") at 11 (footnote omitted).

102.    The FSOC reported that as the OTD model became more pervasive in the

mortgage industry, underwriting practices weakened across the industry. The FSOC Report

found "[t]his deterioration was particularly prevalent with respect to the verification of the

borrower's income, assets, and employment for residential real estate loans." *Id.* Similarly, the

sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed

to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans

were of the represented quality and also failed to ensure that the purported mortgaged property's

appraised value was accurate.

103.    As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate
> due diligence on the mortgages they purchased and at times knowingly waived
> compliance with underwriting standards. Potential investors were not fully informed or
> were misled about the poor quality of the mortgages contained in some mortgage-related
> securities. These problems appear to have been significant.

FCIC Report at 187.

104.     Additionally, the evidence shows that sponsors, and the third party due diligence providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as defective, the sponsors often "waived in" mortgage loans in the interest of preserving their business relationships and their own profits.

105.     In sum, reports regarding the disregard of underwriting standards and poor securitization practices became common by 2009. If validated, those practices would have directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS, resulting in steep losses. By 2009, it was apparent to trustees that the originators and sponsors involved in the securitization of the trusts had engaged in problematic practices such that a reasonable and prudent trustee would have taken upon itself the duty to carefully investigate these issues fully in connection with the trusts entrusted to their care.

**B.     Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

106.     The governing agreements for each of the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

107.     However, as discussed below, Defendants had reason to suspect that those representations and warranties were false and carefully investigate whether the mortgage files for the underlying mortgage loans in their trusts were defective. Numerous investigations, lawsuits,

and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines while pursuing profit by recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards.

108.   The information below provided ample reason for Defendants to suspect, as trustees for the trusts, that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendants should have carefully investigated those issues in the context of the trusts entrusted to their care, provided notice to certificateholders, and taken appropriate action to protect the trusts.

### 1.   American Home

109.   American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated, aggregated, and serviced by its subsidiaries. It was the parent of American Home Mortgage Acceptance, Inc. and American Home Mortgage Holdings, Inc., which was the parent of American Home Mortgage Corp., a retail lender of mortgage loans. Collectively, these entities are referred to as "American Home." American Home originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and sponsored at least one of the trusts.

110.   American Home's lack of adherence to underwriting guidelines was detailed in a 165-page amended class action complaint filed in June 2008. *See* Am. Complaint, *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. June 4, 2008) ("American Home Am. Compl."). Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from over 33

confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See generally* American Home Am. Compl.

111.   According to the American Home Am. Compl., former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied without compensating factors. *See id.* ¶¶ 120-21.

112.   Witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id.*

113.   Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for exceptions. It was commonplace to overrule mortgage underwriters' objections to facilitate loan approval. *See id.* ¶ 123.

114.   A former American Home auditor confirmed that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.* ¶ 124.

115.   The parties settled the litigation on January 14, 2010, for $37.25 million.

116.   Like other originators from this period, American Home's poor lending practices resulted in numerous other civil lawsuits. Those lawsuits contain firsthand accounts from former employees and allegations that reunderwriting revealed that many loans originated by American Home were found to be breaching the associated representations and warranties. *See, e.g.,*

Complaint, *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); First Consolidated and Am. Complaint, *New Jersey Carpenters Health Fund v. Structured Asset Mortgage Invs. II, et al.*, No. 08-cv-8093 (S.D.N.Y. May 15, 2009).

### 2. Bank of America

117.    Bank of America itself was a major sponsor of mortgage-backed securities during the relevant time. Bank of America, including its acquired subsidiary Merrill Lynch Mortgage Lending, Inc. ("Merrill Lynch"), originated, contributed, and sponsored a material portion of the loans in the mortgage pools underlying the trusts. Bank of America also acted as servicer to many trusts.

118.    Bank of America-originated loans are the subject of multiple lawsuits around the country, including lawsuits filed by the SEC, the Department of Justice, and the Federal Housing Finance Agency ("FHFA"). In each of the lawsuits below, Bank of America and/or its affiliates acted as the originator of the underlying loans and/or the sponsor, depositor and/or underwriter of the RMBS at issue. The overwhelming evidence revealed that Bank of America and its affiliates systematically failed to adhere to their obligations in any of their roles in the securitization process.

- **DOJ:** Complaint, *United States v. Bank of America Corp.*, No. 13-cv-446 (W.D.N.C. Aug. 6, 2013).

- **SEC:** Complaint, *SEC v. Bank of America Corp.*, No. 13-cv-447 (W.D.N.C. Aug. 6, 2013).

- **FHFA:** Am. Complaint, *FHFA v. Bank of America Corp.*, No. 11-cv-06195 (S.D.N.Y. June 28, 2012); Mot. Dismiss denied in *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012), motion to certify appeal granted (June 19, 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).

119.    The Department of Justice explained its allegations in the following August 6,

2013, press release titled "Department of Justice Sues Bank of America for Defrauding Investors

in Connection with Sale of Over $850 Million of Residential Mortgage-Backed Securities":

> [T]he United States has filed a civil lawsuit against Bank of America Corporation and certain of its affiliates, including Merrill Lynch, Pierce, Fenner & Smith f/k/a/ Banc of America Securities, LLC, Bank of America, N.A., and Banc of America Mortgages Securities, Inc. (collectively "Bank of America"). The complaint alleges that Bank of America lied to investors about the relative riskiness of the mortgage loans backing the residential mortgage-backed securities (RMBS), made false statements after intentionally not performing proper due diligence and filled the securitization with a disproportionate amount of risky mortgages originated through third party mortgage brokers.
> ...
>
> "Bank of America's reckless and fraudulent origination and securitization practices in the lead-up to the financial crisis caused significant losses to investors," U.S. Attorney Tompkins said. "Now, Bank of America will have to face the consequences of its actions. We have made a commitment to the American people to hold financial institutions accountable for practices that violated the law and wreaked havoc on the financial system, and my office takes that commitment very seriously. Our investigation into Bank of America's mortgage and securitization practices continues."
> ...
>
> The civil complaint filed today in U.S. District Court in Charlotte alleges that Bank of America defrauded investors, including federally insured financial institutions, who purchased more than $850 million in RMBS from Bank of America Mortgage Securities 2008-A (BOAMS 2008-A) securitization. The government's civil complaint also seeks civil penalties from Bank of America under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). According to the complaint, in or about January 2008, Bank of America sold BOAMS 2008-A RMBS certificates to investors by knowingly and willfully making materially false and misleading statements and by failing to disclose important facts about the mortgages collateralizing the RMBS, including Bank of America's failure to conduct loan level due diligence in the offering documents filed with the U.S. Securities and Exchange Commission (SEC). These misstatements and omissions concerned the quality and safety of the mortgages collateralizing the BOAMS 2008-A securitization, how it originated those mortgages and the likelihood that the "prime" loans would perform as expected.
>
> First, according to the filed complaint, a material number of the mortgages in the BOAMS 2008-A collateral pool failed to materially adhere to Bank of America's underwriting standards. Specifically, more than 40% of the 1,191 mortgages in the BOAMS 2008-A collateral pool did not substantially comply with Bank of America's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors. As alleged in the complaint, Bank of America knew that specific loans in the BOAMS 2008-A collateral pool did not materially adhere or comply with Bank of America's underwriting standards.

Second, Bank of America did not conduct any loan-level due diligence at the time of securitization. According to the complaint, this was a violation of Bank of America's own policies, procedures and prior practice, and was contrary to industry standards and investor expectations. Moreover, this decision allowed Bank of America to keep bad loans in the deal. According to the complaint, these bad loans had a range of glaring origination problems, such as overstated income, fake employment, inflated appraisals, wrong loan-to-value ratios, undisclosed debt, occupancy misrepresentation, mortgage fraud and other red flags wholly inconsistent with a purportedly prime securitization. As a result of this lack of due diligence, Bank of America had no basis to make many of the representations it made in the offering documents regarding the credit quality of the underlying mortgages.

Finally, Bank of America concealed important risks associated with the mortgages backing the BOAMS 2008-A securitization. For example, Bank of America originated more than 70% of the loans through third party mortgage brokers. These loans, known as "wholesale mortgages," were riskier than similar mortgages originated directly by Bank of America. More significantly, at the same time Bank of America was finalizing this deal, it was receiving a series of internal reports that showed an alarming and significant decrease in the quality and performance of its wholesale mortgages. According to the complaint, Bank of America did not disclose that important information or the associated risks to investors.

Investors in the BOAMS 2008-A certificates have already suffered millions of dollars in losses and it is estimated that total losses sustained by investors will exceed $100 million.

*Available at* http://www.justice.gov/opa/pr/2013/August/13-ag-886.html.

120.   The SEC's lawsuit against Bank of America had similar allegations:

"In its own words, Bank of America 'shifted the risk' of loss from its own books to unsuspecting investors, and then ignored its responsibility to make a full and accurate disclosure to all investors equally," said George S. Canellos, Co-Director of the SEC's Division of Enforcement.
…

The SEC alleges that Bank of America deceived investors about the underlying risks as well as the underwriting quality of the mortgages, misrepresenting that the mortgage loans backing BOAMS 2008-A were underwritten in conformity with the bank's own guidelines. These mortgage loans, however, were riddled with ineligible appraisals, unsupported statements of income, misrepresentations regarding owner occupancy, and evidence of mortgage fraud. The key ratios of debt-to-income and original-combined-loan-to-value were routinely miscalculated, and then the materially inaccurate ratios were provided to the investing public.

> According to the SEC's complaint, a disproportionate concentration of high-risk
> wholesale loans and the inclusion of a material number of loans failing to comply with
> internal underwriting guidelines resulted in BOAMS 2008-A suffering an 8.05 percent
> cumulative net loss rate through June 2013 – the greatest loss rate of any comparable
> BOAMS securitization.

Press Release, *SEC Charges Bank of America with Fraud in RMBS Offering* (Aug. 6, 2013),

*available at*

http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370539751924#.UgzSb5LVAkQ.

121.    Other cases involving Bank of America and its affiliates acting as originator,

sponsor, depositor and/or underwriter in RMBS have included allegations concerning investors'

forensic analysis or re-underwriting of loan files that highlight the poor quality of mortgage loans

securitized and sold by Bank of America to the trusts. *See, e.g.*, Complaint, *Western Southern*

*Life Ins. v. Bank of America, N.A.*, No. 11-cv-00667 (Ohio Ct. Com. Pl. Aug. 18, 2011) (alleging

misrepresentations regarding LTV and owner occupancy); Complaint, *CIFG Assurance N. Am.*

*Inc. v. Bank of America, N.A.*, No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2011) (alleging that

Bank of America's faulty securitization practices led to inclusion of a high percentage of

defective loans); Complaint, *Prudential v. Bank of America et al.*, No. 13-cv-01586 (D.N.J. Mar.

14, 2013) ("Prudential's loan-level analysis has revealed systematic failures in Defendants' loan

underwriting and assignment practices"); Complaint, *Texas County Dist. Ret. Sys. v. J.P. Morgan*

*Secs. LLC et al.*, No. 1-GN-14-000998 (Tex. Civ. Dist. Ct. May 2, 2014) (forensic review

demonstrated that "Bank of America included recklessly underwritten loans in its RMBS that

failed to meet the applicable standards systematically disregarding its own and third-party due

diligence, and then misrepresented the quality of those loans to investors").

### 3.    Chase

122.    J.P. Morgan Chase Bank, N.A. and its various mortgage-lending affiliates

(collectively, "Chase") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

123.   During the relevant period, Chase employees circulated a memo instructing mortgage associates how to tweak data they entered into the automated underwriting program ("ZiPPY") to get loans approved by the automated underwriting program. *See* Mark Friesen, *Chase mortgage memo pushes 'Cheats & Tricks'*, Oregonian, Mar. 28, 2008, *available at* http://www.oregonlive.com/business/index.ssf/2008/03/chase_mortgage_memo_pushes_che.htm l.

124.   The Chase ZiPPY Memo listed a few steps that mortgage associates could use to manipulate the data entered into the ZiPPY automated underwriting program in order to get the program to recommend using the "Stated Income/Stated Asset" underwriting guidelines for borrowers. *Id.*

125.   Strikingly, "Step 3" advised: "If you do not get Stated/Stated, try resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same for assets." The Chase ZiPPY Memo instructed mortgage associates to inflate borrower income to "trick" ZiPPY into recommending the use of Stated Income/Stated Asset underwriting guidelines. *Id.*

126.   In addition, the Chase ZiPPY Memo told mortgage associates not to report gift funds, but to include gift funds in the borrower's bank account and to include all income as base income. *Id.*

127.   James Theckston, a former regional vice president at Chase Home Finance LLC ("CHF") in southern Florida, was interviewed regarding the company's lending and securitization practices for a November 30, 2011 New York Times article. Nicholas D. Kristof, *A*

*Banker Speaks, With Regret*, N.Y. Times, Nov. 30, 2011, *available at*

http://www.nytimes.com/2011/12/01/opinion/kristof-a-banker-speaks-with-regret.html?_r=0.

Theckston's team wrote $2 billion in mortgages in 2007 alone. According to Theckston, CHF

engaged in high-risk lending practices such as making no-documentation loans to borrowers with

insufficient resources. "On the application, you don't put down a job; you don't show income;

you don't show assets; but you still got a nod," he said. "If you had some old bag lady walking

down the street and she had a decent credit score, she got a loan . . . You've got somebody

making $20,000 buying a $500,000 home, thinking that she'd flip it. It was crazy, but the banks

put programs together to make those kinds of loans."

128.    These excesses were driven by the company's vertically integrated securitization

business model. "The bigwigs of the corporations knew [about declining lending standards], but

they figured we're going to make billions out of it, so who cares?" Theckston said. "The

government is going to bail us out. And the problem loans will be out of here, maybe even

overseas." Because risky loans were securitized and sold to investors, CHF created incentive

structures that rewarded risky lending. Theckston said that some CHF account executives earned

commissions seven times higher from subprime loans rather than prime mortgages. As a result,

those executives looked for unsophisticated borrowers with less education or limited English

abilities and convinced them to take out non-prime loans. Theckston's own 2006 performance

review indicated that 60% of his evaluation depended on him increasing the production of high-

risk loans.

129.    Numerous other former CHF and Chase employees have offered evidence of

Chase's risky lending practices and abandonment of underwriting guidelines. According to an

amended complaint filed in the United States District Court for the District of Massachusetts, a

senior underwriter at Chase from 2001 to 2008 claimed that managers often overturned the decisions of lower-level underwriters to reject stated-income loans. Am. Complaint, *Federal Home Loan Bank of Boston v. Ally Financial, Inc. et al.*, No. 11-cv-10952 (D. Mass. June 29, 2012) ("FHLB Am. Compl."). "If the manager felt the income made sense and the underwriter didn't, the manager could overturn it." FHLB Am. Compl. ¶ 567.

130.    Another witness interviewed for the FHLB Am. Compl., a loan processor and assistant to the branch manager at a Florida branch of CHF from April 2006 until August 2007, noted that many employees inflated borrowers' income on orders from the branch manager to get loans approved, saying, "It was very common to take stuff out of the loan file." *Id.* ¶ 560. Loan officers would often bring their loans to the branch manager for instructions on what the stated income should be to make a loan close. *Id.* ¶ 562. "The branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work." *Id.* Branch managers would also call the regional managers above them for instructions on problem loans. *Id.*

131.    Yet another witness interviewed for the FHLB Am. Compl., a senior loan underwriter at CHF from December 2004 to August 2005, said that CHF loan personnel also knowingly permitted borrowers to submit false income data, saying that, "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month." FHLB Am. Compl. ¶ 565. When borrowers stated unreasonable income levels, management would push the loans through regardless. *Id.* ¶ 566. The witness said that besides being told to accept unreasonable stated incomes, employees could not question appraisals that appeared to be inflated. *Id.* He recalled a subdivision in California in which CHF accepted appraisal values double the sales prices of identical homes sold just a few months ago. *Id.*

132.    According to an amended complaint filed in the United States District Court for the Southern District of New York, a former Wholesale Account Executive with CHF from 2002 to 2008 claimed that the underwriting process was subject to abuse by brokers who purposely originated loans for people they knew could not repay them. Am. Complaint, *New Jersey Carpenters Health Fund v. Novastar Mortgage, Inc., et al.*, No. 08-cv-05310 (S.D.N.Y. June 30, 2011). The complaint discussed the extremely loose and easy to override nature of the proprietary automated underwriting system, ZiPPY. The former Account Executive acknowledged that had ZiPPY's requirements not been so loose or had other measures been taken in the underwriting process, the loans it approved would otherwise not have been approved.

133.    According to a consolidated class action complaint filed in the United States District Court for the Eastern District of New York, a former CHF senior underwriter from March 2002 through January 2008 said that when processing loans that required verification of assets, "we really were not verifying them, what we would do is look to see if a borrower was making, say $15,000 a month, if that's [what] they were listing." Consol. Complaint, *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I, et al.*, No. 09-cv-3209, at ¶ 83 (E.D.N.Y. Mar. 8, 2010) ("Plumbers Consol. Compl."). The former senior underwriter believed that in 2006, 20% to 30% of the loans approved were approved only based on management overriding underwriters' initial rejection of the loans. *Id.* ¶ 82.

134.    A former senior processor, junior underwriter, and compliance controller who worked at CHF between December 2002 and October 2007, stated in the Plumbers Consol. Compl. that loan processors were not provided with all of the relevant borrower information:

"there was some information that was being withheld from us." The witness further claimed that employees were actively encouraged not to investigate or verify suspicious information in loan applications. *Id.* ¶ 84.

135.    According to an amended complaint filed in the United States District Court for the District of New Jersey, several CHF confidential witnesses confirmed that employees would "coach" borrowers how to falsify the loan applications and that forgeries were used to "verify" the borrower's assets. *See* Complaint, *Prudential Ins. Co. of America et al. v. J.P. Morgan Securities LLC et al.*, No. 12-cv-03489 (D.N.J. Aug. 30, 2012). The complaint alleged that a senior underwriter from CHF saw the real names on bank statements crossed out, with the borrower's name typed in its stead.

136.    CHF's departure from industry standards was confirmed by Jamie Dimon, CEO of J.P. Morgan Chase. On January 13, 2010, Mr. Dimon testified under oath to the FCIC that "the underwriting standards in our mortgage business, for example, should have been higher, and we wish we had done an even better job in managing our leveraged lending and mortgage-backed securities exposures." The company also "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios." Dimon further testified that the company would, in the wake of the financial crisis, enhance its mortgage underwriting standards, "returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

137.    On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, told the FCIC: "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in

buying." This competition led to a reduction in diligence and oversight. Buell stated that from 2005 to 2007, J.P. Morgan's underwriting guidelines and origination standards were "deteriorating."

138.   According to documents provided to the FCIC, as of August 31, 2010, Fannie Mae had required Chase to repurchase 6,456 loans originated by its subsidiaries with an unpaid principal balance of $1.359 billion. Fannie Mae had also requested that Chase repurchase an additional 1,561 loans with an outstanding principal balance of $345 million. Likewise, between 2007 and August 31, 2007, Freddie Mac required Chase to repurchase 5,427 loans with an unpaid principal balance of $1.188 billion.

139.   In an amended complaint filed by the FHFA, the plaintiff's analysis of the securitized loans revealed that the loan-to-value ratios represented by Chase in prospectuses were false at the time of the representation. Am. Complaint, *FHFA v. JPMorgan Chase & Co., et al.*, No. 11-cv-6188 (S.D.N.Y. June 13, 2012) ("FHFA-JP Morgan Compl."). On the whole, the plaintiff's investigation revealed that for every securitization at issue, the prospectus misrepresented the percentage of loans with loan-to-value ratios above 100 percent and the percentage of loans with loan-to-value ratios at or below 80 percent.

140.   The amended complaint further explained that Chase was informed by a third-party due diligence firm, Clayton Holdings, Inc. ("Clayton"), that a significant percent of the loans Clayton reviewed for their sponsor entities, including Chase, failed to meet guidelines and had no compensating factors that would allow them to remain in a loan pool. FHFA-JP Morgan Compl. ¶ 205. The amended complaint alleges that 27 percent of the loans Clayton reviewed for J.P. Morgan Acquisition did not comply with underwriting standards. *Id.* Yet Chase did not adjust its practices or stop working with problematic originators. And Chase waived in 51

percent of defective loans. *Id.*

141.    According to the September 23, 2010 testimony of Clayton's Vice President Vicki Beal, Chase, in its role as underwriter and sponsor, was made fully aware regularly that a significant percentage of its loans failed to meet stated underwriting guidelines, but were being included anyway in the pools underlying securities sold to investors. *Id.* ¶ 452.

142.    Finally, the amended complaint details how Chase attempted to sell much of its subprime assets while it continued to securitize and sponsor these deals for others to buy. Chase would ignore its underwriting standards if it stood to profit as a sponsor. *Id.* ¶¶ 455-469.

### 4.    Citigroup

143.    Citigroup, through its affiliates CitiMortgage, Inc. and Citigroup Global Markets Realty Corp. (collectively, "Citigroup"), sponsored some of the trusts.

144.    In November 2011, the Allstate Insurance Company ("Allstate") filed a complaint alleging fraud against CitiMortgage, Inc., Citigroup Global Markets Realty Corp., and other affiliates in connection with the sale of approximately $200 million of RMBS certificates. Complaint, *Allstate Ins. Co. et al. v. CitiMortgage Inc. et al.*, No. 650432/2011 (N.Y. Sup. Ct. Feb. 18, 2011) (the "Allstate Citigroup Complaint"). Allstate performed a forensic review of sampling of loans from the loan pools, which showed that the loans contained numerous defects that indicated pervasive breaches of representations and warranties. Allstate found that Citigroup systematically and significantly overstated the number of owner-occupied properties, understated the loans' LTV and combined loan-to-value ("CLTV") ratios, and routinely included loans that failed to conform to the originator's stated underwriting standards. Allstate Citigroup Complaint ¶¶ 127-144. Moreover, Allstate's forensic analysis found that Citigroup's loan originators systematically abandoned underwriting standards. *Id.* ¶¶ 145-243.

145.    Other investigations have revealed similar problems. As part of its investigation into the causes of the financial crisis, the FCIC interviewed and took public testimony from Richard Bowen, a CPA with over thirty-five years of experience in banking, finance, and information technology. Mr. Bowen was a Chief Underwriter in Citigroup's Consumer Lending Group, which has housed the bank's consumer-lending activities, including prime and subprime mortgages and home equity loans, since 2005.

146.    Mr. Bowen ensured that the mortgages Citigroup was acquiring met the credit standards required by the bank's credit policies. He was also responsible for working closely with the bank's Chief Risk Officer and overseeing over 200 professional underwriters and $90 billion in annual residential mortgage productions. *Id.* at 19, 168.

147.    Citigroup purchased "prime" loans based on the originator's representations that the loans were underwritten under Citigroup's guidelines. *Id.* at 168. For "subprime" loans, Citigroup's policy was to re-underwrite those loans before purchase to ensure the pool conformed to Citigroup's own policies. *Id.*

148.    Citigroup's Quality Assurance department, which operated under Mr. Bowen, was supposed to ensure that the prime loans purchased from other originators met Citigroup's own policies. *Id.* The Quality Assurance underwriters were to review a "small sample" of the loans to make sure that the loans conformed with Citigroup's policies. *Id.*

149.    Citigroup had a policy that 95% of the loans sampled were supposed to meet an "agree" standard, indicating the Citigroup re-underwriter "agreed" that the loan met Citigroup's own credit policies. Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 5.

150.    According to Mr. Bowen, however, Citigroup used fraudulent practices to meet this standard. Bowen Testimony at 5. The only reason that the 95% quality threshold was being nominally met was because Citigroup was including as "agree" loans those that were instead "agree contingent," which meant that documents and information were missing from the file, but the underwriter would agree if those documents existed somewhere and bore out certain additional conditions. *Id*. at 5-6.

151.    Mr. Bowen gave a hypothetical example of a mortgage file showing a 45% debt-to-income ratio. *Id*. at 5. On its face, that ratio would be within guidelines. *Id*. However, if the file did not contain the required documentation showing proof of the borrower's true income, it would be classified for reporting as "agree," even though it should have been "agree – contingent," because whether the loan met the represented standards was contingent on what was contained in the missing documents. *Id*.

152.    Mr. Bowen testified that he conducted an investigation upon learning of this "agree – contingent" category of loans. In that investigation, he re-reviewed all the loans reviewed by the Quality Assurance department for their June 2006 report. *Id*. at 5-6. It took a "significant effort" to separate the categories. *Id*. at 6. He found 5% of the loans he investigated were facially defective, meaning there was no margin for any further errors to be found. *Id*. Yet, 55% of the loans, all of which had been reported to the committee as "agree," were "agree – contingent," meaning they were missing key documents. *Id*. According to Bowen's testimony, these "agree-contingent" loans should have been "defective files," making the actual defective rate 60%. *Id*.

153.    A follow-up study found even worse problems. Mr. Bowen determined that 33% of the loans re-tested should have been "disagree," and another 37% merely "agree-contingent"

due to their missing documentation. *Id.* at 7. Combined, this meant that Mr. Bowen discovered a staggering 70% defect rate in the sample he re-reviewed in 2006. *Id.*

154.    Overall, Mr. Bowen testified that the defect rate for the "delegated flow" channel reached 60% in 2006, growing to 80% in 2007. *Id.* at 1-2. Mr. Bowen's underwriting staff informed him they believed that "over half" of the files being reported as "agree" were missing key documents and information. *Id.* at 6.

155.    Mr. Bowen testified that, for subprime mortgages the bank purchased, it would re-underwrite the loans it was purchasing, resulting in a "approve" or "turn down" decision. *Id.* at 9. In contrast to the "prime" channel, a much larger sample was supposed to be reviewed, with the goal of reviewing 100% of the files for smaller pools, and at least a statistically-significant sample of larger ones. *Id.*

156.    Mr. Bowen testified that during the run-up in the market leading up to the crash, he witnessed "many changes to the way the credit risk was being evaluated" for the subprime pools. *Id.* at 2. The Chief Risk Officer, for example, reversed the judgment of the professional underwriters and changed their decisions from "turn down" to "approval." *Id.* at 2, 9. Such actions would "artificially increase[] the approval rate on the sample," which was then used as justification to approve the collateral pool. *Id.* at 9. Mr. Bowen specifically recalled that 260 of the loans for a pool of 716 loans rejected by Citigroup's underwriters were flipped to "approve" by the Chief Risk Officer. *Id.*

157.    Mr. Bowen testified that large pools of loans were being purchased based on "exceptions" despite their failure to meet the bank's minimum policies. *Id.* at 12. For example, one pool of loans was approved for purchase while he was on vacation despite having a 30% failure rate. *Id.* at 10. Citigroup's policy at the time was to require a sample to feature a 90%

approval rate. *Id.*

158.     Mr. Bowen also discovered that Citigroup was circumventing its underwriting standards by having the Risk Department instruct underwriters to find loans to be "approved" if they merely met the originator's guidelines, rather than Citigroup's. *Id.* Mr. Bowen asked his underwriters to keep a log of when loans met the originator's guidelines but failed Citigroup's. *Id.* He found that 20% of loans approved under this method would not have been approved if Citigroup's standards were applied instead. *Id.*

159.     Mr. Bowen further found that Citigroup overrode its policy of disallowing originators from re-submitting rejected loans. *Id.* at 10-11. Instead, it allowed approval under either Citigroup or the originator's standards to be retroactive and reversed its policy of disallowing the resubmission of loans. *Id.* at 11. This invited the submission of loans that Citigroup already knew fell outside its policies. *Id.*

160.     Mr. Bowen's testimony confirms that Citigroup did not follow underwriting guidelines and was "not compliant" with numerous bank policies, including minimum sample sizes, thresholds for testing by individual sponsors or product types, enforcing policies on new sponsors, and requirements for documenting the approval for "exceptions" to these and other policies. *Id.* at 15.

161.     As Mr. Bowen put it, "A decision was made that 'We're going to have to hold our nose and start buying the stated product if we want to stay in business.'" FCIC Report at 111. All the while, "[t]here was no disclosure being made to investors with regard to the quality of the files [Citigroup was] purchasing." *Id.* at 169.

162.     Despite Mr. Bowen's warnings of a lack of internal control concerning underwriting, investors continued to be told that loans in mortgage-backed securities issued by

Citigroup met Citigroup's underwriting standards. In a *60 Minutes* interview, Mr. Bowen was shown a prospectus for a mortgage-backed security made up of loans Mr. Bowen had tested. This prospectus contained representations that loans were originated under guidelines substantially in accordance with CitiMortgage's guidelines. Mr. Bowen confirmed that based on his personal knowledge these representations were not true and that people at Citigroup knew those representations were not true. CBS News, 60 Minutes, *Prosecuting Wall Street, available at* http://www.cbsnews.com/news/prosecuting-wall-street/.

163. Mr. Bowen also testified that, despite soaring volume, Citigroup issued a "hiring freeze" to help increase its bottom line. Bowen Testimony at 12. This required the bank to outsource its underwriting due diligence to third parties, such as Clayton. Whether the due diligence was performed in-house or by an outside firm, the data arising from the FCIC's investigation confirms that the result was the same: large number of loans rejected by the underwriters were given "waivers" by Citigroup to be included in collateral pools anyway. FCIC Report at 167.

164. According to the FCIC Report, "[b]ecause of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept." *Id.* at 166. For each loan pool it was hired to review, Clayton checked for: (1) adherence to originator credit underwriting guidelines and client risk tolerances; and (2) compliance with federal, state and local regulatory laws. *Id.*

165. Clayton generated reports that summarized its findings, including summaries of the loan files that suffered from exceptions to the relevant underwriting standards. *Id.* Clayton gave loans three grades – Grade 3 loans "failed to meet guidelines and were not approved,"

where as Grade 1 loans "met guidelines." *Id.* Importantly, Grade 3 loans contained no

"compensating factors." *Id.* Clayton allowed the sponsor to cure any problems before assigning a

final grade. *Id.*

166.    According to the FCIC Report, only 54% of the nearly one-million loans

reviewed by Clayton "met guidelines," a number that its former President admitted indicated

"there [was] a quality control issue in the factory" for mortgage-backed securities. *Id.*

167.    Clayton was one of the third-party firms brought in because of Citigroup's hiring

freeze, and it performed work on behalf of Citigroup. Bowen Testimony at 11-12. This is

confirmed by Bowen's testimony and by an internal Clayton "Trending Report" made public by

the government in September 2010. Bowen Testimony at 11-12; FCIC Report at 167.

168.    In that report, Clayton analyzed loans it had reviewed on behalf of Citigroup from

the first quarter of 2006 through the second quarter of 2007, which is when most of the offerings

in this complaint were issued. FCIC Report at 167. It found that 42% "failed to meet guidelines."

*Id.* Although loans that received such a grade were not subject to any purported "compensating

factors," Clayton found that Citigroup had waived in 31%. *Id.*

169.    Clayton and other third-party due-diligence firms identified these high

percentages of problem loans even though underwriters were pressing the diligence firms to

provide reports in a short time frame, with only limited re-verification of data, and to approve

loans. The percent of truly problematic loans was likely much higher than Clayton's reports

indicate.

170.    In short, due-diligence firms identified high numbers of problematic loans, but

those loans were "waived" into the collateral pools at issue here at a materially high rate. As the

FCIC Report concluded as a general matter:

[M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 Event loans were waived in.

. . .

[O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, at the same rate, as the sampled loans. Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

FCIC Report at 167, 170.

### 5.     Countrywide

171.    Countrywide Financial, Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP ("Countrywide") was one of the largest originators of residential mortgages in the United States during the period leading up to the financial crisis. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and acted as master servicer or servicer to a large number of trusts.

172.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."

...

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.
But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan,* NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

173.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.

*See* Complaint, *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009). Mozilo and the other

executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter

Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud*

*Charges,* L.A. Times, Oct. 16, 2010, at A1.

174.    Internal Countrywide e-mails released in connection with the SEC lawsuit and

publicly available show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

175.    Indeed, in a September 1, 2004 email, Mozilo voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."

176.    In 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

177.    Countrywide sold a product called the "Pay Option ARM." This loan was a 30-

year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

178.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.

179.    Mozilo admitted in a September 26, 2006 email that Countrywide did not know how Pay Option ARM loans would perform and had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." Yet such loans were securitized and passed on to unsuspecting investors such as the CCUs.

180.    With growing concern over the performance of Pay Option ARM loans, Mozilo advised in a November 3, 2007 email that he "d[id]n't want any more Pay Options originated for the Bank." In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans expressed in the same email were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."

181.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for

100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

182.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry.

183.    Aguilera confirmed in a June 12, 2006 email that internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

184.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. In a February 21, 2007 email, Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."

185.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 7, 2007 e-mail that "the exception process has never worked properly."

186.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, Countrywide executive Russ Smith stated in an April 11, 2007 email that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."

187.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

188.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

189.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there." NBC Nightly News, *Countrywide Whistleblower Reports "Liar Loans,"* July 1, 2008. Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

190.    Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into

riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income to qualify for loans. *Id.*

191.   NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" *Id.*

192.   Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. Public disclosure of the staggering number of loans breaching the associated representations and warranties discovered in these cases should have alerted the trustee that Countrywide loans were highly likely to have breached the associated representations and warranties.

### 6.    Decision One

193.   Decision One Mortgage Co., LLC ("Decision One") was a major lender specializing in mortgage loans that are commonly referred to as Alt-A lending options, and non-conforming or sub-prime loans. In 2006, Decision One ranked as the 14th largest subprime lender in the nation. Decision One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

194.   A 2011 complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Decision One employees "described Decision One's lax attitude towards its own origination and underwriting standards and

explained that Decision One had been approving loans that should have never been issued." Complaint, *Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011, ¶ 95 (N.Y. Sup. Ct. July 5, 2011). On March 15, 2013, the Court granted Morgan Stanley's Motion to Dismiss with respect to a negligent misrepresentation claim, but denied the Motion in all other respects.

195.    According to testimony and documents submitted to the FCIC by a Clayton executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by originators, including Decision One, for securitization. Clayton determined over 10% of Decision One's loans did not comply with its underwriting guidelines and had no compensating factors. *See* Clayton All Trending Report at 10, available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

196.    Decision One's reckless lending practices earned it a spot on the OCC's 2009 "Worst Ten in the Worst Ten" list.

### 7.    DLJ / Credit Suisse

197.    DLJ Mortgage Capital, Inc. ("DLJ"), is a Delaware corporation and subsidiary of Credit Suisse Securities, an affiliate of Credit Suisse Financial Corp. (collectively, "Credit Suisse") with its headquarters at Credit Suisse's office in New York. Credit Suisse and DLJ originated or acquired a number of loans for the trusts at issue. DLJ also sponsored a substantial number of trusts.

198.    Lawsuits brought against Credit Suisse have revealed that Credit Suisse understood that loan originators were purposely and wrongfully overstating borrower income. On June 28, 2006, Credit Suisse internally circulated to Robert Sacco (Credit Suisse's Head of Underwriting) a take on the final courtroom scene in *A Few Good Men* between a loan officer (the Jack Nicholson role) and an underwriter (the Tom Cruise role) in which the loan officer says

that loans "must be brought in by people . . . who thrive on cold-calling, rejection, and false

promises," and that his "very existence, while grotesque and incomprehensible to you, drive

REVENUE!" When the underwriter asks "Did you overstate the income?" then loan officer yells

back "You're damn right I did!!!!!" *See* Complaint, *CMFG Ins. Co. et al. v. Credit Suisse (USA),*

*LLC*, No. 14-cv-249, Exh. 1 (W.D. Wis. April 3, 2014) (6/28/2006 email from K. Jones to R.

Sacco).

    199.    About two months later, when presented with an article stating that Massachusetts

shut down two mortgage brokers after regulators documented several cases of brokers inflating

the incomes of borrowers on mortgage applications to help buyers qualify for loans, Mr. Sacco

internally remarked, "Isn't that what stated income loans are supposed to do – inflate the income

to qualify borrowers for loans?" *Id.* Exh. 2 (8/30/2006 email from R. Sacco to B. Kaiserman).

    200.    Others in managerial positions with Credit Suisse were willing to take actions

regarding RMBS that even Mr. Sacco had trouble stomaching. According to Michael Daniel

(Managing Director of Credit Suisse), Mr. Sacco "claims he regularly has to respond to pressure

from [Mike] Fallacara [head of Credit Suisse's residential mortgage conduit and Mr. Sacco's

boss] and salespeople to approve loans that he thinks are unworthy (and he showed me plenty of

emails to prove it–undeniably)." *Id.* Exh. 3 (11/22/2006 email from M. Daniel to M. Marriott).

According to Mr. Daniel, Mr. Fallacara pressured Mr. Sacco to approve loans with

"unreasonable income and a huge DTI," and "iffy" appraisals. *Id.*

    201.    Mr. Daniel wrote, "I really don't believe that Fallacara or anyone else in the

conduit can make credit decisions objectively. Mike wants volume, and is all to [sic] willing to

look the other way when volume is at stake." *Id.*

    202.    Several months later, Mr. Daniel told Mr. Vibert and Peter Sack of Credit Suisse

that Mr. Fallacara "has subverted sound underwriting." *Id.* Exh. 4 (1/9/2007 email from M. Daniel to J. Vibert & P. Sack).

203.    Mr. Vibert wrote shortly thereafter that Mr. Fallacara "is an impediment to best practices." *Id.* Exh. 5 (1/18/2007 email from J. Vibert to M. Daniel).

204.    Mr. Fallacara's willingness to funnel through inappropriate loans to RMBS investors was well known to Credit Suisse even before 2007. On June 6, 2006, Mr. Vibert wrote, "Instead of trying to sell bonds, I spend my time playing defense from a guy supposedly on my team who won't stop waiving credit guidelines until we've taken on so much water the firm will pull the plug. Trust me, when this Titanic goes down, fallacara will be the guy on the bow proclaiming 'I'm the king of the world!!!!!" *Id.* Exh. 6 (6/6/2006 email from J. Vibert to M. Marriott).

205.    Problems with Credit Suisse's residential mortgage conduit were long-standing. In September 2004, Credit Suisse's Internal Audit Department gave its residential mortgage conduit and wholesale business the second-to-worst possible rating. *Id.* Exh. 7 (9/20/2004 Executive Summary of Residential Mortgage Conduit and Wholesale (Americas)).

206.    The Credit Suisse Internal Audit Department found that "controls need improvement in certain areas, including . . . approval of underwriting exceptions," and that "underwriting exceptions identified during the due diligence process are not always reviewed and approved by the Front Office as required by policy." *Id.* Exh. 7 p. 1. It also concluded that "[t]here is no formal process for documenting certain decisions made during the underwriting process nor were these exceptions raised to New York for approval. Specific instances noted include: loan appraisals not being compared to external sources for reasonableness as required; and approval of loans that did not have all of the required documentation (second

appraisal/AVM), as prescribed in the Underwriting Guidelines." *Id.* Exh. 7 p. 2.

207.   To remedy the deficiencies identified in its September 20, 2004 internal audit, the Credit Suisse Internal Audit Department recommended that Credit Suisse "implement procedures to ensure decisions made during the due diligence process are documented and that required exceptions are approved in writing." *Id.*

208.   Mr. Fallacara commented that this recommendation was "Agreed and completed. Supervisory procedures have been enhanced to ensure all decisions made during the underwriting process are documented and that all material exceptions are sent to New York for review and approval." *Id.*

209.   A few months later, Credit Suisse's Internal Audit Department gave its RMBS business the worst possible rating. *Id.* Exh. 8 (12/23/2004 Executive Summary of Credit Suisse First Boston Residential Mortgage Backed Securities Trading and Sales (Americas)).

210.   The Internal Audit Department found that "there was also an issue from our prior report related to the lack of documentation for loan acquisition and due diligence procedures for sub performing loans that was improperly reported as 'fully implemented' by management who has subsequently left the Firm." *Id.* Exh. 8 p. 2.

211.   Additionally, on June 28, 2013, U.S. Bank, acting as trustee, filed an amended complaint against DLJ seeking repurchase of defective loans in a pool of over 5,000 mortgages. *See* Am. Complaint, *Home Equity Asset Trust 2007-1 v. DLJ Mortgage Capital Inc.*, No. 650369/2013 (N.Y. Sup. Ct. June 28, 2013).

212.   After suffering severe losses, U.S. Bank conducted a forensic review of more than 1,500 loans. It found that nearly 80% of the loans breached DLJ's representations and warranties. *Id.* ¶ 5. A loan-level review of approximately 1,000 more loans confirmed that "the

principal originators of the Mortgage Loans failed to adhere to industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases." *Id.*

213.    On December 18, 2013, the Attorney General of New Jersey announced that the State had filed a lawsuit against Credit Suisse, DLJ, and Credit Suisse First Boston Mortgage Securities. The complaint includes allegations that the defendants offered over $10 billion in RMBS for sale to investors, but failed to disclose that "there had been a wholesale abandonment of underwriting guidelines" and numerous originators had high delinquency and default rates. Press Release, *Acting Attorney General Announces Lawsuit Against Credit Suisse Arising From Sale of Over $10 Billion in Troubled Mortgage Backed Securities* (Dec. 18, 2013), *available at* http://nj.gov/oag/newsreleases13/pr20131218a.html.

214.    Credit Suisse and DLJ have also been the target of other significant RMBS investigations and lawsuits. A review of loan files by MBIA, which wrote insurance on DLJ Mortgage certificates, demonstrates that DLJ Mortgage routinely misrepresented the quality of loans included in the securitizations. Complaint, *MBIA Ins. Corp. v. Credit Suisse Securities (USA) LLC, et al.*, No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009). In carrying out its review of the approximately 1,386 DLJ defaulted loan files, MBIA found that 87% of the defaulted or delinquent loans in those securitizations contained breaches of DLJ Mortgage's representations and warranties. *Id.* ¶ 68. These findings demonstrated "a complete abandonment of applicable guidelines and prudent practices such that the loans were (i) made to numerous borrowers who were not eligible for the reduced documentation loan programs through which their loans were made, and (ii) originated in a manner that systematically ignored the borrowers' inability to repay the loans." *Id.* ¶ 11. Moreover, "[t]he rampant and obvious nature of the breaches confirms that Credit Suisse made intentional misrepresentations concerning its mortgage loans and the due

diligence that Credit Suisse purported to perform regarding the quality of those loans." *Id.*

215.    Investors have reached similar conclusions regarding the defective loan collateral underlying Credit Suisse securitizations in their review of loans from Credit Suisee-label trusts. For example, FHFA conducted a forensic review of numerous loans in Credit Suisse securitizations. Complaint, *FHFA v. Credit Suisse Holdings (USA), Inc.*, No. 11-cv-06200 (S.D.N.Y. Sept. 2, 2011). The forensic review "revealed that for a majority of the loans reviewed in those Securitizations, there were numerous breaches of the originators' underwriting guidelines, such as failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan." *Id.* ¶ 6.

216.    In November 2011, Allstate Insurance Company ("Allstate") filed an amended complaint alleging fraud against Credit Suisse, DLJ Mortgage and other affiliates in connection with the sale of approximately $232 million in "highly-rated certificates." Am. Complaint, *Allstate Insurance Co. et al. v. Credit Suisse Secs. (USA) LLC et al.*, No. 650547/2011 (N.Y. Sup. Ct. Nov. 16, 2011). Allstate performed a forensic review of sampling of loans from the loan pools, which showed that the loans were riddled with defects constituting pervasive breaches of representations and warranties. For example, Allstate found that Credit Suisse systematically and significantly overstated the number of owner-occupied properties and understated the loans' LTV and CLTV ratios, and "routinely included" loans that "failed to conform to the originator's stated underwriting standards." *Id.* ¶¶ 126-61. Moreover, Allstate's forensic analysis found that Credit Suisse loan originators "systematically abandoned underwriting standards." *Id.* ¶¶ 162-199.

217.    In another case, Prudential's loan-level "analysis revealed systematic failures in