# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal Credit Union,
Members United Corporate Federal Credit Union,
Southwest Corporate Federal Credit Union, and
Constitution Corporate Federal Credit Union,
in its own right, and on behalf of NCUA
GUARANTEED NOTES TRUST 2010-R1, NCUA
GUARANTEED NOTES TRUST 2010-R2, NCUA
GUARANTEED NOTES TRUST 2010-R3, NCUA
GUARANTEED NOTES TRUST 2011-R1, NCUA
GUARANTEED NOTES TRUST 2011-R2, NCUA
GUARANTEED NOTES TRUST 2011-R3, NCUA
GUARANTEED NOTES TRUST 2011-R4, NCUA
GUARANTEED NOTES TRUST 2011-R5, NCUA
GUARANTEED NOTES TRUST 2011-R6, NCUA
GUARANTEED NOTES TRUST 2011-M1,

        Plaintiffs,

  -against-

U.S. BANK NATIONAL ASSOCIATION, and
BANK OF AMERICA, NATIONAL ASSOCIATION,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 14-cv-9928 (KBF)

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...................................................................................1

II.     PARTIES ...............................................................................................................7

III.    BNY MELLON AS INDENTURE TRUSTEE FOR THE NGN TRUSTS
        HAS DIRECT CONFLICTS IN PURSUING THESE CLAIMS ..............................18

IV.     JURISDICTION AND VENUE ..............................................................................19

V.      THE TRUSTS .......................................................................................................21

VI.     BACKGROUND ...................................................................................................21

        A.      RMBS Trusts ...........................................................................................21

                Figure 1 ...................................................................................................23

        B.      The Trustee's General Duties ....................................................................25

        C.      The Trustee's Duties Under the Pooling and Servicing
                Agreements ..............................................................................................26

        D.      Duty Properly to Take Title to the Mortgage Loans Conveyed
                to the Trust ..............................................................................................27

        E.      Duty to Provide Notice of Incomplete or Defective Mortgage
                Files and Enforce Repurchase Rights with Respect to Mortgage
                Files that Cannot be Cured .......................................................................29

        F.      Duty to Provide Notice of Breaches and to Enforce Repurchase
                Rights with Respect to Defective Loans .....................................................30

        G.      Duties under the Transfer Agreements .......................................................32

        H.      Duties Regarding the Servicers ..................................................................34

        I.      The Trustee's Duties upon Knowledge of an Event of Default .....................35

        J.      The Trustee's Duties and Obligations under the TIA, the Streit
                Act, and the Common Law ........................................................................36

VII.  DEFENDANTS SHOULD HAVE CAREFULLY INVESTIGATED THE
      FACT THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS
      IN THE FORM OF BREACHES OF REPRESENTATIONS AND
      WARRANTIES AND TAKEN APPROPRIATE ACTION ......................................38

      A.  General Reports Concerning Originators' Systematic
          Abandonment of their Underwriting Standards and Sponsors'
          Disregard of Prudent Securitization Standards ......................................39

      B.  Specific Reports Concerning the Originators of Loans in the
          Trusts Abandoning their Underwriting Standards and the
          Sponsors Disregarding Prudent Securitization Practices .....................45

          1.   American Home ...............................................................45

          2.   Bank of America .............................................................47

          3.   Chase ..............................................................................51

          4.   Citigroup .........................................................................57

          5.   Countrywide ....................................................................64

          6.   Decision One ...................................................................71

          7.   DLJ/Credit Suisse ...........................................................71

          8.   Fremont ...........................................................................78

          9.   GreenPoint ......................................................................81

          10.  IndyMac ..........................................................................86

          11.  Morgan Stanley Mortgage Capital ...................................91

          12.  National City ...................................................................95

          13.  New Century ....................................................................97

          14.  OwnIt .............................................................................106

          15.  RBS/Greenwich Capital .................................................107

          16.  UBS ................................................................................109

          17.  Washington Mutual .........................................................110

          18.  Wells Fargo ....................................................................121

19.    Argent ...................................................................................126

20.    First Franklin............................................................................131

21.    Option One................................................................................136

22.    WMC Mortgage Corp. ..............................................................140

23.    First National Bank of Nevada ..................................................144

24.    MortgageIT ..............................................................................147

C.    A High Number of Borrower Delinquencies and Defaults on
Mortgages in the Trusts' Loan Pools and Enormous Trust
Losses Are Further Evidence of the Originators' Systematic
Disregard of Underwriting Standards .................................................151

1.    The Trusts Suffered from High Delinquency and
Default Rates........................................................................151

2.    The Trusts Suffered Huge Losses ...........................................152

D.    The Collapse of the Certificates' Credit Ratings Is Further
Evidence of Systematic Disregard of Underwriting Guidelines...........153

Table 2 ...............................................................................154

VIII.   **ADDITIONAL EVIDENCE SHOWS THAT DEFENDANTS KNEW OF
DEFAULTS** ..............................................................................................156

A.    In Their Capacities as RMBS Servicers for Other Trusts,
Defendants Discovered Extensive Responsible Party Breaches
of Representations and Warranties .....................................................156

B.    Defendants Received Written Notice of Systematic,
Widespread Breaches of Representations and Warranties from
Monoline Insurers ............................................................................156

C.    Global RMBS Repurchase Investigations and Settlements
Alerted Defendants to Systematic, Widespread Breaches of
Representations and Warranties..........................................................158

D.    Defendants Have Been Involved in Repurchase Litigation
Against Many Responsible Parties .....................................................160

E.    In Acquiring Bank of America's Trustee Business, U.S. Bank
Attempted to Contract around its Predecessor's Liability and
Obligations......................................................................................162

IX.  **DEFENDANTS FAILED TO PRUDENTLY ADDRESS MASTER
     SERVICER AND/OR SERVICER DEFAULTS** ...................................................163

    A.  Defendants Breached the Governing Agreements and Their
         Common Law and Statutory Obligations By Failing to Fulfill
         Their Duties After Defaults and Events of Default Triggered
         By Master Servicer and Servicer Misconduct ....................................163

    B.  Specific Servicer Misconduct ..........................................................165

    C.  The Master Servicers and Servicers Defaulted on Their Duty to
         Notify the Trustees of Breaches of the Mortgage Loan
         Representations and Warranties .......................................................177

    D.  Defendants Knew that the Trusts Suffered from Widespread
         Master Servicer and/or Servicer Defaults .........................................179

X.   **DEFENDANTS FAILED TO ENSURE LOAN FILES WERE
     PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO
     REMEDY ANY DEFECTS** ...................................................................181

    A.  Defendants Failed to Take Possession of Complete Mortgage
         Loan Files ...................................................................................181

    B.  Defendants Failed to Take Possession of Complete Mortgage
         Loan Files ...................................................................................184

    C.  The Document Delivery Failures Were Events of Default .................186

XI.  **DEFENDANTS FAILED TO SATISFY THEIR PRE-AND POST-
     DEFAULT DUTIES AND BREACHED THE GOVERNING
     AGREEMENTS** ................................................................................188

XII. **THE "NO ACTION" CLAUSES DO NOT APPLY** ...................................198

XIII. **CLAIMS FOR RELIEF** ...................................................................198

    COUNT ONE-BREACH OF CONTRACT .................................................198

    COUNT TWO-BREACH OF FIDUCIARY DUTY .......................................201

    COUNT THREE-NEGLIGENCE AND GROSS NEGLIGENCE .................203

    COUNT FOUR-NEGLIGENT MISREPRESENTATION ...........................204

    COUNT FIVE-BREACH OF THE COVENANT OF GOOD FAITH ..........207

    COUNT SIX-VIOLATION OF THE STREIT ACT.....................................208

COUNT SEVEN-VIOLATION OF THE TRUST INDENTURE ACT
OF 1939 ..................................................................................................................210

PRAYER FOR RELIEF ...........................................................................................214

**XIV.  JURY DEMAND**...........................................................................................................214

The National Credit Union Administration Board ("NCUA Board"), acting in its capacity as liquidating agent for each of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), Southwest Corporate Federal Credit Union ("Southwest"), and Constitution Corporate Federal Credit Union ("Constitution") (collectively, the "CCUs"), and as the holder of the NGN Owner Trust Certificates (as defined below) brings this action against Defendants U.S. Bank, National Association and Bank of America, National Association ("Defendants"), individually and on behalf of the NGN Trusts (as defined below, and collectively the "Plaintiffs") and alleges as follows:

## I.   NATURE OF THE ACTION

1.     Plaintiffs bring this action against Defendants to recover the damages they have suffered because of Defendants' violations of their statutory, contractual, and common law obligations.

2.     This action arises out of Defendants' roles as trustees for 82 trusts identified on Exhibit A that issued residential mortgage-backed securities ("RMBS").[1] Each trust consists of

---

[1] Of the 82 trusts at issue here, U.S. Bank was the original trustee for 47 trusts, LaSalle Bank, N.A. ("LaSalle") was the original trustee for 26 trusts, and Wachovia Bank, N.A. ("Wachovia") was the original trustee for 9 trusts. U.S. Bank acquired Wachovia's corporate trust and institutional custody businesses on December 30, 2005 and was subsequently appointed as successor trustee to Wachovia on those 9 trusts. In or about October 2007, Bank of America acquired LaSalle through its acquisition of ABN AMRO North America Holding Company, thus becoming the trustee of the 26 trusts for which LaSalle was originally the trustee. Between February and April 2009, Bank of America resigned as trustee for 6 trusts in which the CCUs invested, and U.S. Bank was appointed as the successor trustee for those trusts. U.S. Bank acquired Bank of America's securities trust administration business on or about December 31, 2010, and became the trustee of the remaining trusts thereafter. As noted below and in Exhibit A, the NCUA Board is not asserting claims against Bank of America with respect to the following trusts: Banc of America Funding 2005-E Trust; Banc of America Funding 2005-F Trust; Banc of America Funding 2005-H Trust; Banc of America Funding 2006-D Trust; Banc of America Funding 2006-I Trust; Banc of America Funding 2007-1 Trust; Banc of America Funding 2007-

hundreds of individual residential mortgage loans that were pooled together and securitized for sale to investors. Investors purchased certificates issued by the RMBS trust that entitled the investors (or "certificateholders") to fixed principal and interest payments from the income stream generated as borrowers made monthly payments on the mortgage loans in the trusts.

3.      The CCUs purchased the certificates in the trusts identified on Exhibit A at an original face value of approximately $5.3 billion.

4.      The certificates' value was dependent on the quality and performance of the mortgage loans in the trusts and swift correction of any problems with the loans. But, because of the structure of the securitizations, certificateholders do not have access to the mortgage loan files or the power to remedy or replace any defective loans. Instead, certificateholders must rely on the trustees to protect their interests.

5.      Defendants, as the trustees for the trusts, had contractual, common law and statutory duties to address and correct problems with the mortgage loans and to protect the trusts' and the certificateholders' interests. The trustee for each trust has three primary duties. First, the trustee must take possession and acknowledge receipt of the mortgage files, review the documents in the mortgage files, identify any mortgage files that lack a complete chain of title or that have missing documents, and then certify that the mortgage files are complete and accurate. If the trustee identifies defects in the mortgage files, it must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase any mortgage loans with defective mortgage files.

---

3 Trust; Banc of America Funding 2007-B Trust; Banc of America Funding 2007-C Trust; Banc of America Funding 2007-D Trust; First Franklin Mortgage Loan Trust 2006-FF2; Merrill Lynch Mortgage Investors Trust Series MLCC 2005-3; Merrill Lynch Mortgage Investors Trust Series 2006-RM2; Merrill Lynch Mortgage Investors Trust Series 2006-RM3; and Merrill Lynch Mortgage Investors Trust Series 2007-HE3.

6.     Second, if the trustee discovers a breach of the representations and warranties concerning the mortgage loans, including but not limited to representations concerning the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable underwriting criteria, the trustee must notify the appropriate parties and take steps to enforce the responsible party's obligation to cure, substitute, or repurchase the defective mortgage loans. If the trustee fails to exercise this duty, then the trusts and the certificateholders will suffer losses properly borne by the party responsible for the defective loans.

7.     Third, the trustee must act to protect the interests of the trust and the certificateholders when it becomes aware of defaults concerning the trust. Thus, when the trustee discovers a default, or is notified by other parties, such as servicers, of defaults like breaches of representations and warranties with respect to the underlying mortgage loans, the trustee must act prudently to investigate those defaults, notify certificateholders of the defaults, and take appropriate action to address the defaults.

8.     Here, Defendants failed to perform even the threshold duties of taking full possession of the original notes and mortgages and properly reviewing the mortgage loan files for irregularities. If they had fulfilled their obligations, a significant percentage of the mortgage loans in the trusts would have been repurchased or substituted.

9.     Moreover, an overwhelming number of events alerted Defendants to the fact that the trusts suffered from numerous problems, yet they did nothing. First, the trusts suffered enormous losses due to the high number of mortgage defaults, delinquencies, and foreclosures caused by defective loan origination and underwriting. Second, highly publicized government investigations and enforcement actions, public and private litigation, and media reports

3

highlighted the mortgage originators' systematic abandonment and disregard of underwriting guidelines and the deal sponsors' poor securitization standards in the years leading up to the financial crisis. As summarized below, these actions and reports detail the incredible volume of defective loans and notorious activities of the originators, sponsors, and other players in the RMBS industry. Yet Defendants failed to take steps to preserve their rights or hold the responsible parties accountable for the repurchase or substitution of defective mortgage loans in direct contravention of their obligations as trustees.

10.     Finally, Defendants failed to address servicer and/or master servicer defaults and events of default. Defendants knew that the master servicers and servicers were ignoring many of their duties, including their duty to notify other parties, including Defendants as trustees, upon the master servicers' and servicers' discovery of breaches of the mortgage loan representations and warranties. Despite Defendants' knowledge of these ongoing defaults and events of default, Defendants failed to act prudently to protect the interests of the trusts and the certificateholders.

11.     Defendants' failures resulted in the trusts and certificateholders suffering losses rightfully borne by other parties. Had Defendants adequately performed their contractual, common law, and statutory obligations, breaching loans would have been removed from the loan pools underlying the certificates and returned to the responsible party. Defendants' improper conduct directly caused losses to certificateholders like the Plaintiffs.

12.     Even after ample evidence came to light that the trusts were riddled with defective loans, Defendants shut their eyes to such problems and failed to take the steps necessary to protect the trusts and certificateholders. Defendants failed to act in part because protecting the best interests of the trusts and the certificateholders would have conflicted with Defendants' interests. As participants in many roles in the securitization process, Defendants were

4

economically intertwined with the parties they were supposed to police.

13.     Because of the widespread misconduct in the securitization process, Defendants had incentives to ignore other parties' misconduct in order to avoid drawing attention to their own misconduct. Thus, Defendants failed and unreasonably refused to take action to protect the trusts and certificateholders against responsible party breaches.

14.     Under the governing agreements and the common law, Defendants were required to exercise their rights and powers to protect the trusts.  Once Defendants became aware of the various failures discussed in this complaint Defendants were required to use the same degree of care and skill that a prudent person would. But Defendants did not do so. Instead of protecting the trusts and the certificateholders, Defendants sat by as the trusts wasted away. Defendants failed to exercise due care, provide Plaintiffs and certificateholders with their undivided loyalty, failed to act in good faith, and negligently and with gross negligence breached their duties and made misrepresentations to Plaintiffs.

15.     Indeed, it is precisely this type of trustee complicity and inaction that led Congress to enact the Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa *et seq*., to "meet the problems and eliminate the practices" that plagued Depression-era trustee arrangements and provide investors with a remedy for trustees that utterly neglect their obligations. *See, e.g.*, 15 U.S.C. § 77bbb(b) (explaining purposes of the TIA in light of problems identified in 15 U.S.C. § 77bbb(a)).[2]

---

[2] In December 2014, the Second Circuit issued an order in *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. The Bank of New York Mellon*, Case No. 13-1776 (2d Cir. Dec. 23, 2014).  In its order, the Second Circuit held that residential mortgage-backed securities ("RMBS") certificates issued pursuant to pooling and servicing agreements ("PSAs") are not covered by the TIA because they fall under TIA § 304(a)(2), which exempts "any certificate of interest or participation in two or more securities having substantially different rights and

16.     To that end, several sections of the TIA impose duties on trustees. First, TIA Section 315(a) provides that, prior to default (as that term is defined in the governing documents), the trustee is liable for any duties specifically set out in the governing documents. 15 U.S.C. § 77ooo(a)(1). Second, TIA Section 315(b) provides that the trustee must give holders of covered securities "notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b). Third, Section 315(c) requires a trustee to act prudently in the event of a default (as that term is defined in the governing documents). 15 U.S.C. § 77ooo(c). Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).

17.     In addition, New York Real Property Law § 124 *et seq.* (the "Streit Act") was enacted to ensure that trustees act with due care, facilitates the orderly administration of the trust, and protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in the performance of its duties as would a prudent person under the same circumstances. N.Y. Real Prop. Law § 126(1).

18.     Defendants' failure to perform their duties has damaged Plaintiffs. Accordingly, Plaintiffs now bring this action against Defendants for breaching the governing agreements, for failing in their common law duties, for violating the TIA, and, for the New York Trusts, for violating the Streit Act.

---

privileges." 15 U.S.C. § 77ddd(a)(2). Plaintiffs have kept their TIA claims in this Amended Complaint to preserve their appellate rights.

## II.     PARTIES

19.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF"). The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") to stabilize corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation. The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA Board manages the NCUA. *See* Federal Credit Union Act ("FCU Act"), 12 U.S.C. §§ 1751, 1752a(a). Pursuant to 12 U.S.C. § 1787(a) and (b)(2)(A), the NCUA Board, in specified circumstances and in a distinct capacity, may close an insured credit union and appoint itself the Liquidating Agent for such credit union. As Liquidating Agent for a failed credit union, the NCUA Board succeeds to all rights, titles, powers, and privileges of the credit union, its members, accountholders, officers, and directors.

20.     U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas. As a corporate credit union, U.S. Central provided investment and financial services to other credit unions.

21.     WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California. As a corporate credit union, WesCorp

provided investment and financial services to other credit unions.

22.     Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois. Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions. As a corporate credit union, Members United provided investment and financial services to other credit unions.

23.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas. As a corporate credit union, Southwest provided investment and financial services to other credit unions.

24.     Constitution was a federally chartered corporate credit union with its offices and principal place of business in Wallingford, Connecticut. As a corporate credit union, Constitution provided investment and financial services to other credit unions.

25.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant its authority under the FCU Act, 12 U.S.C. § 1786(h). On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. § 1766(a) and 12 U.S.C. § 1787(a)(1)(A) and appointed itself Liquidating Agent. On September 24, 2010, the NCUA Board placed Members United, Southwest, and Constitution into conservatorship pursuant to the FCU Act. On October 31, 2010, the NCUA Board placed Members United, Southwest, and Constitution into involuntary liquidation, appointing itself Liquidating Agent.

26.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the CCUs and of any member, account holder, officer or director of the CCUs, with respect to the CCUs and their assets, including the right to bring the claims asserted in this action. As Liquidating Agent, the NCUA

Board has all the powers of the members, directors, officers, and committees of the CCUs, and succeeds to all rights, titles, powers, and privileges of the CCUs. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the CCUs' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

27.    In 2010, the NCUA created the NCUA Guaranteed Note ("NGN") Program as a means of liquidating the distressed investment securities ("Legacy Assets") from the five failed corporate credit unions and thereby stabilizing funding for the credit union system. The Legacy Assets consist of over 2,000 investment securities, secured by approximately 1.6 million residential mortgages, as well as commercial mortgages and other securitized assets. The NCUA transferred the Legacy Assets, including the CCU's investment in the trusts at issue in this Amended Complaint, to the NGN Trusts. The NGN Trusts then issued approximately $28.3 billion of NGNs, backed by the cash flows from the Legacy Assets. The timely repayment of principal and interest to the investors in the NGN Trusts is guaranteed by the NCUA and backed by the full faith and credit of the United States.

28.    As successor-in-interest to the CCUs, certain of the NCUA Board's interests in the majority of trusts at issue in this Amended Complaint were re-securitized in the NGN Program as part of: NCUA Guaranteed Notes Trust 2010-R1 ("NCUA 2010-R1 Trust"); NCUA Guaranteed Notes Trust 2010-R2 ("NCUA 2010-R2 Trust"); NCUA Guaranteed Notes Trust 2010-R3 ("NCUA 2010-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R1 ("NCUA 2011-R1 Trust"); NCUA Guaranteed Notes Trust 2011-R2 ("NCUA 2011-R2 Trust"); NCUA Guaranteed Notes Trust 2011-R3 ("NCUA 2011-R3 Trust"); NCUA Guaranteed Notes Trust 2011-R4 ("NCUA 2011-R4 Trust"); NCUA Guaranteed Notes Trust 2011-R5 ("NCUA 2011-R5 Trust"); NCUA Guaranteed Notes Trust 2011-R6 ("NCUA 2011-R6 Trust"), and NCUA Guaranteed

Notes Master Trust ("NCUA 2011-M1 Trust") (collectively the "NGN Trusts").  CUSIP

93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1;

CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP 576449AE2 in Trust MABS 2006-

HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8;

CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-

2 were never resecuritized and have been held, and continue to be held, by the NCUA Board

since the liqudation of the CCUs.

29.     Plaintiff NCUA Board is the holder of certain certificates that represent a

beneficial ownership interest in the NGN Trusts (the "Owner Trust Certificates"). As the holder

of the Owner Trust Certificates, the NCUA Board is entitled to payments from the NGN Trusts

after the principal balance of the senior notes issued by the various NGN Trusts has been reduced

to zero; all accrued and unpaid interest on the senior notes has been paid; all amounts owed to

the Guarantor have been reimbursed; and the Indenture Trustee, in all of its related capacities,

the Administrator and the Owner Trustee have been paid in full.

30.     The NCUA Board notified investors that it was actively investigating and

pursuing certain legal claims in connection with the securities underlying the NGNs and any

recovery on those claims would benefit the NCUA Board as Liquidating Agent for the CCUs

(referred to as the "Sellers" under the NGN securitization agreements) exclusively. *See*, *e.g.*,

NGN Trust 2011-R4 Offering Memorandum at 31 ("Beginning in September 2010, in

connection with these investigations, the NCUA requested that various potential defendants,

including potentially these Initial Purchasers, enter into separate tolling agreements to suspend

for a period of time the running of any statutes of limitations that apply to potential claims,

including claims under federal and state securities laws, with respect to specified asset-backed

securities sold to the Corporate Credit Unions. It is not known at this time whether specific legal claims will be asserted by the NCUA in respect of the Underlying Securities, or whether litigation will ensue. Any damages or other amounts recovered by the NCUA in connection with any such claims will not be part of the Trust Estate and will not be used to make payments on the Offered Notes. Any such recoveries will benefit the Sellers exclusively.").

31.     Plaintiff, the NCUA Board, brings this action in its own right as the duly-appointed liquidating agent for each of the CCUs with respect to CUSIPs that were not re-securitized as part of the NGN Program, and in the right of, and on behalf of, the NGN Trusts with respect to CUSIPs that were re-securitized as part of the NGN Program.

32.     NCUA Guaranteed Notes Trust 2010-R1 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of October 27, 2010 (the "NGN 2010-R1 Indenture"), by and between the NCUA 2010-R1 Trust, as issuer, and The Bank of New York Mellon ("BNY Mellon"), as Indenture Trustee, (ii) Trust Agreement dated as of October 27, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"), in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of October 27, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R1 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R1 Indenture and of the Guarantor (collectively, the "NGN 2010-R1 Agreements").

33.     NCUA Guaranteed Notes Trust 2010-R2 is a Delaware statutory trust formed

pursuant to, *inter alia*, the associated (i) Indenture dated as of November 17, 2010 (the "NGN 201-R2 Indenture"), by and between the NCUA 2010-R2 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of November 17, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of November 17, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R2 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R2 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R2 Indenture and of the Guarantor (collectively, the "NGN 2010-R2 Agreements").

34.     NCUA Guaranteed Notes Trust 2010-R3 is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of December 9, 2010 (the "NGN 2010-R3 Indenture"), by and between the NCUA 2010-R3 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of December 9, 2010, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of December 9, 2010, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2010-R3 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2010-R3 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2010-R3 Indenture and of the Guarantor (collectively, the "NGN 2010-R3 Agreements").

35.     NCUA Guaranteed Notes Trust 2011-R1  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of January 27, 2011 (the "NGN 2011-R1 Indenture"), by and between the NCUA 2011-R1 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of January 27, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of January 27, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R1 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R1 Indenture and of the Guarantor (collectively, the "NGN 2011-R1 Agreements").

36.     NCUA Guaranteed Notes Trust 2011-R2  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of February 11, 2011 (the "NGN 2011-R2 Indenture"), by and between the NCUA 2011-R2 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of February 11, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of February 11, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R2 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R2 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R2 Indenture and of the Guarantor

(collectively, the "NGN 2011-R2 Agreements").

37.     NCUA Guaranteed Notes Trust 2011-R3  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of March 1, 2011 (the "NGN 2011-R3 Indenture"), by and between the NCUA 2011-R3 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of March 1, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of March 1, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R3 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R3 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R3 Indenture and of the Guarantor (collectively, the "NGN 2011-R3 Agreements").

38.     NCUA Guaranteed Notes Trust 2011-R4  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of March 31, 2011 (the "NGN 2011-R4 Indenture"), by and between the NCUA 2011-R4 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of March 31, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of March 31, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R4 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R4 Indenture for the benefit of the holders from time to time of the

senior notes issued by the issuer pursuant to the NGN 2011-R4 Indenture and of the Guarantor (collectively, the "NGN 2011-R4 Agreements").

39.      NCUA Guaranteed Notes Trust 2011-R5  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of April 14, 2011 (the "NGN 2011-R5 Indenture"), by and between the NCUA 2011-R5 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of April 14, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of April 14, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R5 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN 2011-R5 Indenture for the benefit of the holders from time to time of the senior notes issued by the issuer pursuant to the NGN 2011-R5 Indenture and of the Guarantor (collectively, the "NGN 2011-R5 Agreements").

40.      NCUA Guaranteed Notes Trust 2011-R6  is a Delaware statutory trust formed pursuant to, *inter alia*, the associated (i) Indenture dated as of May 5, 2011 (the "NGN 2011-R6 Indenture"), by and between the NCUA 2011-R6 Trust, as issuer, and BNY Mellon, as Indenture Trustee, (ii) Trust Agreement dated as of May 5, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the Certificate Paying Agent, and (iii) Guaranty Agreement dated as of May 5, 2011, by and among NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor, the NCUA 2011-R6 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, not in its individual capacity, but solely as indenture trustee under the NGN

2011-R6 Indenture for the benefit of the holders from time to time of the senior notes issued by

the issuer pursuant to the NGN 2011-R6 Indenture and of the Guarantor (collectively, the "NGN

2011-R6 Agreements").

      41.    NCUA Guaranteed Notes Master Trust is a Delaware statutory trust formed

pursuant to, *inter alia*, the associated (i) Master Indenture dated as of June 16, 2011 (the "NGN

2011-M1 Indenture"), by and between the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, as

Indenture Trustee, (ii) Indenture Supplement dated as of June 16, 2011, by and between the

NCUA 2011-M1 Trust, as issuer, and BNY Mellon, (iii) Master Trust Agreement dated as of

June 16, 2011, by and among the NCUA Board in its Capacity as Liquidating Agent, Wells

Fargo, in its capacity as Owner Trustee, and BNY Mellon, as Certificate Registrar and the

Certificate Paying Agent, and (iv) Guaranty Agreement dated as of June 16, 2011, by and among

NCUA in its capacity as an Agency of the Executive Branch of the United States, as Guarantor,

the NCUA 2011-M1 Trust, as issuer, and BNY Mellon, as the Indenture Trustee, (collectively,

the "NGN 2011-M1 Agreements").

      42.    NCUA, in its capacity as an agency in the Executive Brank of the U.S.

Government, has issued a guarantee in connection with the NGNs. Plaintiff NCUA Board, as

liquidating agent for each of the CCUs, is the holder of the Owner Trust Certificates in

connection with the NGNs.  Any recovery the NGN Trusts receive as a result of the claims for

relief in this complaint directly increases the value of the Owner Trust Certificates. The value of

the Owner Trust Certificates will become available to pay claims against the liquidated CCUs,

including those of the NCUSIF and TCCUSF.  Thus any recovery on behalf of the NGN Trusts

in this action will benefit NCUA Board and lessen the financial burden on the government and

federally insured credit unions resulting from the failure of the CCUs.

43.     Plaintiff NCUA Board brings the claims on behalf of the NGN Trusts as the holder of the NGN Owner Trust Certificates, as an express third-party beneficiary of the NGN Trust Indentures, and pursuant to its authority under 12 U.S.C. § 1787.

44.     U.S. Bank is a national banking association organized and existing under the laws of the United States. U.S. Bank's principal place of business and principal place of trust administration is located in Minneapolis, Minnesota. As trustee for the trusts, U.S. Bank owed certificateholders certain statutory and contractual duties with respect to the trusts. As of December 31, 2013, U.S. Bank's corporate parent, U.S. Bancorp, was the fifth largest commercial bank in the United States based on assets and the fourth largest in total branches. U.S. Bank is U.S. Bancorp's second largest subsidiary. U.S. Bank does business in and maintains offices in New York, including a corporate trust office at 100 Wall Street, New York, New York 10005.

45.     U.S. Bank, together with its affiliates, is involved in all aspects of the private-label RMBS market. U.S. Bank currently acts as trustee of more than $3 trillion in trust assets, operating 50 corporate trust offices across the country. U.S. Bank currently serves as trustee for thousands of RMBS trusts with assets of over $1 trillion in original face value. U.S. Bank is trustee for approximately 30% of all RMBS issued between 2004 and 2007.

46.     In addition, U.S. Bank, together with its subsidiary, U.S. Bank Home Mortgage, Inc., serves as a master servicer of residential mortgage loans. U.S. Bank's master servicing portfolio includes approximately 45,700 loans with an unpaid principal balance of approximately $6 billion as of January 2014.

47.     U.S. Bank Home Mortgage, Inc. has acted as a mortgage loan seller, selling over $400 million of loans in RMBS deals issued between 2004 and 2007.

17

48.     Bank of America is a national banking association with its principal offices in Charlotte, North Carolina. In or about October 2007, Bank of America acquired LaSalle, which was serving as the original trustee for some trusts, and became the successor trustee via its acquisition of ABN AMRO North America Holding Company. As trustee for some of the trusts, Bank of America owed certificateholders certain statutory and contractual duties with respect to the trusts.

49.     Of the 82 trusts at issue here, U.S. Bank was the original trustee for 47 trusts, LaSalle was the original trustee for 26 trusts, and Wachovia was the original trustee for 9 trusts. U.S. Bank acquired Wachovia's corporate trust and institutional custody businesses on December 30, 2005 and was subsequently appointed as successor trustee to Wachovia on those 9 trusts. Between February and April 2009, Bank of America resigned as trustee for 6 trusts in which the CCUs invested, and U.S. Bank was appointed as the successor trustee for those trusts. U.S. Bank acquired Bank of America's securities trust administration business on or about December 31, 2010, and became the trustee of the remaining trusts thereafter.

## III.    BNY MELLON AS INDENTURE TRUSTEE FOR THE NGN TRUSTS HAS DIRECT CONFLICTS IN PURSUING THESE CLAIMS

50.     BNY Mellon is the indenture trustee of the NGN Trusts.

51.     BNY Mellon has irreconcilable direct and positional conflicts of interest in pursuing Plaintiffs' claims against Defendants.

52.     Most importantly, BNY Mellon is itself an RMBS trustee. While proceeding as plaintiff on behalf of the NGN Trusts, BNY Mellon would be in the untenable position of advocating against its own interests as an RMBS trustee and positions it has taken in separate litigation.

53.     In particular, BNY Mellon is already a defendant in several lawsuits asserting the

very same claims against BNY Mellon as those asserted in this Amended Complaint. *See, e.g., Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, Case No. 11-cv-5459 (S.D.N.Y. 2011); *Am. Fid Assur. Co. v. Bank of New York Mellon*, Case No. 11-1284 (W.D. Okla. 2011); *Blackrock Allocation Target Shares: Series S Portfolio, et al. v. Bank of New York Mellon, as Trustee, et al.*, Case No. 14-cv-9372 (S.D.N.Y. 2014); *Phoenix Light SF v. Bank of New York Mellon*, Case No. 14-cv-10104 (S.D.N.Y. 2014); *Royal Park Investments SA/NV v. The Bank of New York Mellon*, Case No. 14-cv-6502 (S.D.N.Y. 2014); *Western and Southern Life Ins. Co., et al. v. Bank of New York Mellon, as Trustee*, No. A1302490 (Ohio Ct. Comm. Pl. 2013).

54.     In those lawsuits, BNY Mellon has taken or will take positions directly at odds with Plaintiffs' claims against the Defendants. For example, BNY Mellon has asserted or almost certainly will assert that: (a) the Streit Act does not apply to RMBS trusts; (b) RMBS trustees have no duty of care prior to the occurrence of an Event of Default; (c) there is no independent cause of action against RMBS trustees for breach of fiduciary duty; and (d) that no Events of Default occurred with respect to certain RMBS trusts..

55.     BNY Mellon cannot fully and forcefully safeguard Plaintiffs' interests in light of this irreconcilable conflict.

56.     Because of the foregoing, the NCUA Board brings this action on behalf of itself, as liquidating agent for each of the CCUs, and pursuant to its authority under 12 U.S.C. § 1787, and on behalf of the NGN Trusts, as holder of the NGN Trust Owner Trust Certificates, and as an express third-party beneficiary of the NGN Indentures Agreements.

## IV.   JURISDICTION AND VENUE

57.     This Court has subject matter jurisdiction pursuant to the following statutes:

(a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress"; (c) 15 U.S.C. § 77v, providing for jurisdiction for claims under the TIA; (d) 15 U.S.C. § 1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"; (e) 28 U.S.C. § 1332 because there is compete diversity of citizenship of the parties and the amount in controversy, without interest and costs, exceeds $75,000; and (f) 15 U.S.C. § 1367, providing for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This Court also has jurisdiction over the claims asserted under the Streit Act because this case involves New York common law trusts.

58.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a), and/or 28 U.S.C. §1391(b)(1), because Defendants are residents of and/or conduct business in this District. This Court has personal jurisdiction over Defendants because they are residents of and/or conduct business in this District and under N.Y. C.P.L.R. 301, New York's long arm statute.  The claims relate to Defendants' roles as trustees over trusts created under New York law and/or administered at least in part in New York.  In addition, Defendants have filed foreclosure cases on behalf of the trusts in New York and in the course of such proceedings either discovered or should have discovered multiple defaults and representation warranty breaches.

20

## V.      THE TRUSTS

59.      The trusts identified on Exhibit A are 82 New York common law trusts or Delaware statutory trusts created in connection with residential mortgage-backed securitizations between 2004 and 2008.

60.      The trusts have a high concentration of loans originated by the following lenders and their affiliates: American Home Mortgage Corp. and American Home Mortgage Investment Corp.; Decision One Mortgage Co., LLC; DLJ Mortgage Capital, Inc.; Argent Mortgage Co. LLC; Fremont Investment and Loan; National City Mortgage Co.; Bank of America, N.A.; J.P. Morgan Chase Bank, N.A.; Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP; Credit Suisse Financial Corp.; First National Bank of Nevada; MortgageIT, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; New Century Mortgage Corporation; First Franklin Financial Corp.; WMC Mortgage Corp.; Option One Mortgage Corp.; OwnIt Mortgage Solutions, Inc.; Washington Mutual Bank; and Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage, Inc. (collectively, the "originators").

61.      A significant portion of the trusts were sponsored by the following sponsors and their affiliates: DLJ Mortgage Capital, Inc.; Bank of America, N.A.; Citigroup Global Markets Realty Corp. and CitiMortgage, Inc.; Morgan Stanley Mortgage Capital, Inc. and Morgan Stanley Mortgage Capital Holdings, LLC.; Merrill Lynch Mortgage Lending, Inc.; Washington Mutual Bank and Washington Mutual Mortgage Securities Corp.; Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage, Inc. and Wells Fargo Asset Securities Corp.; Greenwich Capital Financial Products, Inc.; and UBS Real Estate Securities, Inc. (collectively, the "sponsors").

## VI.     BACKGROUND

### A.      RMBS Trusts

62.     RMBS certificates are debt instruments issued to investors by an issuing trust that holds one or more mortgage pools. The corpus of the trust – like the trusts at issue here – consists almost exclusively of the underlying mortgage loans. Certificateholders receive a portion of the income stream generated by the trust as borrowers make payments on their mortgage loans.

63.     Because residential mortgage loans are the assets underlying the RMBS, the origination of mortgages starts the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting. The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.

64.     The securitization process begins with a sponsor who purchases loans in bulk from one or more originators. The sponsor transfers title of the loans to an entity called a depositor.

65.     The depositor transfers the loans to a trust called the issuing entity.

66.     The issuing entity then issues notes and/or certificates, providing certificateholders scheduled principal and interest payments derived from the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

67.     The depositor files required documents (such as registration statements and prospectuses) with the U.S. Securities and Exchange Commission ("SEC") so the certificates can be offered to the public.

68.     One or more underwriters then sell the notes or certificates to investors.

69.     Figure 1 (*infra*) depicts a typical securitization process.

22

**Figure 1**
*Illustration of the Securitization Process*



70.     The establishment and administration of each trust is governed by an agreement called a Pooling and Servicing Agreement ("PSA") and certain related agreements that the PSA references and incorporates (the "governing agreements"). All of the governing agreements are substantially similar, and impose the same duties on Defendants. *See* Exhibit E §§ I – IX. Accordingly, this Amended Complaint refers to the PSAs or the governing agreements when discussing the trustee's contractual obligations.

71.     Once the loans are deposited into a trust, borrowers begin making payments to the trust through a master servicer. The master servicer is ultimately responsible for servicing the

loans, but may use a designee, typically called a servicer or sub-servicer, to perform some or all of the mortgage servicing functions. The master servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, managing and selling foreclosed properties, and overseeing any sub-servicers.

72.     When the master servicer collects loan payments from borrowers, it then transfers those payments, less allowable deductions, to the trustee. The trustee then uses the payments, less allowable fees and expenses, to make scheduled principal and interest payments to certificateholders. The trustee also delivers monthly remittance reports to certificateholders describing the performance of underlying loans and compliance with the governing agreements. The contents of those reports are specified in the governing agreements and in Item 1121 of SEC Regulation AB. *See* 17 C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance reports.

73.     Thus, each trust is administered primarily by two entities – the trustee and the master servicer, under the oversight of the trustee. The trustee owes certificateholders certain duties set forth in the governing agreements, as well as those duties imposed by the common law, the TIA, and the Streit Act.

74.     The purpose of having a trustee in an RMBS securitization is to ensure there is at least one independent party to the governing agreements who, unlike the RMBS certificateholders, does not face collective action, informational, or other limitations, and as a result can protect the trusts and the interests of RMBS certificateholders. The governing agreements, the common law, the TIA, and the Streit Act impose critical duties on trustees, and the trustees' adherence to those duties affects the value of the RMBS.

75.     The Defendants earned fees in connection with their roles as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. Defendants also received significant benefits from the interest-free deposits maintained in their accounts when the servicing payments were remitted to their accounts.  Defendants maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts.  The RMBS trustee engagements further deepened Defendants' business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

### B.     The Trustee's General Duties

76.     The terms of the governing agreements are substantially similar, if not identical, and impose substantially the same, if not identical, duties and obligations on the trustee. *See* Exhibit E §§ I – IX. Further, upon information and belief, Defendants employed the same general set of policies and procedures to oversee and manage the trusts regardless of any individual variations contained within the governing agreements.

77.     Most importantly, Defendants have an absolute duty under the governing agreements, the common law, the TIA, and the Streit Act to acquire and protect the trust corpus for the benefit of certificateholders. "The Trustee acknowledges receipt [of the mortgage loans] and declares that it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets . . . in trust for the exclusive use and benefit of all present and future Certificateholders." PSA Section 2.02; *see also* Exhibit E § II.[3]

---

[3] All cites to the PSA are to the PSA and related agreements specific to the MASTR Asset Backed Securities Trust 2006-WMC4 ("MABS 2006-WMC4"), which, as alleged above, are substantially similar to the governing agreements for all of the trusts. A copy of the MABS 2006-WMC4 PSA is attached as Exhibit B.

### C.    The Trustee's Duties Under the Pooling and Servicing Agreements

78.    The PSAs are contracts between, in addition to others, the depositor, the master servicer or servicer, and the trustee, which govern the trusts that issued the certificates. The PSAs for each of the trusts are substantially similar and memorialize the following events and conditions: (i) the transfer and conveyance of the mortgage loans from the depositor to the trust; (ii) the trust's issuance of beneficial certificates of interests in the trust to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates. *See* Exhibit E §§ I – IX.

79.    The PSAs also set forth Defendants' contractual duties and obligations, which are identical or substantially identical for each trust. *See* Exhibit E §§ I – IX. Specifically, each PSA requires Defendants to oversee and enforce the depositors' and the servicers' obligations. In performing these contractual obligations, Defendants must act in the best interests of and for the protection of the trusts and the certificateholders. Certificateholders, unlike the trustee, have no direct contact with the depositors and servicers. Moreover, under the PSAs, certificateholders do not have the right to compel the trustee to enforce the responsible party's representations and warranties,[4] absent satisfaction of the collective action provisions. Certificateholders must rely on Defendants to protect their interests.

_____

[4] The governing agreements specify the party that is responsible for repurchasing any defective loan. Generally, they provide that, upon discovery and/or notice of a breach of a representation and warranty with respect to a mortgage loan that materially and adversely affects the interests of the certificateholders, the responsible party shall cure the breach or repurchase the affected mortgage loan at its purchase price, which is equal to the then-outstanding amount due on the mortgage loan. The responsible party is generally either the originator of the loans, the seller of the loans, or the sponsor of the securitization. These roles are frequently undertaken by the same or affiliated entities. For simplicity's sake, this complaint uses "responsible party" to refer to the entity responsible for the repurchase of any defective loans.

**D.      Duty Properly to Take Title to the Mortgage Loans Conveyed to the Trust**

80.      The trusts must take title to the mortgages conveyed to them for due consideration for the RMBS properly to be backed by mortgage loans. The PSAs establish the conveyance terms of the mortgage loans to the trustee, on behalf of the trust and the RMBS certificateholders, and those terms are intended to ensure that the trustee, on behalf of the trusts, takes full title to the mortgage loans. *See* Exhibit E § I – III.

81.      The first part of this conveyance involves the depositor assigning to the trustee, among other things, its rights, title, and interest in the mortgage loans and the depositor's rights under the transfer agreement whereby the depositor acquired the mortgage loans. PSA Section 2.01 ("Conveyance of the Mortgage Loans") provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule [and] the rights of the Depositor under the Assignment Agreement [transfer agreement] . . . .

The other PSAs contain substantially similar provisions. *See* Exhibit E § I.

82.      Furthermore, the PSAs require Defendants, or their agents acting as custodians, to acknowledge receipt of the mortgage loans on behalf of the trust and to acknowledge that all mortgage pool assets—including the mortgage files and related documents and property—are held by them as trustees. Significantly, Defendants, or their agents, must take physical possession of the mortgage files, including the mortgage note and the mortgage, properly endorsed and assigned to the trustee. As set forth in PSA Section 2.02:

> The Trustee acknowledges receipt (or receipt by the Custodian on behalf of the Trustee), subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, of the documents referred to in Section 2.01 . . . and declares that it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all

27

such assets and such other assets . . . for the exclusive use and benefit of all present and future Certificateholders.

The other PSAs contain substantially similar provisions. *See* Exhibit E §§ II, IV.

83.     Section 2.01 of the PSA also specifically sets forth the operative documents that

must be contained in the mortgage file:

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Custodian (on behalf of the Trustee), with respect to the related Mortgage Loans, the following documents or instruments with respect to each Mortgage Loan so transferred and assigned (a "Mortgage File"):

(i) the original Mortgage Note, endorsed in blank or in the following form: "Pay to the order of U.S. Bank National Association, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the Originator to the Person so endorsing to the Trustee;

(ii) the original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording thereon, and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(iii) unless the Mortgage Loan is registered on the MERS® System, an original Assignment in blank;

(iv) the original recorded Assignment or Assignments showing a complete chain of assignment from the Originator to the Person assigning the Mortgage to the Trustee (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of the MIN) as contemplated by the immediately preceding clause (iii);

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

(vi) the original lender's title insurance policy, together with all endorsements or riders that were issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a first or second lien on the Mortgaged Property represented therein as a fee interest vested in the Mortgagor, or in the event such original title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

84.     Once the mortgage files are in Defendants' or their custodians' possession,

Defendants, or the custodians on Defendants' behalf, are required to ensure that the underlying

mortgage loans were properly conveyed to the trusts, and that the trusts have perfected

enforceable title to the mortgage loans by reviewing the mortgage files for each mortgage loan.

Defendants, or the custodians on Defendants' behalf, are required to review each mortgage file

within a certain period after the "closing date" of the securitization and deliver to the depositor a

certification that all documents required have been executed and received. This duty overlaps

with and forms part of the requirements that the trustee must satisfy to properly take title to the

mortgage loans. As set forth in PSA Section 2.02:

> The Trustee (or the Custodian on behalf of the Trustee) agrees, for the benefit of the
> Certificateholders and the NIMS Insurer, to review each Mortgage File and, within 45
> days of the Closing Date, to certify . . . that, as to each Mortgage Loan listed in the
> Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage
> Loan specifically identified in the exception report annexed thereto as not being covered
> by such certification), (i) all documents constituting part of such Mortgage File . . .
> required to be delivered to it pursuant to this Agreement are in its possession, (ii) such
> documents have been reviewed by it and appear regular on their face and relate to such
> Mortgage Loan and (iii) based on its examination and only as to the foregoing, the
> information set forth in the Mortgage Loan Schedule that corresponds to items (1), (3),
> (12), (15) and (18) of the definition of "Mortgage Loan Schedule" accurately reflects
> information set forth in the Mortgage File.

The other PSAs contain substantially similar provisions. *See* Exhibit E § III.

85. Defendants breached these contractual obligations by: 1) failing to take proper

title to the mortgage loans; 2) failing to adequately review the mortgage loan files and certify

their completeness; 3) failing to properly oversee the custodian or its agents. *See* Exhibit E § III.

**E.    Duty to Provide Notice of Incomplete or Defective Mortgage Files and
Enforce Repurchase Rights with Respect to Mortgage Files that Cannot be
Cured**

86. If Defendants or the custodians identify any defect in a mortgage loan file for an

underlying mortgage loan contained in a trust, Defendants must promptly notify the relevant

parties. As set forth in PSA Section 2.02 (emphasis added):

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee (or the Custodian on behalf of the Trustee) finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the **Trustee (or the Custodian on behalf of the Trustee) shall so notify the Depositor**, the NIMS Insurer, the Trustee, the Servicer and the Master Servicer.

87.    Once incomplete mortgage files or loans with defective transfer documentation

are identified, the parties to the governing agreements must work to remedy these deficiencies.

The trustee is tasked with enforcing the responsible party's obligation to cure the deficiencies or

repurchase the mortgage loans. As set forth in PSA Section 2.03(a) (emphasis added):

Upon receipt of written notice from the Custodian of any materially defective document in, or that a document is missing from, a Mortgage File … the Trustee shall promptly notify the Trust Administrator, the Seller, the NIMS Insurer, the Originator, the Servicer and the Master Servicer of such defect, missing document or breach and request that the Originator or the Seller, as applicable, deliver such missing document or cure such defect or breach within 90 days from the date the Originator or the Seller, as applicable, was notified of such missing document, defect or breach, and if the Trustee receives written notice from the Depositor, the Servicer, the Master Servicer, the Trust Administrator or the Custodian that the Originator or the Seller, as applicable, has not delivered such missing document or cured such defect or breach in all material respects during such period, **the Trustee shall enforce the obligations of the Originator or the Seller**, as applicable, under the Assignment Agreement and/or Originator Master Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price.

The other PSAs contain substantially similar provisions. *See* Exhibit E § V.

88.    Defendants breached these contractual obligations by: 1) failing to provide notice

of incomplete or defective mortgage files; and 2) failing to enforce repurchase rights with respect

to mortgage files that could not be cured. *See* Exhibit E § V.

**F.    Duty to Provide Notice of Breaches and to Enforce Repurchase Rights with Respect to Defective Loans**

89.    The quality of the mortgage loans to which the trusts purportedly receive title is

also critical to an RMBS securitization. For that reason, the governing agreements contain

"representations and warranties" by the responsible party attesting to the characteristics of the

borrower and collateral for the mortgage loans conveyed to the trusts, and that the loans were made in accordance with applicable underwriting guidelines.

90. As in instances of missing documents or where the transfer of the mortgage was incomplete, the governing agreements also require the responsible party to cure, substitute, or repurchase any mortgage loans that materially breach the responsible party's representations and warranties concerning the quality of the mortgage loans conveyed to the trusts. Specifically, the governing agreements require the trustee, among others, to provide notice of the breaches and enforce the responsible party's repurchase obligations:

> Upon receipt of written notice from the Custodian . . . or from the Depositor, the Servicer, the Master Servicer, the Trust Administrator or the Custodian of the breach by the Originator or the Seller of any representation, warranty or covenant under the Assignment Agreement or the Originator Master Agreement . . . in respect of any Mortgage Loan that materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Trust Administrator, the Seller, the NIMS Insurer, the Originator, the Servicer and the Master Servicer of such defect, missing document or breach and request that the Originator or the Seller, as applicable, deliver such missing document or cure such defect or breach within 90 days from the date the Originator or the Seller, as applicable, was notified of such missing document, defect or breach, and if the Trustee receives written notice from the Depositor, the Servicer, the Master Servicer, the Trust Administrator or the Custodian that the Originator or the Seller, as applicable, has not delivered such missing document or cured such defect or breach in all material respects during such period, **the Trustee shall enforce the obligations of the Originator or the Seller**, as applicable, under the Assignment Agreement and/or Originator Master Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price.

PSA Section 2.03(a) (emphasis added); *see also* Exhibit E § V. Even in instances where enforcement by the trustee of the repurchase obligation is not explicit, trustees still have a right and duty to protect the trusts by ensuring all parties to the governing agreements comply with their respective obligations.

91. Consequently, under the governing agreements, Defendants are entrusted to ensure that the mortgage loans in the trusts were properly underwritten, were of a certain risk

profile, and had characteristics of a certain quality as represented by the responsible party in the transfer agreements.

92.     To protect the trusts and all certificateholders, the governing agreements require Defendants to give prompt written notice to all parties to the governing agreements upon their knowledge of a breach of a representation or warranty made by the responsible party about the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the trusts regarding the breach.

93.     Defendants breached these contractual obligations by: 1) failing to provide notice of defective mortgage loans; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by their contractual obligations. *See* Exhibit E § V.

### G.    Duties under the Transfer Agreements

94.     Depending on the parties, there are several methods whereby the depositor acquires the loans for securitization. These include Mortgage Loan Purchase Agreements ("MLPAs"), Sale and Servicing Agreements ("SSAs"), and Assignment and Recognition Agreements (collectively, "transfer agreements"). These agreements are all substantially similar and govern the terms for transferring mortgage loans acquired for securitization from the originator to the depositor. These transfer agreements are generally between either the originator and the depositor, or the sponsor and the depositor.

95.     One of the parties to the transfer agreement—typically an originator or sponsor— makes extensive representations and warranties concerning the characteristics, quality, and risk

profile of the mortgage loans in either the PSA or the associated transfer agreement.[5] For

simplicity's sake, this Amended Complaint refers to that party as the "responsible party."

96.     The responsible party's typical representations and warranties in the transfer

agreements include, *inter alia*, the following: (i) the information in the mortgage loan schedule is

true and correct in all material respects; (ii) each loan complies in all material respects with all

applicable local, state and federal laws and regulations at the time it was made; (iii) the

mortgaged properties are lawfully occupied as the principal residences of the borrowers unless

specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in

default; (v) no loan has a loan-to-value ("LTV") ratio of more than 100%; (vi) each mortgaged

property was the subject of a valid appraisal; and (vii) each loan was originated in accordance

with the underwriting guidelines of the related originator. To the extent mortgages breach the

responsible party's representations and warranties, the mortgage loans are worth less and are

much riskier than represented. *See, e.g.*, Exhibit E § IX.

97.     Under the transfer agreements, upon discovery or receipt of notice of any breach

of the responsible party's representations and warranties that has a material and adverse effect on

the value of the mortgage loans in the trusts or the interests of the certificateholders therein, the

responsible party is obligated to cure the breach in all material respects. The transfer agreements

do not specify what constitutes "discovery" of a breach or what evidence must be presented to

the responsible party in providing notice of a breach.

98.     If a breach is not cured within a specified period, the responsible party is

obligated either to substitute the defective loan with a loan of adequate credit quality, or to

repurchase the defective loan.

_____

[5] The governing agreements frequently refer to the same entity by different titles depending upon
the role being played. The role of seller or transferor generally overlaps with that of the sponsor.

99.     The repurchase provisions ensure that the trust need not continue to hold mortgage loans for which the responsible party breached its representations and warranties. Thus, the repurchase provisions are designed to transfer the risk of any decline, or further decline, in the value of defective mortgage loans that results from a breach from the trusts to the responsible party.

100.     Under the transfer agreements, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the trusts or the certificateholders' interests in the loans. The responsible party's cure, substitute, and repurchase obligations do not require any showing that the responsible party's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or require that the demanding party prove reliance on servicing and origination documents.

101.     Upon the sale of the mortgage loans to the trust, the rights under the transfer agreements, including the responsible party's representations and warranties concerning the mortgage loans, are generally assigned to Defendants, as trustees, for the benefit of the trusts and all certificateholders, in accordance with the governing agreements.

102.     Defendants breached these contractual obligations by: 1) failing to enforce their contractual rights under the transfer agreement; 2) failing to enforce repurchase rights with respect to defective mortgage loans; and 3) failing to ensure the responsible party abided by their contractual obligations.

### H.     Duties Regarding the Servicers

103.     Each PSA requires the master servicer or servicer to prudently service the loans underlying the trusts.

104.     Section 3.01 of the PSA states that: "[t]he Servicer shall service and administer

the Mortgage Loans on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificateholders." Section 3.01 further provides: "the Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes." The other PSAs contain substantially similar provisions. *See* Exhibit E § VII.

105.    Under the PSAs, Defendants, as trustees, have certain duties and obligations regarding monitoring the master servicers and/or servicers. In particular, the PSAs set forth Defendants' obligations upon occurrence of an "event of default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time. Section 7.01 of the PSAs identifies several types of failures by the servicer that may give rise to an event of default. The other PSAs contain substantially similar provisions. *See* Exhibit E § VIII. Such failures include a breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee.

106.    The remedies for uncured servicer events of default include, among other things, termination of the master servicers and/or servicers. *See* Exhibit E § VIII.

107.    Defendants breached these contractual obligations by failing to properly monitor the servicers and master servicers.

**I.      The Trustee's Duties upon Knowledge of an Event of Default**

108.    The PSAs impose additional obligations upon Defendants once one of their responsible officers knows a default has occurred. First, under Section 7.01 of the PSAs, Defendants must give written notice to the servicer of the occurrence of such an event within the specified period after Defendants obtain knowledge of the occurrence.

109. Second, within sixty to ninety days after a default has occurred, Defendants must provide written notice to all certificateholders about that event, unless the default has been cured or waived. As set forth in PSA Section 7.04(b) (emphasis added):

> Not later than the later of 60 days after the occurrence of any event, which constitutes or which, with notice or lapse of time or both, would constitute a Servicer Event of Default or a Master Servicer Event of Default or five days after a Responsible Officer of the Trust Administrator (in the case of a Servicer Event of Default) or the Trustee (in the case of a Master Servicer Event of Default) becomes aware of the occurrence of such an event, the Trust Administrator or **Trustee, as applicable, shall transmit by mail to the Credit Risk Manager, the NIMS Insurer and to all Holders of Certificates notice of each such occurrence**, unless such default, Servicer Event of Default or Master Servicer Event of Default shall have been cured or waived.

The other PSAs contain substantially similar provisions. *See* Exhibit E § VIII.

110. Third, and most importantly, Section 8.01 of the PSAs requires Defendants to exercise the rights and powers vested in them by the PSA using "the same degree of care and skill . . . as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The other PSAs contain substantially similar provisions. *See* Exhibit E § VI.

111. Defendants breached these contractual obligations by: 1) failing to provide notice of defaults and events of default; 2) failing act as a prudent person following defaults and events of default; and 3) failing to act with due care and without negligence prior to an Event of Default. *See* Exhibit E §§ VI, VIII.

**J.    The Trustee's Duties and Obligations under the TIA, the Streit Act, and the Common Law**

112.   Each of the PSAs is substantially similar and imposes substantially the same duties on Defendants as trustees. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs and the related trusts. 15 U.S.C. § 77ddd(a)(1).

113.   The TIA imposes two sets of duties and obligations on Defendants as trustees of

the trusts – one set "prior to default" and the other set "in case of default."

114.    Prior to default, a trustee must perform "such duties as are specifically set out in [the] indenture," *i.e.*, the instrument governing the trust. 15 U.S.C. § 77ooo(a)(1). Under that provision, Defendants had to perform the duties specifically assigned to them under the governing agreements, including those duties described above.

115.    Also, prior to default, a trustee must "examine the evidence furnished to it [by obligors of the indenture] to determine whether or not such evidence conforms to the requirements of the indenture." 15 U.S.C. § 77ooo(a) (citing 15 U.S.C. § 77nnn). Thus, Defendants were required to examine the evidence the master servicer or custodian provided to the trusts, certifying their compliance with the covenants they made under the governing agreements, and Defendants also had to determine whether that evidence conformed to the governing agreements' requirements.

116.    In addition, a trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Defendants consequently had to inform RMBS certificateholders of defaults and breaches of the governing agreements within ninety days after their occurrence.

117.    In case of a default (as defined in the PSA), a trustee must exercise "such of the rights and powers vested in it by such indenture, and [ ] use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).

118.    The Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care to ensure the orderly administration of the trust and to protect

the trust beneficiaries' rights. N.Y. Real Prop. Law § 124. Like the TIA, following an event of

default, the Streit Act provides that the trustee must exercise the same degree of skill and care in

performing its duties as a prudent person would under the same circumstances. N.Y. Real Prop.

Law § 126(1).

119.    The duty to act as a prudent person is also implicated under the common law

when the trustee substantially breaches its obligations under a contrat or an indenture.  Under

such circumstances, the trustee cannot rely on provisions of the contract or indenture providing

the trustee with the protections afforded to an indenture trustee.

120.    The common law also imposes fiduciary duties upon the trustee and requirements

to act with due care, with undivided loyalties and in good faith, and to refrain from negligent

conduct and negligent misrepresentations. Defendants' negligence, willful misconduct, and

failure to act resulted in breaches of the governing agreements.

121.    As set forth below, Defendants are liable to Plaintiffs under the TIA, the Streit

Act, and the common law for failing to exercise the necessary degree of skill and care in

enforcing their rights and powers under the governing agreements.

VII.    **DEFENDANTS SHOULD HAVE CAREFULLY INVESTIGATED THE FACT
        THAT TRUSTS SUFFERED FROM WIDESPREAD DEFAULTS IN THE FORM
        OF BREACHES OF REPRESENTATIONS AND WARRANTIES AND TAKEN
        APPROPRIATE ACTION**

122.    The trusts' loan pools contained large numbers of loans that materially breached

the responsible parties' representations and warranties concerning the originators' compliance

with underwriting guidelines, owner occupancy statistics, appraisal procedures, and other

associated standards. By 2009 at the latest, Defendants had a duty to carefully investigate the

evidence, public evidence or evidence otherwise available to trustees, demonstrating the

widespread breaches of representations and warranties in the trusts, including: 1) general reports

38

concerning originators' systematic abandonment of their underwriting standards and reports

concerning the sponsors' pervasive disregard of prudent securitization standards; 2) specific

reports concerning the originators of loans in the trusts abandoning their underwriting standards

and sponsors of the securitizations failing to follow prudent practices; 3) the high number of

borrower delinquencies and defaults on mortgages in the trusts' loan pools and enormous losses

to the trusts; 4) the collapse of the certificates' credit ratings from high, investment-grade ratings

when purchased to much lower ratings, including numerous "junk" ratings; and 5) the numerous

lawsuits brought against Defendants and their affiliates alleging the systematic abandonment of

originator underwriting guidelines.

### A. General Reports Concerning Originators' Systematic Abandonment of their Underwriting Standards and Sponsors' Disregard of Prudent Securitization Standards

123. By 2009, government reports, public and private investigations, and media reports

had surfaced concerning the collapse of the RMBS market and revealed the potential for massive

problems in the trusts such that a reasonable and prudent trustee would have taken upon itself the

duty to carefully investigate these issues and to take action as necessary. These reports and

investigations identified the originators' pervasive abandonment of underwriting standards and

sponsors' disregard of prudent securitization standards as the cause of the crisis.

124. For example, the Office of the Comptroller of the Currency (the "OCC"),

published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest

rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in

those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this report the OCC emphasized

the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the
> borrower and market conditions that a borrower is highly likely to be able to repay the

loan as promised—is a major determinant of subsequent loan performance. The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

125.     Despite the importance of sticking to underwriting standards, it was clear that

originators were not following them. Chairman of the Federal Reserve Board, Benjamin

Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs

Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of

Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the*

*President's Working Group on Financial Markets*, Apr. 10, 2008, *available at*

http://www.federalreserve.gov/newsevents/speech/bernanke20080410a.htm.

126.     In November 2010, the Congressional Oversight Panel, which was established as

part of the Emergency Economic Stabilization Act of 2008, issued a report entitled "Examining

the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation."

The report recounts widespread foreclosure abuses in connection with mortgages that have been

securitized and the numerous federal and state investigations that have detailed this problem. The

abuses identified in the report—including forged or back-dated mortgage assignments and "robo-

signing" of false affidavits used in foreclosure actions—arise from failures in the documentation

and transfer of mortgage loans from the originators to other entities in the securitization process, and ultimately into the trusts. As the report explains, irregularities in the chain of title between the originator and the trust can have significant legal consequences that damage the trusts and certificateholders. Cong. Oversight Panel, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation*, Pub. L. No. 110-343 (2010)*, available at* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

127.    Other reports reached similar conclusions. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") issued a report detailing the causes of the financial crisis. Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011).

128.    The Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and the subsequent collapse of the mortgage market and wider economy. *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

129.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately—as has been the case in past speculative booms and

busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crisis in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

130.    The FCIC Report also noted that during the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan, and noted "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. A default in the first few months of a mortgage, known as an early payment default, is known in the mortgage industry as a significant indicator of pervasive disregard for underwriting standards. Not surprisingly, the FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards." *Id*.

131.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

132.    Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low

that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

133.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

134.    The predominant RMBS securitization method involved an originate-to-distribute ("OTD") model where the originators of the loans do not hold the loans, but instead repackage and securitize them. The OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived. The Financial Stability Oversight Council ("FSOC") found:

> In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Report") at 11 (footnote omitted).

135.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans." *Id.* Similarly, the sponsors responsible for securitizing residential mortgages for trusts between 2004-2008 failed

43

to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans

were of the represented quality and also failed to ensure that the purported mortgaged property's

appraised value was accurate.

136.    As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate
> due diligence on the mortgages they purchased and at times knowingly waived
> compliance with underwriting standards. Potential investors were not fully informed or
> were misled about the poor quality of the mortgages contained in some mortgage-related
> securities. These problems appear to have been significant.

FCIC Report at 187.

137.    Additionally, the evidence shows that sponsors, and the third party due diligence

providers they hired, failed to analyze adequate sample sizes of the loan pools, sometimes

reviewing as little as 2%-3% of the entire loan pools. More importantly, when the sponsors and

their due diligence firms identified high percentages of mortgage loans in their sample reviews as

defective, the sponsors often "waived in" mortgage loans in the interest of preserving their

business relationships and their own profits.

138.    In sum, reports regarding the disregard of underwriting standards and poor

securitization practices became common by 2009. Even prior to 2009, Defendants had exclusive

access to proprietary information and data demonstrating the systematic failure of underwriting

standards that was not available to the public. If validated, those practices would have directly

contributed to the sharp decline in the quality of mortgages that became part of mortgage pools

underlying the RMBS, resulting in steep losses. By at least 2009, it was apparent to trustees that

the originators and sponsors involved in the securitization of the trusts had engaged in

problematic practices such that a reasonable and prudent trustee would have taken upon itself the

duty to carefully investigate these issues fully in connection with the trusts entrusted to their

care.

**B.    Specific Reports Concerning the Originators of Loans in the Trusts Abandoning their Underwriting Standards and the Sponsors Disregarding Prudent Securitization Practices**

139.    The governing agreements for each of the trusts incorporated representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.

140.    However, as discussed below, Defendants had reason to suspect that those representations and warranties were false and carefully investigate whether the mortgage files for the underlying mortgage loans in their trusts were defective. Numerous investigations, lawsuits, and media reports have demonstrated that nearly all of the largest mortgage loan originators in the RMBS market between 2000 and 2008 systematically disregarded their stated underwriting guidelines while pursuing profit by recklessly originating loans without regard for the borrowers' ability to repay. In addition, investigations, lawsuits, and media reports have shown that the primary sponsors in the RMBS market ignored prudent securitization standards.

141.    The information below provided ample reason for Defendants to suspect, as trustees for the trusts, that the loans underlying the trusts did not comply with the representations and warranties in the governing agreements. As a result, Defendants should have carefully investigated those issues in the context of the trusts entrusted to their care, provided notice to certificateholders, and taken appropriate action to protect the trusts.

**1.    American Home**

142.    American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated, aggregated, and serviced by its

subsidiaries. It was the parent of American Home Mortgage Acceptance, Inc. and American

Home Mortgage Holdings, Inc., which was the parent of American Home Mortgage Corp., a

retail lender of mortgage loans. Collectively, these entities are referred to as "American Home."

American Home originated or contributed a material portion of the loans in the mortgage pools

underlying the trusts.

143.     American Home's lack of adherence to underwriting guidelines was detailed in a

165-page amended class action complaint filed in June 2008. *See* Am. Complaint, *In re*

*American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. June 4, 2008) ("American

Home Am. Compl."). Investors in American Home common/preferred stock alleged that the

company misrepresented itself as a conservative lender, when, based on statements from over 33

confidential witnesses and internal company documents, American Home in reality was a high

risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit,

violating company underwriting guidelines, and providing incentives for employees to sell risky

loans, regardless of the borrowers' creditworthiness. *See generally* American Home Am. Compl.

144.     According to the American Home Am. Compl., former American Home

employees recounted that underwriters were consistently bullied by sales staff when underwriters

challenged questionable loans, while exceptions to American Home's underwriting guidelines

were routinely applied without compensating factors. *See id*. ¶¶ 120-21.

145.     Witnesses reported that American Home management told underwriters not to

decline a loan, regardless of whether the loan application included fraud. *See id*.

146.     Another former American Home employee stated that American Home routinely

made exceptions to its underwriting guidelines to close loans. When American Home mortgage

underwriters raised concerns to the sales department about the pervasive use of exceptions to

American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for exceptions. It was commonplace to overrule mortgage underwriters' objections to facilitate loan approval. *See id.* ¶ 123.

147.    A former American Home auditor confirmed that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.* ¶ 124.

148.    The parties settled the litigation on January 14, 2010, for $37.25 million.

149.    Like other originators from this period, American Home's poor lending practices resulted in numerous other civil lawsuits. Those lawsuits contain firsthand accounts from former employees and allegations that reunderwriting revealed that many loans originated by American Home were found to be breaching the associated representations and warranties. *See, e.g.*, Complaint, *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); First Consolidated and Am. Complaint, *New Jersey Carpenters Health Fund v. Structured Asset Mortgage Invs. II, et al.*, No. 08-cv-8093 (S.D.N.Y. May 15, 2009).

### 2.    Bank of America

150.    Bank of America itself was a major sponsor of mortgage-backed securities during the relevant time. Bank of America, including its acquired subsidiary Merrill Lynch Mortgage Lending, Inc. ("Merrill Lynch"), originated, contributed, and sponsored a material portion of the loans in the mortgage pools underlying the trusts.

151.    Bank of America-originated loans are the subject of multiple lawsuits around the country, including lawsuits filed by the SEC, the Department of Justice, and the Federal Housing Finance Agency ("FHFA"). In each of the lawsuits below, Bank of America and/or its affiliates acted as the originator of the underlying loans and/or the sponsor, depositor and/or underwriter

of the RMBS at issue. The overwhelming evidence revealed that Bank of America and its affiliates systematically failed to adhere to their obligations in any of their roles in the securitization process.

- **DOJ:** Complaint, *United States v. Bank of America Corp.*, No. 13-cv-446 (W.D.N.C. Aug. 6, 2013).

- **SEC:** Complaint, *SEC v. Bank of America Corp.*, No. 13-cv-447 (W.D.N.C. Aug. 6, 2013).

- **FHFA:** Am. Complaint, *FHFA v. Bank of America Corp.*, No. 11-cv-06195 (S.D.N.Y. June 28, 2012); Mot. Dismiss denied in *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012), motion to certify appeal granted (June 19, 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).

152.    The Department of Justice explained its allegations in the following August 6, 2013, press release titled "Department of Justice Sues Bank of America for Defrauding Investors in Connection with Sale of Over $850 Million of Residential Mortgage-Backed Securities":

> [T]he United States has filed a civil lawsuit against Bank of America Corporation and certain of its affiliates, including Merrill Lynch, Pierce, Fenner & Smith f/k/a/ Banc of America Securities, LLC, Bank of America, N.A., and Banc of America Mortgages Securities, Inc. (collectively "Bank of America"). The complaint alleges that Bank of America lied to investors about the relative riskiness of the mortgage loans backing the residential mortgage-backed securities (RMBS), made false statements after intentionally not performing proper due diligence and filled the securitization with a disproportionate amount of risky mortgages originated through third party mortgage brokers.
> ...
>
> "Bank of America's reckless and fraudulent origination and securitization practices in the lead-up to the financial crisis caused significant losses to investors," U.S. Attorney Tompkins said. "Now, Bank of America will have to face the consequences of its actions. We have made a commitment to the American people to hold financial institutions accountable for practices that violated the law and wreaked havoc on the financial system, and my office takes that commitment very seriously. Our investigation into Bank of America's mortgage and securitization practices continues."
> ...
>
> The civil complaint filed today in U.S. District Court in Charlotte alleges that Bank of America defrauded investors, including federally insured financial institutions, who purchased more than $850 million in RMBS from Bank of America Mortgage Securities 2008-A (BOAMS 2008-A) securitization. The government's civil complaint also seeks

civil penalties from Bank of America under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). According to the complaint, in or about January 2008, Bank of America sold BOAMS 2008-A RMBS certificates to investors by knowingly and willfully making materially false and misleading statements and by failing to disclose important facts about the mortgages collateralizing the RMBS, including Bank of America's failure to conduct loan level due diligence in the offering documents filed with the U.S. Securities and Exchange Commission (SEC). These misstatements and omissions concerned the quality and safety of the mortgages collateralizing the BOAMS 2008-A securitization, how it originated those mortgages and the likelihood that the "prime" loans would perform as expected.

First, according to the filed complaint, a material number of the mortgages in the BOAMS 2008-A collateral pool failed to materially adhere to Bank of America's underwriting standards. Specifically, more than 40% of the 1,191 mortgages in the BOAMS 2008-A collateral pool did not substantially comply with Bank of America's underwriting standards in place at the time they were originated and did not have sufficient documented compensating factors. As alleged in the complaint, Bank of America knew that specific loans in the BOAMS 2008-A collateral pool did not materially adhere or comply with Bank of America's underwriting standards.

Second, Bank of America did not conduct any loan-level due diligence at the time of securitization. According to the complaint, this was a violation of Bank of America's own policies, procedures and prior practice, and was contrary to industry standards and investor expectations. Moreover, this decision allowed Bank of America to keep bad loans in the deal. According to the complaint, these bad loans had a range of glaring origination problems, such as overstated income, fake employment, inflated appraisals, wrong loan-to-value ratios, undisclosed debt, occupancy misrepresentation, mortgage fraud and other red flags wholly inconsistent with a purportedly prime securitization. As a result of this lack of due diligence, Bank of America had no basis to make many of the representations it made in the offering documents regarding the credit quality of the underlying mortgages.

Finally, Bank of America concealed important risks associated with the mortgages backing the BOAMS 2008-A securitization. For example, Bank of America originated more than 70% of the loans through third party mortgage brokers. These loans, known as "wholesale mortgages," were riskier than similar mortgages originated directly     by Bank of America. More significantly, at the same time Bank of America was finalizing this deal, it was receiving a series of internal reports that showed an alarming and significant decrease in the quality and performance of its wholesale mortgages. According to the complaint, Bank of America did not disclose that important information or the associated risks to investors.

Investors in the BOAMS 2008-A certificates have already suffered millions of dollars in losses and it is estimated that total losses sustained by investors will exceed $100 million.

*Available at* http://www.justice.gov/opa/pr/2013/August/13-ag-886.html.

153.    The SEC's lawsuit against Bank of America had similar allegations:

"In its own words, Bank of America 'shifted the risk' of loss from its own books to unsuspecting investors, and then ignored its responsibility to make a full and accurate disclosure to all investors equally," said George S. Canellos, Co-Director of the SEC's Division of Enforcement.
…

The SEC alleges that Bank of America deceived investors about the underlying risks as well as the underwriting quality of the mortgages, misrepresenting that the mortgage loans backing BOAMS 2008-A were underwritten in conformity with the bank's own guidelines. These mortgage loans, however, were riddled with ineligible appraisals, unsupported statements of income, misrepresentations regarding owner occupancy, and evidence of mortgage fraud. The key ratios of debt-to-income and original-combined-loan-to-value were routinely miscalculated, and then the materially inaccurate ratios were provided to the investing public.

According to the SEC's complaint, a disproportionate concentration of high-risk wholesale loans and the inclusion of a material number of loans failing to comply with internal underwriting guidelines resulted in BOAMS 2008-A suffering an 8.05 percent cumulative net loss rate through June 2013 – the greatest loss rate of any comparable BOAMS securitization.

Press Release, *SEC Charges Bank of America with Fraud in RMBS Offering* (Aug. 6, 2013),

*available at*

http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370539751924#.UgzSb5LVAkQ.

154.    Other cases involving Bank of America and its affiliates acting as originator,

sponsor, depositor and/or underwriter in RMBS have included allegations concerning investors'

forensic analysis or re-underwriting of loan files that highlight the poor quality of mortgage loans

securitized and sold by Bank of America to the trusts. *See, e.g.*, Complaint, *Western Southern*

*Life Ins. v. Bank of America, N.A.*, No. 11-cv-00667 (Ohio Ct. Com. Pl. Aug. 18, 2011) (alleging

misrepresentations regarding LTV and owner occupancy); Complaint, *CIFG Assurance N. Am.*

*Inc. v. Bank of America, N.A.*, No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2011) (alleging that

Bank of America's faulty securitization practices led to inclusion of a high percentage of

defective loans); Complaint, *Prudential v. Bank of America et al.*, No. 13-cv-01586 (D.N.J. Mar.

14, 2013) ("Prudential's loan-level analysis has revealed systematic failures in Defendants' loan

underwriting and assignment practices"); Complaint, *Texas County Dist. Ret. Sys. v. J.P. Morgan*

*Secs. LLC et al.*, No. 1-GN-14-000998 (Tex. Civ. Dist. Ct. May 2, 2014) (forensic review

demonstrated that "Bank of America included recklessly underwritten loans in its RMBS that

failed to meet the applicable standards systematically disregarding its own and third-party due

diligence, and then misrepresented the quality of those loans to investors").

### 3.  Chase

155.    J.P. Morgan Chase Bank, N.A. and its various mortgage-lending affiliates

(collectively, "Chase") originated or contributed a material portion of the loans in the mortgage

pools underlying the trusts.

156.    During the relevant period, Chase employees circulated a memo instructing

mortgage associates how to tweak data they entered into the automated underwriting program

("ZiPPY") to get loans approved by the automated underwriting program. *See* Mark Friesen,

*Chase mortgage memo pushes 'Cheats & Tricks'*, Oregonian, Mar. 28, 2008, *available at*

http://www.oregonlive.com/business/index.ssf/2008/03/chase_mortgage_memo_pushes_che.htm

l.

157.    The Chase ZiPPY Memo listed a few steps that mortgage associates could use to

manipulate the data entered into the ZiPPY automated underwriting program in order to get the

program to recommend using the "Stated Income/Stated Asset" underwriting guidelines for

borrowers. *Id.*

158.    Strikingly, "Step 3" advised: "If you do not get Stated/Stated, try resubmitting

with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the

same for assets." The Chase ZiPPY Memo instructed mortgage associates to inflate borrower

income to "trick" ZiPPY into recommending the use of Stated Income/Stated Asset underwriting

guidelines. *Id.*

159.    In addition, the Chase ZiPPY Memo told mortgage associates not to report gift

funds, but to include gift funds in the borrower's bank account and to include all income as base

income. *Id.*

160.    James Theckston, a former regional vice president at Chase Home Finance LLC

("CHF") in southern Florida, was interviewed regarding the company's lending and

securitization practices for a November 30, 2011 New York Times article. Nicholas D. Kristof, *A*

*Banker Speaks, With Regret*, N.Y. Times, Nov. 30, 2011, *available at*

http://www.nytimes.com/2011/12/01/opinion/kristof-a-banker-speaks-with-regret.html?_r=0.

Theckston's team wrote $2 billion in mortgages in 2007 alone. According to Theckston, CHF

engaged in high-risk lending practices such as making no-documentation loans to borrowers with

insufficient resources. "On the application, you don't put down a job; you don't show income;

you don't show assets; but you still got a nod," he said. "If you had some old bag lady walking

down the street and she had a decent credit score, she got a loan . . . You've got somebody

making $20,000 buying a $500,000 home, thinking that she'd flip it. It was crazy, but the banks

put programs together to make those kinds of loans."

161.    These excesses were driven by the company's vertically integrated securitization

business model. "The bigwigs of the corporations knew [about declining lending standards], but

they figured we're going to make billions out of it, so who cares?" Theckston said. "The

government is going to bail us out. And the problem loans will be out of here, maybe even

overseas." Because risky loans were securitized and sold to investors, CHF created incentive

structures that rewarded risky lending. Theckston said that some CHF account executives earned commissions seven times higher from subprime loans rather than prime mortgages. As a result, those executives looked for unsophisticated borrowers with less education or limited English abilities and convinced them to take out non-prime loans. Theckston's own 2006 performance review indicated that 60% of his evaluation depended on him increasing the production of high-risk loans.

162.    Numerous other former CHF and Chase employees have offered evidence of Chase's risky lending practices and abandonment of underwriting guidelines. According to an amended complaint filed in the United States District Court for the District of Massachusetts, a senior underwriter at Chase from 2001 to 2008 claimed that managers often overturned the decisions of lower-level underwriters to reject stated-income loans. Am. Complaint, *Federal Home Loan Bank of Boston v. Ally Financial, Inc. et al.*, No. 11-cv-10952 (D. Mass. June 29, 2012) ("FHLB Am. Compl."). "If the manager felt the income made sense and the underwriter didn't, the manager could overturn it." FHLB Am. Compl. ¶ 567.

163.    Another witness interviewed for the FHLB Am. Compl., a loan processor and assistant to the branch manager at a Florida branch of CHF from April 2006 until August 2007, noted that many employees inflated borrowers' income on orders from the branch manager to get loans approved, saying, "It was very common to take stuff out of the loan file." *Id.* ¶ 560. Loan officers would often bring their loans to the branch manager for instructions on what the stated income should be to make a loan close. *Id.* ¶ 562. "The branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work." *Id.* Branch managers would also call the regional managers above them for instructions on problem loans. *Id.*

164.    Yet another witness interviewed for the FHLB Am. Compl., a senior loan underwriter at CHF from December 2004 to August 2005, said that CHF loan personnel also knowingly permitted borrowers to submit false income data, saying that, "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month." FHLB Am. Compl. ¶ 565. When borrowers stated unreasonable income levels, management would push the loans through regardless. *Id*. ¶ 566. The witness said that besides being told to accept unreasonable stated incomes, employees could not question appraisals that appeared to be inflated. *Id*. He recalled a subdivision in California in which CHF accepted appraisal values double the sales prices of identical homes sold just a few months ago. *Id*.

165.    According to an amended complaint filed in the United States District Court for the Southern District of New York, a former Wholesale Account Executive with CHF from 2002 to 2008 claimed that the underwriting process was subject to abuse by brokers who purposely originated loans for people they knew could not repay them. Am. Complaint, *New Jersey Carpenters Health Fund v. Novastar Mortgage, Inc., et al.*, No. 08-cv-05310 (S.D.N.Y. June 30, 2011). The complaint discussed the extremely loose and easy to override nature of the proprietary automated underwriting system, ZiPPY. The former Account Executive acknowledged that had ZiPPY's requirements not been so loose or had other measures been taken in the underwriting process, the loans it approved would otherwise not have been approved.

166.    According to a consolidated class action complaint filed in the United States District Court for the Eastern District of New York, a former CHF senior underwriter from March 2002 through January 2008 said that when processing loans that required verification of assets, "we really were not verifying them, what we would do is look to see if a borrower was

making, say $15,000 a month, if that's [what] they were listing." Consol. Complaint, *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corporation I, et al.*, No. 09-cv-3209, at ¶ 83 (E.D.N.Y. Mar. 8, 2010) ("Plumbers Consol. Compl."). The former senior underwriter believed that in 2006, 20% to 30% of the loans approved were approved only based on management overriding underwriters' initial rejection of the loans. *Id.* ¶ 82.

167.    A former senior processor, junior underwriter, and compliance controller who worked at CHF between December 2002 and October 2007, stated in the Plumbers Consol. Compl. that loan processors were not provided with all of the relevant borrower information: "there was some information that was being withheld from us." The witness further claimed that employees were actively encouraged not to investigate or verify suspicious information in loan applications. *Id.* ¶ 84.

168.    According to an amended complaint filed in the United States District Court for the District of New Jersey, several CHF confidential witnesses confirmed that employees would "coach" borrowers how to falsify the loan applications and that forgeries were used to "verify" the borrower's assets. *See* Complaint, *Prudential Ins. Co. of America et al. v. J.P. Morgan Securities LLC et al.*, No. 12-cv-03489 (D.N.J. Aug. 30, 2012). The complaint alleged that a senior underwriter from CHF saw the real names on bank statements crossed out, with the borrower's name typed in its stead.

169.    CHF's departure from industry standards was confirmed by Jamie Dimon, CEO of J.P. Morgan Chase. On January 13, 2010, Mr. Dimon testified under oath to the FCIC that "the underwriting standards in our mortgage business, for example, should have been higher, and we wish we had done an even better job in managing our leveraged lending and mortgage-

backed securities exposures." The company also "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios." Dimon further testified that the company would, in the wake of the financial crisis, enhance its mortgage underwriting standards, "returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income."

170.    On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, told the FCIC: "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying." This competition led to a reduction in diligence and oversight. Buell stated that from 2005 to 2007, J.P. Morgan's underwriting guidelines and origination standards were "deteriorating."

171.    According to documents provided to the FCIC, as of August 31, 2010, Fannie Mae had required Chase to repurchase 6,456 loans originated by its subsidiaries with an unpaid principal balance of $1.359 billion. Fannie Mae had also requested that Chase repurchase an additional 1,561 loans with an outstanding principal balance of $345 million. Likewise, between 2007 and August 31, 2007, Freddie Mac required Chase to repurchase 5,427 loans with an unpaid principal balance of $1.188 billion.

172.    In an amended complaint filed by the FHFA, the plaintiff's analysis of the securitized loans revealed that the loan-to-value ratios represented by Chase in prospectuses were false at the time of the representation. Am. Complaint, *FHFA v. JPMorgan Chase & Co., et al.*, No. 11-cv-6188 (S.D.N.Y. June 13, 2012) ("FHFA-JP Morgan Compl."). On the whole, the plaintiff's investigation revealed that for every securitization at issue, the prospectus

misrepresented the percentage of loans with loan-to-value ratios above 100 percent and the percentage of loans with loan-to-value ratios at or below 80 percent.

173.   The amended complaint further explained that Chase was informed by a third-party due diligence firm, Clayton Holdings, Inc. ("Clayton"), that a significant percent of the loans Clayton reviewed for their sponsor entities, including Chase, failed to meet guidelines and had no compensating factors that would allow them to remain in a loan pool. FHFA-JP Morgan Compl. ¶ 205. The amended complaint alleges that 27 percent of the loans Clayton reviewed for J.P. Morgan Acquisition did not comply with underwriting standards. *Id*. Yet Chase did not adjust its practices or stop working with problematic originators. And Chase waived in 51 percent of defective loans. *Id*.

174.   According to the September 23, 2010 testimony of Clayton's Vice President Vicki Beal, Chase, in its role as underwriter and sponsor, was made fully aware regularly that a significant percentage of its loans failed to meet stated underwriting guidelines, but were being included anyway in the pools underlying securities sold to investors. *Id*. ¶ 452.

175.   Finally, the amended complaint details how Chase attempted to sell much of its subprime assets while it continued to securitize and sponsor these deals for others to buy. Chase would ignore its underwriting standards if it stood to profit as a sponsor. *Id*. ¶¶ 455-469.

### 4.   Citigroup

176.   Citigroup, through its affiliates CitiMortgage, Inc. and Citigroup Global Markets Realty Corp. (collectively, "Citigroup"), sponsored one of the trusts and originated or contributed some loans to the trust.

177.   In November 2011, the Allstate Insurance Company ("Allstate") filed a complaint alleging fraud against CitiMortgage, Inc., Citigroup Global Markets Realty Corp., and other

affiliates in connection with the sale of approximately $200 million of RMBS certificates. Complaint, *Allstate Ins. Co. et al. v. CitiMortgage Inc. et al.*, No. 650432/2011 (N.Y. Sup. Ct. Feb. 18, 2011) (the "Allstate Citigroup Complaint"). Allstate performed a forensic review of sampling of loans from the loan pools, which showed that the loans contained numerous defects that indicated pervasive breaches of representations and warranties. Allstate found that Citigroup systematically and significantly overstated the number of owner-occupied properties, understated the loans' LTV and combined loan-to-value ("CLTV") ratios, and routinely included loans that failed to conform to the originator's stated underwriting standards. Allstate Citigroup Complaint ¶¶ 127-144. Moreover, Allstate's forensic analysis found that Citigroup's loan originators systematically abandoned underwriting standards. *Id.* ¶¶ 145-243.

178.    Other investigations have revealed similar problems. As part of its investigation into the causes of the financial crisis, the FCIC interviewed and took public testimony from Richard Bowen, a CPA with over thirty-five years of experience in banking, finance, and information technology. Mr. Bowen was a Chief Underwriter in Citigroup's Consumer Lending Group, which has housed the bank's consumer-lending activities, including prime and subprime mortgages and home equity loans, since 2005.

179.    Mr. Bowen ensured that the mortgages Citigroup was acquiring met the credit standards required by the bank's credit policies. He was also responsible for working closely with the bank's Chief Risk Officer and overseeing over 200 professional underwriters and $90 billion in annual residential mortgage productions. *Id.* at 19, 168.

180.    Citigroup purchased "prime" loans based on the originator's representations that the loans were underwritten under Citigroup's guidelines. *Id.* at 168. For "subprime" loans, Citigroup's policy was to re-underwrite those loans before purchase to ensure the pool

conformed to Citigroup's own policies. *Id*.

181.    Citigroup's Quality Assurance department, which operated under Mr. Bowen, was supposed to ensure that the prime loans purchased from other originators met Citigroup's own policies. *Id*. The Quality Assurance underwriters were to review a "small sample" of the loans to make sure that the loans conformed with Citigroup's policies. *Id*.

182.    Citigroup had a policy that 95% of the loans sampled were supposed to meet an "agree" standard, indicating the Citigroup re-underwriter "agreed" that the loan met Citigroup's own credit policies. Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 5.

183.    According to Mr. Bowen, however, Citigroup used fraudulent practices to meet this standard. Bowen Testimony at 5. The only reason that the 95% quality threshold was being nominally met was because Citigroup was including as "agree" loans those that were instead "agree contingent," which meant that documents and information were missing from the file, but the underwriter would agree if those documents existed somewhere and bore out certain additional conditions. *Id*. at 5-6.

184.    Mr. Bowen gave a hypothetical example of a mortgage file showing a 45% debt-to-income ratio. *Id*. at 5. On its face, that ratio would be within guidelines. *Id*. However, if the file did not contain the required documentation showing proof of the borrower's true income, it would be classified for reporting as "agree," even though it should have been "agree – contingent," because whether the loan met the represented standards was contingent on what was contained in the missing documents. *Id*.

185.    Mr. Bowen testified that he conducted an investigation upon learning of this

"agree – contingent" category of loans. In that investigation, he re-reviewed all the loans reviewed by the Quality Assurance department for their June 2006 report. *Id*. at 5-6. It took a "significant effort" to separate the categories. *Id*. at 6. He found 5% of the loans he investigated were facially defective, meaning there was no margin for any further errors to be found. *Id*. Yet, 55% of the loans, all of which had been reported to the committee as "agree," were "agree – contingent," meaning they were missing key documents. *Id*. According to Bowen's testimony, these "agree-contingent" loans should have been "defective files," making the actual defective rate 60%. *Id*.

186.    A follow-up study found even worse problems. Mr. Bowen determined that 33% of the loans re-tested should have been "disagree," and another 37% merely "agree-contingent" due to their missing documentation. *Id*. at 7. Combined, this meant that Mr. Bowen discovered a staggering 70% defect rate in the sample he re-reviewed in 2006. *Id*.

187.    Overall, Mr. Bowen testified that the defect rate for the "delegated flow" channel reached 60% in 2006, growing to 80% in 2007. *Id*. at 1-2. Mr. Bowen's underwriting staff informed him they believed that "over half" of the files being reported as "agree" were missing key documents and information. *Id*. at 6.

188.    Mr. Bowen testified that, for subprime mortgages the bank purchased, it would re-underwrite the loans it was purchasing, resulting in a "approve" or "turn down" decision. *Id*. at 9. In contrast to the "prime" channel, a much larger sample was supposed to be reviewed, with the goal of reviewing 100% of the files for smaller pools, and at least a statistically-significant sample of larger ones. *Id*.

189.    Mr. Bowen testified that during the run-up in the market leading up to the crash, he witnessed "many changes to the way the credit risk was being evaluated" for the subprime

pools. *Id*. at 2. The Chief Risk Officer, for example, reversed the judgment of the professional underwriters and changed their decisions from "turn down" to "approval." *Id*. at 2, 9. Such actions would "artificially increase[] the approval rate on the sample," which was then used as justification to approve the loan pool. *Id*. at 9. Mr. Bowen specifically recalled that 260 of the loans for a pool of 716 loans rejected by Citigroup's underwriters were flipped to "approve" by the Chief Risk Officer. *Id*.

190. Mr. Bowen testified that large pools of loans were being purchased based on "exceptions" despite their failure to meet the bank's minimum policies. *Id*. at 12. For example, one pool of loans was approved for purchase while he was on vacation despite having a 30% failure rate. *Id*. at 10. Citigroup's policy at the time was to require a sample to feature a 90% approval rate. *Id*.

191. Mr. Bowen also discovered that Citigroup was circumventing its underwriting standards by having the Risk Department instruct underwriters to find loans to be "approved" if they merely met the originator's guidelines, rather than Citigroup's. *Id*. Mr. Bowen asked his underwriters to keep a log of when loans met the originator's guidelines but failed Citigroup's. *Id*. He found that 20% of loans approved under this method would not have been approved if Citigroup's standards were applied instead. *Id*.

192. Mr. Bowen further found that Citigroup overrode its policy of disallowing originators from re-submitting rejected loans. *Id*. at 10-11. Instead, it allowed approval under either Citigroup or the originator's standards to be retroactive and reversed its policy of disallowing the resubmission of loans. *Id*. at 11. This invited the submission of loans that Citigroup already knew fell outside its policies. *Id*.

193. Mr. Bowen's testimony confirms that Citigroup did not follow underwriting

guidelines and was "not compliant" with numerous bank policies, including minimum sample

sizes, thresholds for testing by individual sponsors or product types, enforcing policies on new

sponsors, and requirements for documenting the approval for "exceptions" to these and other

policies. *Id.* at 15.

194.    As Mr. Bowen put it, "A decision was made that 'We're going to have to hold our

nose and start buying the stated product if we want to stay in business.'" FCIC Report at 111. All

the while, "[t]here was no disclosure being made to investors with regard to the quality of the

files [Citigroup was] purchasing." *Id*. at 169.

195.    Despite Mr. Bowen's warnings of a lack of internal control concerning

underwriting, investors continued to be told that loans in mortgage-backed securities issued by

Citigroup met Citigroup's underwriting standards. In a *60 Minutes* interview, Mr. Bowen was

shown a prospectus for a mortgage-backed security made up of loans Mr. Bowen had tested.

This prospectus contained representations that loans were originated under guidelines

substantially in accordance with CitiMortgage's guidelines. Mr. Bowen confirmed that based on

his personal knowledge these representations were not true and that people at Citigroup knew

those representations were not true. CBS News, 60 Minutes, *Prosecuting Wall Street*, *available

at* http://www.cbsnews.com/news/prosecuting-wall-street/.

196.    Mr. Bowen also testified that, despite soaring volume, Citigroup issued a "hiring

freeze" to help increase its bottom line. Bowen Testimony at 12. This required the bank to

outsource its underwriting due diligence to third parties, such as Clayton. Whether the due

diligence was performed in-house or by an outside firm, the data arising from the FCIC's

investigation confirms that the result was the same: large number of loans rejected by the

underwriters were given "waivers" by Citigroup to be included in the loan pools anyway. FCIC

Report at 167.

197.     According to the FCIC Report, "[b]ecause of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept." *Id*. at 166. For each loan pool it was hired to review, Clayton checked for: (1) adherence to originator credit underwriting guidelines and client risk tolerances; and (2) compliance with federal, state and local regulatory laws. *Id*.

198.     Clayton generated reports that summarized its findings, including summaries of the loan files that suffered from exceptions to the relevant underwriting standards. *Id*. Clayton gave loans three grades – Grade 3 loans "failed to meet guidelines and were not approved," where as Grade 1 loans "met guidelines." *Id*. Importantly, Grade 3 loans contained no "compensating factors." *Id*. Clayton allowed the sponsor to cure any problems before assigning a final grade. *Id*.

199.     According to the FCIC Report, only 54% of the nearly one-million loans reviewed by Clayton "met guidelines," a number that its former President admitted indicated "there [was] a quality control issue in the factory" for mortgage-backed securities. *Id*.

200.     Clayton was one of the third-party firms brought in because of Citigroup's hiring freeze, and it performed work on behalf of Citigroup. Bowen Testimony at 11-12. This is confirmed by Bowen's testimony and by an internal Clayton "Trending Report" made public by the government in September 2010. Bowen Testimony at 11-12; FCIC Report at 167.

201.     In that report, Clayton analyzed loans it had reviewed on behalf of Citigroup from the first quarter of 2006 through the second quarter of 2007, which is when most of the offerings in this complaint were issued. FCIC Report at 167. It found that 42% "failed to meet guidelines."

*Id*. Although loans that received such a grade were not subject to any purported "compensating factors," Clayton found that Citigroup had waived in 31%. *Id*.

202.    Clayton and other third-party due-diligence firms identified these high percentages of problem loans even though underwriters were pressing the diligence firms to provide reports in a short time frame, with only limited re-verification of data, and to approve loans. The percent of truly problematic loans was likely much higher than Clayton's reports indicate.

203.    In short, due-diligence firms identified high numbers of problematic loans, but those loans were "waived" into the loan pools at issue here at a materially high rate. As the FCIC Report concluded as a general matter:

> [M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 Event loans were waived in.
> . . .
> [O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, at the same rate, as the sampled loans. Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

FCIC Report at 167, 170.

### 5.    Countrywide

204.    Countrywide Financial, Countrywide Home Loans, Inc. and Countrywide Home Loans Servicing LP ("Countrywide") was one of the largest originators of residential mortgages in the United States during the period leading up to the financial crisis. Countrywide originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

205.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

But it turned out to be no laughing matter for Partow. Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."
…

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.
But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *If You Had a Pulse, We Gave You a Loan,* NBC Dateline (Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

206.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Complaint, *SEC v. Mozilo*, No. 09-cv-3994 (C.D. Cal. June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

207.    Internal Countrywide e-mails released in connection with the SEC lawsuit and publicly available show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

208.    Indeed, in a September 1, 2004 email, Mozilo voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."

209.    In 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20

subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract. In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate." Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic] It's not only subordinated to the first, but the first is subprime. In addition, the [FICOs] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

210.    Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

211.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.

212.    Mozilo admitted in a September 26, 2006 email that Countrywide did not know how Pay Option ARM loans would perform and had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet." Yet such loans were securitized and passed on to unsuspecting investors such as the CCUs.

213.    With growing concern over the performance of Pay Option ARM loans, Mozilo advised in a November 3, 2007 email that he "d[id]n't want any more Pay Options originated for

the Bank." In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans. Mozilo's concerns about Pay Option ARM loans expressed in the same email were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."

214.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product. This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

215.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors. In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed. He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines." Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a

market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry.

216.    Aguilera confirmed in a June 12, 2006 email that internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

217.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. In a February 21, 2007 email, Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."

218.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 7, 2007 e-mail that "the exception process has never worked properly."

219.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting. In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors. After reviewing many of the loans that went bad, Countrywide executive Russ Smith stated in an April 11, 2007 email that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."

220.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

221.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

222. According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there." NBC Nightly News, *Countrywide Whistleblower Reports "Liar Loans,"* July 1, 2008. Zachary also stated that the practices were not the work of a few bad apples, but rather: "It comes down, I think from the very top that you get a loan done at any cost." *Id.*

223. Zachary also told of a pattern of: 1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income to qualify for loans. *Id.*

224. NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices. Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans. NBC News quoted a former loan officer: "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'" *Id.*

225. Countrywide's complete disregard for proper loan underwriting has spawned numerous lawsuits. As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files. Public disclosure of the staggering number of loans breaching the associated representations and warranties discovered in these cases should have alerted the trustee that Countrywide loans were highly likely to have breached the associated representations and warranties.

70

### 6.   Decision One

226.   Decision One Mortgage Co., LLC ("Decision One") was a major lender specializing in mortgage loans that are commonly referred to as Alt-A lending options, and non-conforming or sub-prime loans. In 2006, Decision One ranked as the 14th largest subprime lender in the nation. Decision One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

227.   A 2011 complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Decision One employees "described Decision One's lax attitude towards its own origination and underwriting standards and explained that Decision One had been approving loans that should have never been issued." Complaint, *Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011, ¶ 95 (N.Y. Sup. Ct. July 5, 2011). On March 15, 2013, the Court granted Morgan Stanley's Motion to Dismiss with respect to a negligent misrepresentation claim, but denied the Motion in all other respects.

228.   According to testimony and documents submitted to the FCIC by a Clayton executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by originators, including Decision One, for securitization. Clayton determined over 10% of Decision One's loans did not comply with its underwriting guidelines and had no compensating factors. *See* Clayton All Trending Report at 10, available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

229.   Decision One's reckless lending practices earned it a spot on the OCC's 2009 "Worst Ten in the Worst Ten" list.

### 7.   DLJ / Credit Suisse

230.   DLJ Mortgage Capital, Inc. ("DLJ"), is a Delaware corporation and subsidiary of

Credit Suisse Securities, an affiliate of Credit Suisse Financial Corp. (collectively, "Credit Suisse") with its headquarters at Credit Suisse's office in New York. Credit Suisse and DLJ originated or acquired a number of loans for the trusts at issue. DLJ also sponsored a substantial number of trusts.

231.    Lawsuits brought against Credit Suisse have revealed that Credit Suisse understood that loan originators were purposely and wrongfully overstating borrower income. On June 28, 2006, Credit Suisse internally circulated to Robert Sacco (Credit Suisse's Head of Underwriting) a take on the final courtroom scene in *A Few Good Men* between a loan officer (the Jack Nicholson role) and an underwriter (the Tom Cruise role) in which the loan officer says that loans "must be brought in by people . . . who thrive on cold-calling, rejection, and false promises," and that his "very existence, while grotesque and incomprehensible to you, drive REVENUE!" When the underwriter asks "Did you overstate the income?" then loan officer yells back "You're damn right I did!!!!!" *See* Complaint, *CMFG Ins. Co. et al. v. Credit Suisse (USA), LLC*, No. 14-cv-249, Exh. 1 (W.D. Wis. April 3, 2014) (6/28/2006 email from K. Jones to R. Sacco).

232.    About two months later, when presented with an article stating that Massachusetts shut down two mortgage brokers after regulators documented several cases of brokers inflating the incomes of borrowers on mortgage applications to help buyers qualify for loans, Mr. Sacco internally remarked, "Isn't that what stated income loans are supposed to do – inflate the income to qualify borrowers for loans?" *Id.* Exh. 2 (8/30/2006 email from R. Sacco to B. Kaiserman).

233.    Others in managerial positions with Credit Suisse were willing to take actions regarding RMBS that even Mr. Sacco had trouble stomaching. According to Michael Daniel (Managing Director of Credit Suisse), Mr. Sacco "claims he regularly has to respond to pressure

from [Mike] Fallacara [head of Credit Suisse's residential mortgage conduit and Mr. Sacco's boss] and salespeople to approve loans that he thinks are unworthy (and he showed me plenty of emails to prove it–undeniably)." *Id.* Exh. 3 (11/22/2006 email from M. Daniel to M. Marriott). According to Mr. Daniel, Mr. Fallacara pressured Mr. Sacco to approve loans with "unreasonable income and a huge DTI," and "iffy" appraisals. *Id.*

234.    Mr. Daniel wrote, "I really don't believe that Fallacara or anyone else in the conduit can make credit decisions objectively. Mike wants volume, and is all to [sic] willing to look the other way when volume is at stake." *Id.*

235.    Several months later, Mr. Daniel told Mr. Vibert and Peter Sack of Credit Suisse that Mr. Fallacara "has subverted sound underwriting." *Id.* Exh. 4 (1/9/2007 email from M. Daniel to J. Vibert & P. Sack).

236.    Mr. Vibert wrote shortly thereafter that Mr. Fallacara "is an impediment to best practices." *Id.* Exh. 5 (1/18/2007 email from J. Vibert to M. Daniel).

237.    Mr. Fallacara's willingness to funnel through inappropriate loans to RMBS investors was well known to Credit Suisse even before 2007. On June 6, 2006, Mr. Vibert wrote, "Instead of trying to sell bonds, I spend my time playing defense from a guy supposedly on my team who won't stop waiving credit guidelines until we've taken on so much water the firm will pull the plug. Trust me, when this Titanic goes down, fallacara will be the guy on the bow proclaiming 'I'm the king of the world!!!!!'" *Id.* Exh. 6 (6/6/2006 email from J. Vibert to M. Marriott).

238.    Problems with Credit Suisse's residential mortgage conduit were long-standing. In September 2004, Credit Suisse's Internal Audit Department gave its residential mortgage conduit and wholesale business the second-to-worst possible rating. *Id.* Exh. 7 (9/20/2004

73

Executive Summary of Residential Mortgage Conduit and Wholesale (Americas)).

239.   The Credit Suisse Internal Audit Department found that "controls need improvement in certain areas, including . . . approval of underwriting exceptions," and that "underwriting exceptions identified during the due diligence process are not always reviewed and approved by the Front Office as required by policy." *Id*. Exh. 7 p. 1. It also concluded that "[t]here is no formal process for documenting certain decisions made during the underwriting process nor were these exceptions raised to New York for approval. Specific instances noted include: loan appraisals not being compared to external sources for reasonableness as required; and approval of loans that did not have all of the required documentation (second appraisal/AVM), as prescribed in the Underwriting Guidelines." *Id*. Exh. 7 p. 2.

240.   To remedy the deficiencies identified in its September 20, 2004 internal audit, the Credit Suisse Internal Audit Department recommended that Credit Suisse "implement procedures to ensure decisions made during the due diligence process are documented and that required exceptions are approved in writing." *Id*.

241.   Mr. Fallacara commented that this recommendation was "Agreed and completed. Supervisory procedures have been enhanced to ensure all decisions made during the underwriting process are documented and that all material exceptions are sent to New York for review and approval." *Id*.

242.   A few months later, Credit Suisse's Internal Audit Department gave its RMBS business the worst possible rating. *Id.* Exh. 8 (12/23/2004 Executive Summary of Credit Suisse First Boston Residential Mortgage Backed Securities Trading and Sales (Americas)).

243.   The Internal Audit Department found that "there was also an issue from our prior report related to the lack of documentation for loan acquisition and due diligence procedures for

sub performing loans that was improperly reported as 'fully implemented' by management who has subsequently left the Firm." *Id*. Exh. 8 p. 2.

244.    Additionally, on June 28, 2013, U.S. Bank, acting as trustee, filed an amended complaint against DLJ seeking repurchase of defective loans in a pool of over 5,000 mortgages. *See* Am. Complaint, *Home Equity Asset Trust 2007-1 v. DLJ Mortgage Capital Inc.*, No. 650369/2013 (N.Y. Sup. Ct. June 28, 2013).

245.    After suffering severe losses, U.S. Bank conducted a forensic review of more than 1,500 loans. It found that nearly 80% of the loans breached DLJ's representations and warranties. *Id*. ¶ 5. A loan-level review of approximately 1,000 more loans confirmed that "the principal originators of the Mortgage Loans failed to adhere to industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases." *Id*.

246.    On December 18, 2013, the Attorney General of New Jersey announced that the State had filed a lawsuit against Credit Suisse, DLJ, and Credit Suisse First Boston Mortgage Securities. The complaint includes allegations that the defendants offered over $10 billion in RMBS for sale to investors, but failed to disclose that "there had been a wholesale abandonment of underwriting guidelines" and numerous originators had high delinquency and default rates. Press Release, *Acting Attorney General Announces Lawsuit Against Credit Suisse Arising From Sale of Over $10 Billion in Troubled Mortgage Backed Securities* (Dec. 18, 2013), *available at* http://nj.gov/oag/newsreleases13/pr20131218a.html.

247.    Credit Suisse and DLJ have also been the target of other significant RMBS investigations and lawsuits. A review of loan files by MBIA, which wrote insurance on DLJ Mortgage certificates, demonstrates that DLJ Mortgage routinely misrepresented the quality of loans included in the securitizations. Complaint, *MBIA Ins. Corp. v. Credit Suisse Securities*

*(USA) LLC, et al.*, No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009). In carrying out its review of the approximately 1,386 DLJ defaulted loan files, MBIA found that 87% of the defaulted or delinquent loans in those securitizations contained breaches of DLJ Mortgage's representations and warranties. *Id.* ¶ 68. These findings demonstrated "a complete abandonment of applicable guidelines and prudent practices such that the loans were (i) made to numerous borrowers who were not eligible for the reduced documentation loan programs through which their loans were made, and (ii) originated in a manner that systematically ignored the borrowers' inability to repay the loans." *Id.* ¶ 11. Moreover, "[t]he rampant and obvious nature of the breaches confirms that Credit Suisse made intentional misrepresentations concerning its mortgage loans and the due diligence that Credit Suisse purported to perform regarding the quality of those loans." *Id.*

248.    Investors have reached similar conclusions regarding the defective loans underlying Credit Suisse securitizations in their review of loans from Credit Suisee-label trusts. For example, FHFA conducted a forensic review of numerous loans in Credit Suisse securitizations. Complaint, *FHFA v. Credit Suisse Holdings (USA), Inc.*, No. 11-cv-06200 (S.D.N.Y. Sept. 2, 2011). The forensic review "revealed that for a majority of the loans reviewed in those Securitizations, there were numerous breaches of the originators' underwriting guidelines, such as failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan." *Id.* ¶ 6.

249.    In November 2011, Allstate Insurance Company ("Allstate") filed an amended complaint alleging fraud against Credit Suisse, DLJ Mortgage and other affiliates in connection with the sale of approximately $232 million in "highly-rated certificates." Am. Complaint, *Allstate Insurance Co. et al. v. Credit Suisse Secs. (USA) LLC et al.*, No. 650547/2011 (N.Y.

Sup. Ct. Nov. 16, 2011). Allstate performed a forensic review of sampling of loans from the loan pools, which showed that the loans were riddled with defects constituting pervasive breaches of representations and warranties. For example, Allstate found that Credit Suisse systematically and significantly overstated the number of owner-occupied properties and understated the loans' LTV and CLTV ratios, and "routinely included" loans that "failed to conform to the originator's stated underwriting standards." *Id*. ¶¶ 126-61. Moreover, Allstate's forensic analysis found that Credit Suisse loan originators "systematically abandoned underwriting standards." *Id*. ¶¶ 162-199.

250.    In another case, Prudential's loan-level "analysis revealed systematic failures in Defendants' loan underwriting and assignment practices." Complaint, *Prudential Ins. Co. of America v. Credit Suisse Secs. (USA) LLC et al.*, No. 12-cv-07242, at ¶ 1 (D.N.J. Nov. 21, 2012). Specifically, Prudential found that across the twenty-three Credit Suisse securitizations that it tested, a staggering 48.67% of the mortgage loans contained at least one material defect. *Id.* ¶ 18.

251.    In other cases, monoline insurers and investors have reached similar findings regarding Credit Suisse's widespread breach of representations and warranties concerning the loans securitized in Credit Suisse-label trusts. *See, e.g.*, Complaint, *Assured Guaranty Municipal Corp. v. DLJ Mortgage Capital Inc.*, No. 652837/2011 (N.Y. Sup. Ct. Oct. 17, 2011) (forensic review confirmed that DLJ breached representations about the loans and that a huge number of defective mortgages were packaged into securities); Complaint, *FGIC v. Credit Suisse Secs. (USA) LLC*, No. 651178/2013, at ¶ 9 (N.Y. Sup. Ct. Apr. 2, 2013) (forensic review confirmed that "Credit Suisse's pre-closing representations were fraudulent, the warranties it made in the Insurance Agreement were false, and it willfully disregarded and frustrated its contractual covenants"); Complaint, *Mass. Mut. Life Ins. Co. v. DLJ Mortgage Capital, Inc.*, No. 11-cv-

30047, at ¶ 6 (D. Mass. Feb. 25, 2011) (analysis confirmed "Credit Suisse Defendants abandoned or disregarded disclosed underwriting guidelines, often originating or acquiring loans issued to borrowers regardless of the borrowers' ability to repay").

### 8.  Fremont

252.    Fremont Investment and Loan ("Fremont") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

253.    Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a lender "'known for poor quality loans.'" Opening Statement of Sen. Carl Levin, Chairman, *Wall Street and the Financial Crisis: The Role of High Risk Home Loans*, Hearing Before S. Permanent Subcomm. on Investigations (Apr. 23, 2010). Senator Levin recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, a subprime lender known for loans with high rates of delinquency. On January 24, 2007, an analyst wrote seeking advice from two senior analysts: "I have a Goldman deal with subprime Fremont collateral. Since Fremont collateral has been performing not so good, is there anything special I should be aware of?" One analyst responded: "No, we don't treat their collateral any differently." The other asked: "are the FICO scores current?" "Yup," came the reply. Then "You are good to go." In other words, the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry. In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id*.

254.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc., which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.
>
> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*,

Myrtle Beach Sun-News, Aug. 15, 2010, at A, *available at*

http://www.myrtlebeachonline.com/2010/08/15/1637463/investors-paying-for-risky-loans.html.

On September 28, 2012, the court denied in principal part Defendants' Joint Motion to Dismiss

For Failure to State a Claim. *See Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.,*

*Inc., et al.*, No. 10-2741 (Mass. Super. Ct.).

255.    On December 21, 2011, the FHFA filed an amended complaint against UBS

Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie

Mac and Fannie Mae. In the complaint, the FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans. He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this." The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved. The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams. He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See* Second Am. Complaint, *FHFA v. UBS Americas, Inc.*, No. 11-cv-05201 (S.D.N.Y.) (Dec.

21, 2011). The court denied a motion to dismiss the complaint in May 2012. *See FHFA v. UBS*

*Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). On July 25, 2013, the FHFA announced

that it had reached an agreement to settle the case for $885 million.

256.    Fremont's origination practices have also been addressed in numerous governmental investigations and reports. For example, the FCIC Report discusses that Moody's created an independent surveillance team in 2004 in order to monitor previously rated deals. The Moody's surveillance team saw a rise in early payment defaults in mortgages originated by Fremont in 2006, and downgraded several securities with underlying Fremont loans or put them on watch for future downgrades. Moody's chief credit officer stated that Moody's had never had to put on watch deals rated in the same calendar year. In 2007, Moody's downgraded 399 subprime mortgage-backed securities that had been issued in 2006 and put an additional 32 securities on watch. Moody's noted that about 60% of the securities affected contained mortgages from one of four originators, one of which was Fremont. FCIC Report at 221-222.

257.    According to the FCIC Report, when sponsors kicked loans out of securitization pools, some originators simply put those loans into new pools. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, told the FCIC that Fremont had a policy of putting loans into subsequent pools until they were kicked out three times. FCIC Report at 168.

258.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee. *See* 2008 "Worst Ten in the Worst Ten" Report. In the 2009 "Worst Ten of the Worst Ten" Report, Fremont held the following positions: 2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th

in Bakersfield, California and Merced, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 9.   GreenPoint

259.   GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One"). Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006. Capital One shut down GreenPoint's operations less than one year later on August 21, 2007. Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business. GreenPoint originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

260.   When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%. A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.
> . . .
> "To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance. "Once the door was opened, it was abused."
> . . .
> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*,

Bloomberg, Sept. 12, 2008, *available at*

http://www.bloomberg.com/apps/news?pid=newsarchive&sid=arb3xM3SHBVk.

261.    Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as

successor to Bear Stearns & Co., Inc., in 2011 in connection with an RMBS underwritten by

Bear Stearns and exclusively containing GreenPoint-originated loans. After sustaining large

losses due to the poor performance of GreenPoint loans, Syncora hired an independent consultant

to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected without regard

to payment status. Over 92% of the 1,431 loans contained misrepresentations, and over 85% of

the randomly selected 400 loans contained misrepresentations. The misrepresentations uncovered

included the following:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum; (iv) with debt-to-income and loan-to-value ratios above the allowed maximums, or (v) with relationships to the applicable originator or other non-arm's-length relationships.

*See* Complaint, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, No. 651566/2011 (N.Y. Sup. Ct.

June 6, 2011). Syncora's lawsuit survived a combined motion to dismiss and motion for

summary judgment. *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

262.    GreenPoint's own employees have corroborated the findings of Syncora. A confidential witness in *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.*, stated that (1) GreenPoint employees faced intense pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that contained exceptions for which there were no reasonable compensating factors; and (4) GreenPoint failed to adhere to sound underwriting guidelines. This confidential witness was a senior loan underwriter at GreenPoint from October 1997 through August 2007. *See* Complaint, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortgage Secs., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct. Oct. 15, 2010) ("FHLB Indianapolis").

263.    According to that confidential witness, sales staff and managers at GreenPoint received bonuses based on the number of loans closed. As she said, "sales had tremendous authority" at GreenPoint, and "[t]hey were in business to make more money. They would try to find any way to close a loan." *Id*. ¶ 266.

264.    Between 2005 and 2007, the confidential witness said that stated income loans became increasingly popular and GreenPoint managers approved loans based upon inflated incomes she believed should not have been approved. She saw a lot of loans with stated "income that was more than could be justified by the borrower's employment." When she denied loans because she believed the income was inflated, sometimes the underwriting managers, operations managers, and the regional operations manager overrode her decisions. *Id*. ¶ 267.

265.    More often than not, the confidential witness believed that her managers overrode

her denials due to the incentives they received based upon loan volume. As she said, "They were making the decision because they had to hit certain sales numbers." She knew of such targets because of comments made in operations meetings about the company needing to meet certain goals. *Id*. ¶ 268.

266.    In *Allstate Bank v. J.P. Morgan Chase, N.A.*, Allstate, an RMBS investor, sued J.P. Morgan, the RMBS underwriter, for misrepresentations in RMBS offering documents. Allstate's complaint relied on several confidential witnesses. One confidential witness, who was an underwriting analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans it originated for fraud. He thought this was a "mistake" because the fraud and misrepresentations uncovered in the 10% sample indicated that many more loans likely contained fraud. But the remaining 90% of the loans were not reviewed. Am. Complaint, *Allstate Bank v. J.P. Morgan Chase, N.A.*, No. 11-cv-1869, at ¶ 485 (S.D.N.Y. May 10, 2012).

267.    That confidential witness also stated that sales personnel ran GreenPoint, and senior management was comprised of people from sales who were incentivized to push the volume of mortgage loans, not adherence to the underwriting guidelines or due diligence. Managers' bonuses were tied to production volume, and they were not penalized if loans were later found to be fraudulent or if the borrower defaulted on the first payment. He stated that GreenPoint's management deliberately overlooked misrepresentations from mortgage loan brokers, particularly if the broker brought in a high volume of loans. Problem brokers were rarely suspended, and even when they were, there was never a review of the loans they originated that were already in the pipeline. *Id*. ¶ 486.

268.    Another confidential witness was a Wholesale Account Manager at GreenPoint from 2004 to 2006. That confidential witness stated that GreenPoint employees understood that

if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund the mortgage loan. The majority of the loan products originated in the confidential witness's office were stated income and asset loans and pay-option ARMs. Despite the risk inherent in these products, the sales force "never learned of negative loan performance" and their compensation was not tied to loan performance. *Id*. ¶ 487.

269.     Another confidential witness was an Underwriting Supervisor at GreenPoint from 2005 to 2006 who supervised five Underwriters and three Conditions Specialists. That confidential witness stated that GreenPoint management authorized exceptions to loan underwriting guidelines to approve applications, even when there were no compensating factors justifying the exceptions. The confidential witness knew that management overrode decisions to refuse funding in locations known for fraud and property flipping, even when evidence of fraud was found. According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint. *Id*. ¶ 488.

270.     Allstate's complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers approved to transact with GreenPoint – a large enough number that GreenPoint could exercise no realistic degree of control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved. *Id*. ¶ 490.

271.     GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; and 4th worst in Stockton, Merced,

and Vallejo-Fairfield-Napa, California.

### 10.    IndyMac

272.    By 2007, IndyMac Bank, F.S.B. ("IndyMac") was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States. IndyMac originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

273.    On July 11, 2008, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

274.    IndyMac has been the subject of numerous investigations and lawsuits alleging that IndyMac systematically abandoned its underwriting guidelines in pursuing profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by IndyMac breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits, investigations, and reports, in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide Defendants with notice that large numbers of loans originated by IndyMac, including loans in the trusts, breached the associated representations and warranties.

275.    For example, in June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-

analysis/indymac_what_went_wrong.pdf. The CRL Report detailed the results of CRL's

investigation into IndyMac's lending practices. CRL based its report on interviews with former

IndyMac employees and reviewed numerous lawsuits filed against IndyMac. The CRL Report

summarized the results of its investigation:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

276.    CRL reported that its investigation "uncovered substantial evidence that

[IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely

making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

277.    The CRL Report stated that "IndyMac pushed through loans with fudged or

falsified information or simply lowered standards so dramatically that shaky loans were easy to

approve." *Id*.

278.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more

volume," "the quality of [IndyMac's] loans became a running joke among its employees."

*Id*. at 3.

279.    Former IndyMac mortgage underwriters explained that "loans that required no

documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed

outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information]

. . . and make them look like better credit risks." *Id*. at 8. These "shoddily documented loans

were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a

Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

280.    The CRL also found the following evidence: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL. "And then they pressure you to approve it."

The refrain from managers, Miller recalls, was simple: "Find a way to make this work." *Id*. at 9 (footnote omitted).

281.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated: "I would reject a loan and the insanity would begin . . . . It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3. Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

282.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time. *See id*. at 9. According to Montilla:

> "I would tell them: 'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says. "There were some loans that were just blatantly overstated. . . . Some of these loans are very questionable. They're not going to perform."

*Id*. at 10.

283.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers

did not know their stated incomes were being inflated as part of the application process. *See id*. at 14.

284.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness: Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac. The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

285.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at 2. The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories. Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id*.

286.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id*. at 11, 21. The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id*. at 11.

287.    IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id*. at 2-3.

288.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id*. at 31.

289.    Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id*. at 3. This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id*.

290.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division, alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral. *See FDIC v. Van Dellen*, No. 10-cv-04915 (C.D. Cal. July 2, 2010). The case was tried in late 2012, and the jury entered a verdict in favor of the FDIC.

291.    IndyMac currently faces or has faced additional litigation alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS. *See, e.g.*, *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y. May 14, 2009); *Federal Home Loan Bank of Boston v. Ally Financial, Inc., et al.*, No. 11-cv-10952 (D. Mass. May 26, 2011); *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. July 27, 2012).

292.    IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.

11. **Morgan Stanley Mortgage Capital**

293.     Morgan Stanley Mortgage Capital, Inc. ("MSMC"), now known as Morgan

Stanley Mortgage Capital Holdings, LLC ("MSCH"), did not originate residential mortgages

itself. Rather it purchased closed, first-lien and subordinate-lien residential mortgage loans for

securitization or for its own investment from other lenders. MSMC acquired residential mortgage

loans through bulk purchases and through purchases of single loans through its conduit loan

purchase program.

294.     MSMC and MSCH sponsored a significant number of the trusts.

295.     MSMC has been the subject of numerous investigations and lawsuits alleging that

MSMC systematically abandoned originator underwriting guidelines in pursuing profits. Not

only do these investigations and lawsuits contain accounts from confidential witnesses and

former employees, but many complaints contain detailed information based on forensic reviews

of individual loans. These lawsuits in conjunction with the poor performance of the underlying

loans and the public information concerning wide-spread issues among all originators was more

than sufficient to provide Defendants with notice that large numbers of loans contributed by

MSMC, including loans in the trusts, breached the associated representations and warranties.

296.     On June 24, 2010, the Attorney General of the State of Massachusetts entered into

an Assurance of Discontinuance with "Morgan Stanley & Co. Incorporated together with its

affiliates involved in the mortgage financing and securitization business" concerning its practices

of buying and securitizing loans, primarily from New Century Financial Corp. and its

subsidiaries. Press Release, *Morgan Stanley to Pay $102 Million for Role in Massachusets*

*Subprime Mortgage Meltdown Under Settlement with AG Coakley's Office*, Attorney General of

Massachusetts, (June 24, 2010) *available at* http://www.mass.gov/ago/news-and-updates/press-

releases/2010/attorney-general-martha-coakley-reaches-102.html. The Attorney General found:

- As part of its process for "purchasing and securitizing subprime loans, [Morgan Stanley] engaged in a number of reviews of the quality of the originators' lending practices and loans. These included, inter alia, determining whether the subprime loans were originated in accordance with the originators' underwriting guidelines and assessing compliance with applicable laws ('credit and compliance diligence'), and examining property values ('valuation diligence'). These reviews increasingly demonstrated shortcomings in some of New Century's lending practices and problems with a large number of individual subprime loans."

- Based on an internal analysis run by Morgan Stanley, New Century qualified borrowers based on a teaser interest rate, but when the fully indexed rate was taken into consideration, 45% of the borrowers in Massachusetts would not have qualified for the loan.

- Morgan Stanley hired the underwriting firm Clayton to analyze a sample of loans to be purchased to determine whether they were originated in accordance with underwriting guidelines. Although Clayton's analysis showed that New Century increasingly stretched "underwriting guidelines to encompass or approve loans not written in accordance with the guidelines," Morgan Stanley continued to buy such loans under pressure from New Century to avoid losing New Century's business to another loan buyer.

- During the period from 2006-2007, only 9% of those loans that were granted pursuant to exceptions had adequate compensating factors to offset the exception. Further, Morgan Stanley waived exceptions on a large number of loans Clayton found to be generated in violation of guidelines without adequate compensating factors.

- Although Morgan Stanley had a stated policy not to purchase or securitize loans with a combined LTV ratio of greater than 100%, the reality was about a third of the loans securitized by Morgan Stanley in 2006-2007 had a CLTV greater than 100%.

- Morgan Stanley determined that New Century did not adequately evaluate the borrower's income on "stated income" loans.

- Despite Morgan Stanley's awareness of problems at New Century, it continued to fund, purchase, and securitize New Century loans.

297.    Under the Assurance of Discontinuance, Morgan Stanley agreed to institute

procedures to ensure that loans it securitized conformed to underwriting guidelines and to pay

$102 million to settle the charges against it. *Id.*

298.     In September 2011, MSCH entered into a similar Assurance of Discontinuance with the Attorney General of the State of Nevada following an investigation into the origination practices of originators (primarily New Century) who originated loans that MSCH purchased and sold via securitizations, including whether the originators misrepresented interest rates to borrowers, inflated appraisals, and failed to disclose payment shock to borrowers following expiration of the initial teaser interest rate. Under the agreement, Morgan Stanley agreed to provide relief to consumers valued between $21 million and $40 million and to institute a process to review loans purchased for securitization to ensure compliance with the law. *Available at* http://media.lasvegassun.com/media/pdfs/blogs/documents/2011/09/27/morgandoc092711.pdf.

299.     MSMC/MSCH has also been the subject of numerous civil lawsuits alleging it did not adequately conduct due diligence on loans it purchased and securitized.

300.     For instance, in *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*, No. 5140 (Del. Chanc. Jan. 29, 2010), a servicer of loans sued MSCH (as successor in interest to MSMC) on several contract and fraud theories regarding the plaintiff's purchase of the servicing rights to thousands of loans from MSCH. The complaint alleged that plaintiff paid a premium for the right to service the loans, because MSCH had represented that they were "agency" loans, or loans originated under Fannie Mae and/or Freddie Mac guidelines. The complaint alleged that the loans experienced high rates of delinquency. According to the complaint, a representative of Morgan Stanley admitted the loans had not been screened at Morgan Stanley's internal due diligence facility and were of poorer quality than originally represented. Fannie Mae and Freddie Mac made repurchase requests regarding the loans. After initially honoring the repurchase requests, MSCH eventually stopped doing so notwithstanding

its contractual obligations. The complaint alleged that the plaintiff reviewed the loans and found numerous fields in the mortgage loan schedules that were inaccurate.

301.   In *FHFA v. Morgan Stanley, et al.*, No. 11-cv-06739 (S.D.N.Y. Sep. 2, 2011), the FHFA, as conservator of Fannie Mae and Freddie Mac, sued Morgan Stanley & Co., Inc., several of its subsidiaries, including Morgan Stanley Mortgage Capital Holdings LLC d/b/a Morgan Stanley Mortgage Capital, Inc., and others alleging that the defendants falsely represented that the mortgages underlying certain RMBS sold to Fannie Mae and Freddie Mac "complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans." FHFA alleged that its analysis of a sampling of the loans revealed that a statistically significant rate of owner occupancy and LTV ratios were false. The case was settled in 2014 for $1.25b. Press Release, *FHFA Announces $1.25 Billion Settlement with Morgan Stanley* (Feb. 7, 2014) *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-$1-25-Billion-Settlement-With-Morgan-Stanley.aspx.

302.   Likewise, in *MBIA Ins. Co. v. Morgan Stanley, et al.*, No. 29951/2010 (N.Y. Sup. Ct. Dec. 6, 2010), the monoline insurer MBIA sued Morgan Stanley, Morgan Stanley Mortgage Capital Holdings, LLC, and Saxon Mortgage Services, Inc., alleging that its review of loan files securitized by the defendants revealed breaches of representations and warranties including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed. The parties settled the case in December 2011.

303.   According to the FCIC Report, Morgan Stanley devoted minimal resources to due diligence on the loans it securitized. For instance, the head of due diligence was based not in New York but rather in Boca Raton, Florida, and he had, at any one time, only two to five

individuals reporting to him directly—and they were actually employees of a personnel consultant, Equinox. FCIC Report at 168.

304.     According to the report, internal Clayton documents show that a startlingly high percentage of loans reviewed by Clayton for Morgan Stanley were defective, but were nonetheless included by Morgan Stanley in loan pools. According to Clayton's data 37% (or 23,154) of the 62,940 loans it reviewed for Morgan Stanley failed to conform to Morgan Stanley's stated underwriting standards. Of the 37% of loans identified by Clayton as non-compliant, Morgan Stanley "waived in" 56% (or 20% of the total pool).

### 12.     National City

305.     National City Mortgage Co. was a division of National City Bank which was a wholly owned subsidiary of National City Corporation. Collectively these entities are referred to as "National City." National City originated or contributed a material number of loans to the trusts.

306.     In 2008, investors brought a securities fraud class action lawsuit against National City alleging that National City misrepresented the quality of its mortgage loans. *See* Am. Class Action Complaint, *In Re National City Corp. Sec., Derivative & ERISA Litig.*, No. 08-nc-70004 (N.D. Ohio June 13, 2008). On August 8, 2011, it was announced that the case had settled for $168 million.

307.     National City faced another class action lawsuit in 2010 alleging, among other things, that National City did not adhere to its underwriting standards. *See* Second Am. Class Action Complaint, *Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. and Argent Classic Convertible Arbitrage Fund L.P. v. National City Corp.*, No. 08-nc-70016 (N.D. Ohio Feb. 19, 2010). On November 30, 2010, the case settled for $22.5 million.

308.    Evidence of misconduct on the part of National City employees can also be found in the complaint filed in *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012). For example, in October 2011, in Providence, Rhode Island, National City Loan Officer Juan Hernandez pled guilty to participating in a fraudulent lending scheme. Hernandez pled guilty to fraudulently obtaining loans from National City and other lenders by using "straw purchasers" and providing false information to qualify borrowers for loans they would not have otherwise qualified for. From October 2006 through August 2007, Hernandez prepared false loan applications for phony borrowers containing falsified borrower incomes and debts, and misrepresenting that the properties would be owner occupied when they were not. *Id.* ¶ 361.

309.    Hernandez was joined in the fraud by Miguel Valerio, a National City Loan Processor. Valerio also pled guilty to the fraudulent scheme in December 2011. *Id.* ¶ 362.

310.    Similarly, in the Cleveland, Ohio area, in February 2011, at least two National City employees were indicted for lending fraud, along with 15 other co-conspirators. Loren Segal and Krystal Hill, both National City employees, were indicted for assisting in a fraudulent lending scheme that spanned from March 2005 through November 2007. The scheme included using straw purchasers, inflated appraisals, falsified borrower incomes, fake bank statements, and false verifications of borrowers' funds. Both Segal and Hill pled guilty to participating in the scheme. *Id.* ¶ 363.

311.    National City's systemic failure to follow its underwriting guidelines and evaluate its borrowers' true repayment abilities, and the fraudulent loans that followed, required the parent company, National City Corporation, to take a charge of $4.2 billion in the first quarter of 2008 for its defective loans. Moreover, National City's abject failure to follow its underwriting

guidelines led to the SEC investigating National City's underwriting standards in 2008. In addition, in mid-2008, National City Corporation entered into a confidential agreement with the OCC, "effectively putting the bank on probation," according to a Wall Street Journal article published on June 6, 2008. Damian Paletta *et al.*, *National City is Under Scrutiny*, Wall Street Journal, June 6, 2008, *available at* http://online.wsj.com/articles/SB121271764588650947.

### 13.  New Century

312.    New Century Mortgage Corporation was a subsidiary of New Century Financial Corp. (collectively, "New Century"). New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone. New Century originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

313.    New Century failed amid revelations that its books contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding. The circumstances leading to its collapse tell the story of a company that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

314.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

> The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500. Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.
>
> Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan. They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.
>
> New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus Dispatch, June 2, 2008, at 1A.

315.    The article continued:

Lending experts and consumer advocates say New Century was the poster child for the subprime tsunami – a company that relaxed lending standards so much that even borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id.*

316.    New Century's foreclosure rates reflected its inattention to underwriting standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted. Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

317.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada; Bakersfield, California; Riverside-San Bernardino, California; and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California; Las Vegas, Nevada; Merced, California; Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida; and Vallejo-Fairfield-Napa, California.

318.    The U.S. Bankruptcy Court for the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures. The Examiner engaged a law firm, forensic accountants, and financial advisors to assist in his investigation and reporting. Final Report of

Michael J. Missal, *In re: New Century TRS Holdings, Inc.*, No. 07-bk-10416 (D. Del. Feb. 29,

2008) (the "Examiner's Report) *available at*

http://www.klgates.com/files/upload/Final_Report_New_Century.PDF.

    319.    The Examiner concluded that New Century "engaged in a number of significant

improper and imprudent practices related to its loan originations, operations, accounting and

financial reporting processes." Examiner's Report at 2. The Examiner summarized the findings:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." *Id.* at 3.

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

- "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id.*

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id.* at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the

Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id*. at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses." *Id*.

320.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id*. at 61-62.

321.    From 2003 to 2006, New Century peddled riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated with such products. For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%. And from 2004 to 2005, the percentage of interest-only adjustable-rate loans rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases. New Century qualified borrowers based on their ability to pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years. *Id*. at 57, 125-26.

322.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans—with such loans representing at least 42% of New Century's total loan volume. "Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income. Stated

income loans are often referred to in the industry as "liars' loans," because of the ease with

which unscrupulous borrowers or mortgage brokers can overstate income. *Id*. at 58. New

Century actively discouraged its employees from even seeking to verify whether a prospective

borrower's stated income was reasonable. *Id*. at 127 n.314.

323.    The Examiner identified several "red flags" that indicated the poor quality of New

Century's loans and that New Century was not adhering to its underwriting guidelines.

Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing

documentation" had led to a high number of kick-outs by investors, all of which "suggested that

New Century's loan origination processes were not consistently producing loans that met New

Century's underwriting standards and investor guidelines." *Id*. at 109.

324.    The Examiner found:

New Century's Senior Management recognized that the Company had serious loan
quality issues beginning as early as 2004. For example, in April 2004, New Century's
Chief Credit Officer reported that 'the QA [quality assurance] results [pertaining to the
loan origination processes] are still at unacceptable levels' and that 'Investor Rejects
[kickouts] are at an incline as well.' Two months later, in June 2004, the head of
Secondary Marketing remarked in an e-mail that 'we have so many issues pertaining to
quality and process!'"

*Id*. at 110.

325.    In 2005, New Century began internal audits of its loan origination and production

processes. An audit of the Sacramento wholesale fulfillment center revealed several "high risk"

problems, including that 45% of the loans reviewed had improper RESPA disclosures, 42% did

not have approval stipulations fully satisfied, 39% had noted exceptions regarding the calculation

or verification of income, and 23% had appraisal exceptions or problems. *See id*. at 152.

326.    Further adding to the problem was that exceptions were frequently granted to

underwriting guidelines, but "New Century had no formal exceptions policy." *Id*. at 174.

327.    With no policy in place, granting exceptions was arbitrary. Despite upper

management's awareness of the tremendous problems regarding loan quality, the Examiner

concluded that "New Century continued to focus on generating greater quantities of ever riskier

loans, devoting little effort to such basic issues as making sure that the Company's loan

origination and underwriting policies and procedures were followed to avoid kickouts of loans

offered for sale." *Id*. at 111.

328.    The Examiner reported:

New Century's loan originations grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005. The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume. While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kick-out and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality.

*Id*. at 113.

329.    New Century consistently prioritized the origination of new loans over virtually

all other concerns, including loan quality. Despite after-the-fact assertions by some company

spokespeople that such disregard was anomalous, New Century leaders articulated priorities

demonstrating that the disregard was systematic. For example, Patrick Flanagan, who until 2006

was New Century's Head of Loan Production and Secondary Marketing, "emphasized

maintaining New Century's loan production even when field audits revealed loan quality

problems." *Id*. at 89. Even after Flanagan left the company, New Century's prioritization of

volume, rather than quality, continued.

330.    The Examiner noted that New Century's Quality Assurance Department would

run audit reports after loans were funded to determine if the loan file evidenced compliance with

New Century's underwriting guidelines. "The Quality Assurance audit results tended to identify

the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files." Despite this, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance." *Id*. at 137.

331.    The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of loans. For instance, the Examiner reported that management had determined a way to identify underwriters whose actions led to a high number of defective loans in October 2005, but failed to implement the effort until much later. *See id*. at 169 n.337.

332.    The Examiner's Report found that loan quality trends "worsened dramatically" at New Century in 2006 and early 2007. Although New Century belatedly tried to improve loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the same sorts of problems, including defective appraisals and missing documentation continued to be the main reasons for investors kicking out increasing quantities of New Century loans." *Id*. at 157-58.

333.    The Examiner concluded, "New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004. Yet . . . the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends." *Id*. at 175.

334.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC. She testified that at New Century, risk managers were often viewed as a roadblock rather than a resource and that:

Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers [sic] had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New Century).

335.    She also testified to systematic problems in the appraisal process:

In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id*.

336.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked "common sense"—that the business became "volume driven and automated" with a broker being able to get a loan pre-approved in "12 seconds or less." *Id*.

337.    The FCIC found that New Century "ignored early warnings that its own loan quality was deteriorating and stripped power from two risk-control departments that had noted the evidence." FCIC Report at 157. The FCIC reported that New Century's Quality Assurance staff "had found severe underwriting errors," while New Century's Internal Audit department "identified numerous deficiencies in loan files," with seven out of nine reviews of the company's loan production department resulting in "'unsatisfactory'" ratings. *Id*. Instead of making efforts designed to bring the company into compliance with its underwriting guidelines, New Century's

management directed that the negative results be removed from the company's loan performance tracking system, that the Quality Assurance department be dissolved, and that the Internal Audit department's budget be cut. *Id.*

338.    In December 2009, the SEC filed a complaint charging three former New Century executives with securities fraud. *See SEC v. Morrice, et al.*, No. 09-cv-01426 (C.D. Cal. Dec. 7, 2009). The SEC's complaint alleges that the New Century executives misled investors as to the deterioration of New Century's loan portfolio, including dramatic increases in early default rates and loan repurchases/repurchase requests. On July 30, 2010, the SEC announced it had accepted offers to settle the case, subject to court approval, with defendants agreeing to (1) pay over $1.5 million in disgorgement and civil penalties; (2) be permanently enjoined from further securities law violations; and (3) a five-year ban on serving as an officer or director of a public company.

339.    The Attorney General for the Commonwealth of Massachusetts also investigated New Century's faulty origination practices with the following findings:

- New Century unlawfully qualified borrowers for adjustable rate mortgages by using "teaser" rates instead of using the "fully indexed rates" as required by law. Assurance of Discontinuance at 13, *In re: Morgan Stanley & Co. Incorporated*, No. 10-2538 (Mass. Super. Ct. June 24, 2010), *available at* http://www.mass.gov/ago/docs/press/2010/2010-06-24-ms-settlement-attachment3.pdf.

- New Century engaged in "sloppy underwriting for many loans and stretching of underwriting guidelines to encompass or approve loans not written in accordance with the guidelines." *Id.* at 9.

- New Century successfully pressured Morgan Stanley into buying loans which both parties knew did not comply with the underwriting guidelines. *Id.* at 10.

- "31% of the New Century loans on properties checked via BPOs . . . and securitized by Morgan Stanley in 2006 and 2007 had []LTV ratios . . . that were greater than 100%." *Id.* at 13.

- "As early as October 2005, Morgan Stanley's diligence team determined . . . that the stated income on a number of New Century loans was unreasonable. In early

2006, a Morgan Stanley employee commented that stated income credit was not adequately evaluated by New Century. . . . On average, the stated income of these borrowers was approximately 42% higher than the income of fully documented borrowers." *Id.* at 13-14.

340.     Private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines. In *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc.*, No. 10-2741 (Mass. Super. Ct. July 9, 2010), confidential witnesses stated that: the company abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

### 14.     OwnIt

341.     OwnIt Mortgage Solutions, Inc. ("OwnIt") was a California-based company that specialized in the origination of mortgages for individuals who earned less than $100,000 annually, and had less than $100,000 in personal assets. OwnIt originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

342.     Numerous lawsuits followed in the years after OwnIt's bankruptcy. These lawsuits repeatedly alleged systematic abandonment of OwnIt's underwriting guidelines and many included loan re-underwriting results demonstrating remarkably high breach rates. These complaints include *John Hancock Life Ins. Co. (USA) et al. v. Ally Financial Inc.et al.*, No. 12-cv-1841 (D. Minn. July 27, 2012) and *Royal Park Investments SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al.*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012).

343.     Another lawsuit was filed in August 2011 by several AIG companies against Bank of America Corp., Merrill Lynch, Countrywide and others, alleging that the defendants therein had defrauded plaintiffs in connection with defendants' sale of RMBS. *See* Complaint, *American Int'l Group, Inc. et al. v. Bank of America Corp. et al.*, No. 652199/2011 (N.Y. Sup.

Ct. Aug. 8, 2011). In connection with drafting the allegations, the plaintiffs interviewed several

former OwnIt employees. Those former employees confirmed that OwnIt had abandoned its

underwriting guidelines. Those former employees reported the following:

- A former corporate underwriter at OwnIt stated that OwnIt was "'the worst example'" of a lender making risky loans that should never had been made in the first place. *Id*. ¶ 298.

- According to a former OwnIt senior underwriter from September 2004 through July 2006, OwnIt loan officers were falsely inflating incomes on loan applications, and even when she complained to managers that "'there's no way'" the borrower could be making the claimed income, the amount was accepted anyway. *Id*. ¶ 299.

- The former senior underwriter also observed "'excessive adjustments'" inflating appraisals at OwnIt. *Id*. ¶ 300.

- According to a former OwnIt loan funder, from December 2004 to December 2006, when she brought questionable incomes to the attention of her supervisors she was told to "'mind her own business'" and to fund the loans. *Id*. ¶ 299

344.    OwnIt's systematic disregard of its own underwriting standards is confirmed by

independent government analyses of OwnIt's underwriting standards and the quality of its loans.

Based on figures the OCC updated in 2010, OwnIt ranked among only 21 companies that "in

various combinations occupy the Worst Ten slots in the Worst Ten metro areas." John C. Dugan,

Comptroller of the Currency, *Appendix B: Activities of National Banks Related to Subprime*

*Lending* (Apr. 8, 2010), *available at* http://www.occ.gov/news-issuances/news-releases/2010/nr-

occ-2010-39.html.

### 15.    RBS/Greenwich Capital

345.    The Royal Bank of Scotland Group PLC ("RBS"), through its affiliate RBS

Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.), sponsored a

significant number of the trusts.

346.    RBS's poor mortgage securitization practices have been the subject of

government investigations, reports and significant RMBS investor lawsuits. The FCIC Report

noted that Clayton acted as a due diligence provider for RBS's RMBS offerings. According to

testimony provided to the FCIC, for the loans Clayton tested for RBS from at least January 1,

2006 through June 30, 2007, Clayton informed RBS that at least 17% of the loans it tested did

not comply with the underwriting guidelines, did not have compensating factors otherwise

meriting approval, and/or had defective appraisals. Notwithstanding its receipt of such notice,

RBS then knowingly and deliberately waived well over half of those defective loans (53%) into

their RMBS Offerings. *See* Clayton All Trending Report at 6, *available at* http://fcic-

static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

347.    In *FHFA v. RBS*, the FHFA performed a forensic analysis of sixty-eight RBS-

sponsored securitizations and/or RBS-underwritten securitizations. Am. Complaint, *FHFA v.

Royal Bank of Scotland Group PLC, et al.*, No. 11-cv-01383 (D. Conn. Feb. 1, 2012). The FHFA

found that "at least 3.12 percent of the mortgage loans for each Securitization had an LTV ratio

over 100 percent, and for most Securitizations this figure was much larger." *Id.* ¶ 113. The FHFA

also found that "the Prospectus Supplement for each Securitization was grossly inaccurate,

understating the percentage of non-owner occupied properties by at least six percent, and for

many Securitizations by ten percent or more." *Id.* ¶ 107.

348.    Additional forensic analyses of RBS securitizations have confirmed RBS's

widespread securitization of breaching loans. *See, e.g.*, *Royal Park Investments SA/NV v. Royal

Bank of Scotland Group PLC, et al.*, No. 653541/2013 (N.Y. Sup. Ct. Oct. 11, 2013) (forensic

review demonstrated pervasive breaches of representations and warranties concerning

compliance with underwriting guidelines, owner occupancy, LTV ratios and assignment of title).

### 16.    UBS

349.    UBS, through its affiliate UBS Real Estate Securities, Inc. (collectively, "UBS"),

sponsored a significant number of the trusts and originated or contributed some loans to the trust.

350.    UBS's deficient due diligence practices have become well known. For example,

Clayton's trending reports revealed that from the first quarter of 2006 to the first quarter of 2007,

17% of the mortgage loans UBS submitted to Clayton to review in RMBS groups were rejected

by Clayton as falling outside the applicable underwriting guidelines. Of the mortgage loans that

Clayton found defective, 33% of the loans were subsequently waived in by UBS without proper

consideration and analysis of compensating factors and included in securitizations. *See* Clayton

All Trending Report at 9, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-

testimony/2010-0923-Clayton-All-Trending-Report.pdf.

351.    Over the past five years, UBS's securitization practices have been the focus in at

least nineteen significant RMBS lawsuits, including actions by the FHFA, Federal Home Loan

Banks, monoline insurers, and RMBS holders. Forensic investigations and loan-level reviews of

UBS trusts and substantially similar UBS securitizations conducted by plaintiffs in these actions

have confirmed the pervasive breaches of representations and warranties in UBS's RMBS. On

July 27, 2011, the FHFA sued UBS alleging UBS made untrue or misleading statements

regarding LTV ratios, owner occupancy status, and/or compliance with underwriting guidelines

for sixteen UBS-sponsored securitizations. *See* Second Am. Complaint, *FHFA v. UBS Americas*

*Inc., et al.*, No. 11-cv-05201 (S.D.N.Y. July 27, 2011). The FHFA's review of 996 randomly

selected mortgage loans revealed that approximately 78% of the reviewed loans were not

underwritten under the applicable underwriting guidelines. *Id*. ¶ 298. On July 25, 2013, the

FHFA announced that it had agreed to settle the UBS case for $885 million. *See also Royal Park*

*Investments SA/NV v. UBS AG, et al.*, No. 653901/2013 (N.Y. Sup. Ct. Nov. 7, 2013) (forensic

analysis demonstrated that UBS and the originators "affirmatively misrepresented material

information regarding the very nature and credit quality of the certificates and their underlying

loans").

352.    These loan level reviews of UBS securitizations were corroborated by the

findings of the Association of Financial Guaranty Insurers ("AFGI"), which wrote to UBS on

November 30, 2011, on behalf of its industry members. In the November 30, 2011 letter, the

AFGI stated that its members had performed sufficient sampling of loans within UBS

securitizations and "have concluded that well more than half of the 2005/2006/2007 vintage first

and second lien residential mortgage loans backing such RMBS were ineligible for

securitization." The AFGI concluded that "[g]iven that a large percentage of the loan pool

securitized by UBS are comprised of loans originated by discredited originators (such as

IndyMac), well-known to have originated high percentage of fraudulent and other ineligible

residential mortgage loans, this high percentage of ineligible loans should not be surprising."

Letter from Teresa M. Casey, Exec. Director, Association of Financial Guaranty Insurers, to

Sergio P. Ermotti, Group Chief Exec. Officer, UBS A.G. (Nov. 30, 2011) *available at*

http://www.afgi.org/resources/AFGI_letter_UBS.pdf. *See also Assured Guar. Mun. Corp. v. UBS*

*Real Estate Sec. Inc.*, No. 12-cv-01579 (S.D.N.Y. Mar. 5, 2012) (monoline insurer's analysis of

three UBS securitizations revealed that between 80% to 95% of the loans breached one or more

of UBS's representations and warranties).

### 17.    Washington Mutual

353.    Washington Mutual Bank ("WaMu") was a Seattle-based bank that rapidly grew

from a regional to a national mortgage lender from 1991 to 2006. At over $300 billion in total

assets, WaMu was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS"). On September 25, 2008, however, federal regulators closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu's problems led to a run on the bank by depositors. Federal regulators subsequently facilitated the sale of WaMu to J.P. Morgan Chase & Co.

354.     WaMu and its affiliates originated or contributed a material portion of the loans in the mortgage pools underlying the trusts and sponsored many trusts.

355.     WaMu has been the subject of numerous investigations and lawsuits alleging that WaMu systematically abandoned its underwriting guidelines in pursuing profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by WaMu breached the associated representations and warranties. Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. These lawsuits in conjunction with the poor performance of the underlying loans and the public information concerning wide-spread issues among all originators was more than sufficient to provide the Defendants with notice that large numbers of loans originated by WaMu, including loans contained in the trusts, breached the associated representations and warranties.

356.     In April 2010, the Treasury OIG issued a report titled "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse. The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls." WaMu OIG Report at 2. The report elaborated on how WaMu adopted this new strategy to

compete with Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans. WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide . . . .
> . . .
> WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed loan product and more than 7 times the amount for a fixed-rate loan product.

*Id*. at 8 (footnote omitted).

357.    In 2011, the Permanent Subcommittee on Investigations of the U.S. Senate issued a report on the causes of the economic crisis. Staff of S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* 50 (Subcomm. Print 2011) (the "PSI Report"). The PSI Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble. Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

> (1) High Risk Lending Strategy. [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

> (2) Shoddy Lending Practices. WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

> (3) Steering Borrowers to High Risk Loans. WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

> (4) Polluting the Financial System. WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street

firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans. At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation. WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Report at 50-51.

358.    In particular, the PSI Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach. WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach. The review found that the "top five priority issues" were as follows:

Appraisal deficiencies that could impact value and were not addressed[;] Material misrepresentations relating to credit evaluation were confirmed[;] Legal documents were missing or contained errors or discrepancies[;] Credit evaluation or loan decision errors [; and] Required credit documentation was insufficient or missing from the file.

*Id*. at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory Gunderson (Dec. 11, 2006)).

359.    Pushing "Option ARMs" was a major part of WaMu's new "high risk" lending strategy. In a memorandum from Senators Carl Levin and Tom Coburn to the Members of the PSI, dated April 13, 2010, Option ARMS are labeled WaMu's "flagship" product. Hearing Before S. Permanent Subcomm. on Investigations, 112th Cong., *Wall Street and the Financial Crisis: The Role of High Risk Home Loans* (2010) ("PSI High Risk Home Loans Hearing"), Senate Exhibit 1.a, at 3. The WaMu OIG Report describes the inherently dangerous nature of

WaMu's Option ARMs:

> WaMu's Option ARMs provided borrowers with the choice to pay their monthly mortgages in amounts equal to monthly principal and interest, interest-only, or a minimum monthly payment. Borrowers selected the minimum monthly payment option for 56 percent of the Option ARM portfolio in 2005.

> The minimum monthly payment was based on an introductory rate, also known as a teaser rate, which was significantly below the market interest rate and was usually in place for only 1 month. After the introductory rate expired, the minimum monthly payment feature introduced two significant risks to WaMu's portfolio: payment shock and negative amortization. WaMu projected that, on average, payment shock increased monthly mortgage amounts by 60 percent. At the end of 2007, 84 percent of the total value of Option ARMs on WaMu's financial statements was negatively amortizing.

WaMu OIG Report at 9.

360.    The WaMu OIG Report notes that "Option ARMs represented as much as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id*.

361.    The OIG also notes that WaMu's "new strategy included underwriting subprime loans, home equity loans, and home equity lines of credit to high-risk borrowers. In line with that strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

362.    WaMu's careless underwriting practices rendered these already high risk loan products even more risky. *See id*. The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management and "inadequate internal controls." *Id*. at 3-4. Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation." Hearing Before the United States S. Homeland Security and Governmental Affairs Comm., Permanent Subcomm. on Investigations, 111th Cong., *Wall Street*

*& the Financial Crisis: The Role of Bank Regulators* (Apr. 16, 2010) (statement of the Hon. Eric

M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

WaMu management knew about the pattern of "first payment default" ("FPD") for loans its

Long Beach subsidiary originated. In June 2007, WaMu closed Long Beach as a separate entity

and placed its subprime lending operations in a new division called "Wholesale Specialty

Lending."

363.    An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008, noted

the systematic nature of the problem: "[T]he review defines an origination culture focused more

heavily on production volume rather than quality. An example of this was a finding that

production personnel were allowed to participate in aspects of the income, employment, or asset

verification process, a clear conflict of interest. . . . Prior OTS examinations have raised similar

issues including the need to implement incentive compensation programs to place greater

emphasis on loan quality." PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum

from D. Schneider, President Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS

EIC at 1 (June 19, 2008).

364.    A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008,

Loss Type - Mortgage Loan, stated:

> One Sales Associate admitted that during that crunch time some of the Associates would
> 'manufacture' assets statements from previous loan docs and submit them to the [Loan
> Fulfillment Center ('LFC')]. She said the pressure was tremendous from the LFC to get
> them the docs since the loan had already funded and pressure from the Loan Consultants
> to get the loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification (SIN)," at

1 (Apr. 1, 2008).

365.    A New York Times article described WaMu's underwriting practices as follows:

"On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, N.Y. Times, Dec. 27, 2008, at A1.

366.    Sherri Zaback, a former underwriter at a WaMu branch in San Diego, California, stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address and Social Security number, and to state their income and assets." *Id*. On one occasion, Zaback asked a loan officer for verification of a potential borrower's assets. The officer sent her a letter from a bank showing a balance of about $150,000 in the borrower's account. Zaback called the bank to confirm and was told the balance was only $5,000. The loan officer yelled at her, Ms. Zaback recalled. "She said, 'We don't call the bank to verify.'" *Id.*

367.    Zaback also recalled that the sheer volume of loans precluded WaMu employees from adhering to underwriting standards. According to Zaback, she would typically spend a maximum of 35 minutes per file: "'Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out.'" *Id*. Another WaMu agent in Irvine, California, told the New York Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id*.

368.    WaMu's underwriting also critically failed with respect to appraisals as well. An accurate appraisal of a property's market value is crucial to the underwriting process as the property provides collateral for the loan in case of default.

> WaMu's review of appraisals establishing the value of single family homes did not always follow standard residential appraisal methods because WaMu allowed a homeowner's estimate of the value of the home to be included on the form sent from WaMu to third-party appraisers, thereby biasing the appraiser's evaluation.

WaMu OIG Report at 11.

369.     The New York Times reported, "WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors." Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1. The article quoted the founder of one appraisal company that did business with WaMu until 2007 as saying, "'It was the Wild West,'. . . . 'If you were alive, they would give you a loan. Actually, I think if you were dead, they would still give you a loan.'" *Id.* (quoting Steven Knoble, founder Mitchell, Maxwell & Jackson).

370.     Nor did WaMu adequately monitor non-employee third-party brokers who originated most of WaMu's loans. As Eric Thorson explained before the PSI:

> In addition to originating retail loans with its own employees, WaMu began originating and purchasing wholesale loans through a network of brokers and correspondents. From 2003 to 2007, wholesale loan channels represented 48 to 70 percent of WaMu's total single family residential loan production. WaMu saw the financial incentive to use wholesale loan channels for production as significant. According to an April 2006 internal presentation to the WaMu Board, it cost WaMu about 66 percent less to close a wholesale loan ($1,809 per loan) than it did to close a retail loan ($5,273). So while WaMu profitability increased through the use of third-party originators, it had far less oversight and control over the quality of the originations.

Thorson Statement at 5. According to the WaMu OIG Report, WaMu had only 14 employees monitoring the actions of 34,000 third-party brokers. *See* WaMu OIG Report at 11. This lack of oversight led to WaMu "identif[ying] fraud losses attributable to third-party brokers of $51 million for subprime loans and $27 million for prime loans" in 2007. *Id.*

371.     Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system." Thorson Statement at 5. An integrated risk management system was critically important in light of WaMu's high-risk lending strategy. *See*

*id.*

372.    Based on interviews with two dozen former employees, mortgage brokers, real

estate agents and appraisers, Goodman and Morgenson of the New York Times noted that the

"relentless pressure to churn out loans" while "disregarding borrowers' incomes and assets"

came from WaMu's top executives. Goodman & Morgenson, *Saying Yes, WaMu Built Empire on*

*Shaky Loans* at A1. According to Dana Zweibel, a former financial representative at a WaMu

branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was

told from the top that it was not her concern: her concern was "'just to write the loan.'" *Id.* Said

Zweibel, "'[i]t was a disgrace' . . . . 'We were giving loans to people that never should have had

loans.'" *Id.*

373.    In November 2008 the New York Times, quoting Keysha Cooper, a Senior

Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the

quality of the loans; it was about the numbers' . . . . 'They didn't care if we were giving loans to

people that didn't qualify. Instead, it was how many loans did you guys close and fund?'"

Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. Times, Nov. 1, 2008. According

to the article, "[i]n February 2007 . . . the pressure became intense. WaMu executives told

employees they were not making enough loans and had to get their numbers up." Cooper

concluded, "'I swear 60 percent of the loans I approved I was made to' . . . . 'If I could get

everyone's name, I would write them apology letters.'" *Id.*

374.    WaMu blatantly inflated salaries of baby sitters and mariachi singers to the six-

figure range. Indeed, the only verification of the mariachi singer's income was a photograph of

the mariachi singer in his outfit included in the loan application file. The New York Times

reported:

As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.

Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.

Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.

"I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
…
At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.
. . .
Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results.

Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

375.    Long Beach, a WaMu affiliate, specialized in subprime mortgages. Internal

WaMu documents reveal a well-documented pattern of underwriting deficiencies at Long Beach.

A memorandum to the Washington Mutual, Inc. and WaMu Board of Directors' Audit

Committees, dated April 17, 2006, re: *Long Beach Mortgage Company -Repurchase Reserve*

*Root Cause Analysis* states: "[Long Beach] experienced a dramatic increase in EPDs[] during the

third quarter of 2005. . . . [R]elaxed credit guidelines, breakdowns in manual underwriting

processes, and inexperienced subprime personnel . . . coupled with a push to increase loan

volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan

quality." PSI High Risk Home Loans Hearing, Senate Exhibit 10 at 1-2.

376.    A WaMu Audit Report titled *Long Beach Mortgage Loan Origination &*

*Underwriting*, dated August 20, 2007, states: "[T]he overall system of risk management and

internal controls has deficiencies related to multiple, critical origination and underwriting processes. . . . These deficiencies require immediate effective corrective action to limit continued exposure to losses." PSI High Risk Home Loans Hearing, Senate Exhibit 19 at 2. In its "Executive Summary" section, the Audit Report states:

> In response to challenges resulting from the softening housing market, rising interest rates, tightening capital markets, poor portfolio performance and underwriting deficiencies, [Long Beach] continually refines their processes and guidelines. While management has been responsive to these challenges by identifying and implementing corrective actions, actual underwriting practices have not been consistent to achieve the desired levels of improvement. Continued patterns of loans being underwritten outside of established underwriting and documentation guidelines have been previously identified.

*Id.* It also identifies the following as the number one high rated "repeat issue" to correct: "Underwriting guidelines established to mitigate the risk of unsound underwriting decisions are not always followed and the decisioning methodology is not always fully documented." *Id.* at 8. The number two "repeat issue" was identified as "[p]olicies and procedures defined to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed." *Id.* at 10. An e-mail from a WaMu executive describes the Long Beach audit report as "the ultimate in bayoneting the wounded, if not the dead." PSI High Risk Home Loans Hearing, Senate Exhibit 20 at 1.

377.    The OTS also reported concerns with subprime underwriting practices by Long Beach from 2006 to 2007. *See* Thorson Statement at 9-10.

378.    As a result of its systematic disregard of underwriting standards, Long Beach appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report. In fact, Long Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton, California, Sacramento, California, Denver, Colorado, and Memphis, Tennessee; 2nd in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio and Miami, Florida; and 4th in Riverside, California).

Long Beach again ranked near the top in nearly every city in the 2009 "Worst Ten in the Worst

Ten" Report (1st in Stockton-Lodi, California, Merced, California, and Vallejo-Fairfield-Napa,

California; 5th in Fort Pierce-Port St. Lucie, Florida; and 6th in Riverside-San Bernardino,

California).

379.    Private litigation has also illustrated the fact that WaMu failed to comply with

underwriting guidelines. In *Cambridge Place Investment Management Inc. v. Morgan Stanley &*

*Co., Inc.*, No. 10-2741 (Mass. Sup. Ct. July 9, 2010), multiple confidential witnesses stated that

Long Beach compensated account executives and underwriters based on volume of loans with no

consideration to quality; that directions from management was simply to fund loans; that there

was little to no verification of information; that there was constant pressure on underwriters to

close loans no matter what; that loans that were not approved were often pushed through by

management; that problematic trends were never addressed; that employees were compensated

more for higher risk loans with higher profit margins; that employees were encouraged to push

risky adjustable-rate loans; that underwriting guidelines changed constantly; that loans were put

back in the system for approval if one underwriter refused; and that information on applications

was changed in order to receive automatic approval from the computer system.

380.    The same type of confidential witness testimony was recounted in the complaint

filed in *Federal Home Loan Bank of Boston v. Ally Financial*, No. 11-1533 (Mass. Sup. Ct. April

20, 2011).

### 18.    Wells Fargo

381.    Wells Fargo Bank, N.A., and its affiliates Wells Fargo Home Mortgage, Inc. and

Wells Fargo Asset Securities Corp. (collectively, "Wells Fargo") originated or contributed a

material number of loans to the loan pools underlying the trusts and sponsored many of the

trusts.

382.    The City of Memphis sued Wells Fargo in 2010 over its mortgage practices claiming violations of the Fair Housing Act. *See* Am. Complaint, *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857 (W.D. Tenn. Apr. 7, 2010) ("Memphis Compl."). The complaint includes sworn declarations from former Wells Fargo employees describing Wells Fargo's abandonment of underwriting guidelines.

383.    Camille Thomas was a loan processor at Wells Fargo from January 2004 to January 2008. She handled the paperwork involved in the loan, including processing the file for review and approval by the underwriters. To do her job, she had to be familiar with Wells Fargo's underwriting guidelines. Ms. Thomas recounted how the bonus structure placed pressure on credit managers to make loans that should not have been made. She stated that managers manipulated LTV ratios by using inflated appraisals they knew were not accurate. She also knew that documents were falsified to inflate borrowers' incomes. When she complained, a branch manager told her, "we gotta do what we gotta do." Finally, she stated that borrowers were not informed that their loans were adjustable-rate mortgages with low "teaser rates," or about prepayment penalties, potential violations of lending laws, which would also be violations of the underwriting guidelines. Memphis Compl. Exh. 4.

384.    Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008 in the Memphis area. She stated that the district manager put pressure on credit managers to convince people to apply for loans even if the person could not afford the loan or did not qualify for it. To her shock, many people with bad credit scores and high debt-to-income ratios were approved for subprime loans. Ms. Dancy would shake her head in disbelief and ask herself, "how could that happen?" She knew that Wells Fargo violated its underwriting guidelines to make

those loans. Although she never witnessed it herself, she heard also from other employees that some branch managers falsified information to get customers to qualify for subprime loans. She stated that a bonus system was used to pressure her to make loans she thought should not be made. Memphis Compl. Exh. 1.

385.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to 2008 in the Memphis area. According to Mr. Simpson, Wells Fargo managers falsified the mileage on car loan applications so the loan would be approved. He also stated that Wells Fargo was "very aggressive" in mortgage lending. The culture was "completely results driven." According to Mr. Simpson, Wells Fargo employees did not tell customers about the fees and costs associated with closing a loan – again, potential violations of lending laws, and also violations of the underwriting guidelines. He also knew managers who falsified information in loan files, such as income documentation, to get loans approved. Mr. Simpson further confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the loans. Memphis Compl. Exh. 2.

386.    Mario Taylor was a Wells Fargo credit manager from June 2006 to February 2008 in the Memphis area. His job was to find potential borrowers and to get them to apply for loans. His manager pressured him to push loans on borrowers whether they were qualified for the loan or could pay back the loan. He was also told to mislead borrowers by only telling them the "teaser rate" without disclosing the rate was adjustable and by not telling them about the "fine print." One of his branch managers changed pay stubs and used white-out on documents to alter the borrower's income. Finally, Mr. Taylor confirmed that Wells Fargo employees were heavily incentivized by the bonus structure to generate large volumes of loans. Memphis Compl. Exh. 3.

387.    Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from

1998 to December 2007 in the Maryland area. She described the financial incentives to sign

borrowers up for loans. In two years, she made more than $1.2 million in sales commissions. She

knew loan officers who would lie to potential borrowers about whether they could refinance their

loan once the "teaser rate" period expired. Ms. Jacobson also knew loan officers who falsified

loan applications to qualify them for loans they should not have been given. One loan officer

would "cut and paste" the credit report of an approved borrower into other borrowers'

applications. She reported this conduct to management but was not aware of any action taken to

correct the problems. Memphis Compl. Exh. 7.

388.    The district court denied a motion to dismiss. *City of Memphis v. Wells Fargo Bank, N.A.*, 2011 WL 1706756 (W.D. Tenn. May 4, 2011). The case subsequently settled.

389.    The FCIC's investigation supports the affidavits of these former Wells Fargo

employees. The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who

worked as an underwriter and a quality assurance analyst from 2001 until 2007. According to

Ms. Parmer, at least half the loans she flagged as fraudulent were approved. She also told the

FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never

referred to the Treasury Department's Financial Crimes Enforcement Network. FCIC Report at

162.

390.    In July 2011, the Federal Reserve Board issued a consent cease and desist order,

and assessed an $85 million civil money penalty against Wells Fargo & Co. (parent company of

Wells Fargo Bank, N.A.) and Wells Fargo Financial, Inc. At the time, this was the largest penalty

assessed by the Board in a consumer-protection enforcement action. The order addressed

allegations that Wells Fargo had falsified income information in mortgage applications. These

practices were allegedly fostered by Wells Fargo's incentive compensation and sales quota

programs and the lack of adequate controls to manage the risks resulting from these programs. Press Release, Federal Reserve Board (July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

391.    There is widespread evidence of pervasive breaches of seller representations and warranties in Wells Fargo sponsored RMBS, including detailed allegations in securities cases against Wells Fargo, such as *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, No. 09-cv-1376 (N.D. Cal.), which Wells Fargo agreed to settle for $125 million. This action and others have demonstrated systemic and pervasive deficiencies in Wells Fargo's underwriting practices, which led to inaccurate representations and warranties regarding LTV ratios and owner occupancy.

392.    Other RMBS lawsuits involving Wells Fargo sponsored trusts have revealed Wells Fargo's systemic securitization abuses. For example, in August 2012, the FDIC, as receiver for the now-defunct Alabama-based Colonial Bank ("Colonial"), sued Wells Fargo and twelve other large banks for misrepresentations in connection with the sale of residential mortgage-backed securities to Colonial. The complaint alleged that Wells Fargo made material misrepresentations in the offering documents regarding loan-to-value ratios, owner occupancy rates, compliance with appraisal standards, and loan issuance practices. *See Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortgage Fin. Corp., et al.*, No. 12-cv- 6166 (S.D.N.Y. Aug. 10, 2012).

393.    In *Federal Home Loan Bank of Atlanta v. Countrywide Fin. Corp, et al.*, No. 11-cv-00489 (N.D. Georgia Feb. 17, 2011), the plaintiff performed a forensic review of 30 offerings, including at least one trust sponsored by Wells Fargo. The Federal Home Loan Bank of Atlanta found that in its sample of more than 21,000 loans "over 58% of the appraised

property values in this sample were overstated by 5% or more." Moreover, the analysis revealed that although the offering documents for all 30 offerings represented that no loans had an LTV at origination over 100%, of the "more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (*i.e.*, an LTV over 100%)."

394.     In a similar action brought by the Federal Home Loan Bank of Indianapolis, *Federal Home Loan Bank Indinapolis v. Banc of America Mort. Sec., Inc., et al.*, No. 10-cv-01463 (S.D. Ind. Nov. 15, 2010), the bank conducted a forensic review of 32 offerings, including some Wells Fargo sponsored trusts. For four of those trusts, Wells Fargo represented that no loan in the pool had an LTV ratio over 100%, but the review revealed that 9.02%, 14.29%, 17.39%, and 8.33% of the loans respectively, had an LTV greater than 100%. The review also revealed that the owner occupancy percentages were understated.

### 19.     Argent

395.     ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the nation's largest privately-owned subprime lender. Ameriquest Mortgage Company ("Ameriquest") was ACC Capital's retail mortgage lending unit. Argent Mortgage Company, LLC ("Argent") was ACC Capital's wholly-owned wholesale lending unit that made loans through independent brokers. On September 1, 2007, Citigroup purchased Argent from ACC Capital, and Ameriquest announced that it was shutting down lending operations.

396.     Argent originated or contributed a substantial portion of the loans in the mortgage pools underlying the trusts.

397.     Argent appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report. Argent was ranked as the worst lender in Cleveland, Ohio, and Detroit, Michigan; the second

worst in Las Vegas, Nevada, and Miami, Florida; the third worst in Denver, Colorado; the fourth

worst in Stockton, California; the fifth worst in Bakersfield, California; the sixth worst in

Riverside and Sacramento, California; and the eighth worst in Memphis, Tennessee.

398.    In the 2009 OCC Report, Argent was fourth in Las Vegas, Nevada; sixth in Fort

Pierce-Port St. Lucie, Florida and Reno, Nevada; seventh in Bakersfield, California and

Stockton-Lodi, California; eighth in Riverside-San Bernardino, California; ninth in Merced,

California, Modesto, California and Fort Myers-Cape Coral, Florida; and tenth in Vallejo-

Fairfield-Napa, California.

399.    According to a May 11, 2008, Cleveland Plain Dealer article titled *The Subprime

House of Cards*, Jacquelyn Fishwick, who worked for more than two years at an Argent loan

processing center near Chicago as an underwriter and account manager, reported that "some

Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I

didn't agree with." Ms. Fishwick "saw [Argent] account managers remove documents from files

and create documents by cutting and pasting them." Mark Gillispie, *The Subprime House of

Cards*, The Plain Dealer, May 11, 2008, *available at*

http://blog.cleveland.com/metro/2008/05/the_subprime_house_of_cards.html.

400.    According to a January 29, 2009, article in the Miami Herald, Orson Benn, a

former vice president of Argent who was convicted and sentenced to prison for racketeering

relating to mortgage fraud, spent three years during the height of the housing boom teaching

brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan

applications, and helped them invent phantom jobs for borrowers" so that loans could be

approved. Jack Dolan *et al.*, *Home Loan Racket Flourished In Florida*, Miami Herald, Jan. 29,

2009, *available at* http://www.miamiherald.com/2008/12/07/v-fullstory/878194/home-loan-

racket-flourished-in.html.

401.    According to Mr. Benn himself, "the accuracy of loan applications was not a priority." *Id.* The article reports: "The simplest way for a bank to confirm someone's income is to call the employer. But in at least two dozen cases, the applications show bogus telephone numbers for work references." *Id.* The article notes that one Argent broker generated at least 100 loans worth $22 million in Miami and nearly all of them were based on false and misleading financial information. *See id.* For instance, "one borrower claimed to work for a company that didn't exist—and got a $170,000 loan. Another borrower claimed to work a job that didn't exist—and got enough money to buy four houses." *Id.* The Miami Herald obtained applications for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth." *Id.*

402.    Richard Bowen, the former Business Chief Underwriter at Citibank, was involved in the due diligence process for Citibank's acquisition of Argent. In his April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent, and we found large numbers that did not—that were not underwritten according to the representations that were there." Hearing on Subprime Lending and Securitization and Gov't Sponsored Enterprises Before the Fin. Crisis. Inquiry Comm'n (Apr. 7, 2010) (testimony of Richard M. Bowen, III) ("Bowen Testimony") at 239.

403.    In a video released by the American News Project on May 11, 2009, reporters Lagan Sebert and Mike Fritz interviewed several former employees of Argent and Ameriquest regarding their lending practices. American News Project, *Fraud by Mortgage Companies Key Cause of Foreclosures* (May 11, 2009), *available at* http://www.youtube.com/watch?v=MFPi6mcNubo.

404.   Tamara Loatman-Clark, a former loan closer for Argent, stated "I mean you did what you had to do and again if that meant manipulating documents so that you can get them out so that they could conform, that's what you did…. [T]here were incentives to get as many done as possible. So on a typical Thursday, I may have 15 or 20 files that I need to get funded somehow and you know you need to work very hard to get 20 files funded. Whatever hit your desk for the day is what you wanted to get out." *Id.*

405.   According to the video, "It was the Wall Street business that drove the frantic pace. Even before proper papers were signed, Ameriquest was bundling the loans and passing them on." Loatman-Clark said, "And so sometimes when they came back and you're talking about, you know, names not properly on mortgage documents… you're talking about missing documents, like internally the incentive was to do whatever you needed to do to get them out and that sometimes meant that you manipulated documents to get them out." *Id.*

406.   The video report contained the following exchange:

Reporter: "So you are saying the goal was to make these loans and then get them off your books as quick as possible?"

Loatman-Clark: "Exactly. That was the pressure."

Reporter: "But who were the people who were buying, who were like the most hungry for these loans?"

Loatman-Clark: "Bear Stearns… Citigroup was another one. Basically the ones that were/are hardest hit were the people who invested. And these were the people we were shuffling these documents out to by any means necessary."

*Id.*

407.   On June 23, 2011, the Cleveland Plain-Dealer reported that a Cleveland grand jury indicted nine former Argent employees for their suspected roles in approving fraudulent home loans. Mark Gillespie, *Former Employees of Subprime Mortgage Lender Indicted by*

*Cuyahoga County Grand Jury*, The Plain Dealer, June 23, 2011, *available at*

http://blog.cleveland.com/metro/2011/06/former_employees_of_subprime_m.html.

408.    The indictment alleged that Argent employees "helped coach mortgage brokers

about how to falsify loan documents so that they misstated the source or existence of down

payments as well as borrower's income and assets." *Id*. The article noted that "[e]mployees at an

Argent loan processing center in Illinois ultimately approved the loans knowing that the

company's own lending rules had not been satisfied." *Id*. A spokesman for the prosecutor's

office said that "Argent employees bent the rules to get loans approved in order to inflate their

wages and bonuses." *Id*.

409.    Later, the Plain Dealer reported that additional criminal charges had been brought

against one of the former Argent employees indicted in June—a woman named Angela

Pasternak. Mark Gillespie, *Argent Mortgage Worker Gets Indicted Again in Suspected Mortgage

Fraud Case*, The Plain Dealer, Nov. 15, 2011, *available at*

http://blog.cleveland.com/metro/2011/11/argent_mortgage_worker_gets_in.html.

410.    According to the article, prosecutors said that Ms. Pasternak, "approved

exceptions knowing that loan applications contained false income information and bogus credit

scores." *Id*. The article also reported, "Plain Dealer investigations found numerous instances in

which Argent approved mortgages that contained blatant misrepresentations of borrowers'

income, assets and ability to pay." *Id*.

411.    According to another article, Steve Jernigan, a fraud investigator at Argent, said

that when he sent an appraiser to check on a subdivision for which Argent had made loans, the

address on the loans was clearly fictitious because the appraiser was standing in the middle of a

cornfield. Michael W. Hudson, *Silencing the Whistle-blowers*, The Investigative Fund, May 10,

2010, *available at*

http://www.theinvestigativefund.org/investigations/economiccrisis/1308/silencing_the_whistle-

blowers/.

412.    When Jernigan reviewed the loan files, he determined that the houses did not exist

and that each of the loan files contained the picture of the same house. *See id.* The article also

reported that Argent had been ripped off by a con man named Robert Andrew Penn, who later

admitted that he had appropriated victims' names and credit histories to obtain loans and buy

properties for inflated prices around Indianapolis. *See id*. Although Argent was warned about the

man in 2004, Jernigan said the company did not "conduct a serious investigation" into the fraud

until mid-2006 when it learned the scheme was about to be made public by another duped lender.

*Id*.

413.    In January 2010, Ameriquest and Argent agreed to pay $22 million to settle 29

class action lawsuits against them that had been consolidated in the Northern District of Illinois,

alleging that Argent and Ameriquest inflated appraisal values and borrower income or asset

statements and aggressively employed misleading marketing/sales techniques as part of a

business strategy to force potential borrowers to close loans. *See In re Ameriquest Mortgage Co.*

*Mortgage Lending Pracs. Litig*., MDL No. 1715 (N.D. Ill).\

### 20.    First Franklin

414.    First Franklin Financial Corporation ("First Franklin") originated or contributed a

material portion of the loans in the mortgage pools underlying the trusts.

415.    Starting in 2009, First Franklin was named in numerous lawsuits alleging that it

systematically abandoned its underwriting guidelines in the pursuit of profits. These lawsuits

contain ample evidence that mortgage loans originated by First Franklin breached the associated

Case 1:14-cv-09928-PAE   Document 46   Filed 02/02/15   Page 138 of 222

representations and warranties. Not only do these lawsuits contain eye-witness accounts from confidential witnesses and former employees of First Franklin, but many complaints also contain detailed information based on forensic reviews of individual loans.

416.    One of the earliest lawsuits naming First Franklin was filed on February 17, 2009. Complaint, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. et al.*, No. 09-cv-1392 (S.D.N.Y. Feb. 17, 2009). The complaint alleged that First Franklin "systematically ignored, or abandoned their stated and pre-established underwriting and appraisal standards." *Id.* at ¶ 11. The litigation was eventually settled.

417.    First Franklin was also named in a 2010 class action suit that alleged it systemically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See* Corrected Am. Compl. For Rescission and Damages, *Federal Home Loan Bank of Chicago v. Banc of America Funding Corp et al.*, No. 10-ch-45003 (Ill. Cir. Ct. Apr. 8, 2011) ("FHLB Chicago Am. Compl.").

418.    Statements from confidential witnesses in the FHLB Chicago Am. Complaint represented that First Franklin originated mortgage loans in violation of its stated underwriting standards.

419.    According to one confidential witness who was an underwriter at a First Franklin branch in Georgia from March 2004 to November 2007, account executives at First Franklin were making "$100,000 a month in commissions," which was based on the number and dollar amount of loans processed. Due to this incentive structure, account executives would often pressure underwriters to approve loans that should not have been approved. The executives would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through." *Id.* ¶¶ 387-88.

132

420.     That same confidential witness explained that First Franklin used contract appraisers who inflated property values. There "were homes with busted out windows and the meter boxes [] missing" that appraised for $300,000. He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income. Further, he knew that mortgage brokers who referred loan applications to First Franklin were "whiting out or faxing over" the actual numbers and writing in new numbers so that the loans would work. *Id.* ¶¶ 400, 402.

421.     Another confidential witness was an underwriter and account executive at a First Franklin branch in Ohio from 2000 until 2007. Account executives were responsible for maintaining relationships with mortgage brokers that referred loan applications to the originating banks. This confidential witness stated that "account executives paid processors cash under the table to help them get loans closed," and went on to describe how one loan processor was caught manipulating the loan documents in order to close more loans. *Id.* ¶ 389.

422.     One confidential witness, who was an underwriter at a First Franklin branch in Washington from 2005 until November 2007, described how the systematic disregard for underwriting standards grew worse after First Franklin purchased OwnIt Mortgage and OwnIt employees began working with the confidential witness. She stated that OwnIt employees "were used to approving anything. They'd say, 'If we don't approve it, somebody else will. So why lose the money?'" This witness's manager was a former OwnIt employee who would often override her employees' decisions to decline loans in order to meet performance goals. The witness also noted that First Franklin employees manipulated applications so that they would be approved. *Id.* ¶¶ 390, 406.

423.    The confidential witness who worked at the Ohio branch represented that there was enormous pressure from management to close loans at any cost. "[P]eople were working until 8 p.m. on Saturdays and Sundays" in order to close the loans, stated the witness. As a result, "a lot of loans slipped through. People were tired of being beat up. With the rush of loans, stuff could have been overlooked. Maybe the conditions didn't exactly meet the guidelines." During the last few days of the month, some employees would go to the branch manager "begging for exceptions to close their loans." *Id.* ¶ 395.

424.    Another confidential witness, who was, among other things, an account executive and underwriter at a First Franklin branch in Utah from 1996 until 2008, noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan, and said that "some loans were approved that were not compliant with guidelines." *Id.* ¶ 396.

425.    That same confidential witness also encountered the "blatant fraud" first hand. She recalled a $500,000 loan application for a home that was supposed to be owner occupied even though the same borrower and purchased a $1,000,000 home in the same neighborhood a month earlier and also claimed that it would be owner occupied. Although the underwriter was successful in blocking that particular application, her manager was mad at her for catching it. Other similar loans were approved. *See id.* ¶ 404.

426.    When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation. The confidential witness from the Utah branch was one of them. She reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the loans she reviewed, fifty percent were not compliant with First Franklin's guidelines, citing

problems such as inflated appraisal values, insufficient employment verification, and disqualifying credit scores. *See id*. ¶ 398.

427.    According to another confidential witness, who was an underwriter at a First Franklin branch in Florida from 1999 until 2007, loan document manipulation at First Franklin grew to disconcerting levels. The witness stated that "a lot of fraudulent loans were going through. There was tons of fraud going on." *Id*. ¶ 401.

428.    FHLB's complaint survived the defendants' motion to dismiss, with the court stating "the Bank has provided evidentiary facts, such as testimony, AVM analysis of appraisal values, delinquency and foreclosure rates, and pleadings from other civil actions involving the defendants, which demonstrate the strength of the Bank's case" that the originators systematically disregarded their underwriting standards. Order, No. 10-45033 (Ill. Cir. Ct. Sept. 19, 2012).

429.    First Franklin has also been sued by Ambac Assurance Corporation, a company that provided monoline insurance, a form of credit enhancement for certain certificates in a RMBS. After paying hundreds of millions of dollars to certificateholders as a result of the many defaults and delinquencies on First Franklin-originated loans, Ambac reviewed 1,750 First Franklin loans. It found that 94% had material defects, including:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated appraisals; and

- Pervasive violations of the loan originator's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value

ratios above the allowed maximums, or (iii) with relationships to the applicable originator or other non-arm's-length relationships.

Complaint, *Ambac Assurance Corp. v. First Franklin Fin. Corp.*, No. 651217/2012, at ¶¶ 82-83 (N.Y. Sup. Ct. April 16, 2012).

### 21.    Option One

430.    Option One Mortgage Corp. ("Option One") was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc. in April 2008. Option One originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

431.    In November 2008, the OCC issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations. Option One was ranked as the sixth-worst mortgage originator by number of foreclosures in the worst-affected metropolitan areas.

432.    Reflecting the terrible quality of its loans, Option One has since been named as a defendant in a wave of lawsuits alleging that it engaged in a pattern of fraudulent and otherwise improper lending practices. Cambridge Place, a RMBS investor, sued Morgan Stanley and other Wall Street banks alleging violations of the Massachusetts Securities Act arising from the Wall Street banks' offers and sales of RMBS. Cambridge Place's complaint relied on several confidential witnesses. These former employees with first-hand knowledge confirmed that Option One violated its stated standards for underwriting and appraisals. *See* Am. Complaint, *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. Oct. 14, 2011).

433.    For example, a former underwriter at Option One in Atlanta, Georgia from 2005

to 2006, referred to as CW 52, said that if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. With account executives, "the biggest screamer and shaker of trees gets the most fruit." For a "top-producing" account executive, any red flags that may have been present in the loan file being considered would be "overlooked" and the loan file would invariably be pushed through successfully. CW 52 estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner. CW 52 also stated that a loan applicant could tell "a straight up lie" about his or her income, but the false information would be overlooked and the loan would be approved, despite CW 52's initial rejection of the application. *Id.* ¶ 242.

434.    Similarly, CW 53, an underwriter at Option One's Marietta, Georgia office in 2005, reported that Option One approved stated income loans "knowing good and well that those people did not make that much money in the position they were in." Likewise, CW 54, an underwriter for Option One in Hawaii from November 2004 to January 2006, stated that "the overwhelming majority of stated income loans were crafted," meaning that the borrowers were not making "anywhere near" what they claimed. However, CW 54 stated that he felt pressured to push loans through because every loan generated income and because, "[i]f you applied any level of rational thought, you were frowned upon." *Id.* ¶ 243.

435.    Former employees also revealed that falsified mortgage appraisals were another ubiquitous facet of Option One's questionable origination practices. With respect to artificially inflated appraisals, CW 52 stated that "[o]f course [loan appraisers] inflated values" and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file. Similarly, CW 55 stated that the appraisals "were all bad." He considered the appraisals borderline fraudulent, not

merely incompetent, but was unable to prevent loans based on the flawed appraisals. He

explained, "Our job is supposed to be stopping bad loans, but no one stopped them." When CW

55 objected to loans because of flawed appraisals, the loan officer would complain to the branch

manager, who would complain to the Appraisals Department at headquarters in Irvine,

California, and on up the chain until someone high enough in the Underwriting and Sales

Department would ultimately approve the loan. *Id.* ¶ 244.

436.    Option One was motivated to violate its underwriting and appraisal standards in

order to increase the volume of loans it could sell to Wall Street banks to be securitized. CW 56,

an Assistant Vice President of Option One from 2005 to 2007, worked in the Correspondent

Lending department, which purchased loans from small mortgage companies. CW 56 stated that

Option One purchased loans that raised concerns under the stated guidelines and that when he

raised such concerns he was essentially told, "Shut up. Wall Street will buy it: don't worry about

it." *Id.* ¶ 245.

437.    Similarly, CW 57, who was an underwriter at Option One in Pleasanton,

California from October 2005 to October 2007, stated that "[i]f [a borrower] had a FICO and a

pulse, they could get a loan" from Option One. CW 57 also stated the following:

> I caught blatant fraud, and the [account executive] would still fight for it. [The account
> executives and managers] would fight me because they didn't care. They knew they were
> going to sell it on the secondary market, and they didn't care because it wasn't their
> money. They were going to get paid regardless.... At Option One they didn't have a
> portfolio; they sold everything, so they didn't care.... [Option One] didn't have to worry
> about it, because once they're done with these crappy loans, they'd sell them off. They
> were the investors' problem.

*Id.* ¶ 246.

438.    The *Cambridge Place* suit survived a motion to dismiss, with the court holding

that the allegations paint a "particularized and compelling portrait of a dramatic loosening of

underwriting standards on the part of the originators." *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, 10-2741, 2012 WL 5351233, *13 (Mass. Super. Ct. Sept. 28, 2012).

439.     Option One has also been the subject of state and federal investigations. On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans. Complaint, *Commonwealth v. H&R Block, Inc.*, No. 08-2474 (Mass. Super. Ct. June 3, 2008).

440.     According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market." *Id.* ¶ 4.

441.     The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home." *Id.* ¶ 8. Option One also "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." *Id.* Option One's "origination policies employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id.* ¶ 1.

442.     On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).

443.     On October 29, 2009, the Appeals Court of Massachusetts affirmed the

preliminary injunction. *Commonwealth v. Option One Mortgage Co.*, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

444.     On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. Press Release, *H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions*, Massachusetts Attorney General (Aug. 9, 2011), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2011/option-one-settlement.html.

### 22.     WMC Mortgage Corp.

445.     WMC Mortgage Corp. ("WMC") originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

446.     In 2004, when General Electric ("GE") purchased it from a private equity firm, WMC was the sixth-largest subprime lender in the country. WMC specialized in nonprime loans and jumbo loans of up to $1 million.

447.     On January 20, 2012, the Huffington Post reported that the FBI and the Department of Justice were investigating possible fraud at WMC.

448.     Another article published that same day on iwatchnews.org elaborated on the investigation. According to the article, "the government is asking whether WMC used falsified paperwork, overstated borrowers' income and other tactics to push through questionable loans" with the probe focused on whether "senior managers condoned improper practices that enabled fraudulent loans to be sold to investors." The article reports the following:

> The FBI's San Francisco office indicated that it has been looking into WMC's business practices for nearly two years, according to one of the people who has knowledge of the investigation. The bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sale of mortgages to investors, this person said.

Michael Hudson, *Feds investigating possible fraud at GE's former subprime unit*,

iwatchnews.org, Jan. 20, 2012, *available at* http://www.publicintegrity.org/2012/01/20/7908/

feds-investigating-possible-fraud-ge-s-former-subprime-unit.

449.    Another iwatchnews.org article was a lengthy report on GE's purchase of WMC

and the practices of WMC's sales staff to push through loans at any cost. According to the

article, several ex-employees claim that many WMC sales staff "embraced fraud as a tool for

pushing through loans that borrowers couldn't afford" and that WMC ignored reports of loans

supported by falsified documents and inflated incomes. The article continued:

> Dave Riedel, a former compliance manager at WMC, says sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors.
>
> One WMC official, Riedel claims, went so far as to declare:
> "Fraud pays."
> . . .
>
> [Riedel] supervised a quality-control team of a dozen or more people who watched over WMC's lending in a broad area of Southern California where salespeople were pushing subprime loans as well as "Alt-A" mortgages, another type of risky home loan.
>
> The team, Riedel says, found many examples of fraud committed by in-house staffers or the independent mortgage brokers who helped bring in customers to the lender. These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.
>
> Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms, he says. Some, he says, did it old-school, cutting and pasting numbers from one photocopy to another. Others, he says, had software on their computers that allowed them to create W-2s from scratch.
> . . .
>
> While Dave Riedel was fighting battles inside WMC's California headquarters, Gail Roman was losing battles on the other side of the country.
>
> Roman worked as a loan auditor at WMC's regional offices in Orangeburg, N.Y. She and other colleagues in quality control, she says, dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications.

It did little good. Management ignored their reports and approved the loans anyway, she says.

"They didn't want to hear what you found," Roman told iWatch News. "Even if you had enough documentation to show that there was fraud or questionable activity."

If GE made any progress against fraud at WMC, Roman says, she didn't notice it. Fraud was as bad at WMC in 2006 as it was when she started at the lender in 2004, she says.

"I didn't really see much of a change," Roman says.

Victor Argueta, the former risk analyst, says he didn't see much change either.

Meetings would be held. Executives from GE would agree fraud was a problem and something needed to be done. "But the next month it was business as usual," Argueta says.
. . .

Argueta says one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.
"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta says. "Anything to make the loan look better than what was the real story."

In one instance, Argueta says, he sniffed out salespeople who were putting down fake jobs on borrowers' loan applications — even listing their own cell phone numbers so they could pose as the borrowers' supervisors and "confirm" that the borrowers were working at the made-up employers.

Management gave him a pat on the back for pointing out the problem, he says, but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

Nightmare loans

Roman and Argueta weren't alone in their concerns, according to other ex-employees who spoke on the condition they remain anonymous, because they still work in banking and fear being blackballed within the industry.

"It was ugly," one former fraud investigator at WMC recalls. "I would have nightmares about some of the things I'd find in a file. I'd wake up in the middle of the night going, 'Oh my God, how did this happen?' "

A former manager who worked for WMC in California claims that company officials transferred and essentially demoted her after she complained about fraud, including the

handiwork of a sales rep who used an X-Acto knife to create bogus documents, cutting numbers from one piece of paper and pasting them onto another, then running the mock-up through a photocopier.

. . .

By early 2006, Dave Riedel had begun to rebuild his career inside WMC.

He helped put together a presentation in May 2006 aimed at giving GE officials a sense of how serious WMC's fraud problems were. Riedel says an audit of soured loans that investors had asked WMC to repurchase indicated that 78 percent of them had been fraudulent; nearly four out of five of the loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment.

Michael Hudson, *Fraud and folly: The untold story of General Electric's subprime debacle*, iwatchnews.org, Jan. 6, 2012, *available at* http://www.publicintegrity.org/2012/01/06/7802/ fraud-and-folly-untold-story-general-electric-s-subprime-debacle.

450.    On the radio program This American Life, broadcast May 9, 2008, reporter Alex Blumberg interviewed a WMC sales manager who made over a million dollars a year by making loans to "people [who] didn't have a pot to piss in." Blumberg reported that the manager "didn't worry about whether the loans were good. That's someone else's problem." *This American Life: The Giant Pool of Money*, Chicago Public Radio (May 9, 2008), *available at* http://www.thisamericanlife.org/radio-archives/episode/355/transcript.

451.    In June 2008, the Washington State Department of Financial Institutions filed a "Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC and its owners. The Statement of Charges stemmed from an investigation that found WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage rates by almost 5%, and committed numerous other violations of Washington State deceptive and unfair practices laws. In July 2009, WMC entered a consent

order under which it agreed to pay fines, restitution and the costs of the investigation to settle the matter. *Available a*t http://www.dfi.wa.gov/CS%20Orders/C-07-557-09-CO02.pdf. WMC's lack of underwriting landed it fourth on the OCC's 2009 "Worst Ten of the Worst Ten" list.

### 23.    First National Bank of Nevada

452.    First National Bank of Nevada ("FNB Nevada") was a large subprime mortgage lender and originated or contributed a material portion of the loans in the mortgage pools underlying the trusts.

453.    First National Bank Arizona ("FNB Arizona"), FNB Nevada, and First Heritage Bank were controlled by First National Bank Holding Company ("FNB Holding"), collectively ("FNB Group"). All were under common management. *See* Department of the Treasury, Office of the Inspector General, *Audit Report: Safety and Soundness: Material Loss Review of First National Bank of Nevada and First Heritage Bank, National Association* at 4 (Feb. 27, 2009) ("FNB Nevada OIG Report"), *available at* http://www.treasury.gov/about/organizational-structure/ig/Documents/oig09033.pdf.

454.    FNB Arizona ran the FNB Group's residential mortgage lending operation. *See* FNB Nevada OIG Report at 4.

455.    The dollar amount of mortgage loans originated by FNB Arizona increased substantially in the 2000s. David Enrich and Damian Paletta, *Failed Lender Played Regulatory Angles*, Wall Street Journal, Oct. 3, 2008, *available at* http://online.wsj.com/articles/SB122298993937000343.

456.    FNB Arizona was an OTD lender; in 2006, $6.9 billion of its loans were packaged into RMBS. *See* FNB Nevada OIG Report at 5.

457.    A series of investigations by the OCC detail how FNB Arizona achieved its rapid

growth by pervasively disregarding its underwriting guidelines.

458.    In 2004, the OCC inspected FNB Arizona and determined that it needed better

"[p]rocedures to reduce underwriting exceptions" and better "[p]olicies and internal controls

over the use of appraisers." FNB Nevada OIG Report at 44.

459.    A 2005 OCC investigation found that "[c]redit underwriting and administration

need improvement. The quickness of loan production has had priority over quality. Issues

include loan appraisal violations (repeat issue) and inadequate practices over standby letters of

credit." It recommended FNB Arizona "develop and implement procedures and accountability

that are effective in reducing the high level of underwriting exceptions (repeat issue)" and reduce

the number of employee and vendor errors in loan origination. It also cited FNB Arizona for two

regulatory violations—failing to appraise properties prior to closing and failing to use

independent appraisers. *Id.* at 44-46.

460.    A 2006 investigation found that FNB Arizona still had not implemented

"effective procedures and processes to reduce the level and number of underwriting exceptions."

The OCC also noted that appraisers' reports were often missing or incomplete. *Id.* at 47.

461.    In 2007, FNB Arizona's liquidity problems prompted the OCC to initiate an

informal enforcement action. It cited several matters requiring the direct attention of the bank's

board, including internal loan review that lacked independence due to executive management

influence, understaffed internal loan review, staffing levels and expertise that were not

commensurate with the complexities of the bank's operations, and (yet again) the need to reduce

underwriting exceptions. *See id.* at 48-50.

462.    FNB Arizona's underwriting practices became so poor that in 2007 it was unable

to sell $683 million of residential mortgages to securitizers. It was also forced to repurchase a number of its poorly underwritten mortgages. This contributed to a liquidity crisis for the entire FNB Group. *See id.* at 2, 6.

463.    On June 30, 2008 FNB Arizona merged into FNB Nevada. Shortly thereafter, the OCC closed FNB Nevada and appointed the FDIC as its receiver. Press Release, *OCC Closes First National Bank of Nevada and Appoints FDIC Receiver* (July 25, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2008/nr-occ-2008-87.html.

464.    In its capacity as receiver for FNB Nevada, the FDIC sued former directors and officers of the FNB Group. Complaint, *FDIC v. Dorris et al.*, No. 11-cv-1652 (D. Ariz. Aug. 23, 2011). The FDIC alleged the same pervasive disregard of underwriting guidelines described above. *See id.* ¶¶ 38-42.

465.    The complaint also detailed how the bank's compensation structure was tied to the volume of loans originated, creating an incentive for bank employees to disregard the underwriting guidelines. *See id.* ¶ 30. FNB Arizona also used many mortgage brokers who had the same volume-based incentive to disregard underwriting guidelines and to inflate appraisals. *See id.* ¶¶ 33-34.

466.    The suit settled less than two months after it was filed and the court entered judgments for $20 million against the two defendants.

467.    Evidence uncovered in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-cv-10446 (D. Mass.) further highlights FNB Arizona's disregard of its underwriting guidelines. There, the court allowed the plaintiff to engage in limited discovery, which uncovered four pertinent pieces of evidence:

- "[T]hree 'representative' no-document loans that [FNB Nevada] originated. In each of these 'No Doc' loans, the borrower's income was either unknown or unverified, or

inadequate to make payments on the underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan."

- "[T]he declaration of Susan Wright, who underwrote loans at [FNB Nevada] in 2006 and 2007 and generally corroborates the Complaint's allegations about [FNB Nevada]'s underwriting practices." "Wright describes [FNB Nevada]'s business model as trying to 'make as many loans as possible and then sell them as quickly as possible' and explains that their underwriting practices instructed underwriters to remove income and asset information already in the possession of [FNB Nevada] from 'No Doc' loans. She states that [FNB Nevada] regularly made loans to borrowers whom '[FNB Nevada] knowingly qualified on the basis of what appeared to be obviously false information [and] [FNB Nevada] did not appear to reasonably expect that the borrowers would be able to repay these loans.'"

- "[S]everal emails generated by [FNB Nevada] employees, including Mortgage Division President Pat Lamb; Vice President of Risk Management Renea Aderhold; 'SVP Ops/Communication Manager' Beth Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk Officer Eric Meschen, which collectively paint a picture of a devil-may-care underwriting culture."

- "[T]he expert report of Ira Holt, an accountant who performed a forensic analysis of 408 of the Trusts' loans using the [FNB Nevada] guidelines that were in place when they were originated. Holt found that 108 (26.5%) had material defects that violated even [FNB Nevada]'s slack underwriting standards." "According to Holt, he was unable to 're-underwrite' some of the 408 loans because of the lack of documentation, as well as the 'scrubbing' of the applicant's disqualifying data by [FNB Nevada]. According to plaintiffs, the number of loans in the sample with material defects may be considerably higher than Holt's estimates."

*Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 894 F.Supp.2d 144, 148 & 148 n.6, 8 (D. Mass. Oct. 1, 2012). The court held allegations based on that evidence were sufficient to survive a motion to dismiss. *Id.* at 150.

### 24.   MortgageIT

468.    MortgageIT, Inc. ("MortgageIT") is a residential mortgage banking company headquartered in New York, New York. On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products. MortgageIT originated or contributed a material portion of the loans in the trusts.

469.     MortgageIT has been the subject of numerous investigations and lawsuits alleging that MortgageIT systematically abandoned its underwriting guidelines in the pursuit of profits. These investigations and lawsuits contain ample evidence that mortgage loans originated by MortgageIT breached the associated representations and warranties.

470.     MortgageIT faced a civil mortgage fraud lawsuit brought in May 2011 by the United States Department of Justice ("DOJ") alleging that MortgageIT made repeated false certifications to the U.S. Department of Housing and Urban Development ("HUD") in connection with its residential mortgage origination and sponsorship practices. *See United States v. Deutsche Bank AG and MortgageIT, Inc.*, No. 11-cv-02976 (S.D.N.Y.). An amended complaint was filed on August 22, 2011 ("DOJ Complaint").

471.     The United States alleges that "MortgageIT repeatedly lied to be included in a Government program to select mortgages for insurance by Government. Once in that program, they recklessly selected mortgages that violated program rules in blatant disregard of whether the borrowers could make mortgage payments." DOJ Complaint ¶ 1.

472.     According to the DOJ Complaint, "As of June 2011, HUD has paid more than $368 million in FHA insurance claims and related costs arising out of MortgageIT's approval of mortgages for FHA insurance. Many of those claims arose out of FHA mortgage insurance provided by HUD based on MortgageIT's false certifications of due diligence." *Id*. ¶ 233.

473.     The complaint also alleges that MortgageIT chronically understaffed quality control: "Between 2006 and 2009, the sole employee at Deutsche Bank or MortgageIT conducting quality control reviews of closed FHA-insured mortgages was the Government Loan Auditor. His review of closed FHA-insured mortgages continually declined during that period, and declined most significantly after Deutsche Bank acquired MortgageIT. By the end of 2007,

the Government Loan Auditor was no longer spending any time conducting quality control reviews of closed mortgage files. To increase sales, Deutsche Bank and MortgageIT shifted his work from quality control reviews of closed mortgages (i.e., quality control audits) to assistance with production. By the end of 2007, not a single person at Deutsche Bank or MortgageIT was conducting quality control reviews of closed FHA-insured mortgages, as required by HUD rules." *Id*. ¶ 143-144.

474. MortgageIT allegedly also ignored quality control measures. For example, MortgageIT contracted with an outside vendor to conduct quality control reviews of FHA-insured loans. The vendor provided the reviews in letters detailing underwriting violations found in FHA-insured mortgages to MortgageIT. The findings included identification of serious underwriting violations. Instead of reading the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a closet at MortgageIT's Manhattan headquarters." It was not until MortgageIT hired its first quality control manager that these letters were taken out of the closet and read. Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations." *Id*. ¶ 111-124.

475. The Amended DOJ Complaint further alleged that "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud." *Id*. ¶ 145.

476. Additionally, the complaint alleged that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles." *Id*. ¶ 162.

477.    The complaint cites many examples of MortgageIT's failure to perform due

diligence. These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162-230.

478.    On May 9, 2012, the parties settled the case for $202.3 million.

Several private investigations and lawsuits also illustrated the fact that MortgageIT failed to

comply with its stated underwriting guidelines. The complaint in *Landesbank Baden-*

*Wurttemberg v. Deutsche Bank AG*, No. 654543/2012 (N.Y. Sup. Ct. Dec. 27, 2012), quotes

confidential witnesses demonstrating that there was virtually no effort at compliance at

MortgageIT. Through the confidential witnesses, the complaint alleges that loan officers stated that it did not matter what happened with loans as long as MortgageIT received the commission; that the sales team rejected any attempt to stop using brokers because of likely fraudulent activity; that the due diligence was far from adequate; and that compensation was tied to loan volume and there was no disincentive to originate and sell loans that would later default.

C.   **A High Number of Borrower Delinquencies and Defaults on Mortgages in the Trusts' Loan Pools and Enormous Trust Losses Are Further Evidence of the Originators' Systematic Disregard of Underwriting Standards**

479.    Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level, there are various other indications that the trust's loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties, including the folowing: 1) the trusts' high default and delinquency rates; and 2) the trusts' enormous cumulative losses. A summary of the trusts' default and delinquency rates and the trusts' cumulative losses is attached as Exhibit C. Defendants should have carefully investigated these issues, notified certificateholders of the issues, and taken action to address these issues.

1.    **The Trusts Suffered from High Delinquency and Default Rates**

480.    Residential mortgages are considered delinquent if no payment has been received for over 30 days after payment is due. Residential mortgages where no payment has been received for over 90 days (or three payment cycles) are considered to be in default.

481.    By January 2009, Defendants and their responsible officers witnessed a significant rise in reported default and delinquencies in the loan pools backing the trusts with many defaults and delinquencies occurring within months of the loans' origination. As many commentators have noted, such rapid and numerous defaults indicate loans that should not have

been made. For example, a November 2008 Federal Reserve Board study attributed the general

rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early

payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily

apparent to investors." Christopher J. Mayer et al., *The Rise in Mortgage Defaults*, at 15-16 Fed.

Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59.

482.   By 2009, these massive numbers of defaults and delinquencies should have

alerted Defendants to carefully investigate whether the loans sold into the trusts complied with

the responsible parties' representations and warranties and take action to address any issues.

Loan pools that were properly underwritten and containing loans with the represented

characteristics would have experienced substantially fewer payment problems and substantially

lower percentages of defaults, foreclosures, and delinquency.

483.   These default and delinquency rates were communicated to Defendants monthly

through the service reports and trustee remittance reports. By January 2009, 70 out of the 82

trusts were reporting default and delinquency rates of over 10%, with more than a quarter of all

the trusts reporting delinquency rates of over 40%. The average default and delinquency rate of

the trusts by January 2009 was over 32%. By January 2010, this average was over 41%.

484.    Properly underwritten loans would have experienced far fewer payment problems

and substantially lower percentages of defaults, foreclosures, and delinquencies even during an

economic downturn.

### 2.      The Trusts Suffered Huge Losses

485.   Realized losses are the losses incurred regarding any liquidated mortgage loan or

any mortgage loan charged off by the servicer. The realized losses equal the portion of the stated

principal balance remaining unpaid after applying all net liquidation proceeds to the mortgage

loan.

486.    By January 2009, the trusts' extraordinary losses should have raised a red flag to the trustees to carefully investigate whether the mortgage loans sold to the trusts complied with the responsible parties' representations and warranties. In particular, large realized losses are indicative of severe deficiencies in the appraisal and valuation process. As an example, the MLMI 2006-RM2 trust was reporting cumulative losses in January 2009 of over $215 million, which equates to more than 22% of the trust's total original par value.

487.    By January 2009, the total combined cumulative losses for the trusts (with reported figures) exceeded $2.8 billion, with the trusts reporting an average loss of over $34 million. By January 2011, the total reported cumulative losses for the trusts were over $9.9 billion, with an average loss of over $120 million.

488.    The immense losses are strong evidence that the originators systematically disregarded the underwriting standards and that many mortgages in the pool were not written in adherence to the underwriting guidelines in breach of the representations and warranties.

**D.      The Collapse of the Certificates' Credit Ratings Is Further Evidence of Systematic Disregard of Underwriting Guidelines**

489.    RMBS are generally divided into slices or tranches, each of which represents a different level of risk. RMBS certificates denote the particular tranches of the security purchased by the investor.

490.    The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS. Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

491.    The credit rating agencies use letter-grade rating systems as shown in Table 2 (*infra*).

**Table 2**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | **Prime (Maximum Safety)** | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | **High Grade, High Quality** | **INVESTMENT GRADE** |
| A1<br>A2<br>A3 | A+<br>A<br>A- | **Upper Medium Grade** | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba2<br>Ba3 | BB<br>BB- | **Non-Investment Grade, or Speculative** | |
| B1<br>B2<br>B3 | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | **SPECULATIVE GRADE** |
| Caa2<br>Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

492.    Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Services, Inc., Moody's Rating Symbols & Definitions at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong." Standard & Poor's, Ratings Definitions, *available at* https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1019442&SctArtId

=147045&from=CM&nsl_code=LIME.

493.    In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as the CCUs, that were generally limited at the time to buying only securities with the highest credit ratings. *See*, *e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-).

494.    The vast majority of the certificates owned by the CCUs were initially rated triple-A at issuance. A Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14. By the end of 2008, 47 of 124 certificates—a staggering 38%—had been downgraded to junk status by at least one credit rating agency. By 2009, this figure had increased to almost 96%. A complete list of the downgrades for the certificates is set forth in Exhibit D.

495.    The high initial credit ratings reflected the risk associated with properly originated and underwritten mortgage loans and were based on the credit risk characteristics the responsible parties represented and warranted to the credit rating agencies. Consequently, the total collapse in the credit ratings of the RMBS certificates the CCUs purchased, typically from triple-A to non-investment speculative grade, put Defendants on notice that they were required to carefully investigate whether the trusts contained defective loans, notify certificateholders of any defaults, and take appropriate action.

VIII.   **ADDITIONAL EVIDENCE SHOWS THAT DEFENDANTS KNEW OF DEFAULTS**

A.   **In Their Capacities as RMBS Servicers for Other Trusts, Defendants Discovered Extensive Responsible Party Breaches of Representations and Warranties**

496.     Defendants and their affiliated entities also served as servicers and/or master servicers for numerous other RMBS trusts. In their capacities as servicers and/or master servicers, Defendants learned that many of the loans originated and sponsored by the same parties involved in the trusts at issue in this Amended Complaint were performing poorly. For example, in their capacities as servicers and/or master servicers for those trusts, one of Defendants' duties was to prepare monthly reports for the trustees detailing the poor performance of the loans. Also, as servicers and/or master servicers, Defendants knew that the credit rating agencies had downgraded trusts as a result of the poor quality of the originators' and sponsors' loan pools because they were responsible for communicating with the ratings agencies. As servicers and/or master servicers, Defendants reviewed the loan files of the mortgage loans, discovering systematic, widespread breaches of representations and warranties in the loan pools.

497.     As servicers for various trusts, Defendants were also responsible for modifying loans and enforcing mortgages in foreclosure proceedings. Such tasks would have invariably led to the discovery that title to a substantial number of mortgages was not perfected.

498.     Because of their experiences as servicers to other RMBS trusts, Defendants knew that these same defective underwriting and securitization practices affected the trusts committed to their care, and had an obligation to investigate that issue carefully.

B.   **Defendants Received Written Notice of Systematic, Widespread Breaches of Representations and Warranties from Monoline Insurers**

499.     Monoline insurance is credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The

responsible parties made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS, and the governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible party and the other parties to the agreement, including the trustee.

500.    Monoline insurers have filed many complaints against responsible parties for representations and warranty breaches in connection with other RMBS trusts to which Defendants serve or served either as master servicers, servicers, or trustees. Prior to filing suit against the responsible parties, the monoline insurers often obtained and carried out forensic loan level reviews of the loans at issue.

501.    In *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., et al.*, No. 650042/2009 (N.Y. Sup. Ct. Jan. 28, 2009), the monoline insurer Syncora sued Countrywide Home Loans, Inc.—which had been acquired by Bank of America—and its affiliates, alleging that its review of loan files securitized by the defendants revealed breaches in 75% of the loans reviewed, with an aggregate principal balance in excess of $187 million.

502.    In *Ambac Assuarance Corp., et al. v. Countrywide Home Loans, Inc., et al.*, No. 651612/2010 (N.Y. Sup. Ct. Sept. 28, 2010), the monoline insurer Ambac sued Countrywide Home Loans, Inc. and its affiliates including Bank of America, alleging that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed. Of the 6,533 loans reviewed across twelve transactions, 6,362 or over 97% contained one or more breaches of the mortgage loan representations.

503.     In *MBIA Ins. Co. v. Countrywide Home Loans, Inc.*, No. 602825/2008 (N.Y. Sup. Ct. Sept. 30, 2008), the monoline insurer MBIA sued Countrywide Home Loans, Inc.—which had been acquired by Bank of America—and its affiliates, alleging that Countrywide "developed a systematic pattern and practice of abandoning its own guidelines for loan origination: knowingly lending to borrowers who could not afford to repay the loans, or who committed fraud in loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use." *Id*. ¶ 2. The parties settled the case in 2013.

504.     Because of the monoline insurers' breach notices and lawsuits, Defendants knew that these same defective underwriting and securitization practices likely affected other trusts containing loans originated and securitized by these same originators and sponsors, and had an obligation to investigate that issue carefully for trusts committed to their care.

### C.     Global RMBS Repurchase Investigations and Settlements Alerted Defendants to Systematic, Widespread Breaches of Representations and Warranties

505.     RMBS certificateholders have initiated numerous mortgage repurchase directions, compelling trustees to demand that responsible parties repurchase the mortgage loans due to breaches of representations and warranties. Defendants were trustees in many of the RMBS subject to these directions.

506.     For example, in 2011 Bank of America entered into an $8.5 billion settlement with The Bank of New York Mellon ("BNYM") concerning Bank of America's exposure on Countrywide-issued RMBS repurchase demands. The Article 77 proceeding concerning the settlement was finally concluded in 2014.

507.     In addition, Bank of America paid $1.4 billion to Freddie Mac in 2011 to settle

RMBS repurchase exposure, and approximately $10 billion to Fannie Mae in 2013 to settle RMBS repurchase exposure.

508.    U.S. Bank has also been involved in global RMBS repurchase settlements. On December 16, 2011, for example, several institutional mortgage investors in hundreds of RMBS trusts sponsored by J.P. Morgan or its affiliates issued written instructions to U.S. Bank, Wells Fargo, BNYM, HSBC, and Deutsche Bank National Trust Company, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools backing the trusts and deficient loan servicing practices. The notices covered over $95 billion of RMBS sponsored by J.P. Morgan from 2005 to 2007.

509.    The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts. J.P. Morgan offered to settle the claims for $4.5 billion less than two years later. U.S. Bank approved the settlement and an Article 77 proceeding is pending.

510.    In January 2012, institutional RMBS investors in trusts sponsored by Wells Fargo or its affiliates issued written instructions to U.S. Bank and HSBC, as trustees, to open investigations into potential breaches of certain representations and warranties and servicing breaches in the trusts in pools securing over $19 billion of RMBS issued by various affiliates of Wells Fargo.

511.    On January 31, 2012, a group of major institutional mortgage investors in several dozen Morgan Stanley-sponsored RMBS trusts demanded that U.S. Bank, Deutsche Bank National Trust Company, and Wells Fargo, as trustees, investigate ineligible mortgages in the loan pools securing those trusts and deficient servicing of the loans. The notices covered more

than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007.

512.    The investors sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts; and securitized by the same investment banks and financial institutions that sponsored the trusts.

513.    On May 14, 2012, institutional mortgage investors in several hundred ResCap-sponsored RMBS trusts reached an agreement with ResCap and its affiliated debtors to resolve claims for breaches of representations and warranties concerning large numbers of loans in the pools securing those trusts. The settlement included over $320 billion of RMBS issued mainly between 2004 and 2008, including 195 trusts for which U.S. Bank serves as trustee.

514.    The investors had sought the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the trusts.

515.    As trustees, Defendants have received many breach notices from institutional investors, indicating widespread and systemic violations of representations and warranties by the responsible parties. Defendants knew similar issues likely affected the other RMBS trusts committed to their care, and had an obligation to investigate that issue carefully.

**D.    Defendants Have Been Involved in Repurchase Litigation Against Responsible Parties**

516.    Defendants were also involved in many repurchase claims for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the trusts. Based on their involvement in these repurchase actions, which alleged widespread, systematic breaches of representations and warranties, Defendants had an obligation to investigate that issue carefully for all trusts committed to their care and take action as appropriate.

517.    In fact, U.S. Bank sued Bank of America in connection with repurchase claims against Countrywide Home Loans and its affiliates. Complaint, *U.S. Bank Nat'l Ass'n, as Trustee*

*for HarborView Mortgage Loan Trust, Series 2005-10 v. Countrywide Home Loans, Inc., et al.*,
No. 652388/2011 (N.Y. Sup. Ct. Aug. 29, 2011). In the complaint, U.S. Bank alleged that in a
sample of 786 loans, 66% of the loans breached one or more representation or warranty. *Id.* ¶ 5.
U.S. Bank also alleged that it served notice on Countrywide, through its successor-in-interest—
Bank of America. *Id.* ¶ 6.

518.    Similarly, U.S. Bank, as the indenture trustee of GreenPoint Mortgage Funding
Trust 2006-HE1, sued GreenPoint to force it to repurchase the loans that it had contributed to the
trust. U.S. Bank alleged that GreenPoint "pervasive[ly] fail[ed] to follow its underwriting
guidelines during the origination of the Loans." Complaint, *U.S. Bank Nat'l Ass'n v. GreenPoint
Mortg. Funding, Inc.*, No. 600352/2009, ¶ 35 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive
misrepresentations of borrowers' income, assets, employment, intent to occupy the property,
inflated appraisal values, and violations of GreenPoint's underwriting guidelines regarding credit
scores, debt-to-income ratios, and loan-to-value ratios).

519.    U.S. Bank based its allegations on a forensic analysis of GreenPoint-originated
loans. Of 1,030 randomly sampled loans, 93% violated GreenPoint's underwriting guidelines.
*See id.* ¶ 2.

520.    Additionally, as the trustee of the Morgan Stanley Mortgage Loan Trust 2007-
2AX, U.S. Bank filed repurchase claims against Morgan Stanley Mortgage Capital, Inc. and
GreenPoint, alleging that a forensic review of certain loan files from the trust established
extensive breaches of the defendants' representations and warranties. Complaint, *U.S. Bank Nat'l
Ass'n v. Morgan Stanley Mortgage Capital Holdings LLC et al.*, No. 650339/2013 (N.Y. Sup. Ct.
July 8, 2013). A forensic analysis of 56 mortgage loan files, revealing that 100% or all 56 loans
breached the representations and warranties. A separate loan-level analysis of 758 other loans in

the trust revealed that the principal originators of the mortgages "failed to adhere to the industry-standard and reasonable underwriting guidelines in an extremely high percentage of cases." *Id.* ¶5. The Morgan Stanley Mortgage Loan Trust 2007-2AX is one of the offerings at issue in this Complaint.

521.    Defendants' involvement in repurchase litigation, particularly the forensic reviews conducted in connection with that litigation, shows that Defendants knew that such widespread, systemic breaches of representations and warranties likely affected all of the trusts committed to their care, and had an obligation to investigate that issue carefully and take action to protect the trusts.

### E.    In Acquiring Bank of America's Trustee Business, U.S. Bank Attempted to Contract around its Predecessors' Liability and Obligations

522.    In January 2011, U.S. Bank acquired Bank of America's U.S. and European corporate trust business, including its RMBS trust business. The acquisition made U.S. Bank the largest RMBS trustee by dollar amount and number of trusts under administration.

523.    U.S. Bank also inherited the legacy securitization trust business of LaSalle Bank, N.A. ("LaSalle"), which Bank of America previously had acquired in October 2007. Thus, U.S. Bank succeeded Bank of America and LaSalle as trustee for certain trusts.

524.    Upon information and belief and based on the allegations in this complaint, prior to acquiring Bank of America's corporate trust business, U.S. Bank knew that Bank of America faced significant liability for its own and LaSalle's failure to take action to protect the RMBS trusts for which they served as trustees. In particular, U.S. Bank learned through its due diligence on the transaction (and otherwise) that Bank of America and LaSalle had unreasonably refused to enforce the rights of the trusts with respect to defective mortgage loans. U.S. Bank knew that the loans underlying the trusts were in material breach of representations and warranties and would

cause the trusts to incur (and continue to incur) substantial losses. U.S. Bank proceeded with the acquisition to solidify its position at the top of the securitization trustee business with the greatest market share. U.S. Bank attempted to avoid the substantial liability of its predecessor trustees by negotiating with Bank of America for certain indemnifications and other provisions purporting to provide protection regarding its successor liability. U.S. Bank's attempt to insulate itself from successor liability for the acquisition of the corporate trust business of Bank of America further confirms its knowledge that the trusts were plagued with defective loans and that trustee obligations were implicated by a failure to act on that knowledge.  Further, after acquisition and despite that knowledge, U.S. Bank failed to preserve remedies that may still have been available to the trusts.  Despite acting to protect its own affairs through indemnification clauses, U.S. Bank did not act to protect trust assets on behalf of certificateholders with the same diligence, as required by the plain language of the TIA and the Streit Act.

## IX.   DEFENDANTS FAILED TO PRUDENTLY ADDRESS MASTER SERVICER AND/OR SERVICER DEFAULTS

### A.   Defendants Breached the Governing Agreements and Their Common Law and Statutory Obligations By Failing to Fulfill Their Duties After Defaults and Events of Default Triggered By Master Servicer and Servicer Misconduct

525.    The master servicers and/or servicers failed to prudently service the mortgage loans underlying the trusts. The governing agreements require that the master servicers and/or servicers administer the mortgage loans for and on behalf of the certificateholders, and do so (consistent with the terms of the governing agreements): (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) to maximize the recoveries regarding such

mortgage loans on a net present value basis; and (iii) without regard to the right of the master servicers and/or servicers to receive compensation or other fees for their services under the governing agreements, the obligation of the master servicers and/or servicers to make servicing advances under the governing agreements, and the master servicers' and/or servicers' ownership, servicing or management for others of any other mortgage loans. The master servicers and servicers did not adhere to these requirements.

526.     The master servicers and/or servicers failed to meet their obligations by: (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) providing false or misleading information to borrowers; (v) failing to properly deliver loan documentation; and (vi) failing to maintain appropriate staffing, training and quality control systems.

527.     Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. In that process, because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers were put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the applicable parties or take action based on these breaches as required by the governing agreements.

528.     The master servicers and/or servicers failed to notify parties to the governing agreements upon the discovery of mortgages in violation of the representations and warranties; failed to enforce repurchase obligations; failed to properly respond to denial of mortgage

insurance claims based on originator misrepresentations; failed to foreclose upon properties when appropriate under applicable law; and failed to conduct foreclosures in a lawful fashion.

529.    Much of this conduct constituted Events of Default under the governing agreements. These failures have been confirmed by governmental investigations, published reports, and public and private litigation that have described the master servicers' and/or servicers' pervasive deviation from customary and lawful servicing practices.

530.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, after notice and lapse of time, constitutes a default.

531.    These defaults ripened into Events of Default under the governing agreements for the trusts. Defendants had an obligation to provide notice of such defaults, which would have resulted in additional Events of Default, but it failed to do so.

532.    Defendants breached the governing agreements, their duties, and violated the law after becoming aware of such breaches, defaults and/or Events of Default by failing to: provide notice of such breaches, defaults and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

533.    Defendants failed to exercise the same skill and care as a prudent person in the same circumstances in enforcing their rights and powers under the governing agreements upon learning of the above breaches, defaults and/or Events of Default.

**B.    Specific Servicer Misconduct**

534.    Most of the trusts' loans are or were serviced by the following servicers and their

affiliates: Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc.;

American Home Mortgage Servicing, Inc.; Wells Fargo Bank, N.A.; Washington Mutual Bank;

JPMorgan Chase Bank, N.A.; Fremont Investment and Loan; GMAC Mortgage Corporation or

Mortgage LLC; Saxon Mortgage Servicers, Inc.; PHH Mortgage Corp.; Aurora Loan Services

LLC and Loan Services, Inc.; Select Portfolio Servicing, Inc.; SunTrust Mortgage, Inc.;

GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; National City Mortgage Co. and

Home Loan Services; Bank of America, N.A.; Ocwen Loan Servicing, LLC; and CitiMortgage,

Inc.

535.    After Countrywide was acquired by Bank of America in 2008, Countrywide

Home Loans Servicing L.P. ("CHLS") was renamed BAC Home Loans Servicing LP ("BAC

Servicing"). In July 2011, BAC Servicing was merged into Bank of America.

536.    In March 2008, prior to being acquired by Bank of America, Countrywide was

ranked as the most common mortgage servicer in the United States and had a servicing portfolio

with a balance of over $1.4 trillion. In September 2009, after its acquisition of Countrywide,

Bank of America was the nation's most common mortgage servicer with a servicing portfolio of

over $2.1 trillion.

537.    On October 6, 2008, the attorneys general in multiple states reached an $8.68

billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full

Spectrum Lending. The settlement allowed certain borrowers whose loans were serviced by

Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest

payments and, for certain borrowers, reduction of their principal balances.

538.    On June 7, 2010, the Federal Trade Commission ("FTC") filed a civil

enforcement action against Countrywide Home Loans, Inc. and BAC Servicing for "unlawful

acts and practices in servicing mortgage loans." Complaint, *Federal Trade Commission v. Countrywide Home Loans, Inc. and BAC Home Loan Servicing, LP*, No. 10-cv-4193 (C.D. Cal. June 7, 2010). Countrywide Home Loans and BAC Servicing paid $108 million to settle.

539.   According to the FTC, when borrowers fell behind on their payments, Countrywide and BAC imposed several default-related services "by funneling the work through panoply of Countrywide subsidiaries." In its mortgage servicing operation, Countrywide/BAC followed a so-called "vertical integration strategy" to generate default-related fee income. Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen in the default services process. According to the FTC, these subsidiaries existed solely to generate revenues for Countrywide/BAC and did not operate at arms'-length with Countrywide/BAC. Countrywide/BAC and their subsidiaries – "[a]s a matter of practice" – added a substantial mark-up to their actual costs for the services and then charged the borrowers the marked-up fees. The inflated fees were both contrary to prudent servicing standards and violated the mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the noteholder's interest in the property and rights under the security instrument.

540.   Countrywide/BAC similarly breached servicing standards and mortgage contracts when servicing loans for borrowers who sought to save their homes through a Chapter 13 bankruptcy. According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and deficiencies accrued on their loan. According to the FTC, "Countrywide made false or

unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts." After the bankruptcy cases have closed and borrowers no longer have the protection of the bankruptcy court, Countrywide/BAC collected those amounts, including through foreclosure actions.

541.   Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of 49 State Attorneys General, the Departments of Justice, Treasury and HUD (collectively, the "Coalition") reached a settlement with, among others, Bank of America. In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

542.   Wells Fargo also serviced many of the trusts. The Office of the Comptroller of the Currency ("OCC") issued a consent order dated April 13, 2011 finding, in part, that Wells Fargo as servicer filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re Wells Fargo Bank, N.A.*, Consent Order, No. AA-EC-11-19 (Apr. 13, 2011).

543.   Wells Fargo stipulated to the consent order. *Available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.

544.   The consent order required Wells Fargo to undertake a sweeping review of their

foreclosure practices, including (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

545.    Additionally, the Coalition reached a settlement with Wells Fargo. The Coalition Complaint alleged that Wells Fargo committed unfair and deceptive practices including: (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; and (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

546.    Following a two week trial, on December 19, 2014, a jury verdict was rendered against Wells Fargo in the amount of $54.8 million resolving claims brought in the class action *Mazzei v. The Money Store*, No. 01-cv-05694 (S.D.N.Y. Jun. 22, 2001). The jury determined that Wells Fargo, and its subsidiaries charged improper and excessive fees for default-related services.  *See* Kurt Orzeck, *Wells Fargo Owes $55M in Mortgage Late Fee Suit, Jury Says*, Law360 (Dec. 19, 2014), *available at* http://www.law360.com/articles/606660/wells-fargo-owes-55m-in-mortgage-late-fee-suit-jury-says.

547.    Another entity that was the master servicer or servicer on a substantial number of

the trusts was JPMorgan Chase Bank, N.A. JPMorgan acquired another common servicer of the trusts, Washington Mutual, in or about September 2008.

548.   The OCC issued a consent order dated April 13, 2011 finding that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, J.P. Morgan, including Washington Mutual, filed with state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records.  *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

549.   JPMorgan stipulated to the consent order.  *Id.*

550.   The OCC ordered JPMorgan, including Washington Mutual, to undertake a sweeping review of its foreclosure practices, including: (i) instituting processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

551.   Further, private litigation has brought to light that J.P. Morgan charged marked-up and unnecessary servicing fees (including through the use of default-related service vendors) and assessed them against borrowers' accounts for profits. *See, e.g.*, *Ellis v. J.P. Morgan Chase &*

*Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013).

552.    Additionally, JPMorgan entered into a settlement of claims brought by the

Coaltion that it committed unfair and deceptive practices including overcharging borrowers for

default related services. *See United States, et al., v. Bank of Am., et al.*, No. 12-cv-00361 (D.D.C.

Mar. 14, 2012).

553.    In 2010, the Federal Reserve, the OCC, the Federal Deposit Insurance

Corporation, and the Office of Thrift Supervision conducted on-site reviews of foreclosure

processing at fourteen federally regulated mortgage servicers. The servicers included Ally

Bank/GMAC, Aurora Bank, Bank of America, HSBC, Suntrust, Citibank (affiliated entity to

CitiMortgage – a servicer for the trusts), JPMorgan Chase, OneWest (which had acquired

IndyMac, a common servicer for the trusts, in or about March 2009), PNC (which had acquired

National City, another servicer for the trusts), and Wells Fargo. These entities together served as

servicer or master servicer on a huge percentage of the trusts.

554.    In April 2011, the investigating agencies issued a report titled "Interagency

Review of Foreclosure Policies and Practices." *Available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47a.pdf.

555.    The report found "critical weaknesses in each of the servicers' foreclosure

governance processes, foreclosure document preparation processes, and oversight and

monitoring of third-party vendors, including foreclosure attorneys." Based on the deficiencies

identified in the report, the investigating agencies initiated enforcement actions against each of

the servicers subject to the report.

556.    Specifically, the report found that the foreclosure governance processes were

underdeveloped and insufficient and that weaknesses included: (i) lack of sufficient audit trails to

show how information set out in servicer affidavits (including the amount of fees and penalties

charged) was linked to servicers' internal records; (ii) failure to ensure accurate foreclosure

documentation, including documentation pertaining to the fees assessed; and (iii) lack of

sufficient oversight of default management service providers.

557.    Additionally, the OTS issued a consent order dated April 13, 2011 finding that

OneWest failed to sufficiently oversee outside counsel and other third-party providers handling

foreclosure-related services.

558.    OneWest stipulated to the OTS's findings. *In re OneWest Bank, FSB*, Consent

Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-

orders-97665.pdf.

559.    In addition, the consent order detailed OneWest's practice of charging excessive

fees. The consent order required OneWest to enact a compliance program to ensure that all fees,

expenses, and other charges imposed on the borrower are assessed in accordance with the terms

of the underlying mortgage. The order also required OneWest to review whether a delinquent

borrower's account was only charged fees and/or penalties that were permissible under the terms

of the loan documents and were otherwise reasonable and customary. Further, OneWest is

required to review whether the frequency that fees were assessed to borrowers' accounts was

excessive. Finally, OneWest was required to remediate all injury to borrowers by reimbursing or

otherwise appropriately remediating borrowers for impermissible of excessive penalties, fees, or

expenses.

560.    As mentioned above, in February 2012, forty-nine state attorneys general and the

federal government announced a historic joint $25 billion state-federal settlement with the

country's five largest mortgage servicers and their affiliates for misconduct related to their

origination and servicing of residential mortgages: (i) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC; (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Wells Fargo & Company and Wells Fargo Bank, N.A. The complaint alleged these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, preparing, executing, notarizing or presenting false and misleading documents, engaging in robo signing, and "charging excessive or improper fees for default-related services." *See United States, et al. v. Bank of America, et al.*, No. 12-cv-0361 (D.D.C. April 4, 2012). These entities served as master servicer and servicer for the vast majority of the trusts.

561.    On December 20, 2010, New Jersey Administrative Director of the Courts issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating there were no irregularities in handling their foreclosure proceedings. The order was directed at, among others, Aurora, HSBC, PHH, SunTrust, PNC (and its servicer National City), and Wachovia, all master servicers or servicers to the trusts. *Available at* http://www.judiciary.state.nj.us/notices/2010/n101220b.pdf.

562.    Also on December 20, 2010, the New Jersey Superior Court Chancery Division issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No. F-59553-10 (N.J. Sup. Ct.), directing six mortgage loan lenders and servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the processing of their uncontested residential foreclosure filings should not be suspended. Wells

Fargo, JPMorgan Chase, Citibank, Bank of America/BAC, OneWest FSB (f/k/a IndyMac), and

GMAC were recipients of this show cause order. *Available at*

https://www.judiciary.state.nj.us/notices/2010/n101220c.pdf.

563.   PHH also entered into a consent order with the state of New Jersey pursuant to

allegations regarding its loan modification and foreclosure processes. *In re PHH Mortgage Corp.*

(Dec. 4, 2013), *available at* http://nj.gov/oag/newsreleases13/PHH-Mortgage-Corporation.pdf.

564.   Aurora was also subject to a consent order reached with the Office of Thrift

Supervision related to its servicing misconduct. *In re Aurora Bank FSB*, No. NE-11-16 (April 13,

2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97661.pdf.

565.   In December 2013, the Consumer Financial Protection Bureau, authorities in 49

states, and the District of Columbia filed a proposed court order requiring the country's largest

nonbank mortgage-loan servicer, Ocwen, and its subsidiary, Ocwen Loan Servicing, to provide

$2 billion in first-lien principal reduction to underwater borrowers to compensate for years of

systemic misconduct at every stage of the mortgage-servicing process. The consent order also

covered two companies previously purchased by Ocwen, Litton and Homeward Residential

Holdings LLC (previously known as American Home Mortgage Servicing, Inc.). These entities

served as master servicer or servicer to some of the trusts. *See*

http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-

billion-in-relief-to-homeowners-for-servicing-wrongs/.

566.   According to the complaint, Ocwen violated state law in several ways, including

failing to timely and accurately apply payments made by borrowers and failing to maintain

accurate account statements; charging borrowers unauthorized fees for default-related services;

and providing false or misleading information in response to consumer complaints.

567.     According to Bloomberg, the Texas Attorney General has stated that American Home falsely claimed that borrowers did not make payments so as to justify late fees and also refused to accept payments, forcing the borrower to incur late charges. *See* David McLaughlin, *Wilbur Ross's American Home Mortgage Faces Servicing Lawsuits*, Bloomberg (Oct. 28, 2010), *available at* http://www.bloomberg.com/news/2010-10-28/wilbur-ross-s-american-home-sued-by-homeowner-texas-for-mortgage-practice.html.

568.     On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork, erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms [such as Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers." Jessica Silver-Greenberg & Michael Corkery, *Loan Complaints by Homeowners Rise Once More*, N.Y. Times (Feb. 18, 2014), *available at* http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/.

569.     In October 2012, Ocwen and Green Tree Servicing LLC ("Green Tree") won a joint bid in the United States Bankruptcy Court of the Southern District of New York for GMAC's mortgage servicing platform. GMAC was a common master servicer and servicer to the trusts.

570.     A May 2014 report on servicer mortgage practices found that Green Tree's servicing practices were inadequate in light of the 2012 National Mortgage Settlement's improved servicing standards requirements. Evan Weinberger, *$25B Mortgage Deal Monitor Says Banks Improved Practices*, Law360.com, May 14, 2014, *available at* http://www.law360.com/articles/537724/25b-mortgage-deal-monitor-says-banks-improved-practices.

571.     The report used twenty-nine metrics, including errors in foreclosure sales,

adherence to late fee guidelines and pre-foreclosure initiation notifications, to determine whether

national servicing standards have improved. Office of Mortgage Settlement Oversight,

Compliance in Progress: A Report from the Monitor of the National Mortgage Settlement (May

14, 2014), *available at* https://www.jasmithmonitoring.com/omso/wp-

content/uploads/sites/4/2014/05/compliance-report-interactive-.pdf.

572.     Green Tree's servicing of the GMAC servicing platform fell short of the

requirements for eight of these metrics.  *Id.* at 9. The report ultimately concluded that Green Tree

"has much implementation work to do."  *Id.* at 2.

573.     Saxon was another trust servicer. In April 2012, the Federal Reserve released a

Consent Order against Morgan Stanley to address patterns of misconduct and negligence in

residential mortgage loan servicing and foreclosure processing at Saxon. The consent order

required Morgan Stanley to retain an independent consultant to review Saxon's foreclosure

proceedings. *In re Morgan Stanley*, Consent Order, No. 12-015-B-HC (Apr. 2, 2012), *available

at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20120403a1.pdf.

574.     Another servicer to the trusts, Fremont Investment and Loan, agreed to pay

Massachusetts $10 million to settle a lawsuit brought based on, among other things, Fremont's

misconduct in servicing loans. *Massachusetts v. Fremont Investment & Loan*, No. 07-4374-

BLS1 (June 9, 2009), *available at* http://www.mass.gov/ago/docs/press/2009/2009-06-09-

fremont-consent-judgment.pdf. Fremont collapsed and went into bankruptcy in 2008.

575.     Another original servicer, Greenpoint Mortgage Funding, Inc., was shuttered by

Capital One in 2007 amid escalating problems with its origination and servicing activities.

576.     Finally, in *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC, et al.*,

No. 603751/2009 (N.Y. Sup. Ct. Dec. 14, 2009), MBIA named, among other parties, Select

Portfolio Servicing, Inc., which acted as servicer or master servicer for many trusts. MBIA

alleged that Select had engaged in several improper servicing activities.

> ### C.   The Master Servicers and Servicers Defaulted on Their Duty to Notify the Trustees of Breaches of the Mortgage Loan Representations and Warranties

577.    Under the governing agreements and prudent servicing standards, master servicers

and servicers are generally required to notify the trustee, among others, upon discovery of a

breach of representations and warranties with respect to a mortgage loan that materially and

adversely affects the loan or the interests of the certificateholders in the loans.

578.    For example, the MABS 2006-WMC4 PSA states:

> In addition, upon the discovery by the Depositor, the NIMS Insurer, the Servicer or the Master Servicer of a breach of any of the representations and warranties made by the Seller or the Originator in the Assignment Agreement or the Originator Master Agreement, respectively, in respect of any Mortgage Loan which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties.

PSA Section 2.02. The governing agreements for the other trusts similarly require such

notification. *See* Exhibit E § V.

579.    The PSA Section 7.01 states:

> (a) "Servicer Event of Default," wherever used herein, means any one of the following events:
> …
> (ii) other than with respect to clause (vi) below, any failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement, or the breach by the Servicer of any representation and warranty contained in Section 2.05, which continues unremedied for a period of 30 days (or if such failure or breach cannot be remedied within 30 days, then such remedy shall have been commenced within 30 days and diligently pursued thereafter; …
> …
> (b) "Master Servicer Event of Default," wherever used herein, means any one of the following events:

…

(ii) the Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth in this Agreement to be performed by it, which covenants and agreements materially affect the rights of Certificateholders, and such failure continues unremedied for a period of 60 days after the date on which written notice of such failure, properly requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or the NIMS Insurer or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights; …

580.    In the course of their duties, the master servicer and servicers to the trusts became aware of the overwhelming and widespread problems with the underlying mortgage loans due to the shoddy origination and underwriting practices detailed above.

581.    Sometimes the master servicers and/or servicers modified mortgage loans held by the trusts. Because the loan modification process involves analysis of the underlying origination and mortgage loan files and any supplemental information provided by the borrower, the master servicers and/or servicers must have been put on notice of breaches of representations and warranties. The master servicers and/or servicers failed to notify the trustee or take action based on these breaches.

582.    In addition, in the course of fulfilling their duties to service the loans, and particularly when required to foreclose on certain mortgage loans when appropriate, the master servicers and servicers also became aware of breaches of representations and warranties but failed to notify the trustee.

583.    These breaches materially affected the mortgage loans and the interests of the certificateholders as the breaches made it far more likely that the loans would underperform.

584.    Under the governing agreements, any failure of the master servicers and/or servicers to observe or perform any covenants or agreements under the governing agreements, including the duty to notify the trustee of breaches of representations and warranties, after notice

178

and lapse of time, constitutes an event of default.

**D.    Defendants Knew That the Trusts Suffered from Widespread Master Servicer and/or Servicer Defaults**

585.    Defendants, as trustees, knew of the servicing misconduct alleged, which has been the subject of high profile government investigations and private and public lawsuits. In the aftermath of the financial crisis, servicing abuse has also received widespread attention in the media. Thus, Defendants knew of the breaches, defaults, and events of default alleged herein.

586.    As described above, Defendants and their responsible officers should have carefully investigated the widespread breaches of representations and warranties reported in the media, governmental investigations, private litigation and the servicing reports and monthly remittance reports and taken appropriate action.

587.    Defendants, as prolific servicers, also knew that the master servicers and servicers were discovering breaches of representations and warranties and failing to notify the applicable parties.

588.    U.S. Bank, Bank of America and their affiliates acted as master servicer and servicer to numerous other RMBS trusts. In 2010, the Federal Reserve, the OCC, the FDIC, and the OTS conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, including U.S. Bank and Bank of America.

589.    In April 2011, the investigating agencies issued a report titled "Interagency Review of Foreclosure Policies and Practices." The report found, among other things, that the servicers failed to evaluate "compliance with applicable laws and regulations, court orders, pooling and servicing agreements, and similar contractual arrangements." Based on the deficiencies identified in the report, the investigating agencies initiated enforcement actions against each of the servicers subject to the report. *Available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47a.pdf.

590.    Ally/GMAC, Aurora Bank, Suntrust, Citibank, J.P. Morgan Chase, HSBC,
OneWest, PNC and Wells Fargo were all subjects of the investigation. Along with Bank of
America and its acquired company Countrywide Financial, these entities and their affiliates acted
as master servicer and servicer to the overwhelming majority of the trusts.

591.    Thus, Defendants knew – based on an investigation that they were subject to –
that servicers failed to implement proper quality control, audit and compliance standards and
thus failed to adhere to the notification requirements in the governing agreements.

592.    This failure by the master servicer and servicers to prudently servicer the loans,
notify Defendants of defective loans, and other associated problems constituted events of default,
yet rather than adhere to their statutory and contractual obligations upon such a default,
Defendants ignored the master servicer and servicer misconduct.

593.    Defendants and their responsible officers also received servicing reports and
monthly remittance reports that revealed widespread modifications, large losses and write-
downs, and poor loan quality. Through these reports, Defendants, based on their roles in the
RMBS, knew that there were widespread breaches of representations and warranties that the
master servicers and servicers had discovered but failed to give the required notification.

594.    In addition to the Events of Default discussed above, on July 21, 2011, the
Association of Mortgage Investors notified U.S. Bank that "substantial evidence [] has emerged
of abuses in the servicing and monitoring of" RMBS. The letter set forth in detail the publicly
available evidence demonstrating that there was widespread evidence, including some of the
evidence referenced in this Amended Complaint, that loan originators had systemically breached
representations and warranties provided to securitization trusts, and that the parties servicing

loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements. The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the Certificateholders." The AMI sent similar letters to all major RMBS trustees.

595.    Defendants breached the governing agreements, their duties and applicable law after becoming aware of all of the foregoing breaches, defaults, and/or Events of Default by failing to do the following: provide notice of such breaches, defaults, and/or Events of Default to the master servicers and/or servicers; protect the interests of the certificateholders in the trusts; enforce repurchase obligations; and make prudent decisions concerning remedies after breaches, defaults and/or Events of Default.

596.    Defendants failed to exercise the same skill and care as a prudent person would exercise in the same circumstances in enforcing its rights and powers under the governing agreements.

## X.    DEFENDANTS FAILED TO ENSURE LOAN FILES WERE PROPERLY CONVEYED TO THE TRUSTS AND FAILED TO REMEDY ANY DEFECTS

### A.    Defendants Failed to Take Possession of Complete Mortgage Loan Files

597.    The governing agreements purported to transfer title to the mortgage loans to the trusts for the benefit of certificateholders. To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to the trusts, the governing agreements imposed upon Defendants, or their agents, a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. *See* Exhibit E §§ II, III. The sponsors or

depositors were required to substitute compliant loans for the loans with incomplete files or repurchase the loans. *See* Exhibit E § V, Defendants, however, systematically disregarded their contractual and fiduciary duties to enforce their rights on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates. If Defendants had met their contractual, fiduciary, common law, and statutory duties with respect to the non-compliant loans, Plaintiffs would not have incurred their very significant losses attributable to the default of many of the defective loans. And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

598.     The governing agreements require that Defendants, or their agents, take physical possession of the mortgage files and that the note and mortgage are endorsed and assigned to Defendants. *See* Exhibit E §§ I, II. Under the governing agreements, Defendants were required to review each of the loan files and to certify that the documentation for each loan was accurate and complete. *See* Exhibit E § II, IV.

599.     Defendants had a duty, under the governing agreements, to review the mortgage files and create an exception report identifying mortgage loans with incomplete mortgage files. Those loans had to be cured, repurchased, or substituted by the responsible parties. *Id*.

600.     Upon information and belief, Defendants accepted incomplete files without requiring the responsible parties to cure document defects or substitute or repurchase loans.

601.     Defendants' failure to take possession of the key mortgage loan documents, their failure to ensure proper review of the mortgage files for missing documents or irregularities, and their failure to demand correction of irregularities caused damage to Plaintiffs.

602.     A reasonably prudent trustee who had fulfilled its obligations would have noticed

these failures in mortgage loan documentation. Upon information and belief, Defendants breached their statutory, common law, and contractual obligations by failing to identify these obvious defects and require correction by the responsible parties, and were negligent in failing to do so. Defendants also negligently misrepresented to Plaintiffs that they had done so when they had superior knowledge, a duty to inform, and Plaintiffs had no other way of discovering the truth.

603.   By certifying that they had received documentation that they had not received, Defendants breached their obligations to the detriment of certificateholders, including Plaintiffs.

604.   Defendants failed to act prudently or with due care when they failed to ensure proper review of the required documentation, prepared inaccurate certifications, failed to notify the responsible parties about missing required documentation, failed to require action to remedy the inadequate documentation, failed to properly supervise and review custodian conduct, and failed to notify certificateholders of the inadequate documentation and failure to repurchase, substitute, or cure.

605.   Defendants have failed to exercise due care and to act prudently throughout the life of the trusts. Had Defendants met their contractual, common law, and statutory duties to require delivery of mortgage loan files, review the files, give notice, and issue fully accurate and complete certifications, loans with defective or incomplete files would have been cured, repurchased, or substituted. Because those loans were not cured, repurchased, or substituted, many went into default and caused losses to certificateholders.

606.   Certificateholders did not receive or have access to any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon Defendants to police the deal and protect their contractual and

other legal rights.

607.    Defendants' failure to take physical possession of the key mortgage loan documents, and their failure to review the mortgage files for missing documents or irregularities and then assure that identified irregularities were corrected, was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010.  Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).  Professor Levitin described the implications of the failure by a securitization trustee such as Deutsche Bank to take physical possession of the key documents in the loan file:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
> . . .
> Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee.  If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.
> . . .
> If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities.  In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate).  Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

**B.    Defendants Knew That the Loan Files Were Incomplete**

608.    That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to Defendants, or there was no

duly executed assignment of the mortgage to Defendants, or the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing its contractual duties with due care.

609.    Numerous reports, litigation, and investigations have revealed the widespread misconduct of servicers to the trusts at issue here to cover-up the systemic failure of depositors and sponsors to properly assign the underlying mortgage loans to issuing trusts, including through the use of robo-signers. *See, e.g.*, Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm; Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2;  *In re Citibank, N.A.*, Consent Order, No. AA-EC-11-13 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47c.pdf; *In re Ally Fin. Inc., Ally Bank & GMAC Mortgage, LLC*, Consent Order, No. 11-20-B-HC, No. 11-020-B-DEO (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a3.pdf; *In re HSBC Bank USA, N.A.*, Consent Order, No. AA-EC-11-14 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47d.pdf; *In re OneWest Bank, FSB*, Consent Order, No. WN-11-011 (Apr. 13 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf; *In re JPMorgan Chase Bank*, Consent Order, No. AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf; *In re PNC Bank, N.A.*, Consent Order, No. AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-

releases/2011/nr-occ-2011-47i.pdf; *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19

(Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-

2011-47k.pdf; *In re Aurora Bank FSB*, No. NE-11-16 (April 13, 2011), *available at*

http://www.occ.gov/static/ots/misc-docs/consent-orders-97661.pdf.

610.    Enforcement actions with similar allegations have been brought against

Defendants and thus they clearly knew of the master servicer and servicer failures. *See In re*

*Bank of Am., N.A.*, Consent Order, No. AA-EC-11-12 (Apr. 13, 2011), *available at*

http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf; *In re U.S. Bank,*

*N.A.*, No. AA-EC-11-18 (April 13, 2011), available at http://www.occ.gov/news-issuances/news-

releases/2011/nr-occ-2011-47j.pdf.

### C.    The Document Delivery Failures Were Events of Default

611.    Events of Default occurred shortly after the final exception reports were delivered

for each of the trusts under multiple provisions of the governing agreements.

612.    First, many of the governing agreements provide that that an Event of Default

occurs if the depositor fails to perform its obligations under the governing agreements and such

breach is not remedied within a specified number of days of notice of the breach. *See* Exhibit E

§§ VII. The depositor had an obligation to deliver complete mortgage loan files but failed to do

so. For each trust, notice of the depositor's breach was provided by the trustee, or custodian

acting on the trustee's behalf, when it delivered the final certification and exception report.

Within a period of time after such notice, the breaches ripened into Events of Default and the

Defendants had a duty to exercise due care to protect certificateholders' interests. *See* Exhibit E

§§ V, VI The Defendants should have caused the responsible parties to repurchase the affected

loans and reviewed defaulted loans to determine whether they should be put-back to the

responsible party.

613.    Second, all of the governing agreements require that the servicer's or master servicer's failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period of notice by the Defendants of such breach. *See* Exhibit E § VIII. When borrowers defaulted and the servicers or master servicers were required to commence foreclosures they allegedly fabricated the documents necessary to foreclose rather than cause the sponsor, depositor, or originator to repurchase or substitute the affected loan. The Defendants were aware of this fact as they were aware of the contents of the document exception reports and that properties with exceptions had defaulted and not repurchased or substitute. However, the Defendants did not provide notice as they were required to do. Having failed to provide the required notice, the Defendants had an obligation to act prudently to address all defaults.

614.    Despite the existence of uncured Events of Default, Defendants did not adequately address the defaults and Events of Default. If Defendants had exercised due care, they would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the responsible parties and caused them to repurchase or substitute the affected loans. Defendants' failure to do so damaged Plaintiffs.

615.    If Defendants had performed their duties as trustees, they would have enforced the obligations of the responsible parties and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses. And if the Defendants had enforced these repurchase or substitution obligations, as they were required to do, the Certificates would have been more valuable.

616.    If Defendants had met their contractual, common law, statutory, and fiduciary

duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required, and issue accurate certifications, they would have caused the responsible parties to substitute or repurchase all loans where the master servicers, servicers, sponsors, depositors, and originators failed to deliver required documentation to the Defendants or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default.

617.     Defendants did not exercise due care when they learned of defaults and Events of Default. When Defendants provided their final exception reports to the sponsors, depositors, and master servicers (or servicers) indicating that mortgage files were missing required documents, they should have acted to require the responsible parties to repurchase or replace the non-compliant loans. At a minimum, Defendants should have notified certificateholders that the mortgage files were incomplete and the responsible parties did not repurchase or substitute the loans. Such failure to notify constituted negligent misrepresentation because Defendants had unique and special knowledge where Plaintiffs had no information and Defendants had a duty to notify Plaintiffs.

## XI.     DEFENDANTS FAILED TO SATISFY THEIR PRE-AND POST-DEFAULT DUTIES AND BREACHED THE GOVERNING AGREEMENTS

618.     As the trustee for the trusts, Defendants owe Plaintiffs and the other certificateholders certain contractual and fiduciary duties, and other common law obligations, as well as duties under the TIA and the Streit Act. Among these duties are those set forth in governing agreements, which were incorporated by reference into the certificates Defendants signed, and under applicable state and federal laws.

619.     Defendants breached their contractual, fiduciary, common law, and statutory duties in at least four different ways.

620.     First, the governing agreements purported to transfer title to the mortgage loans to the trusts for the benefit of certificateholders. To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to Defendants, the governing agreements imposed on Defendants a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete. The responsible party was required to substitute the loans with incomplete files with compliant loans or repurchase the loans. Defendants, however, systematically disregarded their contractual and fiduciary duties to enforce their rights on behalf of certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates.

621.     Defendants breached their contractual and fiduciary duties under the governing agreements, their common law duties, and their obligations under the TIA and the Streit Act by failing to take physical possession of many of the operative documents for the mortgage loans in the trusts. If Defendants had met their contractual, fiduciary, and statutory duties with respect to the non-compliant loans, which now constitute the overwhelming majority of the defaulted loans, Plaintiffs would not have incurred their very significant losses.

622.     These breaches constituted defaults and Events of Default under the governing agreements, and all parties to the governing agreements (but not certificateholders) received notice of the defaults in the form of Defendants' document exception reports.  Defendants were required to provide notice of these defaults to certificateholders, among others.  They did not.  If they had, the responsible parties would have been forced to repurchase or replace many of the loans that ultimately caused Plaintiffs' losses. And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

623.     Defendants did not exercise due care or with good faith when they learned of defaults and Events of Default.  When Defendants provided their final exception reports to the sponsors, depositors and master servicers (or servicers) indicating that mortgage files were missing required documents, they should have acted to require the responsible party to repurchase or replace the non-compliant loans. At a minimum, Defendants should have notified certificateholders that the mortgage files were incomplete and the responsible party did not repurchase or substitute the loans.

624.     Defendants acted with gross negligence and negligence when they failed to ensure the proper documentation of the mortgage loans. Further, by not notifying certificateholders, Defendants negligently misrepresented the circumstances surrounding the trusts in a situation where they had unique and special knowledge that the Plaintiffs did not have.

625.     Second, Defendants are obligated to provide notice of defaults under the governing agreements. Defendants violated this requirement by failing to give notice of repeated breaches by the master servicers or servicers designated under the governing agreements or of systemic breaches by the sponsors, originators, or affiliates that served as the depositors. For example, the master servicers or servicers routinely failed to provide notice of the sponsors' or originators' numerous breaches of representation and warranty provisions in the governing agreements and loan purchase agreements that the mortgage loans had been underwritten in accordance with applicable underwriting guidelines. If adequate notice of such breaches had been provided, the responsible party would have been required to repurchase the mortgage loans that did not comply with the applicable underwriting guidelines and which ultimately caused Plaintiffs' losses.

626.     Defendants were aware of these Events of Default but failed to provide notice,

and to act with due care and good faith. Defendants also knowingly and negligently failed to act upon these Events of Default and negligently misrepresented these circumstances to Plaintiffs even though they had special and unique knowledge that Plaintiffs did not have.

627.    Third, when the Defendants performed servicing related functions with respect to the trusts, they had a duty to provide accurate certifications and remittance reports as required under the governing agreements and applicable federal law.  Defendants negligently failed to do so. If they had accurately reported the facts regarding their knowledge of defective mortgage loans, the responsible party would have been forced to repurchase the non-compliant loans that have caused Plaintiffs losses. Accurate certifications also could have prevented subsequent mortgage loan securitizations from including large numbers of defective and non-compliant loans.

628.    Fourth, having notice of the master servicers' and servicers' numerous defaults and Events of Default under the governing agreements and breaches of representations and warranties by the Sponsors and Originators, Defendants failed to exercise due care to ensure that certificateholders' interests were adequately protected. If Defendants had exercised due care and acted in good faith, they would have issued repurchase demands years ago and, if necessary, commenced repurchase litigation forcing the responsible party to repurchase defective loans.

629.    When Defendants learned that the master servicers or servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the governing agreements and that master servicers and servicers engaged in widespread misconduct constituting events of default under the governing agreements, Defendants should have (i) taken steps to require the responsible party to repurchase the loans; and (ii) notified certificateholders of the master servicers' or servicers' defaults and the breaches of representation and warranty

provisions.

630.     Yet Defendants failed to give notice of defaults that occurred when the responsible party breached representation and warranty provisions providing that all loans met applicable loan origination guidelines. In reality, during the 2005–2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

631.     Defendants knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders.

632.     Many facts should have caused Defendants to conduct careful investigations into the trusts and take appropriate action, including the following: 1) the trusts' high default rates and poor performance; 2) breaches of representations and warranties made by the responsible parties; 3) servicer defaults and events of default; 4) incomplete transfer of the mortgage loans; and 5) the failure by sponsors, sellers, originators, issuers, and itself to fulfill the duties and obligations set forth in the governing agreements. Unlike certificateholders, Defendants had the ability under the governing agreements to carefully investigate these issues. Nonetheless, Defendants failed to perform their duties as trustee to provide notice of such failures and to protect the trusts and certificateholders.

633.     By at least 2009, Defendants, based on their access to public information as well as information unavailable to the public, knew of the breaches of representations and warranties and had a duty to carefully investigate circumstances suggesting that the trusts routinely contained loans that materially breached the responsible parties' representations and warranties, which adversely affected the value of those mortgage loans and the trusts' and certificateholders'

interests in those mortgage loans and take appropriate action to address those defaults.

634.     Defendants also knew of failures on the part of the servicers to observe or perform in material respects their covenants or agreements in the governing agreements, including the servicers' and/or master servicers' failure to do the following: (i) give notice to the other parties of responsible party breaches of representations and warranties upon discovery thereof and enforce the responsible parties' repurchase obligations; and (ii) observe or perform the covenants or agreements contained in the governing documents. These breaches by the servicers constituted Events of Default as defined by the governing agreements. Defendants knew these servicers' breaches were material.

635.     Defendants breached their contractual, fiduciary and legal duties under governing agreements, the common law, and the TIA and the Streit Act by failing to do the following: (i) carefully and prudently investigate breaches involving the loans in the trusts committed to their care; (ii) notify certificateholders of breaches; and (iii) take appropriate action to enforce the responsible parties' repurchase of the defective mortgage loans.

636.     These defaults and/or Events of Default occurred and remained uncured for the requisite period. Thus, under the governing agreements, Defendants were obligated to exercise the rights and powers vested in it by the governing agreements, and to use the same care and skill as prudent persons would exercise or use under the circumstances in the conduct of their own affairs. A prudent person would have taken action to protect the trusts and certificateholders from the known responsible party breaches of representations and warranties by exercising all of its rights under the governing agreements to enforce the responsible parties' repurchase obligations, including conducting a timely, careful and prudent investigation to determine all of the materially breaching mortgage loans and suing the responsible parties for specific

performance to compel their repurchase of those loans.

637.    A prudent person would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.

638.    A prudent person also would have ensured that Defendants were receiving notification of breaches of representations and warranties from servicers and master servicers and enforced the responsible parties' obligations with respect to breaching mortgage loans.

639.    In addition to their statutory duty to exercise due care upon learning of a default, Defendants had a similar duty under the governing agreements to exercise due care upon an Event of Default. Events of Default occurred under each of the governing agreements, but Defendants failed to take the required actions to protect the rights of the trusts. Defendants were aware that the master servicers, servicers, depositors, and sponsors failed to provide notice of representation and warranty violations that occurred in the trusts and engaged in other misconduct in contravention of the governing agreements. Defendants, however, did not provide notice of such defaults as it was required to do.  Because these defaults would have seasoned into Events of Default if notice had been provided, Defendants had the duty to act prudently to enforce repurchase provisions once they learned of such defaults.

640.    Events of Default occurred under each of the governing agreements, but Defendants failed to take the required actions to protect the trusts. Although certain Events of Default require formal notice and an opportunity to cure, the trustee cannot escape their duty of care by failing to provide the required notice. Defendants were aware that the master servicers, servicers, depositors, sponsors, and the trustees themselves, failed to provide notice of the sponsors' and originators' representation and warranty violations.  Defendants, however, did not provide notice of such defaults as they were required to do.  Because these defaults would have

seasoned into Events of Default if notice had been provided, the Defendants had the duty to act prudently to enforce repurchase provisions once they learned of such defaults.

641.    Despite the existence of uncured Events of Default, Defendants did not adequately address the defaults and Events of Default. If Defendants had exercised due care, they would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the responsible parties and caused them to repurchase or substitute the affected loans.  Defendants' failure to do so damaged Plaintiffs.

642.    If Defendants had performed their duties as trustee, they would have enforced the obligations of the responsible parties and caused them to buy back, or replace with non-defective loans, the loans that ultimately defaulted and caused Plaintiffs' losses. And if Defendants had enforced these repurchase or substitution obligations, as they were required to do, the Certificates would have been more valuable.

643.    If Defendants had met their contractual, statutory, and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the responsible party to substitute or repurchase all loans where the servicers, sponsors, depositors and originators failed to deliver required documentation to the trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default.

644.    Defendants' failure to meet their contractual and fiduciary duties and duties under the TIA, the Streit Act and the common law once it became aware of defaults relating to the numerous representation and warranty breaches by the sponsors or originators further caused harm. If Defendants had provided notice of defaults and acted with due care as it was required to

do upon the occurrence of a default or Event of Default, it would have caused the responsible

party to repurchase loans as they were required to do and would have taken action against master

servicers and servicers for misconduct.

645.    Defendants and their responsible officers knew of the responsible parties breaches

of representations and warranties and also knew of the numerous defaults and Events of Default.

Defendants' the Trustees were aware (or would have been aware if they had carried out their

duties) of these problems.

646.    Defendants had an obligation under the law and the governing agreements to

provide notice regarding defaults and Events of Default.

647.    Defendants further had a duty to impart correct and accurate information to

certificateholders. Because of their status as trustees, Defendants had special knowledge about

the accuracy of the certifications, the breaches of representations and warranties, and the servicer

misconduct. Defendants negligently breached their duties to Plaintiffs in their conduct and

negligently misrepresented information to Plaintiffs.

648.    Plaintiffs did not have the knowledge that the Defendants had and could not

obtain that information. Plaintiffs were thus dependent on Defendants to accurately impart

information and conduct themselves in accordance with their fiduciary and contractual duties and

other common law and statutory duties.

649.    Defendants further had duties to act with due care, in good faith, and with

undivided loyalty, all of which they breached by failing to protect the trusts and

certificateholders and failing to take action against the responsible parties. Every trustee—

including Defendants—has an absolute duty to avoid conflicts of interest and a duty of undivided

loyalty to trust investors. This duty is non-waivable and arises independently of the PSAs. Every

trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust. Under the common law, Defendants can not contract around all responsibility for their negligence and failure to act.

650.    Further, in contravention of the statutory, contractual, and common law duties, Defendants failed to adequately protect the trusts before and after certain trust sponsors and originators filed for bankruptcy or otherwise became insolvent. Defendants failed to adequately and comprehensively pursue relief against relevant parties and failed to provide adequate notice of relevant defaults and "events of default."

651.    Defendants also breached their contractual, statutory, and common law duties by failing to properly oversee repurchase litigation initiated by monoline insurers. In particular, Defendants failed to ensure that the interests of the trusts and certificateholders were adequately protected and failed to ensure that recoveries adequately benefited the trusts as a whole. Defendants also failed to utilize those suits and the associated reunderwriting results, tolling agreements, and repurchase demands to protect the trusts and certificateholders.

652.    Defendants were guilty of acting with negligence, gross negligence, and willful misconduct in failing to adhere to their contractual, fiduciary, common law, and statutory obligations. Defendants negligently, and with willful misconduct, disregarded their duties to protect the trusts and the certificateholders and their duty to provide accurate information to Plaintiffs.

653.    Defendants' breaches of their contractual, statutory and fiduciary duties have caused Plaintiffs immense damages.

654.    Many, if not all of, the repurchase or substitution claims described above may have lapsed due to Defendants' inaction.

## XII.   THE "NO ACTION" CLAUSES DO NOT APPLY

655.   The "no action" clauses in the governing agreements do not apply to this lawsuit because the claims are brought against Defendants as trustees, not against a third party. The PSAs expressly permit suits against the trustee, stating that no provision of the agreements "shall be construed to relieve the trustee . . . from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct."

656.   Additionally, under the TIA and New York law, "no action" clauses do not apply to an action against the trustee, as here, for their own wrongdoing. Defendants are not being asked to sue as trustee to enforce rights and obligations under the governing agreements. Rather, this action asserts claims against Defendants for breaching their statutory and contractual obligations.

657.   Because this is not an action, suit or proceeding that Defendants are capable of bringing in their own name as trustee under the governing agreements, the "no action" clauses do not apply.

658.   Compliance with the "no action" clauses' pre-suit requirements also would have been futile. The no action clauses (if they applied) would require Plaintiffs to demand that Defendants initiate proceedings against themselves and to indemnify Defendants for their own liability to the trusts, an absurd result that the parties did not intend. *See Cruden v. Bank of New York*, 957 F. 2d 961, 968 (2d Cir. 1992).

## XIII.   CLAIMS FOR RELIEF

### COUNT ONE – BREACH OF CONTRACT

659.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

660.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP 576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

661.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust; NCUA 2010-R2 Trust; NCUA 2010-R3 Trust; NCUA 2011-R1 Trust; NCUA 2011-R2 Trust; NCUA 2011-R3 Trust; NCUA 2011-R4 Trust; NCUA 2011-R5 Trust; NCUA 2011-R6 Trust; and NCUA 2011-M1 Trust.

662.    The PSAs are valid and binding contracts entered into between Defendants, each trust, the sponsors, the master servicers, the servicers, and depositors.

663.    The PSAs provide, among other things, the terms under which Defendants act as trustee for the trusts.

664.    As current holders of certificates issued by each trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

665.    Defendants breached several obligations that they undertook on behalf of Plaintiffs as certificateholder including, without limitation, to:

        (a)    take physical possession of the operative documents for the mortgage loans in the trusts;

(b)     identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;

(c)     make accurate representations in final certifications and exception reports;

(d)     render accurate reports under Regulation AB;

(e)     protect the interests of the beneficiaries of the trusts;

(f)     take steps to cause the responsible party to repurchase loans lacking adequate documentation;

(g)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the responsible parties' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(h)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs, or similar section, relating to repeated failures by the master servicer or servicer to require the repurchase or substitution of mortgage loans by the responsible party (1) under Section 2.03, or similar sections, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, or similar sections, where such loans were lacking proper documentation;

(i)     enforce the repurchase obligations of the responsible party.

666.    The specific provisions breached by Defendants are further detailed herein and in the Exhibits hereto. [6]

667.    Defendants' breach of their duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their certificates and diminished their value.

668.    Plaintiffs have performed their obligations under the PSAs.

669.    Defendants are liable to Plaintiffs for the losses they suffered as a direct result of

---

[6] Full copies of each of the PSAs are publically available on the SEC EDGAR website.  Due to the amount and length of the agreements, only the relevant portions have been attached hereto. Plaintiffs incorporate the full PSAs and governing agreement herein by reference.

Defendants' failure to perform their contractual obligations under the PSAs.

### COUNT TWO – BREACH OF FIDUCIARY DUTY

670.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

671.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP 576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

672.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

673.    As set forth in detail above, Defendants owed certificateholders, including

Plaintiffs, a fiduciary duty to act in good faith, and with due care and undivided loyalty when performing the obligations set forth in the PSAs, and to exercise all powers under the PSAs prudently once an Event of Default occurred or payments to Certificateholders became impaired. These obligations included, without limitation, duties to:

> (a) take physical possession of the operative documents for the mortgage loans in the trusts;
>
> (b) identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;
>
> (c) make accurate representations in the final certifications and exceptions reports;
>
> (d) render accurate reports under Regulation AB;
>
> (e) protect the interests of the beneficiaries of the trusts;
>
> (f) take steps to cause the responsible party to repurchase loans lacking adequate documentation;
>
> (g) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the responsible parties' widespread practice of including in securitization trusts loans which breached such representations and warranties;
>
> (h) make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs, or similar sections, relating to repeated failures by the master servicer or servicer to require the repurchase or substitution of mortgage loans by responsible parties (1) under Section 2.03, or similar sections, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, or similar sections, where such loans were lacking proper documentation;
>
> (i) enforce the repurchase obligations of the responsible party.

674.     As set forth in detail above, Defendants breached their fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

675.    The violations by Defendants of their fiduciary obligations impaired certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT THREE – NEGLIGENCE AND GROSS NEGLIGENCE

676.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

677.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP 576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

678.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA

2011-M1 Trust for claims arising on or after June 16, 2011.

679.     As set forth in detail above, Defendants owed the certificateholders, including Plaintiffs, duties under the PSAs and as trustee for trusts to act in good faith, with undivided loyalty and with due care when performing their contractual obligations under the PSAs.  As described above, Defendants performed or failed to perform their responsibilities in a grossly inadequate and negligent manner. Defendants participated in willful misconduct in their administration of the trusts.

680.     Defendants' negligence and gross negligence impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

<u>**COUNT FOUR – NEGLIGENT MISREPRESENTATION**</u>

681.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

682.     NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP 576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

683.     NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the

following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

684.    This is a claim for negligent misrepresentation against Defendants.  As Defendants served in their capacity as Trustee for thousands of trusts sponsored by the sponsors or including loans originated by the originators from 2004–2007, they had unique and special knowledge about the mortgage loans in the trusts and the mortgage files for those loans.  In particular, Defendants had unique and special knowledge regarding: (i) whether the master servicer or servicers had failed to perform their duties under the PSA; (ii) whether the operative documents for the mortgage loans had been transferred to the trustee, and the trusts' interests perfected, for the benefit of certificateholders in the trusts; (iii) whether the mortgage files contained missing, defective, or incomplete information; (iv) whether the improperly documented loans were identified on the final exception report and whether the irregularities remained uncorrected; and (v) whether the statements in the various certifications provided by Defendants and described herein were accurate.

685.    Because Plaintiffs could not evaluate the mortgage files for the mortgage loans underlying the certificates and because Plaintiffs could not examine whether those files contained complete and accurate documentation for the mortgage loans, they were heavily reliant

on Defendants' unique and special knowledge regarding the mortgage loans and the mortgage files when determining whether or not to make each investment in the certificates, and whether or not to demand that Defendants exercise their powers under the PSAs to require the other parties to the PSAs to satisfy their obligations, including to repurchase or substitute the defective loans. Plaintiffs were entirely reliant on Defendants to provide accurate information regarding the loans and mortgage files with respect to these matters.

686.    Plaintiffs necessarily relied on Defendants' unique and special knowledge regarding the mortgage loans and mortgage files for those loans in the trusts.  Defendants' status as the trustee for the trusts, coupled with their unique and special knowledge about the underlying loans and the mortgage files, created a special relationship of trust, confidence and dependence between Defendants and Plaintiffs.

687.    Defendants, in the exercise of due care, should have been aware that Plaintiffs relied on their unique and special expertise and experience and depended upon Defendants for accurate and truthful information. Defendants also knew that the facts regarding the mortgage loans and the mortgage files were exclusively within their knowledge.

688.    Based on their expertise, superior knowledge, and relationship with Plaintiffs, Defendants owed a duty to Plaintiffs to provide complete, accurate and timely information regarding the mortgage loans and mortgage files for the certificates. Defendants negligently breached their duty to provide such information to Plaintiffs.

689.    Defendants' negligent misrepresentations impaired certificateholders' ability to fully collect the principal and interest due on their certificates and caused losses in the value of Plaintiffs' certificates.

## COUNT FIVE – BREACH OF THE COVENANT OF GOOD FAITH

690.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

691.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP 576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

692.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

693.    As all relevant times, Defendants owed Plaintiffs, as express, intended third party beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that

required Defendants to ensure that they did not, by act or omission, injure the rights of the

Plaintiffs to receive the benefits and protections provided for under the PSAs.

694.    By the conduct described above, Defendants breached their duty of good faith and

fair dealing under the PSAs.

695.    Defendants' breaches are material.

696.    As a result of these breaches, Plaintiffs have suffered damages and will continue

to suffer damages in an amount to be proven at trial.

## COUNT SIX-VIOLATION OF THE STREIT ACT[7]

697.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs as if fully set forth herein.

698.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to

recover damages arising at any time related to CUSIP 93936LAE7 in Trust WMALT 2007-OC2;

CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-

AR7; CUSIP 576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT

2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-

AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

699.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the

NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements,

---

[7] As in Exhibit A, the NCUA Board is not asserting claims against Bank of America with respect
to the following trusts: Banc of America Funding 2005-E Trust; Banc of America Funding 2005-
F Trust; Banc of America Funding 2005-H Trust; Banc of America Funding 2006-D Trust; Banc
of America Funding 2006-I Trust; Banc of America Funding 2007-1 Trust; Banc of America
Funding 2007-3 Trust; Banc of America Funding 2007-B Trust; Banc of America Funding 2007-
C Trust; Banc of America Funding 2007-D Trust; First Franklin Mortgage Loan Trust 2006-FF2;
Merrill Lynch Mortgage Investors Trust Series MLCC 2005-3; Merrill Lynch Mortgage
Investors Trust Series 2006-RM2; Merrill Lynch Mortgage Investors Trust Series 2006-RM3;
and Merrill Lynch Mortgage Investors Trust Series 2007-HE3.

acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA 2011-M1 Trust for claims arising on or after June 16, 2011.

700.    The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee exercise due care in performing its obligations. N.Y. Real Prop. Law § 124.

701.    Plaintiffs, as certificateholders and beneficiaries of the trusts were entitled to the protections afforded under the Streit Act.

702.    The certificates are "mortgage investments" subject to the Streit Act. N.Y. Real Prop. Law § 125(1).

703.    The PSAs that established the trusts are "indentures," and Defendants are "trustees" under the Streit Act. N.Y. Real Prop. Law § 125(3).

704.    As described above, Defendants violated the Streit Act by failing to discharge their pre-default duties.

705.    Following an event of default, the Streit Act provides that the trustee must exercise the same degree of skill and care in the performance of its duties as a prudent man would under the same circumstances. N.Y. Real Prop. Law § 126(1).

706.    In addition, Section 124 of the Streit Act imposes a duty upon the trustee to discharge its duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect the trust beneficiaries' rights. N.Y. Real Prop. Law § 124.

707.    As set forth above, Defendants failed to exercise their rights under the PSAs after becoming aware of numerous defaults, failed to carefully review the mortgage files, failed to identify and rectify defaults by other parties, failed to notify certificateholders and other parties of deficiencies, failed to take steps to address those deficiencies, and, most importantly, failed to protect the best interests of certificateholders particularly through the enforcement of the repurchase, cure, or substitution of defective loans.

708.    Defendants are liable to Plaintiffs for damages incurred as a result of their violations of the Streit Act in an amount to be determined at trial.

## COUNT SEVEN-VIOLATION OF THE TRUST INDENTURE ACT OF 1939[8]

709.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

710.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages arising at any time related to the following RMBS that were not re-securitized in the NGN Program: CUSIP 93936LAE7 in Trust WMALT 2007-OC2; CUSIP 93935NAD6 in Trust WMALT 2007-OA1; CUSIP 93935DAC0 in Trust WMALT 2006-AR7; CUSIP

---

[8] As noted in Exhibit A, the NCUA Board is not asserting claims against Bank of America with respect to the following trusts: Banc of America Funding 2005-E Trust; Banc of America Funding 2005-F Trust; Banc of America Funding 2005-H Trust; Banc of America Funding 2006-D Trust; Banc of America Funding 2006-I Trust; Banc of America Funding 2007-1 Trust; Banc of America Funding 2007-3 Trust; Banc of America Funding 2007-B Trust; Banc of America Funding 2007-C Trust; Banc of America Funding 2007-D Trust; First Franklin Mortgage Loan Trust 2006-FF2; Merrill Lynch Mortgage Investors Trust Series MLCC 2005-3; Merrill Lynch Mortgage Investors Trust Series 2006-RM2; Merrill Lynch Mortgage Investors Trust Series 2006-RM3; and Merrill Lynch Mortgage Investors Trust Series 2007-HE3.

576449AE2 in Trust MABS 2006-HE4; CUSIP 41161PSC8 in Trust HVMLT 2005-8; CUSIP 43709QAG1 in Trust HEAT 2006-8; CUSIP 39538AAK2 in Trust GPMF 2006-AR5; and CUSIP 00703AAG2 in Trust ARMT 2007-2.

711.    NCUA Board, as liquidating agent for each of the CCUs, brings this count to recover damages related to: any CUSIP resecuritized in NCUA 2010-R1 Trust for claims arising prior to October 27, 2010; any CUSIP resecuritized in NCUA 2010-R2 Trust for claims arising prior to November 17, 2010; any CUSIP resecuritized in NCUA 2010-R3 Trust for claims arising prior to December 9, 2010; any CUSIP resecuritized in NCUA 2011-R1 Trust for claims arising prior to January 27, 2011; any CUSIP resecuritized in NCUA 2011-R2 Trust for claims arising prior to February 11, 2011; any CUSIP resecuritized in NCUA 2011-R3 Trust for claims arising prior to March 1, 2011; any CUSIP resecuritized in NCUA 2011-R4 Trust for claims arising prior to March 31, 2011; any CUSIP resecuritized in NCUA 2011-R5 Trust for claims arising prior to April 14, 2011; any CUSIP resecuritized in NCUA 2011-R6 Trust for claims arising prior to May 5, 2011; and any CUSIP resecuritized in NCUA 2011-M1 Trust for claims arising prior to June 16, 2011.

712.    NCUA Board, as liquidating agent for each of the CCUs, and as holder of the NGN Owner Trust Certificates and a third-party beneficiary of the NGN Indenture agreements, acting on behalf of the NGN Trusts, brings this count to recover damages on behalf of the following NGN Trusts: NCUA 2010-R1 Trust for claims arising on or after October 27, 2010; NCUA 2010-R2 Trust for claims arising on or after November 17, 2010; NCUA 2010-R3 Trust for claims arising on or after December 9, 2010; NCUA 2011-R1 Trust for claims arising on or after January 27, 2011; NCUA 2011-R2 Trust for claims arising on or after February 11, 2011; NCUA 2011-R3 Trust for claims arising on or after March 1, 2011; NCUA 2011-R4 Trust for

claims arising on or after March 31, 2011; NCUA 2011-R5 Trust for claims arising on or after

April 14, 2011; NCUA 2011-R6 Trust for claims arising on or after May 5, 2011; and NCUA

2011-M1 Trust for claims arising on or after June 16, 2011.

713.     Congress enacted the TIA to ensure, among other things, that investors in

certificates, bonds, and similar instruments have adequate rights against, and receive adequate

performance from, the responsible trustees.

714.     Each of the PSAs is an "indenture," and Defendants are "indenture trustees,"

within the meaning of the TIA. 15 U.S.C. § 77ccc(7), (10). As noted above, each of the PSAs

and indentures is substantially similar and imposes substantially the same duties on Defendants

in their capacities as trustee. Moreover, the TIA applies to and is deemed to be incorporated into

each of the PSAs and the related trusts. 15 U.S.C. § 77ddd(a)(1).

715.     Defendants violated the TIA in at least four ways. First, TIA Section 315(a)

provides that, prior to default (as that term is defined in the indenture), the trustee is liable for

any duties specifically set out in the indenture. 15 U.S.C. § 77ooo(a)(1). As set forth above,

Defendants failed to comply with a number of duties set out in the indentures, including their

duties to carefully review the mortgage files, to notify certificateholders and other parties of

deficiencies, to take steps to address those deficiencies, and, most importantly, to enforce the

substitution or repurchase of defective loans.

716.     Second, TIA Section 315(b) provides that the indenture trustee notify

certificateholders of "all defaults known to the trustee, within ninety days after the occurrence

thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). As set forth above, Defendants

failed to carefully investigate serious known issues with the loans in the trust, or to notify

certificateholders of numerous defaults, including the failure of the responsible parties to cure,

repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

717.    Third, in case of default (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c). Here, as set forth above, Defendants did nothing after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and events of default. A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans. In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

718.    Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b). Defendants have impaired the ability of the trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which Defendants failed to take action to correct. In addition, Defendants have impaired the ability of the trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

719.    These breaches materially and adversely affected the interests of the certificateholders because they resulted in the trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties and originators.

720.    Defendants are liable to Plaintiffs for damages incurred as a result of their violations of the TIA in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    An award of all appropriate damages and/or equitable relief in favor of Plaintiffs against Defendants for breaches of their common law and statutory duties in an amount to be determined at trial, including any applicable pre- or post-judgment interest thereon;

B.    Awarding Plaintiffs all reasonable costs and expenses incurred in this action, including attorney's fees, expert fees, and any other properly taxable costs and expenses; and

C.    Any other relief that the Court deems just and proper.

## XIV.  JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues properly triable.

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union, Western Corporate Federal
Credit Union, Members United
Corporate Federal Credit Union, Southwest
Corporate Federal Credit Union, and
Constitution Corporate Federal Credit Union
and as holder of the NGN Owner Trust
Certificates

Dated: February 2, 2015

By:  /s/ George A. Zelcs

George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com
mdavies@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

David C. Frederick
Wan J. Kim
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
grapawy@khhte.com

*Attorneys for the National Credit Union
Administration Board*

David H. Wollmuth
William A. Maher
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com

*Attorneys for the National Credit Union
Administration Board For All Claims Except to
the Extent they Relate to FFML 2006-FF2,
GPMF 2006-AR5, GPMF 2006-AR8, GPMF
2007-AR1, and GPMF 2007-AR2*

Of Counsel:
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314
johni@ncua.gov
mikem@ncua.gov