# Exhibit 8

# Exhibit 8

Legislative Document (1937) · No. 94

STATE OF NEW YORK

# FOURTH REPORT

OF THE

## JOINT LEGISLATIVE COMMITTEE

TO

Investigate Bondholders' Committees, Stockholders'
Committees, Creditors' Committees, Certificate
Holders' Committees, Corporations, Trustees
and Fiduciaries

NEW YORK LEGISLATIVE SERVICE, INC.
14 Vesey St., 3rd Floor
New York, NY 10007-2906



ALBANY
J. B. LYON COMPANY, PRINTERS
1937

# FOURTH REPORT

*To the Honorable Legislature of the State of New York:*

Report of the Joint Legislative Committee to Investigate Bond-holders' Committees, Stockholders' Committees, Creditors' Committees, Certificate Holders' Committees, Corporations, Trustees and Fiduciaries, organized for the purpose of aiding and assisting distressed investors in real estate and to make a thorough study and investigation of the acts, conduct, etc. of real estate investment companies operating within the State to determine what, if any, remedial legislation is necessary in the public interest and which will secure for the people the largest measure of protection and safety.

## THE COMMITTEE

LEE B. MAILLER, *Chairman*

SAUL S. STREIT, *Vice-Chairman*[1]

C. TRACEY STAGG, *Secretary*

RAE L. EGBERT

JOSEPH ESQUIROL

LAZARUS JOSEPH

HAMILTON F. POTTER[2]

PRITCHARD H. STRONG

WILLIAM H. MACKENZIE

## EX-OFFICIO

### *The Senate*

JOHN J. DUNNIGAN, *Temporary President*

GEORGE R. FEARON, *Minority Leader*[3]

PERLEY A. PITCHER[4]

### *The Assembly*

IRVING M. IVES, *Speaker*[5]

OSWALD D. HECK, *Majority Leader*[6]

IRWIN STEINGUT, *Minority Leader*

## COUNSEL TO THE COMMITTEE

WILLIAM J. LAMONT, Esq.

EDWARD WEINFELD, Esq.

---

[1] Term expired December 31, 1936.
[2] Term expired December 31, 1936.
[3] Term expired December 31, 1936.
[4] Became Minority Leader January 1, 1937.
[5] Formerly Speaker; became Majority Leader January 1, 1937.
[6] Majority Leader until December 31, 1936; became Speaker January 1, 1937.

## PRELIMINARY STATEMENT

*To the Honorable Legislature of the State of New York:*

Under date of February 10, 1936, we submitted our report containing our findings, conclusions and recommendations with respect to bondholders' committees, trustees and reorganizations as they affected unguaranteed mortgage bonds and participations.

On February 24, 1936, we submitted to your Honorable Bodies our second report containing our findings and conclusions with respect to the purchase of mortgages by trust companies, the distribution of participations by trust companies to their trusts and the purchase of parts or part interests in bonds and mortgages by executors, administrators, trustees and other persons holding trust funds for investments.

In our third report, we submitted our findings as to the methods of operation by original houses of issue, and recommendations as to the future sale of unguaranteed mortgage bonds and participations.

This, the fourth of our reports, contains a summary of testimony given by various public officials with respect to the desirability, if at all, of state regulation of the sale of securities and of a state act to supplement federal securities legislation.

[5]

## REPORT

The investigation conducted by this Committee during the years 1935 and 1936 brought to light and exposed evils and abuses which followed in the wake of the depression with respect to defaulted real estate issues and the improper and wasteful adminis- tration of properties by those pretending to act for bondholders.

The minutes of the hearings conducted by this Committee indi- cated that many of the so-called protective committees afforded no real protection to bondholders and that some committees, and their counsel, trustees and managing agents, were engaged at exorbitant expense and unwarranted cost to the security holder, who received little or no benefit or protection. It was in an effort to cure these evils, amongst other things, which led to the enact- ment by the Legislature of a series of laws intended to afford genuine and not feigned protection to bondholders where issues were in default and imposing active duties upon a trustee under trust indentures. These statutes looked toward adequate control of issues and sought to prevent continued waste in the administra- tion of properties. They also sought to provide full protection to bondholders with respect to the operation and management of properties secured by mortgages, participations of which in various forms had been sold and distributed to the public at large. These laws were Chapters 264, 265, 898, 899 and 900 of the Laws of 1936.

When these acts were passed, it was realized that experience might indicate the desirability of slight changes or amendments with respect to the administration thereof. The policy underlying the law was fully approved by the members of the Committee and, of course, by the Legislature. Although not quite a year has gone by since the enactment of these laws, various suggestions have been submitted with respect to modification thereof insofar as their practical operation is concerned.

This Committee, after careful consideration, is of the opinion that there is no pressing emergency requiring immediate amend- ment of the law and deems it wiser to withhold any proposed amendment until the next session of the Legislature so as to gain in the interim the benefit of further observation of the law in operation for a longer period of time. The proposed amendments have received the attention and consideration of the Committee and it is believed that no hardship will be worked upon any of the parties in whose interests the particular statutes were passed if they were permitted to continue for another year without further change or amendment. It may be stated that the suggested changes were offered by persons who have been close to the problems involved. They in no wise affect the substance or the policy of the laws but are merely intended to round out certain alleged imperfections in daily practice.

[7]

8

The laws referred to above contemplated protection to bond-holders of defaulted unguaranteed mortgage bonds, unguaranteed mortgage bonds not in default, future bondholders, and vested in the courts control over the payment of fees to persons concerned in the administration of properties on behalf of bondholders. Up to now, state legislation has concerned itself primarily with protection after the purchase of the investment or the security. Looking towards the future, it appears that improved economic conditions and the easier flow of money from private sources indicates renewed confidence, resulting in the strong likelihood that the unsuspecting investor may again be subjected to high-pressure salesmanship. With a rising market, there is great danger of unscrupulous salesmen unloading fraudulent securities and fraudulent selling of securities in situations where they are not subject to regulation or control by the S. E. C.

It is the view of this Committee that with a rising market and improved conditions, the state should concern itself with making a survey and study of other state statutes and regulations so that the Legislature may give consideration to the enactment of laws to afford protection to investors prior to the purchase of securities. The investigation by this Committee showed the necessity, certainly in the sale of real estate securities, for the existence of some public body or bureau where a bondholder or certificate holder could obtain information with respect to his investment in a property and its status. This necessarily brought to the attention of the Committee the desirability of legislation in the sale of securities, real estate or otherwise, and the entire field of state regulation in the sale of securities. The need for legislation in this field was expressed by the Governor in his annual message to the Legislature:

"Consideration should be given to legislation regulating the sale of real estate and other securities within the State which do not come within the jurisdiction of the Federal Securities and Exchange Commission. Brokers and dealers should be licensed. Some regulation of the qualification of individuals who seek to sell securities to the public is essential. High-pressure salesmanship of the type so familiar during the last decade must give way to the paramount public interests in honest dealings between security seller and investor."

In order to obtain the views of various public officials on the subject of state regulation or registration of securities, this Committee called before it and examined at hearings public officials particularly qualified to discuss the need for such legislation.

Our investigation developed testimony that there are intrastate situations over which the Securities and Exchange Commission has no control, either because of constitutional limitations or because of S. E. C. regulations, and also where present existing state laws may require amendment to give enforcement officials

9

broader powers to protect the investing public. This Committee has given thought to the drafting of legislation intended to supplement the work of the Securities and Exchange Commission and the Martin Act of the State of New York.

The evidence taken by this Committee discloses that the S. E. C. Law regulations have led to several ingenious methods to overcome federal supervision and have resulted in schemes of evasion which may well be the subject of state regulation long before companies and salesmen are permitted to sell securities of doubtful value. It was testified that a situation had arisen where a group

"had a single holding company organize a series of twenty subsidiaries, the common stock to be held by the single holding company, but each of the twenty subsidiaries would buy a piece of real estate in New York State, subject to a mortgage, and would sell $100,000 second mortgage bonds.

Each one of those issues, it is claimed, is exempt from registration under our act, because it is by a separate corporation, and the issue is limited to less than $100,000, but the scheme as a whole represents twenty times $100,000, or $2,000,000, and I was wondering whether in a situation of that kind it might not be helpful to your organization to have some preliminary information filed which we would not have available for you." (P. H. 27.)

Another evil which appears to have been brought on by the activity of the S. E. C. has been the sale of oil royalties within the State of New York. The Regional Director, testifying before this Committee, indicated that some abuses exist

"on the oil royalties as they are now trying to set them up. The issuer is a New York corporation, and they are selling solely to residents of the State of New York, and we don't just have the jurisdiction. * * * We have a couple of those in the office right now; they are giving us considerable concern. They will not register. They claim they are selling solely to residents, that it is purely intrastate, and if that is correct and the theory is sound,—and the facts bear it out—where can we help it." (P. H. 28.)

State regulation of the sale of securities has taken various forms. There appear to be forty-three states having regulatory bodies or legislation different in degree. Five states, including New York, have no registration requirement or Securities Commission. The so-called state "Blue Sky Laws" appear to be as varied as there are statutes on the subject. Some of the state acts require mere registration; while others attempt to grade and evaluate securities by setting them up in different classes, with power to refuse, in some cases, the issues. (P. H. 8.) Such state legislation, of course, involves an extension of power that does not exist in the present S. E. C. Act. Other states regulate the seller; some states

10

qualify the security, while New York has the so-called injunctive type of law—the Martin Act (P. H. 20), and the view is expressed that "There is no finer securities law" than the Martin Act of the State of New York (P. H. 20).[1]

The testimony taken before this Committee indicates that there are varying and conflicting views as to the advisability of a State Securities Act and the nature thereof, and it has been our purpose to obtain as many expressions of opinion as possible. Some of the viewpoints expressed by public officials are irreconcilable and serve to emphasize the existence of a vast difference of opinion justifying a detailed study of the various state acts to determine, first, whether any legislation at all is desirable on the subject, and, secondly, if so, what form the same should take and whether there is any need for giving the Attorney-General powers in addition to those already possessed by him. It appears that there are four distinct viewpoints. One favors supplementary state legislation to that of the Securities and Exchange Law to bridge such gaps as exist in the instances where the Securities and Exchange Commission is without jurisdiction and where the transactions are purely intrastate. This view was expressed by the Regional Director of the Securities and Exchange Commission for New York,[2] speaking in his individual capacity, who stated at one of the public hearings of this Committee:

> "But it is obvious, as Mr. Weinfeld has pointed out, that there are gaps in the field covered by the present federal legislation on this subject, the most important of those being obviously that afforded by the constitutional limitations on any federal action. In that particular segment of the field, we now find instances of issuers and vendors of securities who, with knowledge of the constitutional shield, so to speak, behind which they can take refuge and put forth securities and carry on that business in a manner which we would like to be able to follow up and impose the sanctions of law if we were not prevented by the constitutional limitations * * *. The need for the regulation of the issue of securities, as distinguished from catching up with their fraudulent or improper sale, has been amply demonstrated, in our judgment, before the S. E. C. came into existence, and certainly by its experience since it has been in existence.
>
> I, for one, would welcome the supplementary, and, in a technical sense, original work of a state body, particularly in the field where we would reach out." (P. H. 5, 6.)

\*     \*     \*     \*     \*     \*     \*     \*

> "I feel there is a definite obvious field for corporate state regulation, certainly of the issue of securities and their sale in the intrastate field." (P. H. 17.)

\*     \*     \*     \*     \*     \*     \*     \*

---

[1] General Business Law, Article 23A.
[2] Hon. Ernest Angell.

11

> "I incline to a belief in the value of the regulation—before issue—style as a supplement, if you will, to the Martin Act." (P. H. 24.)

When questioned directly by an Assistant Attorney-General on "What is lacking in the New York State Law?", the Regional Director answered, "Examination before issue and sale of purely intrastate issues." (P. H. 17.)

Another point of view would seemingly confine state regulation of securities before issuance to real estate financing, and impose such requirements as the filing of appraisals, with a checkup by various state officials, before permission to sell is granted, annual statements of income and disbursements of property to be made available to bondholders or certificate holders. A bureau of the state would be given power under this theory, where it believes the proposed issue is fraudulent, to refer the matter to the Attorney-General, whose powers to act would be broadened by an amendment to the General Business Law (E. M. 9).

The foregoing view is that of the former Chairman of this Committee.[1] Supplementing that point of view was the one expressed by the Superintendent of Insurance,[2] who was of the opinon that

> "No corporation ought to be allowed to sell certificates, that is, guaranteed certificates, or guaranteed mortgages, unless it is under the authority of some responsible state power, either the Banking Department or the Insurance Department, or some other qualified power. This power would also apply to unguaranteed mortgage certificates." (E. M. 10, 11.)

The plan of filing reports and appraisals with respect to real estate issues did not appeal to the Superintendent of Banks because of the difficulty in exercising power over the issuing companies (E. M. 20-21). He was in favor of supervision over companies selling either guaranteed or unguaranteed participations by a department of the state (E. M. 22), with power to refer situations which appeared fraudulent to the Attorney-General. Here, too, the view was expressed which will be presently referred to in this report, to wit, that notwithstanding the broad powers of the Attorney-General, the exercise of these powers, in view of the state law,

> "seldom comes up until after somebody has suffered a loss. That is the trouble with that method of approach. Conceivably such a situation would improve the police phase of supervision but it would not help so far as keeping them solvent is concerned." (E. M. 23.)

The general attitude with respect to "mortgage companies, mortgage certificates and participating certificates in mortgages" was that "there certainly should be some regulation about them

---

[1] Hon. Saul S. Streit.
[2] Hon. Louis H. Pink.

12

* * * and should be subjcet not only to regulation and survey
at the beginning, but should be subject to constant supervision
during the time of their life" (P. H. 19).

The Assistant Attorney-General[1] of the state in charge of investi-
gating the sale of fraudulent securities further amplified this view,
to wit, that there should be regulation of real estate securities as
distinguished from regulation or supervision of all types of securi-
ties, by the following statement:

"There should be regulation of any stock or bond of a
type that is sold as an investment, a bond or a mortgage or
an instalment certificate going over a period of years, where
the very solvency of the corporation is always material and
you cannot follow solvency unless you have annual audits,
not annual but every three months. There is certainly need
for a survey of that type of security, and there would be no
harm in approving that type of security because the people
that buy them are not speculators."

The school of thought reflecting the foregoing view with respect
to real estate securities believes that such securities present a
field for study separate and distinct from the regulation of the
sale of other types of stocks and securities.

A third point of view favors complete state regulation in the
sale and distribution of all types of securities, with certain excep-
tions. An act which was prepared by a committee designated by
the National Conference of Commissioners on Uniform Sale of
Securities Laws was considered by a member of the State Mortgage
Commission[2] who appeared before this Committee and gave his
views with respect to such proposed act. His view was that

" * * * The Martin Act contains no licensing or registra-
tion provision but provides protection only after the sales of
securities have proven fraudulent. It is directed at redress,
not prevention. Everybody knows that the Attorney-General's
office is prosecuting these cases most efficiently, most vigor-
ously, * * * but I think that it is accurate to say that
in the very nature of the case the Martin Act has proven
altogether unequal to the huge traffic of illicit securities to
cover, even aside from the operation of that Act, against
fraud after instead of before the fraud is discovered." (P.
H. 51)

The proposed Uniform Securities Act drafted by the Confer-
ence of Securities Commissioners deals with (a) qualification of
security issues by registration, (b) licensing of dealers, and (c)
the right of the purchaser to rescind if the facts later prove to be
other than as disclosed in the filed prospectus. The administra-

[1] Hon. Ambrose V. McCall.
[2] Hon. Louis S. Posner.

13

tion of the statute is placed in a Security, Registration and
Licensing Division within the Executive Department of the State,
and the Bureau is to be headed by a Commissioner of Securities
appointed by the Governor. Many securities are exempted from
registration, such as bonds of the United States, or other state
or political agencies, railroads, public utilities or other publicly
regulated corporations and securities of small companies whose
capital does not exceed $20,000.00.

The witness was strongly of the opinion that at least as to
certain features of the law, the same should be incorporated
without delay, his view being:

"I do not think that that sort of protection should be with-
held any longer from the investing public. Why should it
be? It does not involve any complicated situation. The
people who need it least are those people; the larger pur-
chasers of securities, they don't need it. They are usually
enabled to study the purchases that they make; they have the
means to do it and the organization to do it, but the great
bulk of those who cannot do it are the people who are entitled
to some sort of protection, I should think, at the hands of
the state. * * * You know there are funds hoarded pri-
vately throughout the country, and I think with this return-
ing confidence it is coming out of the stockings and out of
the back yard and from behind the fireplace, and I think
that if ever protection was needed on the part of those thrifty
people who have been defrauded, and who are beginning to
acquire returning confidence, and this is the time, in the return
of the confidence, that the reapings of the fraudulent sales-
men will be found unless the state recognizes what I think is
its clear duty in that situation." (P. H. 56, 57.)

As to two of the features of the proposed act, to wit, the licensing
of salesmen and protection to investor by giving him the right
of rescission, Mr. Posner was of the opinion that these might be
considered for passage by the Legislature but that as to the third
feature, to wit, regulation and registration, there should be a
more thorough investigation before recommendations are ventured
(P. H. 68).

When questioned, "Do you think that the present Martin Act
is sufficient to cover the sales of securities in the State of New
York now?", he answered:

"I must say decidedly not. I would rather have somebody
watch my stable than have my stable locked for me after my
horse is stolen, and that is apparently, I think, what the Act
provides for; it provides for a remedy after the fraud and
not before. That is always a fault with punitive instead of
prohibitive provisions of the law. And I can quite understand
that that Act originally was considered the only sort of act
necessary; but it seems to me, Mr. Chairman, that the answer

14

to that question resides in the report of the Attorney-General himself, that as late as two or three years ago frauds of $25,000,000 occurs in the sales of securities as to which there were recoveries of a very small amount, comparatively, and it must be apparent that with the greatest of effort and efficiency in that department, the nature of the statute does not permit as thorough a protection as does the prohibitive elements included in the two suggestions I have made." (P. H. 68.)

The foregoing fairly summarizes the point of view that the State of New York should follow the lead of other states and supplement the Martin Act by a type of law which would require registration of securities and licensing of salesmen.

The Attorney-General himself, in an address delivered before the Eastern Group of the New York Association of Securities Commissions[1] reflected a different point of view and indicated his firm belief in the efficiency of the Martin Act—the injunctive type of securities law. His feeling with respect to the so-called registration type of law was

"that qualifying a dealer afforded the public little protection from the swindler who had sufficient money to engage a 'front man'. This 'front man' would qualify for the license and thereafter act for his undisclosed principal, the swindler. Likewise, experience showed that when a security was qualified there was no assurance that the original high quality of the security would continue unchanged. Moreover, a fraudulent dealer could commit fraud even with a qualified security through the operations of a 'bucket shop', or in buying or selling a qualified security at a fictitious price." (Address delivered on March 19, 1937.)

The distinguished Attorney-General was emphatic in his belief "that insofar as regulation is possible, the injunctive type of regulation is superior to any other". The criticism offered by him with respect to any proposed regulation act was fear that a security offered for sale might be sold on the basis of a representation, either express or implied, that the security was being offered with state approval and that it places a powerful weapon in the hands of an unscrupulous stock salesman by suggesting prior investigation and approval by the state.

A further criticism of proposed regulatory legislation was that it might result in the creation of "artificial barriers to the free flow of capital into legitimate and necessary financing". The Attorney-General was of the opinion

"Junior or state securities exchange commissions * * * would add no additional protection to investors, serve no useful

---

[1] March 19, 1937.

15

purpose, and merely would result in costly duplication of effort and work and in further restrictions to the free flow of capital to business throughout the nation."

We have gone to great length to set forth in detail the various divergent views of public officials on the subject of proposed state regulation of securities. The differences of opinion merely serve to emphasize the necessity for detailed study of the problem before proposed legislation is submitted. Two objections seem to be paramount in the minds of those opposed to state regulation of securities. One is that it may result in duplication of effort and needless, unnecessary expense and, secondly, that state registration or regulation may give rise to a belief on the part of the investing public that securities registered with a state body carry with them the implication of state approval. Taking the latter suggestion first, it may be well to recall the fact that similar objection was urged when the original Security Exchange Act was under consideration, and the answer thereto is found in the provision of law which makes it a criminal offense to represent that any securities registered with the S. E. C. carry the approval of the federal government. A similar provision obviously can be effected in any state law, were one to be passed. As to the objection of duplication of effort, it would seem that various states could cooperate on a uniform law so that one filing would be satisfactory for all states, or a group of states, or a filing with the S. E. C. would be deemed sufficient, together with such slight additional information as the state may require.

## CONCLUSION

Legislation which would either supervise or regulate the sale of securities, including real estate or other types, involves a radical departure from the heretofore existing policy of the state with respect to so-called "Blue Sky Laws", and recommendations with respect thereto should not be made to the Legislature until a thorough, complete and exhaustive survey has been made of the various state "Blue Sky Laws" and the Federal Securities Acts to determine the desirability of a change in policy, and if desirable, the precise form thereof.

It may well be if the policy of the state were changed to include preventative legislation with respect to the sale of securities, the losses suffered by citizens would be brought down to an irreducible minimum. While it is to be recognized that there are certain types of individuals and fly-by-night operators who make it a business to fleece investors by dishonest means and that no legislation of any type will deter the tactics of such individuals, preventative legislation will whittle down the losses to a considerable degree.

16

The Committee should be continued for a year for the purpose of completing a study and survey of the various state securities acts and the federal law, with the object of ascertaining the desirability of state legislation on the subject of regulation and sale of securities, if at all, and if so, to make recommendations with respect thereto.

LEE B. MAILLER, *Chairman*
C. T. STAGG
JOSEPH ESQUIROL
RAE L. EGBERT
LAZARUS JOSEPH
PRITCHARD H. STRONG
WILLIAM H. MACKENZIE