USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 25, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

NATIONAL CREDIT UNION : 
ADMINISTRATION BOARD as :
Liquidating Agent of U.S. Central :
Federal Credit Union et al., :
 :
                           Plaintiff, :
 :
          -v- :
 :
U.S. BANK NATIONAL ASSOCIATION :                    14-cv-9928 (KBF)
and BANK OF AMERICA, NA, :
 :                    OPINION & ORDER
                        Defendants, :
 :
          -and- :
 :
NCUA GUARANTEED NOTES TRUST :
2010-R1, et al., :
 :
                   Nominal Defendants. :
 :
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

Plaintiff National Credit Union Administration Board, as Liquidating Agent of

a number of credit unions[1], commenced this lawsuit in December 2014 alleging breach

of various contractual, statutory and common law duties by U.S. Bank N.A. ("U.S.

Bank") and Bank of America, N.A.[2] as Trustees in connection with 98 trusts that

issued residential mortgage-backed securities ("RMBS").  The Court dismissed the

---

[1]     The credit unions include: U.S. Central Federal Credit Union, Western Corporate Federal
Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit
Union, and Constitution Corporate Federal Credit Union.  (Second Am. Compl.  ("SAC") at 1.)
[2]     Bank of America, N.A, was Trustee for the LaSalle trusts before U.S. Bank became successor
Trustee.  (See SAC at 1, n.1; id. ¶ 44.)  Plaintiff is not asserting claims with respect to Bank of America
for 15 trusts.  (See id. at 1, n.1; id. Ex. A.)

initial complaint as failing to allege adequate facts to support standing.  (ECF No. 84.)
Plaintiff filed a "Second Amended Verified Derivative Complaint" ("SAC") on July 17,
2015.  (ECF No. 92.)  Defendants have again moved to dismiss on the action on a
number of grounds.  Defendants argue that as to 89 of 98 trusts, plaintiff had assigned
away its right to pursue the breach of contract claim asserted here, and that in any
event all other claims, which apply to all 98 trusts, are inadequately plead on the
merits.

For the reasons set forth below, the motion is GRANTED.[3]

I.      FACTS

Resolution of this motion requires an understanding of the various interlocking
contractual documents relating to the trusts at issue as well as the rights and
obligations of the parties.  The Court therefore provides a rather detailed overview of
the contractual documents;  for additional detail, the reader is referred to the exhibits
to the SAC as well as the parties' submissions on this motion.

A.      The NCUA

The National Credit Union Administration (referred to either individually or
together with the NCUA Board as "NCUA"), is an independent agency of the
Executive Branch of the U.S. Government that, among other things, charters and
regulates federal credit unions, and operates and manages the National Credit Union
Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union

---

[3]     Defendants did not move to dismiss the breach of contract claim with respect to the nine
remaining trusts, and therefore that claim remains intact as to those trusts.  They are listed in
paragraph 26 of the Second Amended Complaint.

Stabilization Fund ("TCCUSF").  (SAC ¶ 17.)   The NCUA may borrow funds from the U.S. Treasury to stabilize credit unions under conservatorship or liquidation—or credit unions threatened with conservatorship or liquidation.  (Id.)  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state chartered credit unions.  (Id.)  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  (Id.)  The NCUA Board manages the NCUA.  (Id.)

The NCUA is provided with certain statutory authority to act with regard to failed credit unions.  12 U.S.C. § 1787.  When a credit union fails, the NCUA Board may appoint itself the liquidating agent.  (SAC ¶ 17.)  When the NCUA is acting as liquidating agent or conservator, it succeeds to "all rights, titles, powers, and privileges of the credit union, and of any member, accountholder, officer, or director of such credit union with respect to the credit union and the assets of the credit union." 12 U.S.C. § 1787(b)(2)(A)(i).  It may also "place the credit union in liquidation and proceed to realize upon the assets of the credit union."  Id. § 1787(b)(2)(E).  As liquidating agent or conservator, NCUA also has certain "incidental powers," including the right and ability to "take any action authorized by this chapter, which the Board determines is in the best interests of the credit union, its account holders, or the Board."  Id. § 1787(b)(2)(J)(ii).  However, the statute does not provide for an automatic retention of these broad powers following liquidation of a credit union's assets.

B.    The NGN Trusts

In 2009 and 2010, the corporate credit unions ("CCUs") relevant to this action

failed. (SAC ¶ 24.) NCUA took them into conservatorship pursuant to statutory authorization granted by the Federal Credit Union Act, 12 U.S.C. § 1786(h). (Id.) By October 2010, NCUA had placed all of the CCUs into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a) and 1787(a)(1)(A) and became their statutory liquidating agent. (Id.) In such capacity, NCUA was statutorily entitled to exercise "all rights, titles, powers, and privileges" of the CCUs. (Id. ¶ 25.) This included all rights and claims the CCUs may have had as holders of various investment assets. (Id.)

In 2010, NCUA created the Guaranteed Notes Program (the "NGN Program"), in order to stabilize funding for the credit union system. (SAC ¶ 27.) Through the NGN program, the NCUA as liquidating agent sought to liquidate the distressed assets of the failed CCUs, which included over 2,000 investment securities secured by approximately 1.6 million residential mortgages, certain commercial mortgages and other securitized assets. (Id. ¶27.)

At issue in this action are the 146 RMBS certificates previously purchased by the CCUs ("Legacy Assets").[4] (SAC Ex. A; id. ¶ 2, 27.) All 146 certificates were issued by 98 trusts for which defendants served as trustees. (Id. ¶ 1.) NCUA, as liquidating agent, transferred 137 of 146 of the certificates to 10 new NGN Trusts created under the NGN Program. (Id. ¶ 27.) The other 9 certificates remained held by NCUA as liquidating agent. (Id. ¶ 26.)

---

[4]     The Court understands that the Amended Complaint defined Legacy Assets as the totality of the investment securities arising from the failed CCUs and not merely the ones at issue in this case. (Am. Comp ¶ 27.) In this Opinion, however, the Court refers only to those securities that are relevant to this action as "Legacy Assets."

4

The 10 NGN Trusts then issued approximately $28.3 billion of NGNs, backed by cash flows from the Legacy Assets.  (Id. ¶ 27.)  This was, in substance, a re-securitization of the 137 RMBS certificates (the "Re-securitized Certificates").  The timely repayment of principal and interest to investors in the NGN Trusts is guaranteed by NCUA as an agency of the Executive Branch and backed by the full faith and credit of the United States.  (Id.)

Each NGN Trust created under the NGN Program issued Notes pursuant to an Offering Memorandum and three agreements: (1) NGN Indentures by and between the NGN Trusts, as Issuers and The Bank of New York Mellon ("BNYM"), as Indenture Trustee, (ii) a Trust Agreement by and among the NCUA Board in its capacity as Liquidating Agent, as Seller, Wells Fargo Delaware Trust Company, N.A.  ("Wells Fargo") as Owner Trustee and BNYM, as Certificate Registrar and the Certificate Paying Agent; and (iii) Guaranty Agreements by and among NCUA as Guarantor, the NGN Trusts as Issuer, and BNYM as Indenture Trustee.  (SAC ¶ 28.)

Each Indenture is alleged to provide holders of its notes with cash flows from the CCUs' re-securitized holdings, including the 137 RMBS certificates.

      1.      <u>Conveyance of the underlying securities</u>

The NGN Trust Agreement[5] was executed on January 27, 2011.[6]  (SAC Ex. C.)[7]

---

[5]      Plaintiff asserts that the operative agreements are substantially similar and have attached exemplars to the SAC.  When the Court refers to an agreement in the singular, it intends to incorporate all similar agreements thereby.

[6]      The terms of the Indenture, also dated as of January 27, 2011, between the NCUA Guaranteed Notes Trust 2011-R1, as issuer, and BNYM, as Indenture Trustee, are incorporated by reference into the Trust Agreement.  (SAC Ex. C § 1.01.)

[7]      Subsequent references to exhibits, unless otherwise stated, are to those appended to the SAC.

The parties to that Agreement are the NCUA Board, in its capacity as liquidating agent for each of the liquidated federal credit unions as "Seller," Wells Fargo as "Owner Trustee," and BNYM as "Certificate Registrar or Certificate Paying Agent." (Ex. C., at 1.)  NCUA is not a party to that Agreement in its capacity as an agency of the Executive Branch, but rather in its capacity as liquidating agent of the CCUs.[8] (Id.)

The Agreement provides that "the Sellers intend to sell, assign, and transfer to the Trust the residential mortgage-backed securities identified as part of the Trust Estate on Schedule A," in exchange for the Trust's issuance of Owner Trust Certificates "which shall evidence the beneficial ownership interest in the trust estate (the 'Trust Estate')" and entitles the holder of such certificates (NCUA) to payments received on the transferred RMBS once the Notes have been paid in full.  (Id. at 1 ("Recitals" section).)  The Agreement recites that the NCUA Board "is authorized to sell or otherwise dispose of the assets of the liquidation estate of each Credit Union." (Id.)

The Trust Agreement also recites a declaration by the Owner Trustee (Wells Fargo) that it shall hold the Trust Estate for the benefit of Certificateholders, and that the trust shall be a Delaware statutory trust.  (Ex. C § 2.06.)  The Agreement further provides that title in the Underlying Securities "will be assigned of record to the

---

[8]      The Court notes the importance of NCUA's differing capacities for each step of the transaction. For the conveyance of the certificates to be re-securitized under the Trust Agreement, NCUA operates as the liquidators of the CCUs.  (Ex. C.)  For the guaranty agreement, infra, NCUA acted in its capacity as an agency of the executive branch of the United States.  (Ex. D.)

Indenture Trustee pursuant to the Indenture," and all other "legal title to the Trust

Estate shall be vested at all times in the Trust as a separate legal entity." (Id. § 2.08.)

The key provision in the Trust Agreement is the conveyance and transfer of

rights in Section 3.01.[9]  That section is preceded by a representation and warranty by

the Sellers that:

> Such Seller is the sole beneficial owner of the portion of the Underlying
> Securities it is conveying to the Trust.  Such Seller has good and
> marketable title thereto and will transfer and sell, or cause to be
> transferred and sold, its rights, title and interest in and to such
> Underlying Securities to the Trust free and clear of any lien, claim or
> encumbrance of any Person.

(Ex. C § 2.10 (iv).)  Once the transfer contemplated in Section 3.01 occurs, the Sellers

represent that:

> (a) Upon conveyance of the Underlying Securities from the Sellers to the
> Trust pursuant to Section 3.01, the Trust shall pledge the Trust Estate as
> collateral for the Notes issued under the Indenture, as set forth in the
> Indenture.

> (b) The conveyance of the Underlying Securities and all other assets
> constituting the Trust Estate by the Sellers as contemplated hereby is
> absolute and is intended by the parties . . . to constitute a sale of the
> Underlying Securities and all other assets constituting the Trust Estate
> by each Seller to the Trust.

(Ex. C §2.14 (a), (b).)

Article III accomplishes the conveyance of the Underlying Securities.  It

provides:

> Each Seller, concurrently with the execution and delivery hereof, does

---

[9]      With regard to Title to Trust Property, § 2.08 of the Trust Agreement provides that "Except with
respect to the Underlying Securities, which will be assigned of record to the Indenture Trustee pursuant
to the Indenture, legal title to the Trust Estate shall be vested at all times in the Trust as a separate
legal entity . . . ."  (Ex. C § 2.08.)

> hereby contribute, transfer, convey, and assign to, and deposit with the Trust, without recourse, all of such Seller's right, title and interest in and to the portion of the Trust Estate consisting of such Seller's portion of the Underlying Securities, such conveyances in the aggregate to be made in exchange for the Notes and the Certificates, including all rights of the holder of the Underlying Securities . . . .

(Ex. C § 3.01.)

Section 10.02 of the Trust Agreement also provides that "[t]he Certificateholders shall not have legal title to any part of the Trust Estate solely by virtue of their status as Certificateholders."[10] They "shall be entitled to receive distributions" as provided by the Trust Agreement. (Ex. C §10.02.)

### 2. NCUA as Guarantor

On the same day that the parties entered into the Trust Agreement and Indenture, NCUA, in its capacity as an agency of the executive branch of the United States (e.g., not in its capacity as liquidating agent), executed an unconditional guaranty of payments on the notes.[11] (SAC, Ex. D § 1.)[12] The Guaranty provides that NCUA, as Guarantor, "shall be treated by the Indenture Trustee, the Owner Trustee and the Issuer as if [it] were the Noteholders of the Senior Notes for the purpose of giving any consent under the Indenture" or the giving of any direction or exercise of any control rights under the Indenture. (Ex. D § 18.) The guaranty does not impart

---

[10]    The Trust Agreement incorporates definitions in the Indenture by reference. (Ex. C § 1.01.) The Indenture in turn defines "Certificateholder" as the "beneficial owner of such Certificate as registered on the Certificate Register" and "Certificate" as the "owner trust certificates . . . evidencing ownership in the Trust Estate." (Ex. B at 10.)

[11]    The notes ("Senior Notes") were offered for sale by the Seller credit unions pursuant to an Offering Memorandum. (Ex. E.)

[12]    NCUA was paid a variable, monthly "Guaranty Fee"; the first monthly payment was $102,831.94. (Ex. D § 12.)

ownership rights to NCUA.

3. <u>The NGN Indenture</u>

The NCUA Guaranteed Notes Trust 2011-R1 as Issuer (created pursuant to the Trust Agreement referenced above) and BNYM entered into an Indenture Agreement on January 27, 2011.  (Ex. B.)  NCUA is not a party to the Indenture in any capacity.

Pursuant to the Indenture, BNYM was appointed Indenture Trustee.  The purpose of the Indenture was to provide for the issuance of, and payments on the Notes.  The Indenture provides that "[a]s security for the payment and performance by the Issuer (the Trust) of its obligations under the Indenture and the Notes, the Issuer "has agreed to assign the Trust Estate as collateral to the Indenture Trustee, to be held by the Indenture Trustee, as security for the benefit of the Noteholders and the Guarantor."  (Ex. B., at 5.)

A key provision of the Indenture is the Granting Clause.  That clause provides:

> The Issuer [the NGN Trust] hereby Grants on the Closing Date to the Indenture Trustee, for the benefit of the Holders of the Notes and the Guarantor, <u>all of the Issuer's right, title and interest in and to (i) the Underlying Securities</u> identified on Schedule A, and all distributions thereon, on and after January 1, 2011, (ii) the Issuer Accounts . . . , (iii) the rights of the Issuer to enforce remedies against the Administrator under the Administration Agreement (provided that the Issuer retains the right to give instructions and direction to the Administrator thereunder), and against each Seller under the Trust Agreement, (iv) <u>all present and future claims</u>, demands, causes and choses in action in respect of the foregoing including (subject to Section 6.01) the rights of the Issuer under the Underlying Securities and the Underlying Agreements and (v) all proceeds of the foregoing of every kind and nature whatsoever, including . . . rights to payment of any and every kind and other forms of obligations . . . (clauses (i)—(v) collectively, the "Trust Estate.").

(Ex. B, at 5 (emphasis added).)[13]  "Grant" is defined as "[t]o mortgage, pledge, bargain, sell, warrant, alienate, demise, convey, assign, transfer . . . ."  (Id. at 13.)  And a "Grant of Collateral of the Trust Estate" includes "all rights, powers, options (but none of the obligations) of the granting party hereunder, including without limitation . . . to bring Proceedings in the name of the granting party or otherwise . . . " (Id. at 13-14.)  "Proceeding" is, in turn, defined as "[a]ny suit in equity, action at law, arbitration or other judicial or administrative proceeding."  (Id. at 20.)

    C.    This Lawsuit

    On January 30, 2015, four years and a few days following the conveyances, assignments, and grants described above, the NCUA Board, in its capacity as liquidating agent for the credit unions, and the NCUA as Guarantor, entered into an agreement concerning certain "Claims."  The "Claims" are defined as "recovery against trustees for [RMBS] that collateralize the NGNs."  (Ex. H.)  Pursuant to this agreement, the Guarantor authorized the liquidating agent to "take all actions reasonably necessary to ensure the preservation and prosecution of the Claims, particularly in the event that the Indenture Trustee for the NGNs is unable to preserve and prosecute the Claims."  (Ex. H.)  By letter of the same date, in its capacity as Guarantor, the NCUA "direct[ed] the Indenture Trustee to take action to assert the Additional Claims [asserting common law claims against the Underlying Trustees]."  (Ex. F.)  The letter further provided that if the Indenture Trustee would

---

[13]    The Covenant following the Grant states that "the Trust Estate is to be held by or on behalf of the Indenture Trustee and that monies in the Trust Estate are to be applied by the Indenture Trustee for the benefit of the Noteholders and the Guarantor . . . "  (Ex B. at 6.)

not act by February 2, 2015, the NCUA Board, "in its capacity as the Sellers in relation to the NGN Trusts" and with the Guarantor's authorization and consent, intended to file suit.  (Id. (emphasis added).)

On February 25, 2015, BNYM's Head of Litigation-Americas informed NCUA that it did not intend to pursue the claims and further stated that "[w]e take no position on the merits, but acknowledge and agree that the Guarantor has the right to pursue claims based on the re-securitization Trust Indentures when the Trustee fails to do so after receiving notice (which we have for the claims in the Amended Complaints)."  (Ex. G.)

On July 13, 2015, a managing director of BNYM stated that, in its capacity as Indenture Trustee, it takes a "neutral position with respect to any challenge to NCUA's standing and leaves it to the decision of the court presiding over the NCUA Suits" (defined to include that before this Court.)  (Ex. I.)  Neither this letter nor any other document before the Court or referenced in the filings in connection with the SAC purport to transfer to NCUA any rights that BNYM (or Wells Fargo) have to pursue any claims.

NCUA initially filed the instant action on December 16, 2014; it filed its amended pleading on July 17, 2015.  The claims in this action relate to various alleged breaches and failures by the Trustees on the underlying agreements ("Pooling and Servicing Agreements" or "PSAs") pursuant to which the initial notes held by the various credit unions were issued (including in particular with regard to breach of obligations relating to the underlying loans files for the residential mortgages.)

11

Count One asserts breach of contract relating to the PSAs.  NCUA asserts this claim in both a direct and derivative capacity.  (SAC ¶¶ 195-96.)  According to plaintiff, defendants breached several of their obligations under the PSAs, including to take physical possession of the mortgage loan files, to identify whether certain documentation was missing from or was defective in those loan files, to take steps to cause the repurchase of loans lacking proper documentation, to investigate and give notice to all parties to the PSAs of breaches of the representations and warranties relating to the mortgage loans once it "discovered" such breaches, and to make prudent decisions concerning the exercise of appropriate remedies following a defined "Event of Default" in Section 7.01 of the PSAs.  (SAC ¶¶ 194-204.)

Count Two asserts a claims for breach of fiduciary duty.  NCUA also brings this claim in both its direct and derivative capacity.  (SAC ¶¶ 206-07.)   In this claim, NCUA asserts that defendants owed certificateholders a fiduciary duty to act in good faith, with due care and undivided loyalty, and that defendants breached these duties in a variety of ways, including by failing to avoid conflicts of interest.  (SAC ¶ 209.)

Count Three asserts a breach of the covenant of good faith and fair dealing. (SAC ¶ 211-17.)  The allegations in this count are duplicative of those in the breach of contract claim in Count One.

Counts Four and Five allege violations of the Streit Act and the Trust Indenture Act ("TIA") of 1939, respectively.  (SAC ¶¶ 218-29, 230-241.)  The Streit Act, N.Y. Real Prop. Law § 214 et seq., was established "to provide for the regulation and supervision of . . . trustees" and others administering the interests of real estate mortgages.  N.Y.

Real Prop. Law § 124.  Plaintiff alleges that defendants, as trustees under the Streit Act, failed to discharge their pre-default duties and failed to act as a prudent person would have after event of default under N.Y. Real Prop. Law § 126.  (SAC ¶¶ 224-26.) Section 315 of the TIA sets forth certain trustee duties, which plaintiff alleges defendants failed to meet.  (SAC ¶¶ 236-41.)

      D.    <u>The PSAs</u>

The breaches of common law and statutory duty asserted in the SAC relate to defendants' purported obligations under the PSAs governing the 98 original trusts. (<u>See, e.g.</u>, SAC ¶¶ 57, 59, 60-80.)   Each of the 137 Re-securitized Certificates previously owned by the Seller credit unions and transferred to the Owner Trustee (Wells Fargo), and then pledged as collateral to the Indenture Trustee (BNYM) and the 9 certificates retained by NCUA without re-securitization had been initially issued by one of 98 trusts pursuant to a PSA.[14]  The PSAs relevant to this action were executed in the 2005-07 timeframe.  (<u>Id.</u> ¶ 56, n.8.)

The PSA provided for the initial conveyance of the mortgage loans (including the mortgage loan file) by the depositor to a "Trustee."  In connection with this action, U.S. Bank (and in some cases, Bank of America) was appointed as "Trustee" under the PSA.  (SAC ¶ 58; Ex. K (MABS 2006-WMC4 PSA) § 2.01.)  Each PSA provides that the Trustee has certain duties and responsibilities including, <u>inter alia</u>, to take title to the mortgage loans conveyed to the trusts, provide notice of incomplete or defective mortgage files, and to provide notice of breaches.  The Trustee's duties are limited to

---

[14]      The 147 certificates and 98 trusts are listed in Exhibit A of the Second Amended Complaint.

those set forth in the PSAs.  (See Decl. of Jacob S. Kreilkamp in Supp. of Defs.' Joint

Mot. to Dismiss, ECF No. 61 ("Kreilkamp Decl.")[15] Ex. 3 (WAMU 2006-AR15 PSA)

§ 8.01(a) ("Prior to the occurrence of an Event of Default and after the curing of all

such Events of Default which may have occurred, the duties and obligations of the

Trustee shall be determined solely by the express provisions of this Agreement.");

accord SAC Ex. K (MABS 2006-WMC4 PSA) § 8.01.)

The PSAs further provide that the Trustee has specific duties in an "Event of

Default."  An "Event of Default" generally requires (1) a breach of a representation,

warranty or covenant of the servicer or master servicer; (2) notice to certain defined

parties; and (3) a cure period.  (See Kreilkamp Decl. Ex. 4 (MSM 2006-8AR PSA) §

6.14(a)(ii); accord SAC Ex. K (MABS 2006-WMC4 PSA) §§ 7.01(a)(ii) (servicer); id. §

7.01(b)(ii) (master servicer).)  Each PSA also provides that the Trustee is not charged

with notice of an Event of Default unless the Trustee has actual knowledge or has

been provided with written notice of such.  (See Kreilkamp Decl. Ex. 4 (MSM 2006-

8AR PSA) § 6.01(c)(ii); accord SAC Ex. K (MABS 2006-WMC4 PSA) § 8.01(iv).)

## II.    STANDARD OF REVIEW

The Court reviews NCUA's standing pursuant to the standards set forth in Fed.

R. Civ. P. 12(b)(1) and interpreting case law.  Alliance for Envtl. Renewal, Inc. v.

Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006).  "[W]here jurisdictional

---

[15]    The PSAs referenced herein are incorporated by reference into the Second Amended Complaint and properly reviewed by this Court on this motion.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  Copies of the PSA were attached to the declarations submitted in connection with the motion practice on the initial Complaint.

facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings . . . " Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014) (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)).  Accordingly, any necessary factual determinations in connection with the Rule 12(b)(1) motion are by a preponderance of the evidence.

The Court reviews questions regarding the adequacy of the pleadings under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id.  The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly

within the possession and control of the defendant." <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010).  But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate.  <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 556 U.S. at 679).  A court may properly consider documents and contracts attached to or incorporated by reference in a complaint on a motion to dismiss.  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007).

## III.   NCUA'S STANDING

The NCUA brings both direct[16] and derivative claims in this action. Defendants challenge plaintiff's standing with regard to pursuit of any claims— whether in a direct or derivative capacity—for 89 of the 98 Legacy Asset trusts. Defendants argue that as to those 89 Trusts, pursuant to the various conveyances, transfers and assignments that occurred pursuant to subsequent Trust Agreements and Indentures in the NGN program, plaintiff relinquished whatever rights they may have had to pursue such claims.  This Court agrees.  NCUA lacks standing to pursue direct and derivative claims with regard to those trusts, for different reasons.

---

[16]     NCUA's direct claims include those it asserts with regard to the securities in the nine trusts not transferred into the NGN program—and thus that were never included in the NGN trusts.  In addition, NCUA also appears to assert direct standing as a holder of Owner certificates with respect to the other 137 Re-Securitized Certificates.  However, as described above and dismissed below, those certificates were transferred to the NGN Trusts; NCUA's claims as to the PSA for those securities are derivative.

A.   <u>Standing to sue directly</u>

There is an essential and critical difference between believing that one has the ability to pursue a claim directly, and in fact having such an ability.  In this regard, that NCUA and BNYM may both believe NCUA has standing does not alone make it so.  Here, it is quite clear that as of January 27, 2011, the Seller credit unions, and the NCUA as liquidating agent on their behalf, conveyed all rights to the Underlying Securities to Wells Fargo (as Owner Trustee), and that Wells Fargo, in turn, assigned such rights to BNYM as the Indenture Trustee.  As to the underlying securities, NCUA retained only its beneficial interest in the payment stream.  It did not retain and never reacquired rights to pursue claims.  (Exs. B, C.)  Separately, NCUA did not transfer rights to 9 certificates in the Legacy Assets, and its standing to bring a direct claim as to those certificates is not challenged.

The NGN Trust Agreements recite the intention of the Sellers to sell, assign and transfer the RMBS in exchange for Certificates; this is then accomplished in Section 3.01.  As set forth above, that conveyance is preceded by a representation of the Seller which specifically provides that "[s]uch Seller is the sole beneficial owner of the portion of the Underlying Securities it is conveying to the Trust" and has good and marketable title thereto.  (Ex. C § 2.10 (iv).)

The conveyance itself is broad in scope and effect, providing that "Each Seller" conveys, transfers and assigns, without recourse, all of its rights, title in and to "the portion of the Trust Estate consisting of such Seller's portion of the Underlying

Securities."[17]  (Ex. C § 3.01.)  In short, the Sellers conveyed <u>in toto</u> all interest that they had or had ever had in the Underlying Securities.

The Indenture confirms the breadth of what was transferred—and provides the definition of the "Trust Estate."  (Ex. B, at 5.)  In the Granting Clause of the Indenture, the Issuer (which was the NGN Trust, created by the Trust Agreement, with Wells Fargo as the Owner Trustee), grants to the Indenture Trustee (BNYM) all interests that the Issuer NGN Trusts had (which they had only then received pursuant to § 3.01 of the Trust Agreement, effective simultaneously) with regard to the Underlying Securities.  (<u>Id.</u>)  Again, nothing was held back, nothing is referenced as retained by NCUA.  Various components included in such Grant are listed and then collectively defined as the "Trust Estate."  Numerettes (iv) and (v) are of particular interest in connection with this motion, as (iv) relates to "all present and future claims, causes and choses in action" and (v) to all proceeds of the foregoing of any kind.  (<u>Id.</u>)  To avoid doubt, the term "Grant" is further defined as conveying, assigning, transferring, alienating, and demising.  (Ex. B, § 1.01, at 13-14.)  And the term "Grant of Collateral of the Trust" explicitly includes all rights and powers to bring Proceedings in the name of any granting party.  (<u>Id.</u>)  Finally, "Proceeding" is defined broadly to encompass "any" suit in equity or at law.  (<u>Id.</u> at 20.)

---

[17]     The reference to "portion" does not suggest that NCUA retained "a portion" of the assets.  There is no agreement before the Court which carves out, for instance, claims that might accompany the Underlying Securities from the Underlying Securities themselves.  Rather, the Court understands the term "portion" here to refer to the practice of carving up securities into tranches, resulting in ownership in one portion of the security – but perhaps not the entire security.

B.   <u>Derivative standing</u>

NCUA argues that to the extent this language forecloses a direct claim, it nevertheless has derivative standing to bring suit.  It asserts that as a holder of Owner Trust Certificates in NGN Trusts (payable after all obligations on certificates have been met), it has derivative standing;  it further asserts that it has fulfilled any demand requirement.  To show satisfaction of this requirement, it points to correspondence between it and BNYM in which it sought to have BNYM pursue claims;  BNYM refused to do so but stated that it takes a "neutral" position with regard to NCUA's standing in this lawsuit.  (Ex. I.)  Plaintiff then point to the <u>Kaplan</u> case from the Delaware Supreme Court in which a position neutral as to suit was held to excuse a failure to make a demand.  <u>Kaplan v. Peat Marwick, Mitchell & Co.</u>, 540 A.2d 726, 731 (Del. 1988).

Defendants argue that two recent prior decisions, one by this Court in August of 2015 in a related case, <u>Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n</u>, No. 14 Civ. 10116 (KBF), 2015 WL 2359358, at *2 (S.D.N.Y. May 18, 2015), and another decision in this district, <u>House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.</u>, No. 13 Civ. 519 (RJS), 2014 WL 1383703, at *15 (S.D.N.Y. Mar. 31, 2014), have correctly found that assignments to Indenture Trustees may result in a contractual bar to such derivative actions.  The Court agrees that there is a contractual bar.

 In a derivative action, the first question is who has the right to assert a direct claim, and who stands in a derivative position with regard to that claim.  The circumstances here, as outlined in detail above, are that the Sellers transferred all

interests that they had to the Underlying Securities—including (as nothing was held back) their right to pursue direct claims—to the NGN Trusts.  Wells Fargo as the Owner Trustee of the NGN Trusts thus had—prior to its own assignment to BNYM— the right to pursue a direct claim against the defendants here; and plaintiff stood in a derivative position with regard to such claim.  But it did not stop there.

The NGN Trusts—in turn—transferred their claims to the Indenture Trustee (in this case, BNYM).  The Granting Clause makes it clear that when they did so, the Issuer (the NGN Trusts) conveyed all rights including, again (as nothing was held back), their right to pursue a direct claim.  (Ex. B at 5.)  It is true that the grant was made for the benefit of the Noteholders and the Guarantor—but that does not alter the position of the Noteholder and Guarantor vis-à-vis the PSA (and any claims with respect thereto):  they are twice removed. The party who stands in direct line to assert a derivative claim (if, as discussed below, at all) is therefore not plaintiff, but, rather, the Trustee of the NGN Trust.

The question becomes whether there is any principle which allows the Court to ignore the first level of derivative claim altogether.  The Court is aware of none. (Needless to say, once the NGN Trust made its own assignment to the Indenture Trustee, it could no longer pursue any claims directly.)  Similarly, NCUA's Owner Certificates are certificates in the NGN Trusts; the <u>assets</u> underlying those certificates were transferred to the Indenture Trustee.  Section 10.02 of the Trust Agreement is instructive, that Certificateholders "shall not" have legal title to "any part of the Trust Estate" (defined by the Indenture to include "claims, demands, causes and choses in

action") solely by virtue of their status as Certificateholders.  (Ex. C § 10.02.)

At the very least, as plaintiff NCUA stands in a derivative position to an intervening holder of any rights, it would need to fulfill the Rule 23.1 demand requirement vis-à-vis Wells Fargo (Owner Trustee);  and Wells Fargo would, if it chose to pursue such claims, be required to make its own demand on BNYM.  In other words, a derivative claim based on a derivative claim.

But there is another reason altogether why a derivative claim cannot work here—and that is the issue raised by the cases cited by defendants in their opening brief. The breadth and completeness of the Granting Clause forecloses derivative claims.  (Ex. B, at 5.)  When "all rights" to pursue any and all claims were granted in the Granting Clause (and related paragraphs), the contract must be read to mean what it says.  Principles of contract law trump the principle of pursuing of a claim derivatively upon which plaintiff relies.  Cf. Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57 F.3d 146, 152 (2d Cir. 1995) (holding that under New York law, a contract granting "all rights, title and interest" to another results in a "transfer" of claims."); Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank Nat. Ass'n, 731 F.2d 112, 125 (2d Cir. 1985).  If this were not so, anytime that a party transfers all rights to bring a claim but retains some form of beneficial ownership, he would retain the ability to bring a claim.  This is inconsistent with basic contract principles.

There are certainly situations in which parties may grant all rights to an underlying asset—for instance, to a sound recording—but they may retain a right to

sue directly as a part retaining a beneficial ownership interest.  See Cortner v. Israel, 732 F.2d 267, 271 (2d Cir. 1984) ("When a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of that copyright.").  That is not the situation here.  Here, the contractual agreements together effected a complete transfer of all rights including explicitly the right to sue.  Thus, while a beneficial interest in the payment stream was retained, the right to bring claims was expressly transferred away.  In such a situation, principles that might have otherwise applied are foreclosed by contract.

For these reasons, plaintiff lacks standing to sue derivatively with regard to the 89 trusts.

## IV.    THE CLAIMS ON THE MERITS

As a preliminary matter, defendants do not challenge NCUA's assertion of the contract claim in Count One with regard to the certificates they continue to own directly, and the claims NCUA asserts with respect to those 9 of the 98 initial trusts are unaffected by this Court's decision regarding standing.[18]  According to the SAC, NCUA, acting as liquidating agent on behalf of the credit unions, did not transfer 9 certificates held by 9 initial trusts to the NGN Trusts.  (SAC ¶ 26; id. Ex. A.)  They are therefore not among the group as to which Wells Fargo and BNYM received all rights.

---

[18]    The Court observes that Exhibit A of the Second Amended Complaint shows that 6 of the 9 certificates not re-securitized were held in trusts that also issued some of the Re-Securitized Certificates.  Thus, for those six trusts, NCUA lacks standing to bring a derivative claim on behalf of the NGN trusts with respect to the Re-securitized Certificates, but its standing to bring a direct claim in its own right as liquidating agent is not challenged.  As for three remaining trusts, NCUA brings only a direct claim in its own right as liquidating agent.

Defendants do, however, seek to dismiss the non-contract and statutory claims with respect to all 98 trusts.

The Court therefore turns to the question of whether plaintiff has stated claims under Counts Two through Five with regard to those 9 trusts, they have not.

A.   The Non-Contract Claims

The Court reviews the fiduciary duty and other remaining claims proceeds with the pleading standards set forth in Twombly and Rule 8 of the Federal Rules of Civil Procedure as guideposts.  At this stage, plaintiff is required to assert plausible claims only; it is not for the Court to determine at this stage whether such claims have a probability of success.  However, plaintiff's remaining non-contract claims fail as a matter of law.

1.   Breach of fiduciary duty claim (Count Two)

Defendants urge dismissal of the fiduciary duty claim on the basis that it does no more than duplicate the contract claim.  This Court disagrees.  Plaintiff alleges, inter alia, that U.S. Bank operated under a conflict of interest—it had roles and relationships with respect to RMBS in general that prevented it from fulfilling its duties in this case.  (SAC ¶¶ 178-86, 209.)  Such allegations are sufficient to distinguish this claim from the contract claim.[19]

At the next step, however, the claim encounters difficulty.  The damages that

---

[19]      To the extent the breach of fiduciary duty claim overlaps entirely with the contract claim, it is subject to dismissal on that basis.  Snyder v. Wells Fargo Bank, N.A., 594 F. App'x 710, 713 (2d Cir. 2014); Stefatos v. Frezza, 95 A.D.3d 787, 787, 945 N.Y.S.2d 297, 298 (2012).

plaintiffs allege in connection with the breach of fiduciary duty claims arise entirely from defendant's obligations under the PSAs.  Recovery on these claims is barred by the economic loss doctrine—that "a contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings."  17 Vista Fee Associates v. Teachers Ins. & Annuity Ass'n of Am., 693 N.Y.S.2d 554, 559 (1999).  Plaintiff's allegations for damages arising from conflict of interest sound in defendants' failure to take contractual actions—that is, losses due to failures "to take action in response to servicer violations" and "to alert the certificateholders to the servicers' misconduct."  (SAC ¶¶ 183, 209-10.)  Thus, while the cause of action for breach of fiduciary duty may arise from common law duties and not from the PSA, "the injury" and "the manner in which the injury occurred and the damages sought persuade us that plaintiff's remedy lies in the enforcement of contract obligations," and are barred by the economic loss doctrine.  Bellevue S. Associates v. HRH Const. Corp., 78 N.Y.2d 282, 293 (1991).  Therefore, the breach of fiduciary duty claim fails.

### 2.   Breach of the covenant of good faith (Count Three)

Every contract is assumed to incorporate a covenant of good faith and fair dealing unless such obligation is expressly disclaimed.  Here, the PSAs expressly disclaim any implied obligations.  (See Ex. K (MASTR 2006-WMC4 PSA) § 8.01(i) ("[N]o implied covenants or obligations shall be read into this Agreement against the Trustee . . . ."); Decl. of James C. Rutten in Supp. of Defs.' Mot. to Dismiss (ECF No. 99), Exs. A, B.)  This disclaimer is binding.

To the extent that it is not, such claims would in any event be duplicative of the breach of contract in Count One, as plaintiff's claim is based on the "duty of good faith and fair dealing under the PSAs."  (SAC ¶ 215.)  "Where a claim for a breach of the implied covenant of good faith and fair dealing is duplicative of a breach of contract claim, it must be dismissed."  Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA, 907 F. Supp. 2d 536, 558 (S.D.N.Y. 2012); Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 869 (2d Cir. 2015)("[C]laims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach." (internal quotation marks omitted)).

This Court finds no reason not to dismiss that claim for both of these reasons.

B.   Statutory claims

Neither the Streit Act nor the TIA claims are legally cognizable on the facts pled here.

1.   Streit Act claim (Count Four)

Plaintiff asserts claims under two sections of the Streit Act:  under N.Y. Real Property Law §§ 124 and 126(1).  (SAC ¶ 218-229.)

Plaintiff's claims under Section 124 are not actionable because Section 124 is the preamble to the Streit Act and does not impose any obligations.  Instead, it merely recites the New York state legislature's purpose in enacting the law and its applicability to trustees with offices in New York.  N.Y. Real Prop. Law § 124.  See also Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, 109 F. Supp. 3d 587, 610-11 (S.D.N.Y. 2015).

25

Plaintiff's claim under the Streit Act's Section 126 allege that defendants failed to discharge the prudent-man duties that the Act requires for trustees to undertake in events of default.  However, as defendants point out, Section 126 merely requires that "the instrument creating the trust shall contain the following provisions," and that a trustee shall not "accept a trust" without the provisions.  N.Y. Real Prop. Law § 126. Plaintiff does not contend that defendants accepted a trust whose trust instrument lacked any required provision.  See Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *11 (S.D.N.Y. Sept. 29, 2015).[20]

Plaintiff nevertheless claims that the Streit Act allows recovery for trustees' violations of the duties that Section 126 requires that every trust instrument contain. Plaintiff is incorrect—not only because such an interpretation is unfounded given the unambiguous statutory language, but also because it is unsupported by the very case law cited by plaintiff.  In Harper v. Larchmont Yacht Club, 38 N.Y.S. 2d 505 (Sup. Ct. 1942), the trial court did not, as plaintiff contends, rule that once a trust instrument that satisfies Section 126 has been created, that a plaintiff may recover for alleged violations of that trust instrument's requirements.  Instead, the case concerns whether a clause in the trust instrument regarding the definition of event of default violated

---

[20]     In fact, the PSA clearly states that in the event of a Servicer / Master Service Event of Default, "a Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." (See, e.g., Ex. K (MABS 2006-WMC4 PSA) § 8.01.) This provision satisfies—indeed, is nearly identical to—the provision required by the Streit Act, which provides, in relevant part, that the trust instrument must include the provision that "In the case of an event of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the Trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." N.Y. Real Prop. Law § 126.

the requirements of § 126.  See Harper, 38 N.Y.S. 2d at 507-509.  Moreover, in Harper, the trust indenture itself specifically incorporated the underlying contents of Section 126.  Id., 28 N.Y.S.2d at 507 ("Article 4 of the trust indenture . . . provides [in the event of default], then, under section 3, 'unless such event of default shall have been previously cured or waived,' the trustee was to exercise the powers provided by section 126, subdivision 3, of the Real Property Law.").[21]

Because plaintiff has failed to state a claim under the Streit Act, the Court need not reach the state law questions of whether the Streit Act applies to the RMBS trusts here or whether the Act provides a private right of action under New York law.

### 2.   TIA claim (Count Five)

Plaintiff asserts a claim under the TIA in order to preserve appellate rights. (SAC ¶ 15, n.2.)  In Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. The Bank of New York Mellon, 775 F.3d 154, 169 (2d Cir. 2014), the Court of Appeals expressly held that certificates issued in PSA-governed New York trusts are exempt from the TIA.  That precedent is controlling.

---

[21]    Plaintiff's citations to Beck v. Manufacturers Hanover Trust Co., 632 N.Y.S.2d 520, 527-28 (App. Div. 1995) and In re Colonial Trust Co., 67 N.Y.S.2d 534, 539 (Sup. Ct. 1946) are also inapposite, as neither case discusses the scope of recovery under § 126 and merely summarize the existence of the Streit Act in dicta.

V.    CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is GRANTED.

Plaintiff's sole remaining claim is for breach of contract as to the nine trusts listed in

paragraph 26 of the Second Amended Complaint.  The Clerk of Court is directed to

terminate the motion at ECF No. 97.

SO ORDERED.

Dated:      New York, New York
            February 25, 2016

_____
      KATHERINE B. FORREST
      United States District Judge